Robert A. Cohen
Valerie A. Szczepanik
Jorge G. Tenreiro
Daphna A. Waxman
David H. Tutor
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9145 (Tenreiro)
Email: TenreiroJ@sec.gov

FILED
CLERK

2017 DEC -1  PM 1:32

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
SECURITIES AND EXCHANGE COMMISSION,        :
                                                               :
                                            Plaintiff,         :
                                                               :
                       - against -                             :
                                                               :
PLEXCORPS                                                      :
(a/k/a and d/b/a PLEXCOIN and SIDEPAY.CA),                    :
DOMINIC LACROIX and                                            :
SABRINA PARADIS-ROYER,                                         :
                                                               :
                                        Defendants,            :
                                                               :
------------------------------------------------------------- x

CV 17 - 7007

17 Civ.    (  )

ECF Case

COMPLAINT

IRIZARRY, CH.

LEVY, M.J.

    Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint

against Defendants PlexCorps (a/k/a and d/b/a/ PlexCoin and Sidepay.Ca ) ("PlexCorps"),

Dominic Lacroix ("Lacroix"), and Sabrina Paradis-Royer ("Paradis-Royer") (collectively

"Defendants") alleges as follows:

## SUMMARY

    1.    This is an emergency action to stop Lacroix, a recidivist securities law violator in

Canada, and his partner Paradis-Royer, from further misappropriating investor funds illegally

raised through the fraudulent and unregistered offer and sale of securities called "PlexCoin" or

"PlexCoin Tokens" in a purported "Initial Coin Offering." From August 2017 through the present, Defendants have obtained investor funds— purportedly $15 million from thousands of investors, including those throughout the United States and in this District—through materially false and misleading statements made by Lacroix individually and through entities Lacroix controls, including by promising investors returns of 1,354% in under 29 days. Lacroix and Paradis-Royer misappropriated investor funds and engaged in other deceptive acts relating to investments in the PlexCoin Token, despite having both been enjoined by a Quebec tribunal from engaging in the very conduct that is the subject of this action.

2.      The ICO for the PlexCoin Tokens was an illegal offering of securities because there was no registration statement filed or in effect during its offer and sale, and no applicable exemption from registration. The PlexCoin ICO was a general solicitation made using statements posted on the Internet and distributed throughout the world, including in the United States, and the securities were offered to the general public and have been sold to a large number of investors, including many in the United States and in this District.

3.      The stated purpose of the PlexCoin ICO was to obtain "tokenized currency" so that investors could "Take control of [THEIR] money!" Investors in the PlexCoin ICO were promised returns stemming from:  (i) the appreciation in value of the PlexCoin Token through investments PlexCorps would make with the proceeds of the PlexCoin ICO and based on the managerial efforts of PlexCorps' team of supposed experts; (ii) the distribution to investors of profits from the PlexCorps enterprise; and (iii) the appreciation in value of the PlexCoin Tokens based on efforts of PlexCorps' "market maintenance" team, which included listing the token on digital asset exchanges. The PlexCoin Token currently trades under the symbol PXN.

2

4.      Lacroix and PlexCorps enticed potential investors to purchase PlexCoin Tokens early on during the ICO, with promises that if all 400 million PlexCoin Tokens for sale were sold, the early investors would reap outlandish rewards of 1,354% in 29 days or less (the supposed period of the PlexCoin ICO), and by comparing the supposed returns to those in other ICOs or investments in cryptocurrencies—returns as high as 88,000%.

5.      In connection with the PlexCoin ICO, PlexCorps and Lacroix made the following false and misleading statements, among others, for which Lacroix was responsible:  (a) that the PlexCorps' "team" consisted of a growing cadre of experts stationed around the world and with a principal place of business in Singapore; (b) that the identity of PlexCorps' executives had to be kept hidden to avoid poaching by competitors and for privacy concerns; (c) that the proceeds of the PlexCoin ICO would be used to develop other PlexCorps products; and (d) that investors could expect "enormous" and "real" returns on PlexCoin Token investments.

6.      Contrary to these false representations, and as Lacroix knew or recklessly disregarded, PlexCorps and the PlexCoin Token are a scam because:  (a) there is no PlexCorps team, other than a handful of Lacroix's employees in Quebec working on the project, and no group of experts working across the globe; (b) the reason that PlexCorps did not disclose the identity of its principal executive—Lacroix—was because Lacroix was a known recidivist securities law violator in Canada; (c) the proceeds from the PlexCoin ICO were not destined for business development but instead were intended to fund Lacroix and Paradis-Royer's expenses including home décor projects; and (d) there was no reasonable basis to project returns on investment in Defendants' scam.

7.      Lacroix and PlexCorps made and/or controlled the dissemination of the foregoing misstatements and omissions in various postings on the Internet and on social media, including

in a "whitepaper" issued by PlexCorps in connection with the offer and sale of securities during the PlexCoin ICO, and on webpages and Facebook accounts registered in their name, all of which were accessible to United States investors via the Internet during the relevant periods.

8.      The funds fraudulently raised during the PlexCoin ICO have been channeled through various fiat currency accounts belonging to Defendants as well through cryptocurrency addresses under Defendants' control on various "blockchains." The fiat currency accounts include online payment services accounts in the United States that Defendants opened (directly or indirectly) in the name of PlexCorps or its business alter egos, PlexCoin and Sidepay.Ca. Paradis-Royer herself opened and directed the disbursement of funds from some of these accounts, fully aware of or recklessly disregarding the dealings of her partner Lacroix.

9.      To skirt the registration requirements of the federal securities laws, Lacroix has attempted to refashion the PlexCoin Tokens as a "cryptocurrency" and likened them to Bitcoin. In reality, PlexCoin Tokens are securities within the meaning of the U.S. federal securities laws.

10.     The illegal PlexCoin ICO has occurred despite Lacroix being the subject of previous orders by the Quebec Financial Markets Administrative Tribunal (the "Quebec Tribunal") enjoining him from future violations of the Quebec Securities Act, and despite having pled guilty before a Quebec court of securities fraud.

11.     The foregoing illegal offering also occurred despite the Quebec Tribunal issuing an injunction in July of 2017 specifically directing Lacroix, PlexCorps, and certain companies under Lacroix's control, from engaging in the unregistered offering of PlexCoin Tokens, and despite that same tribunal similarly enjoining Defendant Paradis-Royer on September 21, 2017.

12.     Rather than abide by the orders of the Quebec Tribunal and a contempt order entered against Lacroix in the Quebec Superior Court, Defendants have been openly flouting

4

those orders and continue to sell and tout purchases of PlexCoin Tokens. At most, a Facebook page related to PlexCorps indirectly acknowledged the Quebec Tribunal's injunctions, obtained by Quebec's Autorité Des Marchés Financiers (Financial Markets Authority or "QAMF"), by offering for sale a t-shirt with a picture of a man making an offensive gesture at the name and logo of the QAMF.

13.     Throughout the relevant period, tens of thousands of investors, including over 1,500 transactions with investors in the United States and many in this District, have purchased approximately 81 million PlexCoin Tokens for approximately $15,000,000. Of those amounts, approximately $810,000 is currently held in three accounts to which Lacroix and his associates will soon gain access. Defendants have misappropriated or attempted to misappropriate at least $200,000 of these amounts on extravagant personal expenditures. Other amounts are believed to currently reside on Bitcoin or other blockchain addresses or wallets that Defendants control.

## VIOLATIONS

14.     By engaging in the conduct set forth in this Complaint, Paradis-Royer and PlexCorps engaged in and are engaged in ongoing securities fraud in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Lacroix and PlexCorps engaged in and are engaging in the unlawful sale and offer to sell securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)]. In addition, Lacroix aided and abetted PlexCorps' violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, and of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

15.     By engaging in the conduct set forth in this Complaint, Paradis-Royer engaged in and is engaged in ongoing securities fraud in violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (a)(3)], and of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. § 240.10b-5(a), 5(c)], and has aided and abetted PlexCorps' and Lacroix's violations of Section 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act.

16.     Unless the Defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

17.     The Commission brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) & (d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) & (d)(5)].

18.     The Commission seeks, as immediate relief: (1) a temporary restraining order and a preliminary injunction against Defendants prohibiting them from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and prohibiting Lacroix and PlexCorps from participating in any offerings of unregistered securities or otherwise violating Sections 5(a) and 5(c) of the Securities Act  [15 U.S.C. §§ 77e(a), 77e(c)]; and (2) an order (a) freezing Defendants' assets; (b) permitting the Commission to conduct expedited discovery; (c) prohibiting Defendants from destroying or altering documents; (d) requiring Defendants to return to the registry of the Court any assets they have moved from U.S.-based accounts outside of the United States; and (e) requiring Defendants to provide verified accountings of investor proceeds.

6

19.     The Commission also seeks a final judgment: (a) permanently enjoining the Defendants from engaging in acts, practices and courses of business alleged herein; (b) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon; (c) prohibiting Defendant Lacroix, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any public company; (d) prohibiting Defendants Lacroix and Paradis-Royer, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], from participating in an offering of digital securities; and (e) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d) and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

21.     Venue is proper in the Eastern District of New York pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Among other things, Defendants' false and misleading statements and fraudulent schemes were made to the public at large in this District, and several of Defendants' victims reside in this District.

## DEFENDANTS

22.     **PlexCorps** is an unincorporated entity whose activities are directed by Defendant Lacroix.  On its website, http://www.plexcorps.com, PlexCorps purports to be "a group of forty people . . . all independent throughout the world and oriented towards the same goal: To increase accessibility to cryptoservices."  From at least June 2017 through the present, PlexCorps has marketed, offered, and sold investors "PlexCoin," which PlexCorps describes as "the next cryptocurrency."  PlexCorps has also done and is doing business under the names PlexCoin and Sidepay.Ca.

23.     **Lacroix**, age 35, resides in Quebec, Canada.  Since at least 2011, Lacroix has been the subject of numerous proceedings relating to fraudulent securities activities in Canada.

24.     **Paradis-Royer**, age 26, resides in Quebec, Canada.  Paradis-Royer resides at the same address as Lacroix and is believed to be his romantic partner.  Paradis-Royer is the subject of a Canadian court proceeding enjoining her from participating in some of the activities described herein.

## RELATED INDIVIDUALS AND ENTITIES

25.     **DL Innov, Inc.** ("DL Innov") is a corporation organized under the laws of Quebec, Canada, in 2012, with a stated principal place of business in Quebec, Canada.  Lacroix is the majority shareholder and President, Treasurer, and Secretary of DL Innov.

26.     **Gestio, Inc.** ("Gestio") is a corporation organized under the laws of Quebec, Canada, in 2013, and with a stated principal place of business in Quebec, Canada.  DL Innov is Gestio's principal shareholder and Lacroix is Gestio's President, Treasurer, and Secretary.

8

## BACKGROUND ON DIGITAL TOKENS OR COINS

27.     An ICO is a fundraising event in which an entity offers participants a unique

"coin" or "token" in exchange for consideration (often in the form of crypto or fiat currency).

28.     The tokens are issued on a "blockchain" or cryptographically secured ledger.[1]

29.     Generally, coins or tokens may entitle holders to certain rights related to a venture

underlying the ICO, such as rights to profits, shares of assets, rights to use certain services

provided by the issuer, and/or voting rights.  These coins or tokens may also be listed on online

platforms, often called virtual currency exchanges, and tradable for crypto or fiat currency.

Often, the coins or tokens are immediately tradable.

30.     ICOs are typically announced and promoted through public online channels.

Issuers usually release a "whitepaper" describing the project and the terms of the ICO.  To

participate, investors are generally required to transfer funds to the issuer's address, online

wallet, payment processor, or other account.  After the completion of the ICO, the issuer will

distribute its unique coin or token to the participants' unique address on the blockchain.

---

[1]     A blockchain is a type of distributed ledger, or peer-to-peer database spread across a
network, that records all transactions in the network in theoretically unchangeable, digitally-
recorded data packages called blocks.  Each block contains a batch of records of transactions,
including a timestamp and a reference to the previous block, linking the blocks together in a
chain.  The system relies on cryptographic techniques for secure recording of transactions.  A
blockchain can be shared and accessed by anyone with appropriate permissions.  The Bitcoin
blockchain is an example of a "non-permissioned," or public and open access
blockchain.  Anyone can download the Bitcoin open-source software and join.  All participants
share a single view of the Bitcoin blockchain, which is updated when Bitcoin network
participants reach a consensus on the validity of transactions under review.  "Permissioned" or
private blockchains are modifications to that model and require permissioned servers to be
approved to participate on the network or to access particular information on the
blockchain.  Blockchains or distributed ledgers can also record what are called smart contracts,
which essentially are computer programs designed to execute the terms of a contract when
certain triggering conditions are met.

31.     In some instances, the coins or tokens may continue to be sold by the original issuer after the ICO has completed.  In others, they may only be obtained by purchasing them on secondary markets.

## FACTS

### Lacroix's History as a Recidivist Securities Law Violator in Canada

32.     Since at least 2011, Lacroix has been the subject of several Canadian court proceedings involving the fraudulent raising of investor funds.

33.     In 2011, the QAMF charged Lacroix and a company he controlled called Micro-Prêts, Inc. (or "Small-Loans" in French) ("Micro-Prêts"), with offering unregistered investments in Micro-Prêts, purportedly in the loan business.  On July 15, 2011, a division of the Quebec Tribunal issued an ex parte order enjoining Lacroix and Micro-Prêts from further violations.  See Autorité Des Marchés Financiers v. Micro-Prêts, Inc., 2011 QCBDR 60 (QC 2011).  On August 10, 2011, the Quebec Tribunal rejected in all relevant parts Lacroix's request that the injunction entered on July 15, 2011, be lifted.  See Autorité Des Marchés Financiers v. Micro-Prêts, Inc., 2011 QBCDR 70 (QC 2011).

34.     On November 2, 2011, Lacroix and Micro-Prêts signed an undertaking representing to the Quebec Tribunal and to the QAMF that they would not conduct any additional securities transactions, including through transactions through the Internet.

35.     On February 28, 2013, Lacroix and Micro-Prêts pled guilty before a Quebec tribunal to three counts each, including making materially false statements in connection with the offer and sale of, securities, and were ordered to pay over $25,000 Canadian Dollars in criminal penalties, arising out of the same scheme as the 2011 proceedings.

36.     Despite his 2011 undertaking and 2013 guilty plea and conviction, Lacroix ran

afoul of the Quebec Securities Act at least once more earlier this year.  On June 13, 2017, the

Quebec Tribunal issued another order against Lacroix, DL Innov, Gestio, and Micro-Prêts,

having found sufficient evidence that Lacroix and those entities had raised over $2 million USD

from over thirty investors to whom they had promised high returns if they invested in Micro-

Prêts' lending business, and again enjoining them from additional securities-related transactions.

See Autorité Des Marchés Financiers v. Lacroix, 2017 QCTMF 63 (QC 2017).

## Defendants Begin Marketing the PlexCoin ICO

37.     Undeterred by the foregoing actions, Lacroix launched his latest scam, the

PlexCoin ICO, starting at least as early as June of 2017.

38.     In mid to late June of 2017, on a Facebook page for PlexCoin with the Facebook

address @plexcoin (the "PlexCoin Facebook Page"), Lacroix and PlexCorps announced the

PlexCoin "ICO pre-sale launch" scheduled for August 7, 2017.  The PlexCoin Facebook Page

described the PlexCoin Token as "the next decentralized worldwide cryptocurrency based on the

Ethereum structure" whose "mission is to broaden the possibilities of uses and to increase the

number of users by simplifying the process of managing cryptocurrency to the maximum."

39.     On or around July 5, 2017, Lacroix and PlexCorps also launched a Facebook page

for PlexCorps with a Facebook address @plexcorps (the "PlexCorps Facebook Page"), in which

they stated that PlexCorps consisted of "a group of roughly forty people (programmers,

engineers, cryptocurrency specialists, etc.) all independent throughout the world and oriented

towards the same goal:  "To increase accessibility to cryptoservices by simplifying its managing

process."  The same post noted that PlexCorps "decided not to reveal the identities of our team to

make sure no one is getting harassed on social media or recruited by other cryptocurrency companies, thus preventing the concept of PlexCorps from being copied."

40.     A later post on the PlexCorps Facebook Page stated that the PlexCorps team was "grow[ing] . . . every day" and that it consisted of "more than 48 all around the world."

41.     Lacroix registered the PlexCoin and PlexCorps Facebook Pages and was at all relevant times the administrator for both accounts. A credit card account in Lacroix's name was associated with the PlexCoin and PlexCorps Facebook Pages. On several occasions immediately before and during the sale of PlexCoin Tokens to the public, logins were made to both accounts from an IP address previously associated with Lacroix and his businesses, DL Innov and Gestio ("Defendants' IP Address").

42.     The PlexCorps and PlexCoin Facebook Pages were accessible via the Internet to potential investors in the United States.

43.     On or around July of 2017, Lacroix, directly or indirectly, also launched websites for PlexCorps and PlexCoin. Lacroix registered at least some of these websites with an internet service provider on or around May 24, 2017, including websites with URLs http://www.plexcoin.org, http://www.plexcoin.com, http://www.plexbank.com, and http://www.plexwallet.com, and paid for these registrations in his name. These websites were accessible via the Internet to potential investors in the United States.

44.     Lacroix also registered and paid for Internet security services with respect to the URLs http://www.plexcoin.com, http://www.plexcoin.org, and http://www.plexcorps.com, starting at least on July 1, 2017.

45.     Like the PlexCorps Facebook Page, PlexCorps' website, accessible via the URL http://www.plexcorps.com (the "PlexCorps Website"), described PlexCorps as "a group of forty

12

people . . . all independent throughout the world and oriented towards the same goal: To increase accessibility to cryptoservices by simplifying the managing process."

46.     The PlexCorps Website listed four additional products offered by PlexCorp, each with a unique logo: PlexCoin, PlexWallet, PlexCard, and PlexBank. The logo for PlexCoin linked users to PlexCoin's website at http://www.plexcoin.com (the "PlexCoin Website"), and indicated that PlexCoin was at the "Pre-Sale Waiting List" stage. The logo for the other products indicated that they were projected to be launched later in 2017 and or in 2018.

47.     The PlexCorps Website also directed readers to the PlexCorps Facebook Page.

48.     From at least July 2017 through the present, the PlexCoin Website states that "PlexCorps presents: PlexCoin," which the PlexCoin Website describes as "a cryptocurrency . . . that has a value based on the current market." In July of 2017, the PlexCoin Website announced the "ICO" for PlexCoin Tokens would begin on August 7, 2017, and that the pre-sale period was currently open to potential investors.

49.     Under a section entitled "Frequently Asked Questions" on the PlexCoin Website, the answer to the question of "How to Invest?" instructed users that they would "have to enter [their] email address" so that "at the launch of the pre-sale on August 7, [they] will be able to buy [their] PlexCoin at a discounted price and in priority, and enjoy a return of 1,354% on your investment!"

50.     The PlexCoin Website explained that "[a]n Initial Coin Offering (ICO) is a derivative from the known expression IPO (Initial Public Offering, or stock market launch) which refers to cryptocurrency fundraiser. An ICO can allow the financing of a new blockchain, but in most cases, the ICO is set up to issue a token, a coin or creating a Dapp (decentralized application) based on an already existing blockchain such as Bitcoin or Ethereum."

13

51.     In July of 2017, the PlexCoin Facebook Page and the PlexCoin Website both announced that a "whitepaper" for PlexCoin Tokens (the "PlexCoin Whitepaper") would be available on August 4, 2017, that the PlexCoin ICO "pre-sale" would begin on August 7, 2017, and that PlexCoin Tokens would officially "launch" on September 5, 2017.

52.     Answering the question "What is the anticipated return on investment (ROI)?," the PlexCoin Website explained that the return depended "on the sale stage you will be at when purchase your PlexCoin." The PlexCoin Website further explain that the first 50 million PlexCoin Tokens would be sold at the equivalent of $0.13 U.S. Dollars ("USD"), the following 50 million PlexCoin Tokens would be sold at the equivalent of $0.28 USD, the following 100 million PlexCoin Tokens would be sold at the equivalent of $0.53 USD, and the last 200 million PlexCoin Tokens (for a total of 400 million coins sold), would be sold at the equivalent of $0.88 USD. Based on the foregoing discounting scheme, the PlexCoin Website projected that investors in PlexCoin Tokens would obtain a "projected return on investment" after 29 days, depending on where and when in the discount scheme the investor purchased PlexCoin, of either 1,354%, 629%, 332%, or 200%.

53.     Elsewhere, the PlexCoin Website explained that after the 29 days of the pre-sale, "the value . . . will be 1,76 $ [sic] per PlexCoin and it is from that date forward that the value should normally increase, as PlexCoin will be from that moment available on the open market." The PlexCoin Website also explained that the $1.76 USD value assumed that 400 million PlexCoin Tokens were sold during the PlexCoin pre-sale, but other materials expressed confidence that all 400 PlexCoin Tokens would be sold and stated that even if fewer were sold, investors would still reap returns that were "real" and commensurate to amounts sold.

14

54.     From July 2017 through at least October 1, 2017, the PlexCoin Website explained

to investors that they would be able to purchase PlexCoin Tokens during the ICO with either

USD, Canadian Dollars ("CAD"), Euros, Bitcoin, Ether (which the PlexCoin Website calls

"Ethereum"), and Litecoin.

### The Quebec Tribunal Enjoins Defendants from Continuing the PlexCoin ICO

55.     On July 19, 2017, the QAMF made an ex parte application to the Quebec Tribunal

based on many of the foregoing PlexCoin Token marketing efforts and asking, inter alia, that the

Quebec Tribunal enjoin Lacroix, PlexCoin, PlexCorps, Gestio, and DL Innov from offering or

distributing investments in PlexCoin Tokens.

56.     On July 20, 2017, the Quebec Tribunal granted the QAMF's request (the "July

Order") having concluded, as it explained at a later date,  that the PlexCoin Token was a

"security" under the laws of Quebec, relying in part on the United States Supreme Court decision

in SEC v. Howey, 328 U.S. 293 (1946).  See also Financial Markets Authority v. Plexcorps,

TMS, Montreal, 2017-023-001 (July 20, 2017); Financial Markets Authority v. Plexcorps, et al.,

TMS, Montreal, 2017-023-001 (Sept. 13, 2017).

57.     In the July Order, the Quebec Tribunal ordered PlexCorps, PlexCoin, DL Innov,

Gestio, and Lacroix to, inter alia:

> a.   "cease engaging directly or indirectly in any activity for the purpose of
>       making any transaction on any form of investment,
>
> b.   "withdraw any advertising or solicitation of the same nature as that made on
>       the Internet sites www.plexcorps.com and www.plexcoin.com, Facebook, any
>       Internet forums or others, or in relation to securities or any form of
>       investment, whether advertised or disseminated, over the Internet or
>       otherwise, directly or indirectly, [and]
>
> c.   "shut down the Internet sites www.plexcorps.com and www.plexcoin.com or
>       any other site of the same nature as those sites, advertised or disseminated,
>       directly or indirectly, by the latter or, failing that, to render them inaccessible

15

to any IP address in Quebec so as to prevent anyone residing in Quebec from visiting these Internet sites."

58.     The Quebec Tribunal's July Order also ordered a Facebook subsidiary in Canada to shut down the PlexCoin and PlexCorps Facebook Pages from accessibility in Quebec.

59.     On July 21, 2017, the QAMF served Defendants PlexCoin, PlexCorps, and Lacroix, as well as Lacroix's entities DL Innov and Gestio with the Quebec Tribunal's July Order and, on that day, Defendant Lacroix filed a notice of dispute against the decision.

60.     But Lacroix and PlexCorps did not abide by the Quebec Tribunal's July Order. On October 17, 2017, the Superior Court of Quebec held Lacroix in contempt of the July Order. Sanctions against Lacroix are currently pending for that contempt order.

## Defying the Quebec Tribunal's Injunctions, Defendants Continue to Market the PlexCoin Tokens to Investors and Begin Raising Investor Funds

61.     Rather than ceasing advertisement and solicitations for PlexCoin Tokens as required by the July Order, Lacroix and PlexCorps took several steps in open defiance of the Quebec Tribunal's July Order including, as further detailed below, (a) publishing a "whitepaper" for PlexCoin (the "PlexCoin Whitepaper") on August 4, 2017; (b) registering online payment services accounts to receive PlexCoin investor funds and receiving investor funds through those accounts; (c) shutting down the PlexCoin Website from Quebec IP addresses (but not U.S. addresses) but then registering the domain http://www.plexcoin.tech on August 18, 2017; and (d) posting additional social media and online advertisements for PlexCoin, including in new Facebook accounts associated with PlexCorps and its businesses.

62.     Lacroix made some of the foregoing attempts to evade the Quebec Tribunal's July Order by enlisting the help of his partner, Paradis-Royer, and by obscuring his involvement with the registration of new domains or accounts by using a fake name, including but not limited to

16

"San Lee," or "See Lam," and/or using email addresses that belonged to or were under his control.

63. Paradis-Royer did her part to conceal Lacroix's involvement by, for example, registering certain digital payments accounts under her name or purporting to use those accounts for a fictional business called "Sidepay.Ca," which was really Defendants' alter ego.

64. By at least August 3, 2017, the PlexCoin Website stated that "PlexCorps' team is constantly working on . . . developing" certain products associated with PlexCoin Tokens, such as the PlexWallet and PlexCard, and that the PlexCoin ICO would begin on August 8.

65. On or around August 4, 2017, Lacroix and PlexCorps published the PlexCoin Whitepaper on the Internet, which was available to potential investors in the United States.

66. The PlexCoin Whitepaper contained PlexCoin's logo on the front page, PlexCoin's and PlexCorps' logos in the interim pages, and linked to PlexCoin's and PlexCorps' Websites and Facebook Pages.

67. The PlexCoin Whitepaper contained many of the same statements that Defendants previously made to investors in their various online postings through the summer of 2017.

68. For example, the PlexCoin Whitepaper explained that the PlexCoin "pre-sale" would run during the 29 days from August 7 through September 5, 2017, but set September 10, 2017 as the "launch" for PlexCoin secondary market trading. The PlexCoin Whitepaper, like previous statements by Lacroix and PlexCorps, directed users to register for the "pre-sale" by entering their email address in the registration tab of the PlexCoin Website, and advised investors that they could purchase PlexCoin through USD, CAD, Euros, Bitcoin, Ether, or Litecoin.

69.     The PlexCoin Whitepaper touted the "ROI after 29 days or less" of 1,354%, 629%, 332%, or 200% depending on when the investor purchased.  The PlexCoin Whitepaper stated that the foregoing "numbers might seem enormous, but they are real," and further encouraged investors to view a purchase of PlexCoin Tokens as a profit-making opportunity by noting "ROI examples from previous ICOs," including supposed returns of 88,736.89%.  The PlexCoin Whitepaper further stated that it "estimate[d] an approximate unitary value of US$8.50 before the end of the year 2017, and a value of US$ 14.00" by the end of 2018."

70.     The PlexCoin Whitepaper also touted the supposed experience, expertise, and size of the "team" that was behind PlexCorps, including by: (a) now describing PlexCorps as "a team of 53 people . . . all over the world who have a common goal"; (b) touting "[e]xperts of their own field bring[ing] their contribution to our ambitious project," including "former managers of the finance world; prosperous company founders; specialists in private funds management; lawyers, notaries, accountants, and renowned tax experts; a business development manager; a risk management supervisor; a regulations manger; a marketing manager," and others; (c) explaining that the PlexCorps team "gathers all types of specialists necessary for the accomplishment of its mission"; and (d) talking about their "specialists distribution under six categories" and touting the "solid experience" of "team members."

71.     The PlexCoin Whitepaper insisted that the identity of PlexCorps' "executives" would remain hidden to protect "our projects' security" and to avoid poaching by competitors.

72.     The PlexCoin Whitepaper stated that PlexCorps' "offices are currently based at the heart of Singapore" with a team "located all over the world."

73.     The PlexCoin Whitepaper refers to the PlexCoin ICO as a means of "crowdfunding" to raise $249,500,000.  The PlexCoin Whitepaper notes that a portion of the funds raised in the PlexCoin ICO "will be used to develop and design PlexCorps' products."

74.     The PlexCoin Whitepaper also explained the supposed uses to which the funds raised during the PlexCoin ICO would be put, noting "[t]he funds earned from the PlexCoin pre-sale will be used according to the chart," a copy of which is included as Figure 1 here.



**Figure 1.  Chart in PlexCoin Whitepaper Explaining Use of Offering Proceeds**

75.     The PlexCoin Whitepaper explained that the 70% reference to market maintenance meant that a "team will remain on the lookout for PlexCoin's value fluctuations when it will be launched" and "will limit the value decreases by buying if the value drops," such that they "will thus guarantee a rather steady increase of PlexCoin's value."

76.     The PlexCoin Whitepaper explained that the profits of the PlexCorps enterprise would be distributed to the investors in PlexCoin Tokens, by noting, for example, that (a) "PlexCoin will profit from the PlexCoin sale" and promised that after collecting fees "[t]he company will then offer this profit to its members after the pre-sale;" and (b) that PlexCorps would make money from the transaction fees charged during the use of the PlexCard, and that

this "2% revenue per transaction ensure great profitability [sic]" such that PlexCorps "will be able to guarantee a profit margin during the pre-sale to our founding members."

77.    The PlexCoin Whitepaper contained financial forecasts for the enterprise, ranging from "conservative" estimates of north of $77 million USD in profits for the fifth year of the enterprise, to nearly $6 billion USD in profit for that year under the "optimistic" view.

78.    The PlexCoin Whitepaper promised investors that PlexCoin would be available for purchase and sale on "exchange platforms" starting on September 10, 2017, and, Defendants, directly or indirectly, did in fact make PlexCoin Tokens exchangeable on a digital asset exchange platform known as Etherdelta.

79.    In a November 6, 2017 post on the PlexCorps' Facebook Page, investors were admonished to "wait for the official launch of PlexCoin to sell at a better price, and also for us to launch our other services, which will have an impact on the value of PlexCoin."

80.    As further detailed below, Defendants began collecting investor victim funds in connection with the PlexCoin ICO, in contravention of the Quebec Tribunal's July Order, on or about August 7, 2017.  Although the PlexCoin ICO ran through October 1, 2017, additional sales of PlexCoin Tokens appear to continue, and total sales will have netted Defendants a combined equivalent to at least $15 million USD (based on PlexCoin's stated offering price).

81.    Lacroix and PlexCorps made many of the foregoing statements to potential and actual investors on other online fora, including Twitter and a blog available at http://www.plexcoin.com/blog.

**Lacroix's and PlexCorps' Materially False and Misleading Statements and Omissions With Respect to the PlexCoin ICO**

20

82.     Many of the foregoing statements made in the PlexCorps and PlexCoin Websites and Facebook Pages and in the PlexCoin Whitepaper, all of which Lacroix controlled, were materially false or misleading, or omitted material information.

83.     For example, it was and is not true that PlexCoin or PlexCorps consisted of teams of dozens of experts in their fields, spread across the world, or with offices based in Singapore. PlexCoin is nothing more than a fraudulent scam run primarily by Lacroix and his cohorts, mostly out of Lacroix's offices in Quebec.

84.     The statements about PlexCorps' use of the funds were also false.  There was no meaningful market maintenance and no meaningful project development.  Lacroix further failed to disclose that Lacroix actually used a portion of the proceeds to pay for personal expenses. PlexCoin is and was a fraud aimed at enriching Defendants.

85.     Moreover, there was no reasonable basis for the statements that PlexCoin Tokens would be worth any amount by the end of 2017 or 2018, or to tell investors they could expect certain "return[s] on investment" between 200% and 1,354%, given that, as Lacroix and PlexCorps knew or recklessly disregarded, victims were simply investing in a scam.

86.     Nor did Defendants conceal the identity of the individuals behind the project for reasons related to security or to avoid competition—they did so, upon information and belief, because of Lacroix's status as a recidivist securities law violator in Canada.  By purposefully failing to disclose Lacroix's involvement with PlexCoin, Lacroix and PlexCorps also knowingly omitted material facts required to make their statements about the secrecy of PlexCorps' executives not misleading.

87.     A reasonable investor would want to know that a repeated securities law violator such as Lacroix was behind the PlexCoin ICO, a fact that Defendants understood well.

21

**Defendants Fraudulently Attempt to Conceal Lacroix's Involvement with PlexCoin**

88.     In an Internet posting in early July of 2017 on an online forum in French called
CryptoFR, a user traced the IP address associated with the user profile of a poster called
"PlexCoin" to Defendants' IP Address. That user ran further searches on the owner of those
entities (Lacroix), and speculated that because of Lacroix's background, the PlexCoin ICO
sounded more like a fraud than a good investment idea.

89.     Lacroix responded or directed one of his associates to respond to the revelations
by falsely stating that Gestio and DL Innov were "appointed to manage the Francophone social
networks [of] PlexCorps and nothing more" and that the allegations of Lacroix's involvement
were thus "completely false." Cognizant of the damage the revelations on CryptoFR could do to
their illegal enterprise, he then sent a letter, through counsel, demanding that CryptoFR remove
the revelatory post, which CryptoFR apparently agreed to do.

90.     Lacroix took other steps to conceal his involvement with the PlexCoin ICO,
including instructing an employee via a text on June 14, 2017 "[d]on't forget when you talk
about plex, it's not me that did that! You don't know, you just saw it somewhere."

91.     In another exchange with his cohorts, Lacroix complained that a potential online
payment system set up for PlexCoin was "not confidential enough and it's too easy to trace" and
that the "[q]amf could make a purchase with their card and they'll see their money go." Indeed,
Lacroix explored various options to collect victim funds in ways that were not traceable.

92.     Paradis-Royer did her part to help Lacroix conceal his identity and both of their
involvements with the fraudulent PlexCoin ICO. On August 2, 2017, when Quebec authorities
knocked on Lacroix and Paradis-Royer's residence to execute a search warrant, Paradis-Royer
frantically texted Lacroix to inform him that the police were at the residence and that the "white

22

paper is on the table" so she was "not answering." During that search, authorities found materials used to create the website www.plexcoin.com as well as a draft of the PlexCoin Whitepaper.

### Defendants Obtain and Misappropriate Investor Funds

93.      Investors, including investors in the United States, were permitted to invest in PlexCoin Tokens starting on August 7, 2017, using a variety of methods, including by tendering cryptocurrency to Defendants' addresses on a blockchain, by providing credit card information through payment portals available on the PlexCoin Website, or by U.S.-based online payment processors such as PayPal, Square, Inc., or Stripe, Inc., and were permitted to tender, inter alia, USD to make their investments.

94.      The PlexCoin ICO continued until at least October 1, 2017.  However, Lacroix and PlexCorps appear to have been selling additional PlexCoin Tokens since.

95.      On a PayPal account registered to Lacroix's name (and containing "PlexCoin" as the "business" of the account and https://www.plexcoin.tech as the URL), Lacroix received over $380,000 USD from August 8, 2017 through September 4, 2017.  Many of these payments mention "PlexCoin – Paypal" as the subject of the payments.

96.      Almost immediately from the first payment received on this PayPal account, PayPal flagged the account for suspicious activity and reversed most of the payments to the investors.  Accordingly, on August 10, 2017, Defendants began the process of seeking an alternative method to obtain their victims' fiat currency.  On that day, using the name "San" and email address he had previously used, Defendants, directly or indirectly, began making inquiries of an online payments service similar to PayPal called "Shopify," including whether Shopify would have any problems if an account received thousands of payments of various amounts in a

short period of time. During the conversation, Defendants and/or their cohorts falsely told a Shopify online representative that they had a "gaming company" and that they were selling "some item in our game" that the customers would "use . . . in our game."

97.     On or around August 16, 2017, Defendants registered an account at Shopify in the name of Defendant Paradis-Royer, using Lacroix's personal email ("Lacroix's Email Address").

98.     At least as of September 10, 2017, Lacroix and PlexCorps announced on the PlexCoin Facebook Page that investors could remit PlexCoin purchase payments through a service called "SidePay.Ca" making a similar announcement on a Facebook page with the identifier @PlexCoinINFORMATION. The HTML source code for the SidePay.Ca payment portal revealed that an investor that sought to invest in PlexCoin via SidePay.Ca was actually remitting money to Defendants' PlexCoin account at Shopify to purchase PlexCoin Tokens.

99.     Defendants associated their PlexCoin Shopify account with two accounts held at Royal Bank of Canada ("RBC") belonging to Defendant Paradis-Royer. The first, which had been opened in May of 2017, was associated with Defendants' Shopify account on September 1, 2017 (the "First RBC Account").

100.    On or about September 11, 2017, Shopify placed a hold on Defendants' accounts and notified Lacroix of the hold in an email addressed to Lacroix's Email Address.

101.    Undaunted, Defendants opened another account at RBC in Paradis-Royer's name on September 14, 2017, and associated it to the Shopify account (the "Second RBC Account").

102.    In various transactions beginning on September 19, 2017 and going through September 25, 2017, Defendants' Second RBC Account received over $1.68 million USD from the Shopify accounts that had collected the funds received through the Sidepay.Ca portal.

103.     On September 19, 2017, Paradis-Royer transferred $300,000 in CAD, the equivalent of approximately $246,000 USD, from the Second RBC Account to the First RBC Account.  Paradis-Royer made or attempted to make immediate use of these funds, which belonged to PlexCoin ICO investors whose funds had moved from Paradis-Royer's Sidepay.Ca/Shopify account to the Second RBC Account and then to the First RBC Account.

104.     On September 20, 2017, for example, Defendants transferred $30,000 CAD from the First RBC Account to pay a personal line of credit that they had used for home improvements.  In the three weeks prior to September 20, 2017, Paradis-Royer had also written checks for nearly $100,000 CAD from the First RBC Account to pay for other home improvement expenses, including lawn services, painting services and electricians.

105.     As detailed further below, the QAMF obtained an order freezing Paradis-Royer's bank accounts on September 21, 2017, which caused RBC to refuse to cash other checks that Paradis-Royer had written and remitted around that date.  These checks included payments for $75,000 CAD in ceramic work and approximately $52,000 CAD in aluminum work.

106.     Paradis-Royer also used PlexCoin ICO investor proceeds to "reimburse" purported expenses of DL Innov.

107.     Defendants have also been obtaining PlexCoin ICO investor funds through another online payment services provider called Stripe, Inc., which is a U.S.-based entity ("Stripe") having affiliated entities in at least Canada and the United Kingdom.

108.     On July 29, 2017, Defendants and their cohorts registered a Euro-denominated account in the name of the PlexCoin Website to collect proceeds from the PlexCoin ICO (the "Stripe Euro Account").

109.    The Stripe Euro Account lists "PlexCoin" as its business, and contains an associated false bank account supposedly in the name of one of Defendants' associates in France. In a Skype conversation with this associate, Lacroix discussed opening a Stripe account in France and changing the associated bank information when it was time to "cash out" the proceeds.

110.    As of December 1, 2017, the Stripe Euro Account holds approximately €262,000 (or the equivalent of approximately $311,000 in USD) (the "Stripe Euro Account"), obtained from approximately 890 different transactions. At least 115 of these transactions occurred with individuals in the United States, of which some were registered to addresses within this District.

111.    Logins to the Stripe Euro Account have occurred with an email that has a plexcoin.com domain and at least some such logins have been from Defendants' IP Address.

112.    Due to Stripe's internal policies, transfers out of the Stripe Euro Account were placed on a 90-day administrative hold as of September 5, 2017. The hold is set to expire on December 4, 2017, at which point the funds presumably will be available to Defendants.

113.    On August 31, 2017, Defendants registered an additional account with Stripe in the name of Defendant Paradis-Royer to collect the proceeds from the PlexCoin ICO, using Lacroix's Email Address, associating it to Paradis-Royer's Second RBC Account, and listing the associated business as "SidePay" (the "Stripe USD Account").

114.    From approximately September 8, 2017 through September 19, 2017, Defendants received over $1 million in USD in payments in the Stripe USD Account, covering nearly 5,400 different transactions. At least 1,400 of these transactions occurred with individuals whose addresses were in the United States, at least two dozen of which reside in this District.

26

115.    Between September 18 and 20, 2017, Defendants transferred approximately $900,000 in USD to the Second RBC Account in Canada from the Stripe USD Account, but approximately $211,492.38 in USD remains in that account.

116.    The Stripe USD Account was temporarily suspended by Stripe on approximately September 27, 2017 through January 25, 2018.

117.    On September 6, 2017, Defendants registered a third account with Stripe, again in the name of Defendant Paradis-Royer, to collect the proceeds from the PlexCoin ICO, this one denominated in CAD (the "Stripe CAD Account," together with the Stripe Euro Account and the Stripe USD Account, the "Stripe Accounts").

118.    The Stripe CAD Account is associated to Defendant Paradis-Royer's First RBC Account, and engaged in 218 transactions totaling over $322,000 USD.  Log-ins to the Stripe CAD Account were done by a user with an email belonging to Paradis-Royer and from Defendants' IP Addresses.

119.    The Stripe CAD Account currently holds over $372,000 in CAD (the USD equivalent of approximately $290,000), but is also temporarily suspended by Stripe until December 10, 2017.

120.    Together, the Stripe Accounts currently hold over $800,000 in USD as proceeds of the fraudulent distribution of unregistered securities detailed in this Complaint.

121.    On or about September 5, 2017, http://www.plexcoin.tech stated that PlexCorps had distributed over 24 million PlexCoin Tokens and 68 million as of September 28, 2017. Assuming Defendants sold the first 50 million PlexCoin Tokens at the stated offering price of $0.13 USD and the subsequent 18 million at the stated offering price of $0.28, this represents over $11.54 million USD collected.

27

122.    The Ethereum blockchain indicates that two addresses received 400 million and 550 million PlexCoin Tokens on or about August 13, 2017.  The first address distributed over 71.4 million PlexCoin Tokens from August 22 through the present, in over 36,000 transactions.

123.    The second address distributed over 10 million PlexCoin Tokens from November 3 through today in over 32,000 transactions.

124.    Assuming all of the distributions of PlexCoin Tokens from these addresses were sold to investors as per the discount pricing scheme stating in the various PlexCoin ICO marketing materials, these sales would have generated proceeds of more than $15 million USD (50 million PlexCoin Tokens sold at $0.13 generate $6.5 million USD, and 31 million PlexCoin Tokens sold at $0.28 generate $8.68 million USD).

### Continued Harms to Investors in the United States is Threatened

125.    As of December 1, 2017, publicly available data on the Ethereum block chain indicates daily transactions in PlexCoin up to and including December 1, 2017, and over 76,000 transactions in PlexCoin through December 1, 2017.

126.    Defendants are in possession of substantial amounts of PlexCoin, which they continue to promote and to solicit investments in, including by secondary market purchases.

127.    As of December 1, 2017, Defendants control the three Stripe Accounts, which are due approximately $810,000 USD.  Although the Stripe Accounts are on an administrative hold, the funds will begin to be released as early as December 4, 2017.  Defendants also control unknown amounts of Bitcoin, Ether, or Litecoin cryptocurrency fraudulently obtained in exchange for PlexCoin Tokens.

128.    On September 21, 2017, the QAMF obtained an additional ex parte order from the Quebec Tribunal (the "September Order"), freezing certain of Defendants' Lacroix and Paradis-

28

Royer assets in Canada, and enjoining Paradis-Royer from engaging in any transactions with respect to securities, as the July Order had similarly enjoined Lacroix and PlexCorps.

129.   But Defendants have continued to defy the Quebec Tribunal's orders, including the September Order, by misappropriating investor funds, and Lacroix and PlexCorps by continuing to make online postings marketing PlexCoin Tokens and PlexCorps.

130.   For example, on October 10, 2017, Lacroix launched an online forum posting "PlexCorps live updates," and on which Lacroix or his cohorts have been posting updated news about PlexCorps and the PlexCoin Token through at least November of 2017.

131.   Lacroix is making posts on the Facebook page @PlexCoinINFORMATION about supposed PlexCorps projects and the tradability of PlexCoin Tokens on digital asset exchanges.

132.   And, starting at least as early as November 16, 2017, a new Facebook page identified as @PlexCoinWorldTeam and purporting to be located in Paris, France, mentioned PlexCorps and that PlexCoin would be "listed on as many public platforms as possible." That page also sells t-shirts depicting an individual making an offensive gesture at the QAMF.

133.   As of December 1, 2017, both the PlexCoin and the PlexCorps Websites are live and accessible to Internet users in the United States and in this District.

### FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (All Defendants)

134.   The Commission repeats, realleges and incorporates by reference paragraphs 1 through 133, as though fully set forth herein.

135.   By virtue of the foregoing, Defendants Lacroix, Paradis-Royer and PlexCorps, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly,

employed devices, schemes, or artifices to defraud, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit; and Defendants Lacroix and PlexCorps made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

136.    By virtue of the foregoing, Defendants Lacroix, Paradis-Royer and PlexCorps violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5  [17 C.F.R. § 240.10b-5] promulgated thereunder.

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (All Defendants)

137.    The Commission repeats, realleges and incorporates by reference paragraphs 1 through 133, as though fully set forth herein.

138.    By virtue of the foregoing, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) Defendants Lacroix, Paradis-Royer and PlexCorps employed devices, schemes or artifices to defraud; (b) Defendants Lacroix and PlexCorps obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) Defendants Lacroix, Paradis-Royer and PlexCorps engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

139.    By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)(1), (a)(3)].

### THIRD CLAIM FOR RELIEF
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(Defendants Lacroix and PlexCorps)**

140.    The Commission repeats, realleges and incorporates by reference paragraphs 1 through 133, as though fully set forth herein.

141.    By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants Lacroix and PlexCorps, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

142.    By reason of the conduct described above, Defendants Lacroix and PlexCorps, directly or indirectly violated and, unless enjoined will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and e(c)].

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting PlexCorps' Violations of Sections 5(a), 5(c), and 17(a) of the Securities**
**Act, and of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Defendant Lacroix)**

143.    The Commission repeats, realleges, and incorporates by reference paragraphs 1 through [134], as though fully set forth herein.

144.    By virtue of the foregoing, Defendant Lacroix provided knowing or reckless substantial assistance to Defendant PlexCorps, which, directly or indirectly, singly or in concert

with others, in connection with the purchase or sale of a security, with scienter, used the means

or instrumentalities of interstate commerce, or of the mails, to make untrue statements of

material fact and omitted to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading, and without a

registration statement in effect as to that security, directly and indirectly, made use of the means

and instruments of transportation or communications in interstate commerce and of the mails to

sell securities through the use of means of a prospectus.

145.    By virtue of the foregoing, Defendant Lacroix aided and abetted and, unless

restrained and enjoined, will continue aiding and abetting, violations of Sections 5(a), 5(c), and

17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)], Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder, in

violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

### FIFTH CLAIM FOR RELIEF
**Aiding and Abetting Lacroix's and PlexCorps' Violations of Section 17(a) of the Securities
Act, and of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
(Defendant Paradis-Royer)**

146.    The Commission repeats, realleges, and incorporates by reference paragraphs 1

through 133, as though fully set forth herein.

147.    By virtue of the foregoing, Defendant Paradis-Royer provided knowing or

reckless substantial assistance to Defendants Lacroix and PlexCorps, which, directly or

indirectly, singly or in concert with others, in connection with the purchase or sale of a security,

with scienter, used the means or instrumentalities of interstate commerce, or of the mails, to

make untrue statements of material fact and omitted to state material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not

misleading.

148.    By virtue of the foregoing, Defendant Paradis-Royer aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder, in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court grant the following relief:

### I.

An Order temporarily and preliminary, and a Final Judgment permanently, restraining and enjoining Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise, from any future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] issued thereunder, and Defendants Lacroix and PlexCorps and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise from any future direct or indirect participation in any offering of unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)];

### II.

An Order temporarily and preliminarily freezing all of Defendants' assets;

## III.

An Order requiring Defendants to transfer to the registry of the Court all funds and assets obtained from the United States from unlawful activities described herein that are now located outside the Court's jurisdiction;

## IV.

An Order temporarily and preliminarily enjoining and restraining Defendants, and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing or otherwise interfering with the access of the Commission to relevant documents;

## V.

An Order providing that the Commission may take expedited discovery;

## VI.

An Order directing Defendants to file with this Court and serve upon the Commission, within three (3) business days, or within such extension of time as the Commission staff agrees to, a verified accounting, signed by each Defendant, and under penalty of perjury;

## VII.

A Final Judgment directing each of the Defendants to disgorge all ill-gotten gains, including prejudgment interest thereon;

## VIII.

A Final Judgment permanently barring Defendant Lacroix from serving as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## IX.

A Final Judgment prohibiting Defendants Lacroix and Paradis-Royer from participating in any offering of digital securities pursuant to Section 20(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)];

## X.

A Final Judgment directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## XI.

Such other and further relief as this Court deems appropriate and necessary for the benefit of investors.


Dated: New York, New York
       December 1, 2017

                                   SECURITIES AND EXCHANGE COMMISSION

                          By: _____
                                   Robert A. Cohen
                                   Valerie A. Szczepanik
                                   Jorge G. Tenreiro
                                   Daphna Waxman
                                   David H. Tutor
                                   200 Vesey Street, Suite 400
                                   New York, New York 10281-1022
                                   (212) 336-9145 (Tenreiro)
                                   Email: TenreiroJ@sec.gov
                                   Attorneys for Plaintiff