UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,    :

                 **Plaintiff,**    :

              :

       - against -    :

              :

PLEXCORPS    :
(a/k/a and d/b/a PLEXCOIN and SIDEPAY.CA),    :
DOMINIC LACROIX and    :
SABRINA PARADIS-ROYER,    :

           **Defendants,**    :

              :

------------------------------------------------------------------ x

FILED
CLERK

2017 DEC -1 PM 1: 32

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

17 Civ.

ECF Case

CV 17 - 7007

IRIZARRY, CH.J.

LEVY, M.J.

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS *EX PARTE* EMERGENCY APPLICATION FOR AN ORDER TO SHOW CAUSE, TEMPORARY RESTRAINING ORDER, AND ORDER FREEZING ASSETS AND GRANTING OTHER RELIEF

Robert A. Cohen
Jorge G. Tenreiro
Valerie A. Szczepanik
Daphna A. Waxman
David H. Tutor
Counsel for the Plaintiff
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-9145 (Tenreiro)

December 1, 2017

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS........................................................................................................3

    I.    BACKGROUND ...........................................................................................................3

    II.  DEFENDANTS DEFRAUD INVESTORS IN THE PLEXCOIN ICO ...............................4

        A.    Lacroix and PlexCorps Tout the PlexCoin ICO Pre-Launch .........................................4

        B.    Defendants Fraudulently Seek to Conceal the Involvement of Lacroix, a Recidivist
             Securities Law Violator in Canada.................................................................................8

        C.    Lacroix and PlexCorps Launch PlexCoin ICO In Defiance of Court Orders .............10

    III. DEFENDANTS MISAPPROPRIATE PLEXCOIN INVESTORS' FUNDS...................14

    IV. DEFENDANTS' ONGOING FRAUDULENT AND DECEPTIVE ACTS.....................15

ARGUMENT..........................................................................................................................16

    I.    DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION IN THE UNITED
        STATES.......................................................................................................................16

    II.  DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND
        PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE FEDERAL
        SECURITIES LAWS ..................................................................................................17

        A.    The Interests Offered and Sold in the PlexCoin ICO are Securities ...........................18

        B.    Defendants Ongoing Offers and Sales of Unregistered Securities...............................19

        C.    Defendants' Ongoing Violations of the Anti-Fraud Provisions ...................................21

        D.    Defendants' Conduct is Ongoing .................................................................................25

    III. THE COURT SHOULD FREEZE DEFENDANTS' ASSETS........................................26

    IV. OTHER ANCILLARY RELIEF IS NECESSARY .........................................................27

        A.    An Order to Deposit Assets with the Registry of the Court Is Necessary...................28

        B.    Defendants Should Be Ordered to Provide an Accounting ..........................................28

        C.    Expedited Discovery and an Order Mandating  Preservation of Documents Is
             Appropriate..................................................................................................................29

CONCLUSION .......................................................................................................................30

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980)...........................................................................................21

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988). .........................................................................23

*Bersch v. Drexel Firestone*, 519 F.2d 974 (2d Cir. 1975) ......................................................16

*In re Application to Enforce Admin. of Subpoenas of SEC v. Knowles*,
   87 F3d 413 (10 Cir. 1996) ....................................................................................................16

*In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012), *aff'd*, No. 12–
   3859, 2013 WL 1982534 (2d Cir. May 15, 2013) ................................................................22

*In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449 (S.D.N.Y. 2005) ..........................................17

*Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011)........................22

*Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972) .............16

*Pennaluna & Co. v. SEC*, 410 F.2d 861 (9th Cir. 1969) .........................................................20

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ...........................................................19

*SEC v. Braverman*, No. 14 Civ. 7482 (S.D.N.Y. Sept. 17, 2014) ...........................................28

*SEC v. Carillo*, 115 F.3d 1540 (11 Cir. 1997)........................................................................16

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y.), aff'd, 155 F.3d 129 (2d Cir. 1998)............20, 25

*SEC v. Chinese Consol. Benevolent Ass'n.*, 120 F.2d 738 (2d Cir. 1941) ................................20

*SEC v. Commonwealth Chem. Secs. Inc.*, 574 F.2d 90 (2d Cir. 1978)......................................25

*SEC v. Compania Internacional Financiera S.A.*,
   2011 WL 3251813 (S.D.N.Y. July 29, 2011)........................................................................28

*SEC v. Culpepper*, 270 F.2d 241 (2d Cir. 1959) ....................................................................20

*SEC v. Edwards*, 540 U.S. 389 (2004) ...................................................................................18

*SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402 (S.D.N.Y. 2001)......................................27

*SEC v. Hedén*, 51 F. Supp. 2d 296 (S.D.N.Y. 1999)..............................................................26

*SEC v. Illarramendi*, 2011 WL 2457734 (D. Conn. 2011) ....................................................28

*SEC v. International Chem. Dev. Corp.* 469 F.2d 20 (10 Cir. 1972) .......................................20

*SEC v. International Swiss Inv. Corp.*, 895 F.2d 1272 (9th Cir. 1990).....................................29

*SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011).............................................................23

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) ................................24, 28

*SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998) .......................................................................21

Page

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975)....................................17, 25

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980)................................................................20

*SEC v. Musella*, 578 F. Supp. 425 (S.D.N.Y. 1984)........................................................25

*SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279 (2d Cir. 2013) ..............................21

*SEC v. Recoin*, No. 17 Civ. 5725 (E.D.N.Y. Sept. 29, 2017)........................................29

*SEC v. Softpoint, Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997)............................................20

*SEC v. Spongetech Delivery Sys., Inc.*, 2011 WL 887940 (E.D.N.Y. Mar. 14, 2011)................29, 30

*SEC v. Stanard*, No. 06 Civ. 7736 (GEL) (S.D.N.Y. May 16, 2007)............................17

*SEC v. Suter*, 732 F.2d 1294 (7th Cir. 1984)..................................................................25

*SEC v. Tecumseh Holding Corp.*, No. 03 Civ. 5490 (SAS),
    2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009)..............................................................20

*SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2d Cir. 1990)......................................17, 26

*SEC v. W.J. Howey*, 328 U.S. 293 (1946) ....................................................................18

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011) ............................................................17, 26

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*,
    647 F.2d 300 (2d Cir. 1981) ......................................................................................16

*Tcherepnin v. Knight*, 389 U.S. 332 (1967)..................................................................19

*SEC v. Unifund SAL*, 901 F.2d 1028 (2d Cir. 1990).......................................................26

*United Housing Found, Inc. v. Forman*, 421 U.S. 837 (1975).......................................19

**Statutes**

15 U.S.C. § 77e(a) ........................................................................................................19

15 U.S.C. § 77e(c) ........................................................................................................19

15 U.S.C. § 77v(c)........................................................................................................16

15 U.S.C. § 78aa......................................................................................................16, 28

15 U.S.C. § 78u(d)(5)...................................................................................................27

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this memorandum of law in support of its *ex parte* emergency application, by proposed order to show cause, against defendants PlexCorps (a/k/a and d/b/a PlexCoin and SidePay.Ca) ("PlexCorps"), Dominic Lacroix ("Lacroix") and Sabrina Paradis-Royer ("Paradis-Royer") (collectively, "Defendants"). The Commission seeks both a temporary restraining order pending a preliminary injunction and then a preliminary injunction (1) enjoining further violations of the securities laws; (2) freezing Defendants' assets, (3) requiring Defendants to repatriate assets now outside the United States obtained as a result of their fraudulent acts; and (4) preventing Defendants from destroying or altering documents. The Commission also seeks expedited discovery and an order requiring an accounting from Defendants.

## PRELIMINARY STATEMENT

The Commission seeks emergency relief to stop Lacroix's and PlexCorps' ongoing offer and sale of unregistered securities called "PlexCoin Tokens" and to stop Defendants' fraudulent acts and further misappropriation of over $15 million in victim funds obtained in the offering.

Since at least June of 2017, Lacroix has been orchestrating the fraudulent offering as sales of PlexCoin Tokens in a so-called "Initial Coin Offering" ("ICO") (the "PlexCoin ICO"). To induce investors, Lacroix has been disseminating false and misleading statements with respect to the PlexCoin Tokens, including that teams of professionals have been employed around the globe to ensure that the investments perform and that investors profit; that the identity of PlexCorps' executives are being held secret for privacy and competitive reasons; that proceeds from the PlexCoin ICO will be used to develop other PlexCorps products (which will then purportedly increase the value of the PlexCoin Token and generate revenue for investors); and that investors can expect outlandish returns ranging from 200% to over 1,300% in short periods.

These statements are all false. There are no teams of professionals managing the investments, both because Lacroix is behind the entire scheme with the aid of no more than a handful of cohorts, and because the investments are a scam the proceeds of which Defendants are misappropriating. Accordingly, it was also not true that PlexCoin ICO proceeds would be used to develop PlexCorps products or that investors could expect returns based on that enterprise.

Moreover, the real reason Lacroix and Paradis-Royer have orchestrated their scheme through various deceptive and fraudulent means to keep Lacroix's involvement with PlexCorps hidden is simply because Lacroix is a serial securities law violator in Canada, and the subject of several civil injunctions and penal proceedings in Quebec, including injunctions and a contempt order arising out of the PlexCoin ICO itself. But what Defendants have done in the face of these injunctions is to continue their unlawful behavior undeterred, defrauding United States investors while, at the same time, literally "giving the finger" to Canadian regulators.

Inducing investors with their lies, disseminated widely on the Internet in postings accessible to United States investors, Lacroix and PlexCorps appear to have raised at least approximately $15,000,000 from tens of thousands of investors, many of whom reside in the United States and in this District. Lacroix already has misappropriated or attempted to misappropriate approximately $200,000 of those amounts, including spending on costly home renovation projects for a second home, and Paradis-Royer has transferred another $900,000 of those proceeds from accounts at a U.S.-based online payment services provider to accounts in Canada. Moreover, a U.S.-based payment processor has another $800,000 of illegal proceeds to which Defendants will soon gain access.

The Commission's Complaint alleges that, based on the foregoing, Defendants violated the antifraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities

2

Exchange Act of 1934 ("Exchange Act"), and that Lacroix and PlexCorps violated the registration provisions of the Securities Act. The material submitted in support of the Commission's application provides ample evidence, not only of Defendants' wrongdoing as alleged in the Complaint, but also of the need for a temporary and preliminary injunction against further violations of these provisions, to protect investors from any additional harm arising out of Defendants' ongoing conduct. And, to preserve the *status quo* and ensure that Defendants do not further dissipate the assets necessary to pay the likely monetary judgment the Commission will obtain, the Commission seeks an order freezing Defendants' assets, ordering that Defendants deposit with the registry of the Court assets obtained from their fraud, preventing Defendants from further destroying documents, and requiring an accounting of the amounts Defendants have obtained through their fraudulent schemes.

## STATEMENT OF FACTS

### I.   BACKGROUND

An initial coin offering or "ICO" is a fundraising event in which an entity offers participants a unique "coin" or "token" in exchange for consideration (often in the form of "cryptocurrency"—most commonly Bitcoin and Ether—or fiat currency). *See* Decl. of David H. Tutor dated December 1, 2017 ("Tutor Decl.") at ¶ 4. The tokens are issued on a "blockchain" or cryptographically secured ledger. *Id.* at ¶ 5.[1]

---

[1]      A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called blocks. Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain. The system relies on cryptographic techniques for secure recording of transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. The Bitcoin blockchain is an example of a "non-permissioned," or public and open access blockchain. Anyone can download the Bitcoin open-source software and join. All participants share a single view of the Bitcoin blockchain, which is updated when Bitcoin network

The token may entitle its holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights. These tokens may also be listed on online platforms, often called cryptocurrency exchanges, and tradable for crypto or fiat currencies. *Id.* at ¶¶ 6. 8. ICOs are typically announced and promoted through online channels, including a "whitepaper" describing the project and the terms of the ICO. To participate, investors are generally required to transfer funds (often cryptocurrency) to the issuer's address, online wallet, or other account. After the completion of the ICO, the issuer will distribute its unique "tokens" to the participants' unique address on the blockchain. *Id.* at ¶ 7. In some cases, the issuer may continue to sell the ICO tokens, or they may be available only on the secondary market. *Id.* at ¶ 8.

## II.  DEFENDANTS DEFRAUD INVESTORS IN THE PLEXCOIN ICO

### A.  Lacroix and PlexCorps Tout the PlexCoin ICO Pre-Launch

As early as June 2017, Lacroix began marketing PlexCoin Tokens when he announced the PlexCoin ICO "pre-sale" to begin on August 7, 2017, and to run for 29 days. *Id.* at ¶¶ 18, 26. Lacroix posted these statements, and those described below, on several online fora accessible via the Internet to potential investors in the United States. *Id.* at ¶¶ 18-22, 35, 38, 85. These included at least two Facebook pages that he registered and paid for, and for which he was the administrator, one for PlexCorps (the "PlexCorps Facebook Page") and one for PlexCoin (the "PlexCoin Facebook Page"), as well as on websites such as http://www.plexcorps.com (the

---

participants reach a consensus on the validity of transactions under review. "Permissioned" or private blockchains are modifications to that model and require permissioned servers to be approved to participate on the network or to access particular information on the blockchain. Blockchains or distributed ledgers can also record what are called smart contracts, which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met. *Id.* at ¶ 5 n.2.

"PlexCorps Website"), http://www.plexcoin.com (the "PlexCoin Website"), and later,

http://www.plexcoin.tech, that he also registered and paid for. *Id.* at ¶¶ 18-22.

Starting around August 4, 2017, Lacroix and PlexCorps posted on the Internet a

whitepaper describing the terms of the PlexCoin ICO (the "PlexCoin Whitepaper"), which was

available to potential investors in the United States. *Id.* at ¶¶ 35, 38. The PlexCoin Whitepaper

contained PlexCoin's logo on the front page, PlexCoin's and PlexCorps' logos in the interim

pages, and linked to PlexCoin's and PlexCorps' Websites and Facebook Pages. *Id.* at ¶ 39.

Among other things, the PlexCoin Whitepaper, like the PlexCoin and/or PlexCorps'

Websites and Facebook Pages, explained that the PlexCoin ICO or "pre-sale" would run from

August 7 through September 5, 2017, and that investors could "preregister" for the sale by

entering their email address on the PlexCoin Website. *Id.* at ¶ 41. These materials also noted

that investors would be able to purchase PlexCoin Tokens with U.S. Dollars, Canadian Dollars,

Euros, Bitcoin, Ether, or Litecoin. *Id.* at ¶¶ 33, 41. The materials also explained that PlexCoin

Tokens would be sold at increasing prices, $0.13 for the first 50 million, $0.28 for the following

50 million, $0.53 for the next 100 million, and $0.88 for the last 200 million PlexCoin Tokens,

which would then supposedly trade at $1.76. *Id.* at ¶¶ 31-32.

These materials contained additional statements that would lead a reasonable reader to

believe that purchasing a PlexCoin Token would potentially derive the investor profit based on

the efforts of others. For example, the materials:

- touted that investors in the PlexCoin ICO could expect certain returns on investment
  ("ROI"), "after 29 days or less" of 1,354%, 629%, 332%, or 200% depending on when
  the investor purchased PlexCoin Tokens, *id.* at ¶¶ 29, 31, 42;

- explained that the foregoing "numbers might seem enormous, but they are real," and
  further encouraged investors to view a purchase of PlexCoin Tokens as a profit-making
  opportunity by noting "ROI examples from previous ICOs," including supposed returns
  of 88,736.89%, *id.* at ¶ 42;

- stated that the author "estimate[d] an approximate unitary value of US$8.50 before the end of the year 2017, and a value of US$ 14.00" by the end of 2018," *id.*;

- touted the supposed experience, expertise, and size of the "team" that was behind PlexCorps, including by, for example, describing PlexCorps as a team of anywhere between forty (40) and fifty-three (53) people, "men and women from all over the world who have a common goal, improving global financial services," mentioning "[e]xperts of their own field bring[ing] their contribution to our ambitious project," including "former managers of the finance world; prosperous company founders; specialists in private funds management; lawyers, notaries, accountants, and renowned tax experts; a business development manager; a risk management supervisor; a regulations manger; a marketing manager," and others, explaining that the PlexCorps team "gathers all types of specialists necessary for the accomplishment of its mission," and talking about "specialists distribution under six categories" and touting the "solid experience" of "team members," *id.* at ¶¶ 20, 34, 43, 45;

- referred to the PlexCoin ICO as a means of "crowdfunding" to raise $249,500,000 and noted that a portion of the funds raised in the PlexCoin ICO "will be used to develop and design PlexCorps' products," *id.* at ¶ 46;

- explained the supposed uses to which the funds raised during the PlexCoin ICO would be put, noting "[t]he funds earned from the PlexCoin pre-sale will be used according to [a] chart" reproduced below, *id.* at ¶ 47;



- explained that the 70% devoted to market maintenance meant that a "team will remain on the lookout for PlexCoin's value fluctuations when it will be launched" and "will limit the value decreases by buying if the value drops," such that they "will thus guarantee a rather steady increase of PlexCoin's value," *id.* at ¶ 48;

6

- explained that the profits of the PlexCorps enterprise would be distributed to investors by noting, for example, that (a) "PlexCoin will profit from the PlexCoin sale" and promised that after collecting fees "[t]he company will then offer this profit to its members after the pre-sale;" and (b) that PlexCorps would make money from the transaction fees charged during the use of the PlexCard, and that this "2% revenue per transaction ensure great profitabilility [sic]" such that PlexCorps "will be able to guarantee a profit margin during the pre-sale to our founding members," *id.* at ¶ 49;

- contained financial forecasts for the enterprise, ranging from "conservative" estimates of north of $77 million USD in profits for the fifth year of the enterprise, to nearly $6 billion USD in profit for that year under the "optimistic" view, *id.* at ¶ 50;

- promised investors that PlexCoin would be available for purchase and sale on "exchange platforms" starting on September 10, 2017, *id.* at ¶ 51.

In addition to leading a reasonable reader to expect profits and returns from their investment, through the efforts of PlexCorps' supposed team of experts, some of the foregoing statements were false and/or materially misleading. For example, statements about the use of proceeds were false because the proceeds were destined to line Defendants' pockets and would not be devoted to any meaningful product development. *Id.* at ¶¶ 47-48, 80-82.

The PlexCoin Whitepaper, and other materials disseminated by Lacroix and PlexCorps on the Internet made other materially false statements, such as insisting that PlexCorps' "offices are currently based at the heart of Singapore" with a team "located all over the world." *Id.* at ¶¶ 20, 34, 43, 45. PlexCorps had no Singapore offices and no team located anywhere in the world other than in Quebec, as orchestrated by Lacroix. *Id.* at ¶ 45.

And the statements that the identity of PlexCorps' "executives" would "remain discreet until all of our projects are launched" to protect "our projects' security" and to avoid competitors contacting the team and "check[ing] on [its] operations," *id.* at ¶¶ 9-14, 56-60, were similarly false and misleading. Indeed, Lacroix and PlexCorps purposefully omitted mentioning his involvement and took several steps to obscure his ties to the PlexCoin ICO, but that was because of Lacroix's status as a serial securities law violator in Quebec. *Id.* at ¶¶ 56-60, 85.

**B.      Defendants Fraudulently Seek to Conceal the Involvement of Lacroix, a Recidivist Securities Law Violator in Canada**

The real reason Lacroix and his cohorts took extraordinary steps to hide his involvement with the PlexCoin ICO was because Lacroix was a known securities law fraudster in Quebec. Lacroix has been the subject of several Canadian court proceedings and filings involving the fraudulent raising of investor funds since at least 2011, including a series of orders from 2011 through 2017 issued by a division of the Quebec Financial Markets Administrative Tribunal (the "Quebec Tribunal") enjoining Lacroix from offering unregistered investments in and making false statements in connection with an enterprise he owned purportedly in the loan business. Lacroix even pled guilty before a Quebec court in connection with those charges and was ordered to pay over $25,000 in criminal fines. And, despite undertaking in 2011 to cease these activities, the Quebec Tribunal issued an additional injunction against him just this past June of 2017 for the same conduct, involving raising over $2 million from over thirty investors, including with false statements. *Id.* at ¶¶ 9-14.

With such an extensive regulatory history, it is no wonder that Lacroix instructed his cohorts in text messages or Skype conversations to not "forget when [they] talk about plex, it's not me that did that!" and to say they "just saw it somewhere else," *id.* at ¶ 59, or that he complained about payment-receipt methods for the PlexCoin ICO that were "not confidential enough and . . . too easy to trace," in particular by the Quebec securities regulator known as the QAMF (for its initials in French meaning Financial Markets Authority), *id.* at ¶ 60.

It is also for those reasons that Lacroix went so far as to falsely deny a posting made by a savvy and resourceful reader in a public cryptocurrency discussion forum in French. The reader had traced to Lacroix and his business the IP address from which a user called "PlexCoin" was making postings ("Defendants' IP Address"), and exposed this fact as well as Lacroix's

8

checkered past. *Id.* at ¶¶ 56-58. In response, Lacroix demurred by saying that his companies had only been hired to do francophone social media for PlexCoin and that the post was otherwise "completely false," and then had his lawyers send a demand letter to the online forum demanding removal of the revelatory posting. *Id.* at ¶¶ 57-58.

But, as it turned out, Lacroix's regulatory troubles before he began marketing PlexCoin were just the beginning. Starting in July of 2017, the Quebec Tribunal, at the behest of the QAMF, issued new orders, these enjoining Lacroix from offering or selling the PlexCoin Tokens (which the Quebec Tribunal concluded were securities). *Id.* at ¶ 15. The string of orders included a ruling by the Superior Court of Quebec holding Lacroix and PlexCorps in contempt, and a September 2017 order adding Paradis-Royer into the injunction, and freezing her accounts at Royal Bank of Canada. *Id.* at ¶¶ 15, 16.

This latest string of orders did not deter Lacroix (or Paradis-Royer) any more than the series of orders against him had in the first place. Instead, they emboldened him. In Skype conversation with a cohort in late July, Lacroix is seen considering various options to set up payment processing services on the PlexCoin Website such that the services would not become suspicious of his activities and that the funds could later be transferred in ways that could not be connected to him. *Id.* at ¶¶ 67, 85. In these conversations, Lacroix and his associates also discuss "wip[ing] all [their] servers" to "remove[] every trace" and to "stop using skype" in case someone "come[s] in and cuff[s]" them. *Id.* at ¶ 85.

Because some payment services processors like PayPal had given Lacroix trouble when he began receiving thousands of small payments from investors, *id.* at ¶ 67, Lacroix sought other alternatives and lied to representatives of other payment processors by telling them, for example, that he owned a gaming company and that many users would be depositing funds into the game.

*Id.*. And, in August, Lacroix registered for the http://www.plexcoin.tech website to be set up to process online payments. *Id.* at ¶ 69.

Paradis-Royer did her part to help Lacroix conceal his identity and to conceal both of their involvement with the fraudulent PlexCoin ICO. On August 2, 2017, when Canadian authorities knocked on Lacroix and Paradis-Royer's residence to execute a search warrant, Paradis-Royer frantically texted Lacroix to inform him that the police were at the residence and that the "white paper is on the table" so she was "not answering." *Id.* at ¶ 61. During that search, authorities found materials used to create the website www.plexcoin.com as well as the PlexCoin Whitepaper. *Id.* at ¶ 62.

Paradis-Royer was also instrumental in setting up the various payments accounts through which Defendants would obtain a portion of the illegal proceeds from the fraud. For example, Paradis-Royer registered a digital payments account with the online payments processor known as "Shopify" under her name or purporting to use those accounts for a fictional business called "Sidepay.ca," which was really Defendants' alter ego. *Id.* at ¶ 70-72. Paradis-Royer also registered at least two other digital payment accounts with the processor known as "Stripe," using her name and/or email addresses and connecting those accounts to bank accounts she had at the Royal Bank of Canada in Quebec, one of them expressly for the purpose of collecting proceeds from this fraud. *Id.* at ¶ 73-77.

## C. Lacroix and PlexCorps Launch PlexCoin ICO In Defiance of Court Orders

Starting on August 7, 2017, Lacroix and PlexCorps began selling PlexCoin Tokens to investors, including some in the United States. Investors were permitted to purchase PlexCoin Tokens including by tendering cryptocurrency to Defendants' addresses on a blockchain, by providing credit card information through payment portals available on the PlexCoin Website, or

by U.S.-based online payment processors such as PayPal, Square, or Stripe, and were permitted to tender, inter alia, U.S. dollars to make their investments. *Id.* at ¶¶ 33, 41, 63, 71.

The PlexCoin ICO lasted through October 1, 2017, *id.* at ¶ 63, but it appears that Lacroix and PlexCorps have continued to distribute PlexCoin Tokens from the Ethereum blockchain on which they are located up to this day. *Id.* at ¶¶ 98, 100. From at least August 2017 to the present, Defendants appear to have obtained approximately at least $15 million in the sale of PlexCoin Tokens. *Id.* at ¶ 99.

First, on a PayPal account registered to Lacroix's name (and containing "PlexCoin" as the "business" of the account and https://www.plexcoin.tech as the URL), Lacroix received over $380,000 USD from August 8, 2017 through September 4, 2017. Many of these payments mention "PlexCoin – Paypal" as the subject of the payments. *Id.* at ¶ 66.

Second, after PayPal flagged the account for suspicious activity and reversed most of the payments to the investors, Defendants registered an account at another payment services provider, Shopify, in the name of Defendant Paradis-Royer, using Lacroix's personal email ("Lacroix's Email Address"), but using a fake business name, "SidePay.Ca." *Id.* at ¶¶ 68-72. Defendants associated their PlexCoin Shopify account with two accounts held at Royal Bank of Canada ("RBC") belonging to Defendant Paradis-Royer. The first, which had been opened in May of 2017, was associated with Defendants' Shopify account on September 1, 2017 (the "First RBC Account"). *Id.* at ¶¶ 73-75. Paradis-Royer opened another account at RBC on September 14, 2017, and associated it to the Shopify account (the "Second RBC Account"). *Id.* at ¶ 77. In various transactions beginning on September 19, 2017 and going through September 25, 2017, Defendants' Second RBC Account received over $1.68 million USD from the Shopify accounts that had collected the funds received through the Sidepay.ca portal. *Id.* at ¶ 78.

Third, Defendants have also been obtaining PlexCoin ICO investor funds through another online payment services provider called Stripe, which is another United States based entity (the "Stripe Accounts"). *Id.* at ¶ 83. Together, the Stripe Accounts currently hold over $800,000 in USD as proceeds of the fraudulent distribution of unregistered securities detailed in this Complaint. *Id.* at ¶ 96.

On July 29, 2017, Defendants and their cohorts registered a Euro-denominated account in the name of the PlexCoin Website to collect proceeds from the PlexCoin ICO (the "Stripe Euro Account"). *Id.* at ¶ 84. The Stripe Euro Account lists "PlexCoin" as its business, and contains an associated false bank account supposedly in the name of one of Defendants' associates in France. *Id.* As of December 1, 2017, the Stripe Euro Account holds approximately €262,000 (or the equivalent of approximately $311,000 in USD) (the "Stripe Euro Account"), obtained from approximately 890 different transactions. *Id.* at ¶ 86. At least 115 of these transactions occurred with individuals in the United States, of which some were registered to addresses within this District. *Id.*. Logins to the Stripe Euro Account have occurred with an email that has a plexcoin.com domain and at least some such logins have been from Defendants' IP Address. *Id.* at ¶ 87. Due to Stripe's internal policies, transfers out of the Stripe Euro Account were placed on a 90-day administrative hold as of September 5, 2017. The hold is set to expire on December 4, 2017. *Id.* at ¶ 88.

On August 31, 2017, Defendants registered an additional account with Stripe in the name of Defendant Paradis-Royer, using Lacroix's Email Address, associating it to Paradis-Royer's Second RBC Account, and listing the associated business as "SidePay" (the "Stripe USD Account"). *Id.* at ¶ 89. From approximately September 8, 2017, through September 19, 2017, Defendants received over $1 million in USD in payments in the Stripe USD Account, covering

nearly 5,400 different transactions. *Id.* at ¶ 90. At least 1,400 of these transactions occurred with individuals whose addresses were in the United States, at least two dozen of which reside in this District. Between September 18 and 20, 2017, Defendants transferred approximately $900,000 to the Second RBC Account from the Stripe USD Account (included in the $1.6 million or so transfers from "Shopify" into the RBC accounts, discussed previously), but approximately $211,492.38 in USD remains in that account. *Id.* at ¶ 91.

On September 6, 2017, Defendants registered a third account with Stripe, again in the name of Defendant Paradis-Royer, to collect the proceeds from the PlexCoin ICO, this one denominated in CAD. *Id.* at ¶ 93. The Stripe CAD Account is associated to Defendant Paradis-Royer's First RBC Account, and engaged in 218 transactions totaling over $322,000 USD. *Id.* at ¶ 94. Log-ins to the Stripe CAD Account were by a user with an email belonging to Paradis-Royer and from Defendants' IP Addresses. *Id.* The Stripe CAD Account currently holds over $372,000 in CAD (the USD equivalent of approximately $290,000), but is also temporarily suspended by Stripe until December 10, 2017. *Id.* at ¶ 95.

Fourth, Defendants have also obtained substantial amounts in cryptocurrency like Bitcoin in exchange for the fraudulent PlexCoin Tokens. On approximately September 28, 2017, Defendants' own website, http://www.plexcoin.tech, stated that PlexCorps had distributed over 68 million PlexCoin Tokens. *Id.* at ¶ 97. Assuming Defendants sold the first 50 million PlexCoin Tokens at the stated offering price of $0.13 USD and the subsequent 18 million at the stated offering price of $0.28, this represents over $11.54 million USD collected. *Id.*. The Ethereum blockchain indicates that even more PlexCoin Tokens have been distributed since that date. Two Ethereum blockchain addresses received 400 million and 550 million PlexCoin Tokens on or about August 13, 2017. *Id.* at ¶ 98. The first address distributed over 71.4 million

PlexCoin Tokens from August 22 through the present, in over 36,000 transactions. *Id.* The

second address distributed over 10 million PlexCoin Tokens from November 3 through today in

over 32,000 transactions. *Id.* Assuming all of the distributions of PlexCoin Tokens from these

addresses were sold to investors as per the discount scheme stated in the PlexCoin ICO

marketing materials, these sales would have generated proceeds of more than $15 million (50

million PlexCoin Tokens sold at $0.13 generate $6.5 million, and 31 million PlexCoin Tokens

sold at $0.28 generate $8.68 million). *Id.* at ¶ 99.

## III.   DEFENDANTS MISAPPROPRIATE PLEXCOIN INVESTORS' FUNDS

Defendants have already begun to misappropriate for their own use some of the assets

they obtained from PlexCoin Token investors. For example, in various transactions beginning

on September 19, 2017 and continuing through September 25, 2017, Paradis-Royer's Second

RBC Account received over $1.68 million USD from the Shopify accounts that had collected the

funds received through the Sidepay.ca portal. *Id.* at ¶ 78. On September 19, 2017, Paradis-

Royer transferred $300,000 in CAD, the equivalent of approximately $246,000 USD, from those

funds to the First RBC Account. *Id.* at ¶ 79. Paradis-Royer then made or attempted to make

immediate use of these funds, on September 20, 2017, for example, Defendants transferred

$30,000 CAD from the First RBC Account to pay a personal line of credit that they had set up

and used for home improvements on a second home. *Id.* at ¶ 80.

As mentioned previously, the QAMF obtained an order freezing Paradis-Royer's bank

accounts on September 21, 2017, which caused RBC to refuse to cash other checks that Paradis-

Royer had written and remitted around that date. These checks included payments for $75,000

CAD in ceramic work and approximately $52,000 CAD in aluminum work, as well as thousands

in supposed "expense" reimbursements for one of Lacroix's companies. *Id.* at ¶¶ 81-82. Had the

QAMF not intervened, Paradis-Royer likely would have succeeded in converting hundreds of thousands in victims funds for her and Lacroix's own personal use.

## IV. DEFENDANTS' ONGOING FRAUDULENT AND DECEPTIVE ACTS

Despite repeated Canadian court orders that they cease engaging in the very conduct alleged in these proceedings, Defendants continue to defraud investors in the PlexCoin Token. Moreover, as of December 1, 2017, the Ethereum blockchain (where PlexCoins are issued) indicates daily disbursements of PlexCoin Tokens from the two main addresses that received those Tokens during the PlexCoin ICO, both of which still contain a substantial amount of PlexCoin Tokens. *Id.* at ¶¶ 100-101.

Lacroix and PlexCorps also continue to make statements promoting and soliciting investments in PlexCoin Tokens. For example, on October 10, 2017, Lacroix launched an online forum posting "PlexCorps live updates," and on which Lacroix or his cohorts have been posting updated news about PlexCorps and the PlexCoin Token through at least November of 2017. *Id.* at ¶ 104. New PlexCoin-related Facebook pages continue to appear on the Internet. For example, on the Facebook page @PlexCoinINFORMATION one may still read posts about supposed PlexCorps projects and the tradability of PlexCoin Tokens on digital asset exchanges. *Id.* at ¶ 105. And, starting at least as early as November 16, 2017, a new Facebook page identified as @PlexCoinWorldTeam and purporting to be located in Paris, France, mentioned PlexCorps and that PlexCoin would be "listed on as many public platforms as possible." That page purports to sell t-shirts which depict an individual making an offensive gesture at the QAMF, *id.* at ¶ 106; *see also id.* at ¶ 110.

As of December 1, 2017, both the PlexCoin and the PlexCorps Websites are live and accessible to Internet users in the United States and in this District.

15

## ARGUMENT

## I. DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION IN THE UNITED STATES

It is well-settled that when, as here, the "personal jurisdiction of a federal court is invoked based upon a federal statute providing for nationwide or worldwide service, the relevant inquiry is whether the respondent has had sufficient minimum contacts with the United States." *In re Application to Enforce Admin. of Subpoenas of SEC v. Knowles*, 87 F3d 413, 417 (10th Cir. 1996); *cf. Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 314 (2d Cir. 1981) (construing the Federal Sovereign Immunities Act). Here, Section 22(c) of the Securities Act, 15 U.S.C. § 77v(c), and Section 27(b) of the Exchange Act, 15 U.S.C. § 78aa(b), provide for nationwide service of process. Accordingly, the provisions provide for personal jurisdiction bounded only by the minimum contacts test under the Due Process Clause of the Fifth Amendment and have been construed to include foreign nationals who have minimum contacts with the United States. *See, e.g., SEC v. Carillo*, 115 F.3d 1540 (11th Cir. 1997); *Bersch v. Drexel Firestone*, 519 F.2d 974 (2d Cir. 1975); *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir. 1972).

In this case, Lacroix and PlexCorps conducted their scheme by posting statements on the Internet, including on social media cites such as Facebook, about the PlexCoin ICO and the PlexCoin Tokens, including statements about the potential value of PlexCoin Tokens denominated in U.S. Dollars. Not only were these posts not restricted to United States investors or the U.S. markets, Defendants obtained funds from hundreds of investors in the United States. Defendants also received some of the illicit proceeds of their frauds in U.S. Dollar-denominated transfers, and employed multiple U.S.-based vendors in their scheme, including Facebook, PayPal, and Stripe, which the Court may take judicial notice are headquartered in the United

States. Because Defendants actions "caused effects in the United States [and] those effects were direct and foreseeable results of those actions," and given that Defendants exhibited "good reason to know that [their] conduct would have effects here," the Court may exercise personal jurisdiction. *See In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 455 (S.D.N.Y. 2005). As then-District Judge Lynch explained from the bench in *SEC v. Stanard*, "[w]here an executive of a foreign securities issuer, wherever located, participates in a fraud directed to deceived United States shareholders in violation of federal regulations requiring disclosure of accurate information to holders of securities traded in the United States, such direct consequences have occurred. SEC regulations would be meaningless as applied to foreign issuers of U.S.-traded securities if the United States courts lacked jurisdiction over executives abroad who violate those regulations." No. 06 Civ. 7736 (GEL) (S.D.N.Y. May 16, 2007) (Attached hereto as Exhibit A). Accordingly, this Court may exercise personal jurisdiction over Defendants.

## II.  DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975). The Commission need not show irreparable harm, a balance of equities in its favor, or that remedies at law are unavailable. *Id.*; *see also Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011); *SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2d Cir. 1990). Instead, the Commission is entitled to the entry of temporary and preliminary injunctive relief against future securities laws violations upon a "substantial showing of likelihood of success as to both a current violation and the risk of repetition." *Smith*, 653 F.3d at 127-28 (quoting *SEC v. Cavanaugh*, 155 F.3d 129, 132 (2d Cir. 1998)).

Here, the Commission makes a "substantial showing" that Defendants have violated and are still violating the antifraud provisions, and Lacroix and PlexCoin have violated and are still violating the registration provisions, of the Securities Act and the Exchange Act and rules thereunder. Given the ongoing and egregious nature of these violations, a temporary restraining order is warranted to protect investors from further harm and to preserve the *status quo* pending a preliminary injunction hearing.

### A. The Interests Offered and Sold in the PlexCoin ICO are Securities

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include "stock" and "investment contract[s]." As a threshold matter, the interests offered and sold in this particular case in PlexCoin Tokens—whether termed "cryptocurrencies," "tokens," "coins," "memberships" or whatever else—were "securities" under the seminal test to determine what an investment contract is, as set forth in *SEC v. W.J. Howey*, 328 U.S. 293 (1946). The *Howey* test looks to whether there was an investment of money in a common enterprise, with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *Id.* at 301; *see also SEC v. Edwards*, 540 U.S. 389, 393 (2004). This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.

Here, all three factors are met. First, Lacroix and PlexCoin solicited and received payments through the PlexCorps and PlexCoin Websites. Second, Lacroix and PlexCorps told potential investors that PlexCorps would be investing proceeds from the PlexCoin ICO into the costs of running and developing the PlexCorps business and that such efforts would net returns to investors both directly as profit distributions and indirectly as the PlexCoin Token value appreciated. Moreover, Lacroix and PlexCorps touted the supposed expertise of a cadre of

employees supposedly stationed around the world that would make the PlexCorps business a success. Finally, Lacroix and PlexCorps touted the potential returns to investors in the PlexCoin Tokens by citing returns of purchasers of other digital assets. Accordingly, a reasonably investor purchasing the PlexCoin Tokens would have a reasonable expectation of profit from his purchases.

Third, the PlexCoin Tokens purportedly involved the entrepreneurial and managerial efforts of others. In the Second Circuit, a common enterprise can be established by showing horizontal commonality, or "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994). Here, the investor assets at issue were supposedly to be pooled and investors were even promised a distribution of dividends or profits. Moreover, investors were promised that the team of experts would expend efforts in developing products and in propping up the value of the PlexCoin Token itself.

And even though Defendants have sought to recast the interest they sold as "cryptocurrency," the economic substance of these transactions makes clear that this label makes no difference. In analyzing whether something is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on economic realities underlying a transaction, and not on the name appended thereto." *United Housing Found, Inc. v. Forman*, 421 U.S. 837, 849 (1975).

**B.      Defendants Ongoing Offers and Sales of Unregistered Securities**

Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), prohibit any person from selling a security through interstate commerce "[u]nless a registration statement is in effect as to [such] security," or from offering to sell or offering to buy a security "unless a registration statement has been filed as to such security." To establish a prima facie case for a

Section 5 violation, the Commission must prove: "first, that no registration statement was in effect as to the securities; second, that the defendant sold or offered to sell these securities; third, that there was a use of interstate transportation, or communication, or of the mails in connection with the sale or offer of sale." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y.), *aff'd*, 155 F.3d 129 (2d Cir. 1998). Further, "[l]iability does not require that the defendant actually passed title of the security. Any person who 'engaged in steps necessary to the distribution' of the unregistered security is liable under Section 5." *SEC v. Tecumseh Holding Corp.*, No. 03 Civ. 5490 (SAS), 2009 WL 4975263, at *3 (S.D.N.Y. Dec. 22, 2009) (quoting *SEC v. Chinese Consol. Benev. Ass'n*, 120 F.2d 738, 741 (2d Cir.1941)).

Here, there was no registration statement in effect as to the interests sold, and interstate communication (the Internet) was used in connection with the offer or sale of the securities. And Defendants offered and sold securities (here, investment contracts) to potential and actual investors both because Lacroix was behind the entire PlexCoin ICO scheme and because PlexCorps was supposedly the enterprise towards which the PlexCoin ICO proceeds would be directed. *See, e.g., SEC v. Murphy*, 626 F.2d 633, at 650-51 (9th Cir. 1980) ("[T]hose who ha[ve] a necessary role in the transaction are held liable as participants.") (citing *SEC v. North Am. Research & Dev. Corp.*, 424 F.2d 63, 81 (2d Cir. 1970); *SEC v. Culpepper*, 270 F.2d 241, 247 (2d Cir. 1959); *SEC v. International Chem. Dev. Corp.*, 469 F.2d 20, 28 (10th Cir. 1972); *Pennaluna & Co. v. SEC*, 410 F.2d 861, 864 n.1, 868 (9th Cir. 1969)); *SEC v. Softpoint, Inc.*, 958 F. Supp 846, 859-60 (S.D.N.Y. 1997) ("The prohibitions of Section 5... sweep[] broadly to encompass 'any person' who participates in the offer or sale of an unregistered, non-exempt security."); *SEC v. Chinese Consol. Benevolent Ass'n.*, 120 F.2d 738, 740-41 (2d Cir. 1941) (defendant violated Section 5(a) "because it engaged in selling unregistered securities" issued by

a third party "when it solicited offers to buy the securities 'for value'"). The Commission has

met its prima facie case to show Lacroix and PlexCorps each violated Section 5.

## C. Defendants' Ongoing Violations of the Anti-Fraud Provisions

Section 17(a) of the Securities Act makes it unlawful for any person, in the offer or sale

of a security, to (1) "employ any device, scheme, or artifice to defraud"; (2) "obtain money or

property by means of any untrue statement of a material fact" or a material omission necessary to

make the statements made not misleading; or (3) "engage in any transaction, practice, or course

of business which . . . operates or would operate as a fraud or deceit upon the purchaser."

Section 17(a)(1) requires a showing that the defendant acted with scienter. Scienter is not an

element of Sections 17(a)(2) or (3) of the Securities Act; accordingly, a showing of negligence

by the Defendants is sufficient to establish a violation of those sections. *SEC v. Pentagon

Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013).

Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder make it unlawful for

any person, in connection with the purchase or sale of a security, to make untrue statements of

material fact, or to omit material facts necessary to make statements made not misleading. Rule

10b-5(a) and (c) prohibit employing any device, scheme, or artifice to defraud, and engaging in

any act, practice or course of business which operates or would operate as a fraud or deceit upon

any person. Section 10(b) of the Exchange Act and Rule 10b-5 require a showing that the

defendant acted with scienter. *Aaron v. SEC*, 446 U.S. 680, 695 (1980). Reckless conduct

generally satisfies the scienter requirement. *See, e.g., SEC v. McNulty*, 137 F.3d 732, 741 (2d

Cir. 1998).

Lacroix and PlexCorps "made" the statements at issue. There is no question that

PlexCorps itself made the statements at issue. PlexCorps' logo appears in the PlexCoin

Whitepaper and is held out as "presenting" PlexCoin on the PlexCoin Website. Moreover,

although Lacroix attempted to conceal his involvement with PlexCorps and the PlexCoin ICO, Lacroix registered the PlexCorps and PlexCoin Websites with GoDaddy (an internet service provider), he registered the PlexCoin and PlexCorps Facebook Pages, and he was the administrator of those Websites and Facebook Pages. Accordingly, Lacroix had authority over the statements posted on those fora. Indeed, Skype conversations reveal that Lacroix himself often discussed posts he was contemplating making or had made on Facebook, or emails he was composing to individuals who had registered on the PlexCoin Website as potential investors in the PlexCoin ICO. Because Lacroix was the "ultimate authority" over the statements included on the website or otherwise disseminated to investors, he was the "maker" for purposes of *Janus*. *See Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011); *see, e.g., In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012), *aff'd*, No. 12–3859, 2013 WL 1982534 (2d Cir. May 15, 2013) ("In the post-*Janus* world, an executive may be held accountable where the executive had ultimate authority over the company's statement; signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive").

Falsity. Most of the statements Lacroix and PlexCorps made in connection with the PlexCoin ICO were plainly false, mostly because PlexCorps is nothing but a sham created to enrich Defendants' pockets. PlexCorps had no team of experts in Singapore and/or around the world, but instead consisted of a handful of Lacroix's cronies in his office in Quebec. Neither PlexCorps nor Lacroix would utilize the proceeds of the PlexCorps ICO for product development, but instead for Defendants' personal gain. Nor was Lacroix's identity kept secret for privacy or anti-poaching reasons, but rather simply to avoid disclosing that the individual behind the PlexCoin ICO was a serial securities law violator in Quebec. And, given that the

proceeds of the PlexCoin ICO were eventually destined for Defendants' pockets and that no projects would be developed, there was no basis to tout expected returns or projected prices for the PlexCoin Tokens based on the (nonexistent) managerial efforts of PlexCorps.

Materiality. The misstatements and omissions at issue are material. A statement or omission is material if there is a substantial likelihood that a reasonable investor would consider such information important in making an investment decision or if the information would significantly alter the total mix of available information. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). A reasonable investor would want to know if PlexCorps' attempt to appear as if it was conducting a legitimate business was a sham, if the proceeds of the PlexCoin ICO would not be used to develop the PlexCorps business, and if a recidivist violator was behind the ICO.

Defendants engaged in a scheme to defraud. Lacroix and PlexCorps engaged in a scheme to defraud that included not only the statements alleged here. In addition, all Defendants engaged in a scheme to defraud investors including by setting up of fraudulent websites and attempting to give the appearance of legitimacy by touting non-existing connections with other enterprises that they set up and controlled for purposes of effectuating the fraud, in particular the non-existent entity known as "Sidepay.Ca," which Paradis-Royer used to register two of the Stripe Accounts through which she obtained PlexCoin ICO proceeds. Defendants, including Paradis-Royer, also made a series of convoluted transfers of funds from different accounts, and specifically sought to avoid these transfers being traced back to them, including by opening accounts under names other than their own. These are all "inherently deceptive" sufficient to constitute a scheme in violation of Rules 10b-5(a) and 10b-5(c). *See, e.g.*, *SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011).

Scienter. Defendants acted with scienter. First, Lacroix understood that the statements he made in connection with the PlexCoin ICO were materially false and misleading because he knew that he was the individual behind PlexCorps, and that there was no cadre of experts. Conversations between Lacroix and his employees reveal concerted efforts to hide his involvement, and disparaging comments at regulators, including mentioning "who cares about the [Q]AMF," and offering for sale t-shirts "giving the finger" to the QAMF. Tutor Decl. ¶¶ 59-60, 85, 106. Lacroix also clearly understood the import of hiding his involvement with PlexCorps and the PlexCoin ICO, going so far as to seek to deceive an individual who had caught on to him that his companies only had limited involvement. And Lacroix's scienter is buttressed by the fact that he acted while being aware of the injunctions against his doing so.

Paradis-Royer's scienter is betrayed by her reaction to the Canadian authorities showing up at her residence, reflected in her frantic messages to Lacroix. Paradis-Royer surely understood that having the PlexCoin Whitepaper in their residence would be incriminating. Her scienter is also demonstrated by her efforts to divert PlexCoin investor funds by writing of a series of checks destined for expensive home renovations, including on her and Lacroix's second home. Further, as the individual behind PlexCorps, Lacroix's scienter may be properly attributed to the Companies. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

The statements were made "In Connection With" the offer or sale of a security. Lacroix and PlexCorps' statements were made both in the offer and sale and in connection with the purchase or sale of securities because they were made to induce purchases of PlexCoin Tokens.

Defendants obtained Money or Property. Lacroix and PlexCorps obtained money and property in the offer and sale of securities by virtue of their false statements because, without those false statements, investors would have never given Defendants the monies which

Defendants have already obtained, including in their Stripe accounts, Paradis-Royer's RBC accounts, and on the cryptographically secured blockchain. And Paradis-Royer aided and abetted Lacroix's and PlexCorps' obtaining of money by registering accounts in her name.

## D. Defendants' Conduct is Ongoing

In determining whether to grant emergency relief, courts consider the likelihood that, unless enjoined, a defendant will violate the securities laws again. *Cavanagh*, 155 F.3d at 135. As the Second Circuit has explained, "the commission of past illegal conduct is highly suggestive of the likelihood of future violations" and that "cessation of illegal activity does not ipso factor justify the denial of an injunction." *Mgmt. Dynamics*, 515 F.2d at 807 (citations omitted). In assessing likelihood of repetition, courts also look to such factors as the character of the violation, the degree of scienter involved, and the degree to which a defendants' occupation or activities may present future opportunities to violate the law. *E.g.*, *Cavanagh*, 155 F.3d at 135; *SEC v. Commonwealth Chem. Secs. Inc.*, 574 F.2d 90, 100 (2d Cir. 1978); *SEC v. Musella*, 578 F. Supp. 425, 444 (S.D.N.Y. 1984). Courts may also look to the likelihood that a defendant's business activities might again involve him in such transactions and his or her recognition of culpability coupled with the sincerity of assurances against future violations. *SEC v. Suter*, 732 F.2d 1294, 1301 (7th Cir. 1984).

Here, where the PlexCoin Tokens are still being offered and sold to investors, including investors in the United States, and where Lacroix and PlexCorps are still touting the enterprise, the violative conductive not only risks repeating, but *is* repeating, making an injunction necessary *a fortiori*. And even if the Court were to improbably conclude that the conduct related to the PlexCoin ICO violated the securities laws but that the violation ceased when that offering ceased, all factors still point to the need for emergency relief. Defendants have been the subject of numerous injunctions by Canadian tribunals and have nevertheless acted in open defiance of those orders. Nor have Lacroix or Paradis-Royer accepted any responsibility or offered any assurance against future

violative conduct, but have instead posted offensive gestures in mockery of the Canadian regulators' authority.

Finally, given the degree of scienter with which the violations occurred—brazen misappropriation of investor funds for personal expenses, repeated violations of court orders, complex and convoluted schemes to avoid assets and acts being traced to them—Defendants, already securities laws violators in Canada, are likely to be recidivists in the United States as well.

## III. THE COURT SHOULD FREEZE DEFENDANTS' ASSETS.

"A freeze of assets is an ancillary remedy that merely 'assures that any funds that become due can be collected,'…including disgorgement of profits, penalties equal to three times the profits, …and possibly prejudgment interest." *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 416 (S.D.N.Y. 2001) (quoting *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990)). An asset freeze simply "functions like an attachment." *Unifund*, 910 F.2d at 1041.

To obtain an asset freeze, "the SEC must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) (internal quotation marks and citations omitted). This standard is lower than the required showing for the Commission to obtain a preliminary injunction against future securities law violations. *See Unifund*, 901 F.2d at 1041 (holding that "an ancillary remedy" of an asset freeze "may be granted, even in circumstances where the elements required to support a traditional SEC injunction have not been established"); *SEC v. Hedén*, 51 F. Supp. 2d 296, 298 (S.D.N.Y. 1999) (holding that an asset freeze requires "a lesser showing" than a preliminary injunction against future securities law violations).

As set forth above, the Commission is likely to succeed on the merits of its fraudulent misrepresentation and deceptive conduct case against Defendants, as well as on its claims that Lacroix and PlexCorps engaged in the offer or sale of unregistered securities. At a minimum, an

26

inference can be drawn that Defendants violated the antifraud provisions. Either way, an asset freeze is appropriate, particularly to prevent Defendants from moving funds held in accounts at United States-based payment processing entities or in blockchain wallets handled by United States-based entities, to a foreign bank account or otherwise dissipating assets to avoid having to satisfy an eventual monetary judgment, as Paradis-Royer has already done. As citizens of Canada, both Paradis-Royer and Lacroix have foreign bank accounts, and Lacroix has betrayed his efforts to avoid monies raised in the PlexCoin ICO being traced back to him.

Without an asset freeze, Defendants are likely to dissipate funds or transfer funds to foreign accounts beyond the Court's jurisdiction, rendering the Commission unable to collect disgorgement, prejudgment interest, and a civil penalty from after obtaining a final judgment. An asset freeze is therefore necessary and appropriate. *See, e.g., Gonzalez de Castilla*, 145 F. Supp. 2d at 420 (granting asset freeze where defendant's "status as a citizen and resident of Mexico with accounts at Mexican banks raises a danger that the funds would be dissipated or transferred beyond this Court's jurisdiction if his account did not remain frozen") (citing *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 215–16 (1945) (holding, in antitrust action, that "sequestration of [defendants'] property is the only means of enforcing this Court's orders or decree against said foreign corporate defendants. The principal business of said defendants is carried on in foreign countries and they could quickly withdraw their assets from the United States and so prevent enforcement of any order or decree which this Court may render.")).

## IV.    OTHER ANCILLARY RELIEF IS NECESSARY

Exchange Act Section 21(d)(5) authorizes the Court to grant equitable relief "that may be appropriate or necessary for the benefit of investors," 15 U.S.C. § 78u(d)(5), Section 27 of the Exchange Act, 15 U.S.C. § 78aa, the Court has general equitable powers in Commission actions.

*Manor Nursing Centers, Inc.*, 458 F.2d at 1103-04. Pursuant to such powers, this Court may order ancillary relief to effectuate the purposes of the federal securities laws, and to ensure that wrongdoers do not profit from their unlawful conduct. *Id.*

### A. An Order to Deposit Assets with the Registry of the Court Is Necessary

Courts routinely use their equitable powers in Commission actions to order defendants and relief defendants to repatriate assets held in foreign accounts or locations, usually to help effectuate an asset freeze. *See, e.g., SEC v. Compania Internacional Financiera S.A.*, 2011 WL 3251813, at *13 (S.D.N.Y. July 29, 2011) ("[A]n order to bring assets to the United States is appropriate if needed to make effective an asset freeze and preserve assets for potential future relief."); *SEC v. Illarramendi*, 2011 WL 2457734, at *6 (D. Conn. 2011) ("[W]here the Court has the authority to order equitable relief such as an asset freeze in order to preserve particular funds in anticipation of potential future disgorgement, it also has the authority to order repatriation of assets to effectuate that freeze order.").

Such an order is appropriate here, particularly given that Paradis-Royer has already transferred over $900,000 from the U.S.-Dollar denominated Stripe accounts to her RBC accounts. The Commission seeks an order requiring Defendants to turn over to the registry of the Court assets they may holds in foreign locations obtained as a result of their actions. Courts in this Circuit have granted Commission requests for return of already-dissipated assets even against defendants residing abroad. *See* Order to Show Cause and Order Freezing Assets and Granting Other Relief in *SEC v. Braverman*, No. 14 Civ. 7482 (DE 3) (S.D.N.Y. Sept. 17, 2014) (attached hereto as Exhibit B).

### B. Defendants Should Be Ordered to Provide an Accounting

To accurately determine the scope of a fraud and a defendant's ability to disgorge illicit proceeds, courts frequently require defendants to provide an accounting of all monies or property

obtained as a result of the fraudulent activity, as well as their current financial resources or assets. *See, e.g., SEC v. Int'l Swiss Inv. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *SEC v. Spongetech Delivery Sys., Inc.*, No. 10-cv-2031, 2011 WL 887940, at *5 (E.D.N.Y. Mar. 14, 2011) (noting that ordering an accounting is "minimally intrusive") (citing *SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997)). In this case, where Defendants have raised funds from thousands of investors in a digital format that creates a record for Defendants, an accounting is both necessary to the Commission and minimally burdensome to Defendants. Judge Dearie of this Court recently granted a similar order against other defendants that the Commission alleged had engaged in similarly deceptive conduct with respect to thousands of investors in digital assets. *See* Order to Show Cause and Order Freezing Assets and Granting Other Relief in *SEC v. Recoin*, No. 17 Civ. 5725 (DE 3) (E.D.N.Y. Sept. 29, 2017) (attached hereto as Exhibit C).

### C. Expedited Discovery and an Order Mandating Preservation of Documents Is Appropriate

The Court should grant the Commission's request for expedited discovery in order to permit the parties to present evidence to the Court at a hearing on the Commission's application for a preliminary injunction. In this case, where Defendants reside abroad and the Commission has had only a few days to subpoena and obtain all relevant documents and to elicit testimony from those with essential information, an order expediting discovery is particularly necessary.

To preserve documents that the Commission may later seek through discovery requests, the Commission further seeks an order prohibiting Defendants from altering, destroying, or concealing documents, including documents concerning the allegations of the Complaint or the assets or finances of Defendants. Such orders are routinely granted "to preserve the status quo until a final resolution of the merits." *Spongetech Delivery*, 2011 WL 887940, at *5 (citing *Unifund*, 910 F.2d at 1040 n. 11). An order is particularly needed in this matter where Defendants and their associates

29

have already discussed ways to destroy relevant evidence to avoid the consequences of their frauds being traced back to them. Tutor Decl. at ¶ 85.

## CONCLUSION

For the foregoing reasons, the Court should grant the Commission's emergency application.

Dated: New York, New York
      December 1, 2017

_____
Jorge G. Tenreiro

Robert A. Cohen
Valerie A. Szczepanik
Daphna A. Waxman
David H. Tutor
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

# Exhibit A

75gWstaC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    SECURITIES AND EXCHANGE
     COMMISSION,
4
                    Plaintiff,
5
            v.                          06 CV 7736 (GEL)
6
     JAMES N. STANARD, MARTIN J.
7    MERRITT, and MICHAEL W. CASH,

8                   Defendants.

9    ------------------------------x
                                    New York, N.Y.
10                                  May 16, 2007
                                    12:00 p.m.
11
     Before:
12
                    HON. GERARD E. LYNCH,
13
                                    District Judge
14
                             APPEARANCES
15
     UNITED STATES SECURITIES and EXCHANGE COMMISSION
16   BY:  PREETHI KRISHNAMURTHY

17   MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO & BOHRER, P.C.
          Attorneys for Defendant Stanard
18   BY:  PAUL R. GRAND
          -and-
19   DLA PIPER US LLP
     BY:  JAMES D. MATHIAS
20
     SCHULTE ROTH & ZABEL, LLP
21        Attorneys for Defendant Cash
     BY:  MARTIN L. PERSCHETZ
22

23

24

25

1           (Case called)

2           MS. KRISHNAMURTHY:  Good afternoon, your Honor.

3    Preethi Krishnamurthy, for the SEC.

4           THE COURT:  Good afternoon.

5           MR. PERSCHETZ:  Martin Perschetz, for Mr. Cash, your

6    Honor.

7           MR. MATHIAS:  Jim Mathias, for James Stanard.

8           MR. GRAND:  Paul Grand, for Mr. Stanard.

9           THE COURT:  We're here to rule on a motion in this SEC

10   enforcement action.  Defendants James Stanard and Michael Cash

11   move to dismiss the claims against them.  The motion will be

12   denied.

13          At the outset, Cash argues that the action should be

14   dismissed for lack of personal jurisdiction over him.  To a

15   considerable extent, this motion overlaps with his motion on

16   the merits that the complaint fails to state a claim against

17   him, because to the extent that the complaint does state a

18   claim, his jurisdictional argument verges on the frivolous.

19   The federal securities laws "permit the exercise of personal

20   jurisdiction to the limit of the due process clause of the

21   Fifth Amendment."  SEC v. Unifund SAL, 910 F.2d 1028, 1033 (2d

22   Cir. 1990).  It is well established that the Constitution

23   permits the exercise of personal jurisdiction over a defendant

24   who "has acted in such a way as to have 'caused consequences'

25   in the forum state."  That's from the Unifund case of the same

1   page, quoting World-Wide Volkswagen v. Woodson, 444 U.S. 286,

2   297 (1980).  Where an executive of a foreign securities issuer,

3   wherever located, participates in a fraud directed to deceiving

4   United States shareholders in violation of federal regulations

5   requiring disclosure of accurate information to holders of

6   securities traded in the United States, such direct

7   consequences have occurred.  SEC regulations would be

8   meaningless as applied to foreign issuers of U.S.-traded

9   securities if the United States courts lacked jurisdiction over

10  executives abroad who violate those regulations.  The complaint

11  here alleges that Cash conceived and implemented a strategy for

12  entering a sham transaction and specifically intended that his

13  work would result in false statements by RenRe in its

14  publicly-filed financial statements in the United States.  At

15  least to the extent that this allegation states a claim for

16  violation of the United States securities laws, this Court has

17  jurisdiction over the persons alleged to have committed that

18  violation.

19          The next overarching argument advanced by both Stanard

20  and Cash is that all of the charges must be dismissed because

21  the misstatements of earnings at the heart of the plaintiff's

22  case are immaterial as a matter of law.  This argument is

23  insufficient to require dismissal at the pleading stage.

24          The sham transaction and resulting distortion of

25  earnings statements alleged in this complaint are somewhat

1  unusual in that the SEC alleges that the purpose of the

2  transaction was to understate rather than overstate RenRe's

3  profits at the time the transaction was entered.  Of course,

4  the Court has seen many more cases in which private plaintiffs

5  or the SEC allege that companies in financial trouble engaged

6  in sham activities in order to increase their apparent

7  profitability, thus falsely luring investors to purchase

8  securities that soon become less valuable.  Here, in contrast,

9  the company was making huge profits and is accused of engaging

10  in a transaction to "smooth" its earnings by shifting profits

11  in fact made in 2001 into future years.  The motive for such

12  maneuverings and their potential to harm investors is certainly

13  less apparent than in the more conventional cases.

14      The complaint alleges, however, that the transactions

15  which for purposes of this motion the Court must accept were

16  essentially shams of no economic import, had the effect of

17  misstating RenRe's net income, sometimes reducing it and

18  sometimes increasing it, by percentages ranging from 7 percent

19  to nearly 40 percent in various reporting periods.  Defendants

20  would glide past this allegation, emphasizing that the initial

21  impact was to reduce the apparent profitability of the company,

22  noting that the company genuinely made large and dramatically

23  increasing profits in the affected years, and pointing out that

24  the amount of money involved in the transactions amounted to

25  just 2.2 percent of the company's aggregate profits over the

1  three-year period.

2      Defendants also point out that the market did not

3  react negatively to the eventual disclosure of the

4  misstatement, suggesting that actual investors did not find the

5  errors material.  It is possible that these facts, which are

6  not apparently disputed by the SEC, would ultimately support a

7  conclusion by a fact finder that the alleged misstatements are

8  not material.

9      But materiality is a mixed question of fact and law

10  and rarely suitable for resolution on the pleadings.  As the

11  Second Circuit has held, "a complaint may not properly be

12  dismissed on the ground that the alleged misstatements or

13  omissions are not material unless they are so obviously

14  unimportant to a reasonable investor that reasonable minds

15  could not differ on the question of their importance."

16      The quote is from Ganino v. Citizens Utilities, 228

17  F.3d 154 at 162 (2d Cir. 2000), in turn quoting Goldman v.

18  Belden, 754 F.2d 1059 at 1067 (2d Cir. 1985).  The very facts I

19  have just outlined, as presented by the defendants, are

20  susceptible to different readings, showing how easily

21  reasonable people may differ on the materiality or even the

22  appropriate characterization of these facts.

23      First, the understatement of profits in one year is

24  simply the flip side of the overstatement of profits in other

25  years.  To the extent defendants suggest that understating

1  profits can't hurt anyone, it is clear that the future
2  overstatement of profits contemplated by the "smoothing" of
3  profitability over a multiyear period could significantly
4  distort a reasonable investor's picture of a company's health
5  and of the trends that might suggest investment potential for
6  future profits.

7       Second, the amounts of misstatement can easily be
8  regarded as substantial.  If, as defendants point out, only a
9  small amount of profit was shifted relative to the overall
10  profits in the relevant years, the effect on reported earnings
11  in particular periods was sometimes quite substantial, rising,
12  as alleged, to nearly a 40 percent overstatement of profits in
13  the third quarter of 2002.

14       Third, while defendants emphasize that in the end
15  RenRe was genuinely profitable in 2002 and 2003 and, in fact,
16  that profits rose dramatically in those years, it is far from
17  clear that this could have been anticipated in 2001 when the
18  scheme was conceived and implemented.  No one could know in
19  2001 what the company's profits really would be in 2002 or
20  2003.  Had the company done badly in those years, the false
21  appearance created by a $26 million infusion of phony profits
22  from a previous year could have considerably distorted an
23  investor's picture of the company.

24       Fourth, the lack of market reaction could be seen,
25  given the nature of this scheme, as a post-hoc shrug, given

1   that by the time the fraud was revealed, the income shifting

2   was in the past and the company's then current profits were no

3   longer being affected.  The market might well have responded

4   differently if the fraud had been revealed shortly after the

5   announcement of the 2002 third quarter results, when the

6   announcement would have required a substantial write-down of

7   the company's most recent announced earnings.

8        Of course, it's premature to reach any conclusion

9   about whether this is the correct explanation for the market's

10  apparent indifference, but that is exactly the point.  The

11  significance of these various factors is best addressed in the

12  context of a full factual record.  At this point, reasonable

13  people can easily disagree about the meaning and weight of each

14  of these arguments.

15       Fifth, and finally, in a world in which investors are

16  frequently believed to pay attention to whether profits meet

17  projections or targets, it is not necessarily irrational for a

18  manager seeking to manipulate share prices to consider profits

19  in a given period as essentially excessive, if they exceed such

20  targets, and to seek to save some for a future, potentially

21  rainier day, or for such a manager to expect such a stratagem

22  to have a favorable effect on investors -- that is, an effect

23  that distorts their behavior.  Defendants confuse this point by

24  suggesting that squirreling away money for a rainy day is

25  conservative, desirable management.  Of course, it is.  But a

1    company saves for the future by reporting its profits

2    accurately and putting some of those actual profits aside for

3    future use.  The complaint here charges defendants not with

4    saving actual funds for the future but with lying about profits

5    in one year in order to make it appear that the money was not

6    saved from 2001 profits but, instead, was earned in 2002 and

7    2003.

8         Whether this charge can be sustained is for the

9    future, but it cannot be said on the basis of the pleadings

10    that the alleged falsifications were immaterial as a matter of

11    law.

12         Cash next argues that he cannot be liable as a primary

13    violator of Rule 10b-5 and Section 10-b because no false

14    statement was directly attributable to him, arguing that Second

15    Circuit cases interpreting the Supreme Court's decision in

16    Central Bank of Denver v. First Interstate Bank of Denver, 511

17    U.S. 164, (1994), which held that there was no liability under

18    the securities laws for aiding and abetting violations of those

19    laws, have established a bright-line rule that only the

20    speakers themselves can be liable as primary violators.  As so

21    broadly stated, this legal proposition seems to me very likely

22    wrong.  The Second Circuit cases are less than fully consistent

23    in this regard.  Compare Wright v. Ernst & Young, 152 F.3d 169

24    (1998) and Lattanzio v. Deloitte Touche, 476 F.3d 147 (2007),

25    on which the plaintiffs rely, with In re Scholastic Corp., 252

1   F.3d 63, 76 (2d Cir. 2001) and SEC v. First Jersey Securities,

2   101 F.3d 1450, 1471 (2d Cir. 1996), which are cited by the

3   plaintiff.

4           This Court has rejected such a bright-line view in the

5   past.  See In re Global Crossing, 322 F.Supp.2d 319 (S.D.N.Y.

6   2004) and In re Salomon Analyst AT&T Litigation, 350 F.Supp.2d

7   455 (S.D.N.Y. 2004), and nothing in Lattanzio or in defendants'

8   briefs persuades me that I was wrong to do so.

9           On the other hand, it is not clear that Cash needs to

10  take such a sweeping view in order to prevail on this point.

11  In both Global Crossing and Salomon AT&T, this Court held that

12  the plaintiffs had alleged facts suggesting that the defendants

13  in question were moving forces in the fraud; arguably, the

14  facts alleged here make out a purer case of mere aiding and

15  abetting.

16          But however interesting is the question whether Cash

17  could be charged as a primary violator, the issue is entirely

18  academic in this case.  I see no reason why this debate needs

19  to be resolved in this case now or perhaps ever.  This is not a

20  private action for damages but an SEC enforcement action, and

21  the SEC is expressly permitted by statute to move against

22  aiders and abettors.  See Exchange Act Section 20(e), 15,

23  United States Code, Section 78t(e).  In the complaint, the SEC

24  expressly pleads its charged 10b violations in the alternative

25  as primary violations and as aiding and abetting.  See amended

1  complaint, paragraphs 106 and 107.  Cash does not even attempt

2  to suggest that the facts alleged would not make out a claim

3  for aiding and abetting.  Indeed, the entire thrust of his

4  argument is to suggest that that is exactly what the SEC has

5  pleaded.

6       No party has indicated any way in which it matters

7  whether Cash is found to violate these rules as a principal or

8  as an aider and abettor.  Nor has any party suggested that

9  whether Cash's name is stricken from paragraph 106, which

10  charges Cash with primary violations, would make the slightest

11  difference to how discovery is conducted or even how the case

12  is tried.  It is a well-established principle of criminal law

13  that there is no need for an indictment even to specify whether

14  a charge is laid under 18, United States Code, Section 2, or

15  not.  See, for example, United States v. Knoll, 16 F.3d, 1313,

16  (2d Cir. 1994).  The same practical principle seems to apply

17  here.  Accordingly, the Court declines to decide this question

18  at this time, since the same causes of action will remain in

19  the complaint whether Cash's reading of Second Circuit case law

20  on primary violators is right or wrong.

21       For the same reason, there is no need to stay these

22  proceedings pending the Supreme Court's resolution of

23  Stoneridge Investment v. Scientific-Atlanta, Inc., a case in

24  which certiorari was recently granted to decide whether claims

25  for deceptive conduct may go forward under Rule 10b-5(a) and

1   (c) where a defendant engaged in transactions with a public

2   corporation with no legitimate business or economic purpose

3   except to inflate artificially the public corporation's

4   financial statements, but where the defendant himself made no

5   public statements concerning those transactions.  See 2007 WL

6   879583, the order granting certiorari, 2006 WL 1909677, the

7   petition with the question presented.  Under the law as it now

8   stands, the complaint adequately states violations of Rule

9   10b-5(a) and (c).  See In re Global Crossing, 322 F.Supp.2d at

10  335-36, and In re Parmalat, 376 F.Supp.2d 472, 502 (S.D.N.Y.

11  2005).  Even if the Supreme Court's decision in Stoneridge

12  Investments changes the law in such a way that a claim against

13  Cash can no longer be stated under Rule 10b-5(a) and (c),

14  Cash's liability, if any, as an aider and abettor under

15  10b-5(b) will be unaffected.

16          Finally, Cash argues that the charges of books and

17  records violations should be dismissed, because Cash did not

18  have primary responsibility for maintaining the books and

19  records.  Unlike the argument under Section 10b, which does

20  present interesting questions under the statutory and

21  regulatory language, this claim is completely contrary to the

22  language of the statute and rule.  That language does not speak

23  of the person who makes entries or devises accounting

24  procedures.  Rather, Section 13(b)(5) applies to anyone who,

25  among other things "knowingly circumvents...a system of

1    internal accounting controls."  The plain language covers

2    someone who knows that internal accounting procedures would

3    require something to be reported in a particular way, and then

4    undertakes deliberately to devise a scheme that would avoid

5    such proper reporting.  Similarly, Rule 13b2-1 forbids anyone

6    "directly or indirectly" to "cause to be falsified" the

7    corporate books and records.  Again, the plain language covers

8    someone who engages in such a scheme to cause the records to be

9    falsified, even if that person is not directly in charge of

10   making the false entries themselves.

11          The complaint here clearly alleges that Cash designed

12   the transactions in question with the specific intention of

13   fooling the company's auditors with respect to their true

14   nature.  See amended complaint paragraph 70.  Whether or not

15   that is so remains to be seen, but the allegation squarely

16   states a violation of the cited books and records provisions.

17          Accordingly, the defendants' motions will be denied.

18          All right.  That's the ruling on the motions.

19          Now, as I understand the case management order,

20   discovery is ongoing and is due to end on July 31.  Does

21   anybody think we need more time or that there is some problem

22   with that?

23          MS. KRISHNAMURTHY:  Your Honor, the discovery order

24   that your Honor entered asked the parties to hold off on

25   depositions until after the Court had ruled.  And we haven't

1    had a chance, we spoke briefly yesterday, but we weren't sure

2    what your Honor's ruling would be.  We would propose that we

3    confer and submit a revised case management plan that would

4    extend out the discovery timetable to take into account the

5    elapsed time.

6              THE COURT:  Okay.  Has document discovery been

7    completed now?

8              MS. KRISHNAMURTHY:  It isn't completed, but we have

9    made substantial document production to date.

10             THE COURT:  Let's get it completed and get moving on

11   this.  I think many of the same reasons that motivated the

12   denial of this motion make it very unlikely that materiality,

13   if that's going to be the hinge of the case, is going to be

14   decidable by summary judgment motion.  So, it would be my

15   expectation that if the parties can't settle the dispute, the

16   case is going to have to be tried.  I don't think we need to

17   set a trial date now, unless the defense has a different

18   perspective.  I think plaintiff's suggestion is appropriate

19   that there be some consultation or working out of the

20   deposition schedule.  And then once those depositions are

21   complete, we'll come back and have a conference at which we'll

22   see what needs to be done thereafter.  But do I understand this

23   is solely an injunctive action and basically it's going to be a

24   bench trial, if it's a trial?

25             MS. KRISHNAMURTHY:  We're also asking for disgorgement

1    and penalties, your Honor.

2            THE COURT:  But that doesn't change that it's a bench

3    trial, does it?  Or does it?

4            MS. KRISHNAMURTHY:  We are not requesting a bench

5    trial.  Our preliminary discussions with defendants, I think in

6    those preliminary discussions, defendants thought they might

7    not request a bench trial.  I'm not sure.

8            I'm sorry.  A jury trial.

9            THE COURT:  So there is a jury trial right on at least

10   some of these things?

11           MS. KRISHNAMURTHY:  Your Honor, there is a right to a

12   jury trial because the SEC's seeking penalties in this case.

13           THE COURT:  Do we know what the parties' position is

14   on this?

15           MR. MATHIAS:  We need to talk about that, your Honor.

16   But it is a distinct possibility that this will be a bench

17   trial in any event, that we won't request a jury trial.

18           THE COURT:  One reason why it's relevant to me in

19   terms of thinking about what lies ahead, if there is going to

20   be a jury trial, the practical import of motions for summary

21   judgment may make some difference.  If it's going to be a bench

22   trial, I rarely see the point of trying to figure out whether

23   there's an issue of fact on which I might reasonably disagree

24   with myself; it just doesn't make a lot of sense to me.  I

25   don't know why either party would wish to win in a way that

1  tees up a separate set of issues for the Court of Appeals about

2  whether even though you probably should have won, you can't

3  tell for sure because there are issues of fact.  So, in bench

4  trials, it seems to me that it is generally preferrable to

5  proceed directly to the main event, since a lot of what happens

6  is very similar to a summary judgment motion, plus you hear a

7  few witnesses live, and then instead of saying here's what I'm

8  either absolutely sure of, but, or not quite absolutely sure

9  of, here's what I find by a preponderance of the evidence and

10  the case is much, usually, closer to being put to bed.

11      Now, in a jury trial case, there are more functions

12  that can be served by summary judgment motions.  Since there's

13  often considerable expense to a jury trial, sometimes parties

14  find it worthwhile to take a flier on the summary judgment

15  motion.  But these are all things we can talk about at a

16  postdiscovery conference.  I just wanted to put them on

17  people's agenda, but certainly based on what I've seen so far,

18  if it's not going to be a jury trial, I really don't see a

19  point to summary judgment type motions.  Again, I could be

20  wrong, and there are many different claims in the case, and

21  maybe some issues might be more appropriate for summary

22  disposition after there's a full record, but I just wanted to

23  lay that on the table at this point.

24      It doesn't sound to me like there's anything much more

25  that needs to be done here.  I would hope that by the end of

1 next week, the parties will get back to me with a revised

2 discovery deadline for when we're going to finish with

3 depositions.  I hope we can move fairly quickly on this, since,

4 in effect, the plaintiff has had an opportunity to investigate

5 the case and do the kind of things that plaintiffs typically do

6 in discovery.  It doesn't mean they're not entitled to do some

7 of it over again, but it makes me less sympathetic to any

8 argument coming from the plaintiff that we need a lot of time

9 here.  And the defendants obviously do need a shot at deposing

10 witnesses if they're going to do that.  But I would imagine

11 that can be done in a reasonable period of time and get us back

12 here soon after Labor Day, would be my guess.  But I'm not

13 dictating that.  You'll submit a schedule and so long as it's

14 reasonable, I'll sign off on it, set up a postdiscovery

15 conference, and then we'll move forward.

16         Anything else I need to do now?

17         Hearing nothing, have a good lunch.  Thank you very

18 much.

19         (Adjourned)

20

21

22

23

24

25

# Exhibit B

**14 CV** 7482

Berman, R

JUDGE BERMAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,       :

                         Plaintiff,       :

    -against-       :

DIMITRY BRAVERMAN,       :

                         Defendant,       :

    -and-       :

VITALY PUPYNIN,       :

                 Relief Defendant.       :

-------------------------------------------------------x

# MEMO ENDORSED

14 Civ. 7482 (RMB)



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/17/14

## [PROPOSED] ORDER TO SHOW CAUSE AND
## ORDER FREEZING ASSETS AND GRANTING OTHER RELIEF

On the Emergency Application (the "Application") of Plaintiff Securities and Exchange

Commission (the "Commission") for an order:

(1)    Directing Defendant Braverman ("Braverman") and Relief Defendant Pupynin

       ("Pupynin") to show cause why an order should not be entered, pending a final

       disposition of this action:

       (a)    Freezing Braverman's assets;

       (b)    Freezing Pupynin's assets up to the amount of the potential ill-gotten gains

             that Pupynin received;

       (c)    Ordering Braverman to transfer to the registry of this Court all assets, funds,

             and other property held in foreign locations in his name, or for his benefit or

             under his direct or indirect control, or over which Braverman exercises

             control or signatory authority;

    (d)    Ordering Pupynin to transfer to the registry of this Court all assets, funds, and other property held in foreign locations in his name, or for his benefit or under his direct or indirect control, or over which Pupynin exercises control or signatory authority, up to the amount of the potential ill-gotten gains he received; and

    (e)    Prohibiting Braverman and Pupynin from destroying, altering, or concealing documents in their possession, custody or control, including documents concerning the allegations in the Complaint or the assets, finances, or business operations of Braverman and/or Pupynin;

(2)    Pending adjudication of the relief described in paragraph (1) above, an order:

    (a)    Temporarily freezing Braverman's assets;

    (b)    Temporarily freezing Pupynin's assets up to the amount of the potential ill-gotten gains that Pupynin received;

    (c)    Temporarily ordering Braverman to transfer to the registry of this Court all assets, funds, and other property held in foreign locations in his name, or for his benefit or under his direct or indirect control, or over which Braverman exercises control or signatory authority;

    (d)    Temporarily ordering Pupynin to transfer to the registry of this Court all assets, funds, and other property held in foreign locations in his name, or for his benefit or under his direct or indirect control, or over which Pupynin exercises control or signatory authority, up to the amount of the potential ill-gotten gains he received; and

    (e)    Temporarily prohibiting Braverman and Pupynin from destroying, altering, or concealing documents in their possession, custody or control, including

documents concerning the allegations in the Complaint or the assets, finances, or business operations of Braverman and/or Pupynin.

The Court has considered: (1) the Commission's Complaint; (2) the Local Rule 6.1 Declaration of Charu A. Chandrasekhar in Support of Plaintiff's Emergency Application for an Asset Freeze and Other Relief; (3) the Declaration of Jordan Baker and the exhibits thereto; and (4) Plaintiff Securities and Exchange Commission's Memorandum of Law in Support of Its Emergency Application for an Asset Freeze and Other Relief.

Based upon the foregoing documents, the Court finds that a proper showing, as required by Section 21(d) of the Exchange Act and Federal Rule of Civil Procedure 65(b), has been made for the relief granted herein, for the following reasons:

1.      It appears from the evidence presented that Defendant Braverman has violated Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5 and 14e-3 thereunder by tipping and trading on material, nonpublic information, as alleged in the Complaint, and it appears likely that the Commission will prevail on the merits of its claims under these provisions.

2.      It appears from the evidence presented that Braverman has received more than $300,000 in proceeds from his unlawful insider trading and that at least some of these funds are in accounts still controlled by Braverman.

3.      It appears from the evidence presented that Pupynin received and currently holds proceeds of the unlawful trades that Braverman executed using a brokerage account in Pupynin's name (the "Pupynin Account") and that Braverman transferred some of the proceeds of the illegal trades from the Pupynin Account to bank accounts associated with Pupynin, a foreign citizen and resident. It appears likely that the Commission will prevail on the merits of its claim that Pupynin has been unjustly enriched because he has no legitimate claim to these ill-gotten gains and obtained

3

the funds under circumstances in which it is not just, equitable, or conscionable for him to retain the funds.

4.     It appears that Braverman has already transferred over $26,000 of his insider trading proceeds to a Latvian bank account.

5.     It appears that an order freezing Braverman's and Pupynin's assets, as specified herein, is necessary to preserve the *status quo* and to protect the Commission's ability to collect on any final judgment of this Court ordering Braverman and Pupynin to disgorge ill-gotten gains, with prejudgment interest, and ordering Braverman to pay a civil penalty.

6.     It appears that an order requiring Braverman to transfer to the registry of this Court all assets, funds, and other property held in foreign locations in Braverman's name, or for his benefit or under his direct or indirect control or over which Braverman exercises control or signatory authority, is necessary to preserve the *status quo* and to protect the Commission's ability to collect on any final judgment of this Court ordering Braverman to disgorge illegal profits, with  prejudgment interest, and to pay a civil penalty.

7.     It appears that an order requiring Pupynin to transfer to the registry of this Court all assets, funds, and other property held in foreign locations in his name, or for his benefit or under his direct or indirect control or over which Pupynin exercises control or signatory authority, up to the amount of the potential ill-gotten gains he received, is necessary to preserve the *status quo* and to protect the Commission's ability to collect on any final judgment of this Court ordering Pupynin to disgorge illegal profits, with  prejudgment interest.

8.     It appears that an order prohibiting Braverman and Pupynin from destroying, altering, or concealing records of any kind -— including documents concerning the allegations in the Complaint or the assets, finances, or business operations of Braverman and/or Pupynin -— is

4

necessary to ensure compliance with the asset freeze imposed on Braverman and Pupynin and to protect the integrity of this litigation.

9.     Good and sufficient reasons have been shown why a procedure other than by notice of motion is necessary. It is therefore appropriate for the Court to issue this Order to Show Cause *ex parte* so that prompt service on appropriate financial institutions can be made, thus preventing the dissipation of assets.

10.     This Court has jurisdiction over the subject matter of this action and over Braverman and Pupynin, and venue properly lies in this District.

**NOW, THEREFORE,**

### I.

**IT IS HEREBY ORDERED** that Braverman and Pupynin show cause, if there be any, to this Court at ___3:00___ **P**.m. on the ___30th___ day of ___September___, 2014, in Room ___17B___ of the United States Courthouse, 500 Pearl Street, New York, New York 10007, why this Court should not enter an Order pursuant to Rule 65 of the Federal Rules of Civil Procedure directing that, pending a final disposition of this action, Defendant Braverman and each of his financial and brokerage institutions, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of such Order by personal service, facsimile service, telephonic notice, email notice, any other means permitted in Section IX of this Order, or otherwise, and each of them, hold and retain within their control and otherwise prevent (except to the extent this Order requires any transfer to repatriate assets to the United States) any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment or other disposal (including the use of any credit cards or any other incurring of debt) of any assets, funds, or other property (including money, real or personal property, securities, commodities, choses in action or other property of any kind whatsoever, in whatever form such assets may presently exist and wherever

5

located) of, held by, or under the control of Braverman, whether held in his name or for his direct or indirect beneficial interest, and directing each of the financial or brokerage institutions, debtors and bailees, or any other person or entity holding such assets, funds or other property of Braverman to hold or retain within its or his control and prohibit the withdrawal, removal, transfer or other disposal of any such assets, funds or other properties, including without limitation all assets, funds, or other properties held in Braverman's name, held by Braverman, or under Braverman's control, including but not limited to the accounts listed on Schedule A.

## II.

**IT IS FURTHER ORDERED** that Relief Defendant Pupynin show cause at that time why this Court should not also enter an Order directing that, pending a final disposition of this action, Pupynin and each of his financial and brokerage institutions, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of such Order by personal service, facsimile service, telephonic notice, email notice, any other means permitted in Section IX of this Order, or otherwise, and each of them, hold and retain within their control and otherwise prevent (except to the extent this Order requires any transfer to repatriate assets to the United States) any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment or other disposal (including the use of any credit cards or any other incurring of debt) of any assets, funds, or other property (including money, real or personal property, securities, commodities, choses in action or other property of any kind whatsoever, in whatever form such assets may presently exist and wherever located) of, held by, or under the control of Pupynin, whether held in his name or for his direct or indirect beneficial interest, and directing each of the financial or brokerage institutions, debtors and bailees, or any other person or entity holding such assets, funds or other property of Pupynin to hold or retain within its or his control and prohibit the withdrawal, removal, transfer or other disposal of any such assets, funds or other properties,

including without limitation all assets, funds, or other properties held in Pupynin's name, held by Pupynin, or under Pupynin's control, including but not limited to the accounts listed on Schedule B.

### III.

IT IS FURTHER ORDERED that Braverman and Pupynin show cause at that time why this Court should not also enter an Order that directs that (a) Braverman and Pupynin shall immediately repatriate all funds and assets obtained, directly or indirectly, from the activities described in the Commission's Complaint that are now located outside the jurisdiction of this Court, by transferring all such funds and assets to the registry of this Court; (b) with respect to all funds and assets outside the jurisdiction of this Court that are repatriated by Braverman, such assets shall become subject to the restrictions described in paragraph I, above; (c) with respect to all funds and assets outside the jurisdiction of this Court that are repatriated by Pupynin, such assets shall become subject to the restrictions described in paragraph II, above; and (d) with respect to any other asset owned and/or controlled by Braverman and/or Pupynin that is now located outside the jurisdiction of this Court (including, but not limited to, any monies, securities, or real or personal property), the Defendant or Relief Defendant with ownership or control over the asset shall immediately identify the location of such asset, the price paid or consideration given, and the date upon which it was purchased.

### IV.

IT IS FURTHER ORDERED that Defendant Braverman and Relief Defendant Pupynin show cause at that time why this Court should not also enter an Order enjoining and restraining them, and any person or entity acting at the direction of or on behalf of either or both of them, from destroying, altering, or concealing all documents, books, and records that are in the possession, custody, or control of Braverman or Pupynin, their respective agents, servants, employees, and attorneys, and those persons in active concert or participation with them, including documents that

7

concern the allegations in the Complaint or Braverman's or Pupynin's assets, finances, or business operations.

## V.

**IT IS FURTHER ORDERED** that, pending a hearing and determination of the Commission's Application, Defendant Braverman and each of his financial and brokerage institutions, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of such Order by personal service, facsimile service, telephonic notice, email notice, any other means permitted in Section IX of this Order, or otherwise, and each of them, hold and retain within their control and otherwise prevent (except to the extent this Order requires any transfer to repatriate assets to the United States) any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment or other disposal (including the use of any credit cards or any other incurring of debt) of any assets, funds, or other property (including money, real or personal property, securities, commodities, choses in action or other property of any kind whatsoever, in whatever form such assets may presently exist and wherever located) of, held by, or under the control of Braverman, whether held in his name or for his direct or indirect beneficial interest, and directing each of the financial or brokerage institutions, debtors and bailees, or any other person or entity holding such assets, funds or other property of Braverman to hold or retain within its or his control and prohibit the withdrawal, removal, transfer or other disposal of any such assets, funds or other properties, including without limitation all assets, funds, or other properties held in Braverman's name, held by Braverman, or under Braverman's control, including but not limited to the accounts listed on Schedule A.

## VI.

IT IS FURTHER ORDERED that, pending a hearing and determination of the Commission's Application, Relief Defendant Pupynin and each of his financial and brokerage institutions, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of such Order by personal service, facsimile service, telephonic notice, email notice, any other means permitted in Section IX of this Order, or otherwise, and each of them, hold and retain within their control and otherwise prevent (except to the extent this Order requires any transfer to repatriate assets to the United States) any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment or other disposal (including the use of any credit cards or any other incurring of debt) of any assets, funds, or other property (including money, real or personal property, securities, commodities, choses in action or other property of any kind whatsoever, in whatever form such assets may presently exist and wherever located) of, held by, or under the control of Pupynin, whether held in his name or for his direct or indirect beneficial interest, and directing each of the financial or brokerage institutions, debtors and bailees, or any other person or entity holding such assets, funds or other property of Pupynin to hold or retain within its or his control and prohibit the withdrawal, removal, transfer or other disposal of any such assets, funds or other properties, including without limitation all assets, funds, or other properties held in Pupynin's name, held by Pupynin, or under Pupynin's control, including but not limited to the accounts listed on Schedule B.

## VII.

IT IS FURTHER ORDERED that, pending a hearing and determination of the Commission's Application, (a) Braverman and Pupynin shall immediately repatriate all funds and assets obtained, directly or indirectly, from the activities described in the Commission's Complaint that are now located outside the jurisdiction of this Court, by transferring all such funds and assets

to the registry of this Court; (b) with respect to all funds and assets outside the jurisdiction of this Court that are repatriated by Braverman, such assets shall become subject to the restrictions described in paragraph V, above; (c) with respect to all funds and assets outside the jurisdiction of this Court that are repatriated by Pupynin, such assets shall become subject to the restrictions described in paragraph VI, above; and (d) with respect to any other asset owned and/or controlled by Braverman and/or Pupynin that is now located outside the jurisdiction of this Court (including, but not limited to, any monies, securities, or real or personal property), the Defendant or Relief Defendant with ownership or control over the asset shall immediately identify the location of such asset, the price paid or consideration given, and the date upon which it was purchased.

## VIII.

**IT IS FURTHER ORDERED** that, pending a hearing and determination of the Commission's Application, Braverman and Pupynin are enjoined and restrained, and any person or entity acting at the direction of or on behalf of either or both of them is enjoined and restrained, from destroying, altering, or concealing all documents, books, and records that are in the possession, custody, or control of Braverman or Pupynin, their respective agents, servants, employees, and attorneys, and those persons in active concert or participation with them, including documents that concern the allegations in the Complaint or Braverman's or Pupynin's assets, finances, or business operations.

## IX.

**IT IS FURTHER ORDERED** that a copy of this Order and the papers supporting the Commission's Application be served upon Braverman (or his attorney who agrees to accept service on his behalf) and Pupynin (or his attorney who agrees to accept service on his behalf) on or before **4:00 P.M.**, **Sept 18**, 2014, by personal delivery, facsimile, email, overnight courier, *showing proof of service* international express mail, or first-class mail and upon any bank, saving and loan institution, credit

*RMB*

10

union, financial institution, transfer agent, broker-dealer, investment company, title company, commodity trading company, storage company, or any other person, partnership, corporation, or legal entity that may subject to any provision of this Order. For purposes of notice of anyone in possession of documents, records, assets, funds, property, or property rights, actual notice of this Order shall be deemed complete upon notification by any means, including, but not limited to, notice from distribution by facsimile transmission or electronic mail.

## X.

IT IS FURTHER ORDERED that Defendant Braverman and Relief Defendant Pupynin shall deliver any opposing papers in response to the Order to Show Cause no later than **Sept. 24**, 2014, at **4:00** p.m. Service shall be made by that date and time by emailing the papers to chandrasekharc@sec.gov and receiving a reply email confirming receipt or by sending the papers by overnight courier service to the New York Regional Office of the Commission at Brookfield Place, 200 Vesey Street, Suite 400, New York, New York 10281, Attn: Charu A. Chandrasekhar, or such other place as counsel for the Commission may direct in writing. The Commission shall have until **September 25**, 2014, at **NMN** p.m., to serve, by the most expeditious means available, any reply papers upon Defendant Braverman and Relief Defendant Pupynin or their counsel, if counsel shall have made an appearance in this action.

## XI.

**IT IS FURTHER ORDERED** that this Order shall be, and is, binding upon Defendant

Braverman, Relief Defendant Pupynin, and each of their agents, servants, employees, and attorneys,

and those persons in active concert or participation with them who receive actual notice of this

Order by personal service, facsimile, email, overnight courier, or otherwise.

_RMB_

UNITED STATES DISTRICT JUDGE

Issued at :  _1 : 35 P_.m.

_Sept. 16_ , 2014

New York, New York

_Parties to work in good faith to resolve all issues prior to the hearing._  _RMB_

12

Schedule A

| BROKERAGE FIRM OR FINANCIAL INSTITUTION | ACCOUNT NUMBER (Last 4 Digits) |
|---|---|
| Charles Schwab & Co., Inc. | ****5291 |
| Charles Schwab & Co., Inc. | ****4438 |
| Charles Schwab & Co., Inc. | ****5970 |
| Interactive Brokers LLC | ****9428 |
| Bank of America Corporation | ******3310 |

Schedule B

| BROKERAGE FIRM OR FINANCIAL INSTITUTION | ACCOUNT NUMBER (Last 4 Digits) |
|---|---|
| Bank of America Corporation | *******3517 |
| Bank of America Corporation | *******3978 |
| Interactive Brokers LLC | ****9428 |

# Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,    :

    :

                             Plaintiff,    :        17 Civ. 5725 (RJD) (RER)

    :

           - against -    :

    :

RECOIN GROUP FOUNDATION, LLC, DRC    :
WORLD INC. a/k/a DIAMOND RESERVE CLUB,    :
and MAKSIM ZASLAVSKIY,    :

    :

                       Defendants.    :

------------------------------------------------------------------x

### ORDER TO SHOW CAUSE, TEMPORARY RESTRAINING ORDER, AND ORDER FREEZING ASSETS AND GRANTING OTHER RELIEF

On the Emergency Application (the "Application") of Plaintiff Securities and Exchange

Commission (the "Commission") for an order:

(1)     Directing Defendants REcoin Group Foundation, LLC ("REcoin"), DRC World, Inc.

a/k/a Diamond Reserve Club ("Diamond") and Maksim Zaslavskiy ("Zaslavskiy")

(collectively, "Defendants") to show cause why an order should not be entered,

pending a final disposition of this action:

(a) Preliminarily enjoining Defendants from violating Section 17(a) of the Securities

Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule

10b-5 issued thereunder [17 C.F.R. § 240.10b-5], and from participating in any

offerings of unregistered securities or otherwise violating Sections 5(a) and 5(c)

of the Securities Act  [15 U.S.C. §§ 77e(a), 77e(c)];

(b) Freezing Defendants' assets;

(c) Ordering Defendants to repatriate all funds, assets, or other property held in foreign locations in their name, or for their benefit or under their direct or indirect control, or over which Defendants exercise control or signatory authority by transferring to the registry of this Court all such assets, funds, and other property; and

(d) Prohibiting Defendants from destroying, altering, or concealing documents in their possession, custody, or control, including documents concerning the allegations in the Complaint or the assets or finances of Defendants;

(2) Pending adjudication of the relief described in paragraph (1) above, an order:

(a) Temporarily restraining Defendants from violating the aforementioned statutes and rules;

(b) Temporarily freezing Defendants' assets;

(c) Temporarily ordering Defendants to repatriate all funds, assets, or other property held in foreign locations in their name, or for their benefit or under their direct or indirect control, or over which Defendants exercise control or signatory authority by transferring to the registry of this Court all such assets, funds, and other property;

(d) Temporarily prohibiting Defendants from destroying, altering, or concealing documents in their possession, custody, or control, including documents concerning the allegations in the Complaint or the assets or finances of Defendants;

(e) Providing that the Commission may take expedited discovery in preparation for a hearing on this Order to Show Cause;

2

    (f)  Directing Defendants to provide a full verified accounting of assets within three

         (3) business days, or within such extension of time as the Commission staff agrees

         to; and

    (g)  Issuing a Writ of <u>Ne</u> <u>Exeat</u> and Surrender of Passport against Defendant

         Zaslavskiy until five days after he has provided the Commission with a sworn

         accounting and repatriated assets located overseas that he controls.

The Court has considered: (1) the Complaint filed by the Commission on September 29,

2017; (2) the Local Rule 6.1 Declaration of Jorge G. Tenreiro executed on September 29, 2017;

(3) the Declaration of Valerie A. Szczepanik executed on September 29, 2017, and the exhibits

thereto; and (4) the Commission's Memorandum of Law in Support of Its *Ex Parte* Emergency

Application for an Order to Show Cause, Temporary Restraining Order, and Other Relief, dated

September 29, 2017.

Based upon the foregoing documents, the Court finds that a proper showing, as required

by Section 20(b) of the Securities Act, Section 21(d) of the Exchange Act, and Rule 65 of the

Federal Rules of Civil Procedure, has been made for the relief granted herein, for the following

reasons:

      1.    It appears from the evidence presented that Defendants have violated Sections

17(a)(1)-(3) of the Securities Act, Section 10(b) of the Exchange and Rules 10b-5(a)-(c)

thereunder, have engaged in the offering of unregistered securities and have violated Sections

5(a) and 5(c) of the Securities Act, and it appears likely that the Commission will prevail on the

merits of its claims under these provisions.

3

2.      It appears that an order freezing Defendants' assets, as specified herein, is necessary to preserve the status quo and to protect the Court's ability to award relief in the form of disgorgement of ill-gotten gains, prejudgment interest and civil penalties.

3.      It appears that an order requiring REcoin and Diamond to repatriate all funds, assets, or other property held in foreign locations in their names, or for their benefit or under their direct or indirect control, or over which REcoin or Diamond exercise control or signatory authority is necessary to preserve the status quo and to protect the Court's ability to award relief in the form of disgorgement of ill-gotten gains, prejudgment interest and civil penalties.

4.      It appears that an order requiring Zaslavskiy to repatriate all funds, assets, or other property derived from REcoin or Diamond and held in foreign locations in his name, or for his benefit or under his direct or indirect control, or over which Zaslavskiy exercises control or signatory authority is necessary to preserve the status quo and to protect the Court's ability to award relief in the form of disgorgement of ill-gotten gains, prejudgment interest and civil penalties.

5.      It appears that an order prohibiting Defendants from destroying, altering, or concealing records of any kind is necessary to ensure compliance with the asset freeze imposed on Defendants and to protect the integrity of this litigation.

6.      Good and sufficient reasons have been shown why a procedure other than by notice of motion is necessary.  It is therefore appropriate for the Court to issue this Order to Show Cause *ex parte* so that prompt service on appropriate financial institutions can be made, thus preventing the dissipation of assets.

7.      This Court has jurisdiction over the subject matter of this action and over Defendants, and venue properly lies in this District.

4

**NOW, THEREFORE,**

## I.

**IT IS HEREBY ORDERED** that Defendants show cause to this Court at 10:00 a.m. on the 5th day of October, 2017, in Courtroom 10A of the United States Courthouse, 225 Cadman Plaza East, Brooklyn, New York 11201, why this Court should not enter an Order pursuant to Rule 65 of the Federal Rules of Civil Procedure, Section 20(b) of the Securities Act, and Section 21(d) of the Exchange Act preliminarily enjoining Defendants form violating Sections 17(a) of the Securities Act, Section 10(b) of the Exchange and Rules 10b-5 thereunder, and from engaging in the offering of unregistered securities or violating Sections 5(a) and 5(c) of the Securities Act.

## II.

**IT IS FURTHER ORDERED** that Defendants show cause at that time why this Court should not also enter an Order directing that, pending a final disposition of this action, Defendants and each of their financial and brokerage institutions, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of such Order by personal service, facsimile service, telephonic notice, email notice, any other means permitted in Section XIV of this Order, or otherwise, and each of them, hold and retain within their control and otherwise prevent (except to the extent this Order requires any transfer to repatriate assets to the United States) any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment or other disposal (including the use of any credit cards or any other incurring of debt) of any assets, funds, or other property (including money, real or personal property, securities, commodities, choses in action or other property of any kind whatsoever, in whatever form such assets may presently exist and wherever located) of, held by,

5

or under the control of Defendants, whether held in their name or for their direct or indirect

beneficial interest, and directing each of the financial or brokerage institutions, debtors and

bailees, or any other person or entity holding such assets, funds or other property of Defendants

to hold or retain within its or his control and prohibit the withdrawal, removal, transfer or other

disposal of any such assets, funds or other properties, including without limitation all assets,

funds, or other properties held in Defendants' name, held by Defendants, or under Defendants'

control, including but not limited to the accounts listed on Schedule A.

### III.

**IT IS FURTHER ORDERED** that Defendants show cause at that time why this Court

should not also enter an Order that directs that (a) Defendants shall repatriate all funds, assets, or

other property held in foreign locations in their names, or for their benefit or under their direct or

indirect control, or over which Defendants exercise control or signatory authority by transferring

to the registry of this Court all such assets, funds, and other property; and (b) with respect to any

other asset owned and/or controlled by Defendants that is now located outside the jurisdiction of

this Court (including, but not limited to, any monies, securities, or real or personal property), the

Defendant with ownership or control over the asset shall immediately identify the location of

such asset, the price paid or consideration given, and the date upon which it was purchased.

### IV.

**IT IS FURTHER ORDERED** that Defendants show cause at that time why this Court

should not also enter an Order enjoining and restraining them, and any person or entity acting at

the direction of or on behalf of either or all of them, from destroying, altering, or concealing all

documents, books, and records that are in the possession, custody, or control of Defendants, their

respective agents, servants, employees, and attorneys, and those persons in active concert or

participation with them, including documents that concern the allegations in the Complaint or Defendants' assets or finances.

### V.

**IT IS FURTHER ORDERED** that, pending a hearing and determination of the Commission's Application, Defendants are temporarily restrained from violating Section 10(b) of the Exchange and Rules 10b-5 thereunder, by using the mails or any means or instrumentality of interstate commerce, directly or indirectly:

    (a) to employ devices, schemes, or artifices to defraud;

    (b) to make untrue statements of material fact or omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    (c) to engage in acts, practices, and courses of business which operate or would operate as a fraud or deceit.

**IT IS FURTHER ORDERED** that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Order by personal service or otherwise: (a) Defendants' officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with any described in (a).

### VI.

**IT IS FURTHER ORDERED** that, pending a hearing and determination of the Commission's Application, Defendants are temporarily restrained from violating Section 17(a) of the Securities Act, by using the mails or any means or instrumentality of interstate commerce, directly or indirectly:

(a) to employ devices, schemes or artifices to defraud;

(b) to obtain money or property by means of an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) to engage in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

**IT IS FURTHER ORDERED** that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Order by personal service or otherwise: (a) Defendants' officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with any described in (a).

### VII.

**IT IS FURTHER ORDERED** that, pending a hearing and determination of the Commission's Application, Defendants are temporarily restrained from engaging in the offering of unregistered securities or violating Sections 5(a) and 5(c) of the Securities Act, by:

(a) without a registration statement in effect as to that security, making use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus; and/or

(b) making use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement has been filed.

**IT IS FURTHER ORDERED** that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this

Order by personal service or otherwise: (a) Defendants' officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with any described in (a).

## VIII.

**IT IS FURTHER ORDERED** that, pending a hearing and determination of the Commission's Application, Defendants and each of their financial and brokerage institutions, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of such Order by personal service, facsimile service, telephonic notice, email notice, any other means permitted in Section XIV of this Order, or otherwise, and each of them, hold and retain within their control and otherwise prevent any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment or other disposal (including the use of any credit cards or any other incurring of debt) of any assets, funds, or other property (including money, real or personal property, securities, commodities, choses in action or other property of any kind whatsoever, in whatever form such assets may presently exist and wherever located) of, held by, or under the control of Defendants, whether held in their name or for their direct or indirect beneficial interest, and directing each of the financial or brokerage institutions, debtors and bailees, or any other person or entity holding such assets, funds or other property of Defendants to hold or retain within its or his control and prohibit the withdrawal, removal, transfer or other disposal of any such assets, funds or other properties, including without limitation all assets, funds, or other properties held in Defendants' name, held by Defendants, or under Defendants' control, including but not limited to the accounts listed on Schedule A.

## IX.

**IT IS FURTHER ORDERED** that, pending a hearing and determination of the Commission's Application, (a) REcoin and Diamond shall immediately repatriate all funds, assets, or other property held in foreign locations in their name, or for their benefit or under their direct or indirect control, or over which REcoin or Diamond exercise control or signatory authority by transferring to the registry of this Court all such assets, funds, and other property; (b) Zaslavskiy shall immediately repatriate all funds, assets, or other property derived from REcoin or Diamond and held in foreign locations in his name, for his benefit or under his direct or indirect control, or over which Zaslavskiy exercises control or signatory authority by transferring to the registry of this Court all such assets, funds, and other property; (c) with respect to all funds and assets outside the jurisdiction of this Court that are repatriated by Defendants, such assets shall become subject to the restrictions described in paragraph VIII, above; and (c) with respect to any other asset owned and/or controlled by Defendants that is now located outside the jurisdiction of this Court (including, but not limited to, any monies, securities, or real or personal property), the Defendant with ownership or control over the asset shall immediately identify the location of such asset, the price paid or consideration given, and the date upon which it was purchased.

## X.

**IT IS FURTHER ORDERED** that, pending a hearing and determination of the Commission's Application, Defendants are enjoined and restrained, and any person or entity acting at the direction of or on behalf of either or all of them is enjoined and restrained, from destroying, altering, or concealing all documents, books, and records that are in the possession, custody, or control of Defendants, their respective agents, servants, employees, and attorneys,

and those persons in active concert or participation with them, including documents that concern

the allegations in the Complaint or Defendants' assets or finances.

### XI.

**IT IS FURTHER ORDERED** that, discovery is expedited as follows: pursuant to Rules

26, 30, 31, 33, 34, 36 and 45 of the Federal Rules of Civil Procedure, and without the

requirement of a meeting pursuant to Fed. R. Civ. P. 26(f), and without regard to the limitations

of Federal Rules of Civil Procedure 30(a)(2), 30(d), 31(a)(2), and 33(a)(1):

(1) the Commission may take the depositions on two (2) calendar days' notice by email,

facsimile or otherwise, of Defendants and non-party witnesses; and

(2) the Commission may obtain the production of documents within three (3) days from

service by email, facsimile or otherwise of a request or subpoena, from the

Defendants or any other persons or entities, including non-party witnesses.

Service of any discovery requests, notices, or subpoenas may be made by personal

service, facsimile, email, overnight courier, or first-class mail.

### XII.

**IT IS HEREBY FURTHER ORDERED** that, pending a hearing and determination of

the Commission's Application, within three (3) business days of the issuance of this Order, each

Defendant shall each make a sworn verified written accounting to this Court, under penalty of

perjury, in the manner set forth below. The sworn accounting shall cover the period from July 1,

2017 to the present.

The sworn accounting shall reflect (1) all assets, funds and property received, directly or

indirectly, from anyone who invested in, provided loans to, or otherwise gave, directly or

indirectly, assets, funds or property to any Defendant; (2) the amount of such funds or value of

such assets; (3) the location of where such funds were put and for each location provide the name

and address of the bank or other financial institution, the account name, the account number and

the approximate date on which the funds were placed at the location; (4) the uses to which such

funds were put; and (5) the amounts of any remaining assets or funds described in Section XII(3)

of this Order and their location and for each location provide the name and address of the bank or

other financial institution, the account name, the account number and the approximate date on

which the funds were placed at the location.

### XIII.

**IT IS FURTHER ORDERED** that immediately upon entry of this Order and service

thereof, Defendant Zaslavskiy shall surrender to the Clerk of the Court all passports that he

holds. The Clerk of the Court shall maintain custody of such passports until five days after he

has complied with Section IX (requiring repatriation of assets) and Section XII (requiring an

accounting) of this Order.

**IT IS FURTHER ORDERED** that Defendant Zaslavskiy is prohibited from traveling

outside the United States unless and until this Court finds that he has fully complied with Section

IX (requiring repatriation of assets) and Section XII (requiring an accounting) of this Order.

### XIV.

**IT IS FURTHER ORDERED** that a copy of this Order and the papers supporting the

Commission's Application be served upon Defendants (or their attorney who agrees to accept

service on their behalf) on or before Saturday, September 30, 2017, by personal delivery,

facsimile, overnight courier, international express mail, first-class mail to Maksim Zaslavskiy,

2729 E 23rd Street, Brooklyn, N.Y. 11235, or by email at mzaslavskiy@gmail.com or

mzaslavskiy@101recoin.com.

## XV.

**IT IS FURTHER ORDERED** that Defendants shall deliver any opposing papers in response to the Order to Show Cause no later than Tuesday, October 3, 2017, at 12:00 p.m. Service shall be made by that date and time by emailing the papers to tenreiroj@sec.gov and receiving a reply email confirming receipt or by sending the papers by overnight courier service to the New York Regional Office of the Commission at Brookfield Place, 200 Vesey Street, Suite 400, New York, New York 10281, Attn: Jorge G. Tenreiro, or such other place as counsel for the Commission may direct in writing.  The Commission shall have until Wednesday, October 4, 2017, at 5:00 p.m., to serve, by the most expeditious means available, any reply papers upon Defendants or their counsel, if counsel shall have made an appearance in this action. All papers shall be electronically filed with the Court by the same times specified above.

## XVI.

Unless otherwise ordered this temporary restraining order shall expire at the time of entry on Friday, October 13, 2017.

/s/(RJD)
_____
Raymond J. Dearie
UNITED STATES DISTRICT JUDGE

Issued at:   4 : 42  p.m.
             9/28 , 2017
             Brooklyn, New York