**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,    :

                                       :

                    Plaintiff,             :        17 Civ. 7007 (CBA-RML)

                                         :

                 - against -             :        ECF Case

                                         :

PLEXCORPS                                    :

(a/k/a and d/b/a PLEXCOIN and SIDEPAY.CA),    :

DOMINIC LACROIX and                       :

SABRINA PARADIS-ROYER,                :

                                         :

                    Defendants,         :

                                         :

----------------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

Jason P. Gottlieb
Allison Khaskelis
MORRISON COHEN LLP
909 Third Avenue
New York, New York 10022
(212) 735-8600
*Attorneys for Defendants Sidepay Ltd.,*
*Dominic Lacroix, and Sabrina Paradis-Royer*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iv

PRELIMINARY STATEMENT .............................................................................. 1

STATEMENT OF FACTS ...................................................................................... 6

    A.  The Defendants ..................................................................................... 6

    B.  Background on cryptocurrency and initial coin offerings ................................ 7

    C.  The PlexCoin Sale .................................................................................. 8

    D.  Restrictions on U.S. Persons ..................................................................... 9

        1.  The Terms and Conditions ................................................................. 9

        2.  The "Checkbox" .............................................................................. 9

    E.  Payment Systems .................................................................................. 10

    F.  The Futility of Ringfencing ..................................................................... 11

    G.  Ongoing Activity ................................................................................. 14

    H.  The Instant Complaint and Service Issues ................................................. 14

    I.  Jurisdictional Discovery.......................................................................... 15

ARGUMENT ...................................................................................................... 16

  I.    DEFENDANTS HAVE NOT BEEN SERVED WITH PROCESS ................................ 17

  II.    THE LEGAL STANDARDS FOR PERSONAL JURISDICTION ................................ 18

  III.    THERE IS NO PERSONAL JURISDICTION OVER THE DEFENDANTS UNDER THE JURISDICTIONAL STATUTES................................................... 20

    A.  Defendants Did Not Transact Business Within the United States to the Extent or In the Manner Required by Law .............................................................. 20

        1.  Transacting Business Requires Purposeful Availment of the Forum ............. 21

2.  Defendants Did Not Purposely Avail Themselves of United States Jurisdiction – Indeed They Tried to Avoid It.................................... 22

 a.  Defendants Sought to Avoid Contacts with U.S. Persons Through Use of a "Checkbox"............................................ 22

 b.  Any Purchase of PlexCoin by a U.S. Person was a Unilateral Action of that U.S. Person ................................ 24

 c.  The PlexCoin Terms and Conditions, Which Contained a non-U.S. Governing Law and Dispute Resolution Clause, Militate Against Personal Jurisdiction ...................... 25

 d.  Defendants Did Not Communicate With Potential Purchasers in the United States ................................ 25

3.  The Nature of Blockchain Technology Reinforces That Defendants Did Not "Transact Business" Within The United States ............................... 26

4.  The SEC's Previous Suggestions For Why Jurisdiction Exists Are Wrong as a Matter Of Law ...................... 27

 a.  Internet Postings Are Not Transacting Business within the State ...... 27

 b.  Use of International Payment Services Does Not Confer Personal Jurisdiction ............................ 29

 c.  Use of U.S. Dollars Does Not Confer Personal Jurisdiction ............. 30

B.  Defendants Did Not Reasonably Expect Their Acts to Have Effects in the United States ............................ 31

IV.  EXERCISING PERSONAL JURISDICTION WOULD ALSO VIOLATE CONSTITUTIONAL DUE PROCESS ............................ 32

A.  The Defendants Have No Minimum Contacts With the United States ..................... 33

B.  It Is Not Fair or Reasonable to Exercise Jurisdiction Over Defendants .................... 34

V.  THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE CORPORATE DEFENDANT............................ 38

A.  The Corporate Defendant Was Not Properly Named ................................ 38

B.  There is No Personal Jurisdiction Over Sidepay Ltd................................ 39

VI.    LEAVE TO AMEND SHOULD BE DENIED ................................................................. 39

CONCLUSION.................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*A.I. Trade Fin., Inc. v. Petra Bank*,
  989 F.2d 76 (2d Cir. 1993)........................................................................34

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012).......................................................................35

*Adv. Tactical Ordinance Sys., LLC v. Real Action Paintball, Inc.*,
  751 F.3d 796 (7th Cir. 2014) ...................................................................28

*AESP, Inc. v. Signamax, LLC*,
  29 F. Supp. 3d 683 (E.D. Va. 2014) ........................................................22

*Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek (Persero)*,
  600 F.3d 171 (2d Cir. 2010).....................................................................16

*APWU v. Potter*,
  343 F.3d 619 (2d Cir. 2003)......................................................................16

*Aqua Prods., Inc. v. Smartpool, Inc.*,
  No. 04-CV-5492, 2005 U.S. Dist. LEXIS 17246 (S.D.N.Y. Aug. 18, 2005)...................24

*Asahi Metal Indus. v. Superior Ct. of Cal.*,
  480 U.S. 102 (1987).............................................................................33, 34

*Bensusan Rest. Corp. v. King*,
  126 F.3d 25 (2d Cir. 1997).......................................................................20

*Bersch v. Drexel Firestone, Inc.*,
  519 F.2d 974 (2d Cir. 1975)
  *cert. denied*, 423 U.S. 1018 (1975)......................................................19, 20

*Blue Water Int'l., Inc. v. Hattrick's Ir. Sports Pub, LLC*,
  Civ. No. 8:17-cv-1584-T-23AEP,
  2017 U.S. Dist. LEXIS 154121 (M.D. Fla. Sep. 21, 2017) .............................28

*Bragg Live Foods, Inc. v. Eco Action SDN BHD*,
  No. CV 15-8261 DSF (JPRx),
  2016 U.S. Dist. LEXIS 186410 (C.D. Cal. Apr. 29, 2016) .................29, 30, 31

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)........................................................................21, 32, 33

iv

*Calder v. Jones,*
  465 U.S. 783 (1984)....................................................................................18

*Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni,*
  No. 15 CV 9003-LTS-SN,
  2017 U.S. Dist. LEXIS 137829 (S.D.N.Y. Aug. 28, 2017)..............................39

*Charles Schwab Corp. v. Bank of America Corp.,*
  883 F.3d 68 (2d Cir. 2018).....................................................................20, 32

*Chew v. Deitrich,*
  143 F.3d 24, 28 (2d Cir. 1998),
  *cert. denied,* 525 U.S. 948 (1998)..................................................................33

*Citigroup Inc. v. City Holding Co.,*
  97 F. Supp. 2d 549 (S.D.N.Y. 2000)..............................................................23

*Cybersell, Inc. v. Cybersell, Inc.,*
  130 F.3d 414 (9th Cir. 1997)........................................................................28

*Daimler AG v. Bauman,*
  571 U.S. 117 (2014)...............................................................................18, 39

*In re Dental Supplies Antitrust Litig.,*
  No. 16 Civ. 696 (BMC)(GRB),
  2017 U.S. Dist. LEXIS 153265 (E.D.N.Y. Sep. 20, 2017)..............................21

*Doe v. Nat'l Conf. of Bar Exam'rs,*
  No. 1:16-CV-264 (PKC), 2017 U.S. Dist. LEXIS 248117 (E.D.N.Y. Jan. 6, 2017).........20

*Forbes v. City of N.Y.,*
  No. 16 CV 2751 (SJ) (SJB),
  2018 U.S. Dist. LEXIS 66117 (E.D.N.Y. Apr. 19, 2018) ................................20

*Gabelli v. SEC,*
  568 U.S. 442 (2013).....................................................................................38

*Gerena v. Korb,*
  617 F.3d 197 (2d Cir. 2010)..........................................................................18

*Gordian Group, LLC v. Syringa Expl., Inc.,*
  168 F. Supp. 3d 575 (S.D.N.Y. 2016).............................................................24

*GTE New Media Servs., Inc. v. BellSouth Corp.,*
  199 F.3d 1343 (D.C. Cir. 2000) ...............................................................28, 29

*Gundlach v. IBM*,
    No. 11-CV-846 (CS), 2012 U.S. Dist. LEXIS 60926 (S.D.N.Y. May 1, 2012)...............40

*Hanson v. Denckla*,
    357 U.S. 235 (1958)................................................................................19, 24, 33

*Hau Yin To v. HSBC Holdings, PLC*,
    700 F. App'x 66 (2d Cir. 2017) .....................................................................21

*Helicopteros Nacionales de Colombia, S. A. v. Hall*,
    466 U. S. 408 (1984)...................................................................................24

*Hsin Ten Enter. USA v. Clark Enters.*,
    138 F. Supp. 2d 449 (S.D.N.Y. 2000)..............................................................27

*Intercarrier Commc'ns LLC v. WhatsApp Inc.*,
    No. 3:12-cv-776, 2013 U.S. Dist. LEXIS 131318 (E.D. Va. Sept. 13, 2013) ..................30

*Int'l Shoe v. Washington*,
    326 U.S. 310 (1945)....................................................................................20

*ISI Brands, Inc. v. KCC Int'l, Inc.*,
    458 F. Supp. 2d 81 (E.D.N.Y. 2006) .........................................................23, 28

*J. McIntyre Mach. Ltd. v. Nicastro*,
    564 U.S. 873 (2011)...............................................................................32, 36

*Katiroll Co. v. Kati Roll & Platters, Inc.*,
    No. 10 Civ. 1703 (LTS)(RLE),
    2010 U.S. Dist LEXIS 70977 (S.D.N.Y. July 9, 2010) ....................................28

*Kelly v. Vesnaver*,
    No. 16-CV-883 (DRH) (SIL),
    2017 U.S. Dist. LEXIS 56262 (E.D.N.Y. Apr. 11, 2017) .................................17

*Krepps v. Reiner*,
    414 F. Supp. 2d 403 (S.D.N.Y. 2006)..............................................................30

*Laborers Local 17 Health & Benefit Fund v. Phillip Morris, Inc.*,
    26 F. Supp. 2d 593 (S.D.N.Y. 1998)...........................................................16, 18

*Leasco Data Processing Equip. Corp. v. Maxwell*,
    468 F.2d 1326 (2d Cir. 1972)..................................................................19, 32

*Loginovskaya v. Batratchenko*,
    764 F.3d 266 (2d Cir. 2013)..........................................................................35

*Lyons v. Rienzi & Sons, Inc.*,
    856 F. Supp. 2d 501 (E.D.N.Y. 2012) ...................................................................27

*Mattel, Inc. v. Securenet Info. Servs. & 2857111 Can., Inc.*,
    2001 U.S. Dist. LEXIS 6288 (S.D.N.Y. May 16, 2001)......................................31

*In re Maxwell Commc'n Corp.*,
    93 F.3d 1036 (2d Cir. 1996).................................................................................37

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010)........................................................................................6, 35

*Mortgage Funding Corp. v. Boyer Lake Pointe, L.C.*,
    379 F. Supp. 2d 282 (E.D.N.Y. 2005) ................................................................25

*Mugno v. Societe Internationale de Telecomms. Aeronautiques, Ltd.*,
    No. 05-cv-2037 (DRH) (ARL),
    2007 U.S. Dist. LEXIS 6573 (E.D.N.Y. Jan. 30, 2007) ....................... 16-17, 17

*Novak v. Petsforum Group, Inc.*,
    No. 02-CV-2978 (DLI), 2005 U.S. Dist. LEXIS 48483 (E.D.N.Y. Aug. 1, 2005) ..........29

*Ole Media Mgmt., L.P. v. EMI April Music, Inc.*,
    12-cv-7249 (PAE), 2013 U.S. Dist. LEXIS 82073 (S.D.N.Y. June 11, 2013)................36

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014)................................................................................35

*Porina v. Marward Shipping Co.*,
    521 F.3d 122 (2d Cir. 2008)................................................................................24

*In re Rhodia S.A. Sec. Litig.*,
    531 F. Supp. 2d 527 (S.D.N.Y. 2007).................................................................33

*In re Roman Catholic Diocese of Albany, New York, Inc.*,
    745 F.3d 30 (2d Cir. 2014)..................................................................................18

*SEC v. Alexander*,
    160 F. Supp. 2d 642 (S.D.N.Y. 2001).................................................................31

*SEC v. Carrillo Huettel LLP*,
    No. 13 Civ. 1735 (GBD),
    2014 U.S. Dist. LEXIS 77560 (S.D.N.Y. June 4, 2014).................................22, 39

*SEC v. Ross*,
　　504 F.3d 1130 (9th Cir. 2007) .........................................................18

*SEC v. Sharef*,
　　924 F. Supp. 2d 539 (S.D.N.Y. 2013)..........................................19, 32, 33, 35

*SEC v. Unifund SAL*,
　　910 F.2d 1028 (2d Cir. 1990)...................................................19, 31

*Skrodzki v. Marcello*,
　　810 F. Supp. 2d 501 (E.D.N.Y. 2011) ...............................................22, 25, 26

*Toys "R" Us, Inc. v. Step Two, S.A.*,
　　318 F.3d 446 (3d Cir. 2003)..........................................................28

*United States v. Dowell*,
　　711 F. App'x 280 (6th Cir. 2017) .....................................................20

*Weiss v. Barc, Inc.*,
　　No. 12 CV 7571 (TPG), 2013 U.S. Dist. LEXIS 75406 (S.D.N.Y. May 29, 2013).........27

*Whitaker v. Am. Telecasting, Inc.*,
　　261 F.3d 196 (2d Cir. 2001)..........................................................16

*World-Wide Volkswagen Corp. v. Woodson*,
　　444 U.S. 286 (1980)...............................................................29, 33

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*,
　　952 F. Supp. 1119 (W.D. Pa. 1997)..................................................23

## STATE CASES

*George Reiner & Co. v. Schwartz*,
　　41 N.Y.2d 648 (1977) .............................................................24

*Grimaldi v. Guinn*,
　　72 A.D.3d 37 (2d Dep't 2010) ......................................................23

*Paterno v. Laser Spine Inst.*,
　　24 N.Y.3d 370 (2014) ............................................................21, 23

## FEDERAL STATUTES

15 U.S.C. § 77...................................................................................................19, 38

15 U.S.C. § 78...................................................................................................19, 38

## STATE STATUTES

N.Y. C.P.L.R. § 302....................................................................................................20

## OTHER AUTHORITIES

James Condos, William H. Sorrell and Susan L. Donegan,
    Blockchain Technology Opportunities and Risks (January 15, 2016),
    http://legislature.vermont.gov/assets/Legislative-Reports/blockchain-technology-
    report-final.pdf ...........................................................................................................26

2017 Emerging Issues 7512,
    Blockchain Technology and Its Applicability to the Practice of Real Estate Law ...... 26-27

O'Shields, Reggie, SMART CONTRACTS: LEGAL AGREEMENTS FOR THE
    BLOCKCHAIN, 21 N.C. Banking Inst. 177 (March 2017) ..............................................26

6 McCarthy on Trademarks and Unfair Competition § 32:45.50 (5th ed.) ...................................28

Jack Metzler, Cleaning Up Quotations, J. App. Prac. & Process (forthcoming 2018)
    (available at SSRN: https://ssrn.com/abstract=2935374) ...................................................20

Defendants respectfully submit this memorandum of law in support of their Rule 12(b)(2) motion to dismiss the December 1, 2017 complaint filed by plaintiff Securities and Exchange Commission ("SEC").

## PRELIMINARY STATEMENT

The Securities and Exchange Committee has broad authority to regulate United States securities markets. But its reach is not absolute, and it is not worldwide. Even the SEC needs to establish personal jurisdiction over foreign citizens before haling them into a U.S. court.

The individual defendants Dominic Lacroix and Sabrina Paradis-Royer are, as the SEC's complaint states, Canadian residents. They live and work in Canada, where they helped to create and launch a decentralized, blockchain-based cryptocurrency, akin to Bitcoin and others currently in circulation on world markets, called "PlexCoin." They advertised PlexCoin generally on internet sites available all over the world, and held an initial sale of PlexCoin.

The complaint makes no mention of centrally important fact to jurisdiction: the PlexCoin sale process explicitly and specifically attempted to exclude U.S. persons from PlexCoin transactions. The defendants literally took measures to prevent "doing business" in the United States. As the accompanying jurisdictional affidavit from defendant Dominic Lacroix demonstrates, defendants informed people that the offer to obtain PlexCoin was not for U.S. persons. Defendants set up a "checkbox" system designed to exclude United States purchasers. Because of this roadblock, for a U.S. person to obtain PlexCoin, that U.S. person would have to affirmatively claim to be not a U.S. person; and then make payments to a non-U.S. company; in a transaction whose governing law and dispute resolution mechanism was outside the U.S., all in order to acquire a currency in a transaction that took place outside the United States.

Despite Defendants' efforts, it appears that a significant number of Americans did indeed affirmatively misrepresent their national status to purchase PlexCoin.  The SEC's chief argument <u>for</u> jurisdiction appears to be that while Defendants tried to exclude Americans, they didn't try hard enough, or that they didn't try the "right" way.  But the SEC cannot apply its own views, not codified in law or regulation, to foreign citizens who have no obligation to understand the SEC's uncodified, shifting, and still-developing positions on cryptocurrency transactions, when they are taking deliberate steps to avoid the United States.

The "cryptocurrency" setting creates two additional wrinkles, each making jurisdiction less reasonable in this case.  <u>First</u>, it is indisputable that defendants could have tried harder to exclude Americans, through electronic "ringfencing," or address checks followed by rejections of U.S. persons, or other means.  But defendants knew what the result of such efforts would be:  Americans could still participate, but thanks to the modern internet, in ways that would be untraceable and completely anonymous, thus removing any hope of later unwinding transactions with those individuals on the basis that they were U.S. persons.

<u>Second</u>, the nature of PlexCoin's "blockchain" transactions means that the actual transactions took place offshore.  In the past, when the SEC has brought cases against foreign defendants, the securities at issue in those cases were generally U.S. securities, or traded on U.S. exchanges.  Personal jurisdiction in those instances is well-grounded in law.  Here, in contrast, PlexCoin – to the extent it could even be considered a security, which is disputed – is not a U.S. security.  It is not represented by a physical item like a stock certificate held by a U.S. company. It does not appear as a book entry on the books of a U.S. company.  It was not sold to purchasers over a U.S. stock exchange.  PlexCoin is entirely digital.  Its transference to purchasers was accomplished by changing some code on a server that existed outside the United States.  A U.S.

purchaser could only "take possession" of the cryptocurrency by acknowledging the changed computer code on that foreign server, and joining a distributed ledger system that would "mirror" that change on their own computer.  Accordingly, the transaction itself never touched the United States.  PlexCoin did not come to Americans; Americans went abroad to PlexCoin.

Despite the wrinkles of new technologies, this case can be disposed of based on fairly traditional law.  Under the relevant jurisdictional statutes, provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, personal jurisdiction lies where a non-United States defendant transacts business in the United States, or engages in conduct that has a foreseeable substantial effect within the United States.  Under well-settled doctrine, "transacting business" requires purposeful availment of the forum:  purposefully conducting activities within the jurisdiction, thus invoking the benefits and protections of the forum's laws.  A defendant must, on his or her own initiative, project himself or herself into the forum to engage in a sustained and substantial transaction of business.  Unilateral acts of persons within the United States will not suffice to create jurisdiction.  And the person sought to be charged must know, or have good reason to know, that his or her conduct will have effects in the forum.

None of these factors are present in this case.  It is true, as the SEC will no doubt emphasize, that a substantial number of U.S. persons acquired PlexCoin.  But it was not because of Defendants' efforts – indeed, it was _despite_ their explicit efforts to exclude those U.S. persons.

The SEC's other suggestions for why jurisdiction is appropriate are even less convincing.  The SEC has alleged that webpages about PlexCoin were available to the public in the United States; that defendants posted statements on the Internet, including social media sites like Facebook, that were available in the United States; that defendants used "U.S.-based"

vendors like Facebook, PayPal, and Stripe; and that defendants obtained U.S. dollars through the internet from people with addresses in the United States in connection with PlexCoin.

These allegations are insufficient.  As courts have repeatedly pointed out, if posting information on a site generally available on the World Wide Web were sufficient, then this Court would have personal jurisdiction over virtually every online transaction on the planet. If use of U.S. dollars were sufficient, the SEC could hale into court the participants in many international securities transactions priced in U.S. dollars, without other connections to the United States.  And internet payment sites like PayPal are available for transactions from around the world.  If the use of such sites were sufficient for jurisdiction, U.S. courts would have jurisdiction over every tort and contract claim involving PayPal, or eBay, or even banks with online services like Citibank and Bank of America – regardless of where the parties are located, where the injuries occurred, etc.  Courts consistently hold that such overreaching jurisdiction is inconsistent with the requirements of due process.

Accordingly, there is no personal jurisdiction over the individual defendants.

The corporate entity should be dismissed all of those reasons, and more. Primarily, the SEC has not come close to properly naming it.  There is no such corporate entity as "Plexcorps (a/k/a and d/b/a Plexcoin and Sidepay.ca)".  "Plexcorps" and "PlexCoin" are merely project names.  "Sidepay.ca" is a Canadian website for a separate United Kingdom entity, Sidepay Ltd., an entity the SEC found after it filed the complaint (but refused to amend the complaint).  "Close enough" is not good enough, especially for an agency of the United States federal government imbued with extraordinary statutory investigative powers and seeking to freeze assets and assess civil penalties and injunctive relief.

Further, it is vital to note that as of this writing, the SEC has not even managed to serve any of the defendants, a fact it admits, further conceding that it only began the process of service through the Hague Convention the week of April 16, 2018, some three and a half months after rushing to Court to file an emergency, ex parte TRO.  The SEC – a United States federal agency imbued with extraordinary investigative and quasi-prosecutorial powers – should not be allowed to cut corners on formalities, particularly jurisdiction over foreign defendants.

The SEC's mission – to investigate potential violations of the federal securities laws – is, of course, incredibly important.  Its role in protecting United States investors should be lauded, and when within its jurisdictional bounds, supported.  But in this case, the SEC has exceeded its reach.  Enforcing the rules of personal jurisdiction law, and bounds of the reach of the federal government, is even more important.  Not only should this Court uphold due process, but a proper view of jurisdiction, consistent with well-established case law, will be beneficial for international comity as well.  The SEC's aggressive investigation, even before a finding of jurisdiction, has led to multiple procedures in Canadian courts.  The SEC's desired relief, if granted, would literally take assets away from innocent third-party citizens of Canada and other countries, and give those assets to the U.S. Treasury, risking very real conflict with a Canadian judicial process that is perfectly equipped to handle this case in all respects.

Finally, there is a larger context in this case, one of significant international economic importance.  Very simply, if this Court holds that blockchain and cryptocurrency developers cannot avoid U.S. jurisdiction – even if they try – the result will be to chill development of this burgeoning technology not only in the United States, but all around the world.  The SEC is absolutely entitled to regulate U.S. securities and exchanges per our statutes and its promulgated regulations.  But if the SEC starts reaching into foreign countries to freeze

the assets of individuals involved in blockchain technologies, that overreach will have a

significant dampening effect on a growing area of the international economy.  It is vital to hold

the SEC to scrupulous jurisdictional standards.

The SEC will undoubtedly argue, as it has publicly and repeatedly, that

defendants are fraudsters that must be stopped.  Defendants respectfully request that this Court

remember:  the SEC's words are only allegations, and they are vigorously disputed.  Unproven

and untested allegations on the merits should not be entitled to any weight when determining the

vitally important Constitutional issues of personal jurisdiction and due process.[1]

## **STATEMENT OF FACTS**

### A.     **The Defendants**

The individual defendants are Canadians who live and work in Quebec.  Compl.

¶¶ 23-24; April 24, 2017 Jurisdictional Affidavit of Dominic Lacroix ("Lacroix Aff.") ¶ 2.[2]

Possible defendant Sidepay Ltd., apparently sued here as "Plexcorps (a/k/a and

d/b/a Plexcoin and Sidepay.ca)", is a United Kingdom company.  The complaint makes no

allegations as to Sidepay Ltd. whatsoever; it alleges "PlexCorps" is doing business as

"Sidepay.Ca."  Compl. ¶ 22.  It is unclear whether the SEC alleges that these entities are the

same legal entities, or what jurisdiction the SEC alleges over the U.K. entity Sidepay Ltd. at all.

---

[1]     Two larger questions with jurisdictional importance loom over these proceedings, but are not currently positioned on this motion because they are more fact-specific.  First, does the SEC have jurisdiction under *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010), and its progeny, given that the transactions took place abroad?  And second, does the SEC have jurisdiction over PlexCoin at all, given that PlexCoin may not be a security, but instead something else – a currency, or a commodity, or a good, or a smart contract?  Defendants submit the answers to these questions are both "no."  Should this case survive a motion to dismiss on personal jurisdiction, defendants will move for summary judgment at the appropriate time on these issues.

[2]     The original Lacroix Affidavit is in Quebecois French; this memorandum will refer to and quote from the English certified translation.  Both are filed under seal, under order from U.S. Magistrate Judge Robert Levy (and on consent of the parties), at Dkt# 49.

All of Defendants' involvement with the PlexCoin cryptocurrency has taken place outside of the United States.  Defendants never set foot in the United States in connection with PlexCoin.  To the best of their knowledge, defendants never made any phone calls, sent any mail, electronic mail or text messages, or had any direct discussions, with any person in the United States in connection with PlexCoin.  Lacroix Aff. ¶¶ 4-6.

It is possible that defendants spoke to someone in the United States, or emailed with someone located in the United States.  They did not do so intentionally.  Defendants were not aware of their location at the time, and had no intention to involve anyone from the United States.  Certain internet companies (PayPal, etc.) are international, and when dealing with a representative of that country, Defendants did not know whether they were dealing with someone in Canada, the U.S., or anywhere else in the world.  Lacroix Aff. ¶ 8.

**B.**     **Background on cryptocurrency and initial coin offerings**

A "cryptocurrency" is a digital asset designed to act as a medium of exchange, like a traditional national fiat currency such as the dollar, euro, or yen, but privately issued. Many cryptocurrencies, such as Bitcoin, Ethereum, and Litecoin, are freely traded in on-line markets such as Coinbase (https://www.coinbase.com) or Etherdelta (https://etherdelta.com).

Cryptocurrencies are issued on a "blockchain," a cryptographically secured, distributed ledger that records all transactions in the network in theoretically unchangeable, digitally recorded data packages called blocks.  Each block contains records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain that can be accessed by anyone with appropriate permissions.  Compl. ¶ 28 & n.1. "Permissioned" or private blockchains require servers to be approved to participate on the network or to access particular information on the blockchain.  Compl. ¶ 28 & n.1.

C.      **The PlexCoin Sale**

In June 2017, on a Facebook page for PlexCoin announced a PlexCoin "pre-sale launch" scheduled for August 7, 2017.  The PlexCoin Facebook page described the PlexCoin Token as "the next decentralized worldwide cryptocurrency based on the Ethereum structure" whose "mission is to broaden the possibilities of uses and to increase the number of users by simplifying the process of managing cryptocurrency to the maximum."  Compl. ¶ 38.[3]

Certain websites related to PlexCoin were accessible via the internet worldwide. Compl. ¶ 43; Lacroix Aff. ¶ 38.  At certain times, the PlexCoin website explained that people would be able to purchase PlexCoin tokens with either U.S. dollars, Canadian dollars, Euros, Bitcoin, Ethereum, and Litecoin.  Compl. ¶ 54.

The system for the distribution of PlexCoin was such that when payments for PlexCoin were received by the servers on which the PlexCoin code was running, an automatic transfer for the corresponding PlexCoin amount was directed to the buyer's online access platform.  The physical servers that recorded the receipt of payments and conducted the automatic transfers of PlexCoin were not located in the United States.  Lacroix Aff. ¶ 10.

A buyer could acquire PlexCoin either by paying for it with cryptocurrency forwarded to addresses on the blockchain, or by use of a credit card through online payment services such as Shopify – a Canadian e-commerce company that has its registered office located

---

[3]      Ethereum bills itself as "a decentralized platform that runs smart contracts: applications that run exactly as programmed," running on a "custom built blockchain."  It allows users to "[d]esign and issue your own cryptocurrency … Create a tradeable digital token that can be used as a currency, a representation of an asset, a virtual share, a proof of membership or anything at all. … The total amount of tokens in circulation can be set to a simple fixed amount or fluctuate based on any programmed ruleset. YOU CAN BUILD: A tradeable token with a fixed supply / A central bank that can issue money / A puzzle-based cryptocurrency."  *See* https://www.ethereum.org/ (accessed on April 27, 2018).  Gottlieb Decl. Ex. 1.

in Ontario – which would then deposit the funds into a related bank account in Canada or elsewhere outside the United States.  Lacroix Aff. ¶ 11.

**D.**     **Restrictions on U.S. Persons**

           1.     The Terms and Conditions

Prior to acquiring PlexCoin, each potential purchaser had to agree to the Terms and Conditions, which specifically stated that "[r]esidents of the United States and of the province of Quebec (Canada) cannot directly or indirectly participate" in the offering.  Lacroix Aff. ¶¶ 15, 22 & Ex. 3; March 27, 2018 Affidavit of Rose Thomas ("Thomas Aff.") ¶ 9.

Additionally, those Terms and Conditions stated that the agreement to purchase PlexCoin "shall be governed and construed in accordance with the laws of Singapore."  Further, it stated that "All disputes, controversies or differences arising out of or in connection with this contract, including any question regarding its existence, validity or termination, shall be first referred to mediation in Singapore in accordance with the Mediation Rules of the Singapore International Mediation Centre for the time being in force."  "The applicable law is Singapore law. Any dispute arising out of or in connection with the creation of the PlexCoin (PLX) shall be finally settled by the ordinary courts of the registered domicile of the defendant."  Lacroix Aff. ¶ 39 & Ex. 3.  Singapore was chosen because Defendants intended to open a local office and incorporate a company in Singapore for the PlexCoin project.  Lacroix Aff. ¶ 39.

           2.     The "Checkbox"

To minimize the chances of U.S. persons participating, each potential purchaser would have to check a box confirming that he/she was not a citizen of the United States, and was not transacting in the name of a citizen of the United States.  *See* Lacroix Aff. ¶ 15 & Ex. 1; Thomas Aff ¶ 7.  Thus, a transaction to acquire PlexCoin could not be completed without checking the box to confirm the purchaser was not a citizen of the United States.  *See* Lacroix

Aff. ¶¶ 15-16 & Ex. 2; Thomas Aff ¶ 7.  In order to leave the checkbox screen and eventually

progress to the screen in which one could purchase PlexCoin, a person would have to check the

box indicating that the person was not a U.S. person, nor buying on behalf of a U.S. person.  If

someone did not affirm their non-U.S. status, they could not go to the next screen.  Lacroix Aff.

¶ 15; Thomas Aff ¶ 7.

   The checkbox was active for the entire time of the pre-sale (the only time a person

could initial purchase PlexCoin from its creators).  There was a period after the pre-sale in which

those who had previously purchased PlexCoin could trade with each other.  No checkbox was

required for those logins – again, anyone who had already purchased in the pre-sale had already

checked the box and affirmed that he or she was not a U.S. person.  Lacroix Aff. ¶ 17.

   Defendants did not tell any potential U.S. investors, nor did they tell any

employees to tell any potential U.S. investors, to avoid the requirement to check the boxes or to

assert falsely that he or she was not a resident of the United States.  Lacroix Aff. ¶ 20.

**E.**  **Payment Systems**

   A buyer could purchase PlexCoin either with cryptocurrency transmitted to the

addresses on the blockchain, or with a credit card through online payment services such as

Shopify – a Canadian e-commerce company that has its registered office located in Ontario –

which then deposited the funds into a related bank account in Canada or elsewhere outside the

United States.  Lacroix Aff. ¶ 11.  Investors could also remit PlexCoin purchase payments

through a Canadian website, "SidePay.Ca".  Compl. ¶¶ 98-99.

   Defendants also received payment for PlexCoin through another online payment

services provider called Stripe, a U.S.-based entity with affiliated entities in (at least) Canada and

the United Kingdom.  Defendants used a Euro-denominated account in the name of the PlexCoin

Website.  Compl. ¶¶ 107-108.  On August 31, 2017, Defendants registered an additional account

with Stripe in the name of Ms. Paradis-Royer, associating it to one of her Royal Bank of Canada accounts in Canada.  Compl. ¶ 113.

PlexCoin could also be purchased with Bitcoin, Litecoin, or Ethereum tokens.  In that event, and particularly if that person used a "virtual private network" or a proxy server, it would be impossible for defendants to confirm after the fact whether the buyer was a resident of the United States.  It is impossible to know where a PlexCoin buyer using cryptocurrency (such as Bitcoin, Ethereum tokens, or Litecoin) to purchase PlexCoin and has decided deliberately not to reveal his identity, because cryptocurrency is decentralized and highly anonymous.  Moreover, it is impossible to trace it back to a specific geographical location.  Lacroix Aff. ¶ 28.

The SEC has alleged that from approximately September 8, 2017 through September 19, 2017, Defendants received over US$1 million in in payments in the Stripe Account, covering nearly 5,400 different transactions.  Some 1,400 of these transactions allegedly occurred with individuals whose addresses were in the United States.  Compl. ¶ 114.

## F.    **The Futility of Ringfencing**

PlexCoin did not block U.S. internet protocol ("IP") addresses located in the United States, since an address-blocking system is very complex to install and is not reliable.   It is easy for a person to mask his or her IP address by means of services that are easy to use and offered online free of charge, i.e., a "virtual private network" (or "VPN"), a "proxy server," or a service like the "Tor Browser."[4]  Lacroix Aff. ¶ 23.

In fact, Defendants saw on the PlexCoin Facebook page comments where persons advised using a VPN network, a proxy server, or other circumvention methods in order to

---

[4]      "Tor" is "free software for enabling anonymous communication."  "Using Tor makes it more difficult to trace Internet activity to the user. … The intent for Tor's use is to protect the personal privacy of its users, as well as their freedom and ability to conduct confidential communication by keeping their Internet activities from being monitored."  *See* https://en.wikipedia.org/wiki/Tor_(anonymity_network).

succeed in being connected anonymously.  Lacroix Aff. ¶ 24.  *See also* Declaration of Jason

Gottlieb in Support of Defendants' Motion to Dismiss, dated April 27, 2018 ("Gottlieb Decl."),

Ex. 2 (compilation of PlexCoin World Team Facebook page comments, including:  "I just go on

the website via hide.me proxy…."; "VPN, and browser Tor"; "Prend un vpn pour accéder a ton

compte" ("Take a vpn to access your account"); "Hey Sean, look into getting a VPN on your

computer or phone. Works really well. I went through ExpressVPN. Easy install."; "I'm going to

try and set up a VPN tonight like some others suggested ….")

   Defendants wanted to avoid transacting with residents of the United States,

because they did not understand the American laws that govern cryptocurrency, and did not

intend to invest the resources necessary in order to understand them.  In particular, Defendants

did not want to incur the wrath of the SEC.  Thus, Defendants took lessons from previous

cryptocurrencies, which excluded the United States by means of a "checkbox," and completed

their offerings without apparent problems (such as TENX).  Lacroix Aff. ¶ 26.[5]

   Defendants suspected from the outset that some individuals from the United

States were going to lie and check the boxes in order to be able to buy their PlexCoin.  Thus,

Defendants believed they should find an effective and definitive method to remove them from

the list of buyers.  Lacroix Aff. ¶ 27.

   The only possible method was to wait for the end of the "pre-sale" period, when it

would have been impossible to purchase PlexCoin directly, and then reimburse all the buyers

with a billing address in the United States.  If Defendants had blocked the IP addresses in the

United States during the pre-sale, buyers could simply have used a free, easy-to-use VPN to

deceive the PlexCoin servers and purchase again.  Similarly, if PlexCoin had reimbursed United

---

[5]  *See, e.g.*, https://www.tenx.tech/.  By the time of the PlexCoin offering, many other initial coin
offerings had also taken place.

States transactions immediately, buyers could easily have purchased other cryptocurrency and conducted the purchase of their PlexCoin anonymously, or simply opened a PayPal account in France, for example, to purchase PlexCoin.

Defendants decided that the only 100% reliable method was to allow anyone who was willing to provide an address to purchase PlexCoin with their address, and then unwind those transactions at the end of the pre-sale for violating the PlexCoin terms and conditions. Lacroix Aff. ¶ 27.  Once the pre-sale was finished, individuals could no longer purchase PlexCoin directly, and Defendants could have avoided the problem of persons known to be U.S. individuals purchasing PlexCoin.  Lacroix Aff. ¶ 30.

When a buyer paid by credit card, he or she had to provide to the payment company the billing address associated with the credit card.  It was therefore possible for Defendants, at the end of the pre-sale, to determine the buyers with U.S. addresses to make reimbursements.  Lacroix Aff. ¶ 31.  (Individuals who purchased with cryptocurrency and concealed their identities would be anonymous in any event.  Lacroix Aff. ¶ 28.)  Accordingly, Mr. Lacroix asked Shopify, Square, Stripe, PayPal, and Wave to provide to lists of addresses of buyers who used a credit card, in order to identify the residents of the United States who had lied about their location to buy PlexCoin, in order to reimburse those purchases.  Lacroix Aff. ¶ 32.

Unfortunately, on September 21, 2017, prior to the conclusion of the presale, the Autorité des Marchés Financiers du Quebec ("QAMF") froze certain of the Defendants' assets, including the bank account to which all Shopify transactions were deposited.  Compl. ¶ 128. Consequently, defendants were unable to make the refunds to U.S. residents as planned.  Lacroix Aff. ¶ 33.  Even today, Defendants simply want to unwind the transactions conducted by the

13

persons who are residents of the United States and who still hold their PlexCoin.  Lacroix Aff.

¶ 36.

**G.**     **Ongoing Activity**

        The PlexCoin website continues to be available to PlexCoin holders in the United

States, and PlexCoin holders can log in from the United States to check their holdings.  Thomas

Aff. ¶¶ 11-12 & Ex. C.  Defendants are unable to prevent such activity – because of the activity

and account freezes in both Canada and the United States, Defendants cannot return the

PlexCoin to U.S. persons.  Thus, U.S. persons who purchased PlexCoin still have active

accounts.  Further, to the extent U.S. persons purchased PlexCoin from others (without any

knowledge or involvement of the Defendants), information about their accounts (including their

login locations) is available.  Thomas Aff. ¶¶ 13-15.

**H.**     **The Instant Complaint and Service Issues**

        On December 1, 2017, the SEC filed a complaint under the antifraud provisions

of the federal securities laws, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange

Act"), 15 U.S.C. § 78j(b), SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 17(a) of the

Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), as well as under Section 5(a) and

5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c).  Compl. ¶¶ 134-42.  The SEC sought and

secured an *ex parte* TRO based on its Complaint and affidavits.  None of those papers mentioned

the efforts that Defendants took to exclude U.S. persons.

        On December 4, 2017, this Court ordered that its "Order To Show Cause,

Temporary Restraining Order, And Order Freezing Assets And Granting Other Relief" and the

papers supporting the Commission's emergency application for be served upon Defendants (or

their attorney who agrees to accept service on their behalf) on or before December 4, 2017, by

personal delivery, facsimile, overnight courier, international express mail, first-class mail to

14

Defendants' attorney, or to Defendants at one of two Canadian physical addresses, or to Defendants via email (with the "corporate" entity email address listed as "account@plexcoin.com").  Dkt# 10.

On December 12, 2017, the SEC filed a summons for the "corporate entity," addressed to "PlexCorps a/k/a and d/b/a PlexCoin and Shopify.ca" and sent to "815, boul. Lebourneuf, bureau 404, Quebec, Quebec, G2J 0C1, Canada."  Dkt#20; 20-1.  On December 22, 2017, the SEC filed a summons to "PlexCorps a/k/a and d/b/a PlexCoin and Sidepay.ca," with the address "72 High Street, Haslemere, Surrey, United Kingdom GU27 2LA."  Dkt# 23.

On January 31, 2018, the SEC filed requests for waiver of service.  Dkt # 33. The waiver requests were made to Dominic Lacroix, Sabrina Paradis-Royer, and "PlexCorps (d/b/a and a/k/a PlexCoin and SidePay.ca)".  Defendants elected not to waive service.

In an April 18, 2018 minute order, the Court noted the lack of proof of service on the docket, and further noted that "proof of service is still required if the SEC files no waiver, *see*, *e.g.*, *Fileccia v. City of N.Y.*, No. 10-CV-889 (ARR), 2011 WL 4975313, at *3 (E.D.N.Y. Sept. 23, 2011), *report and recommendation adopted*, 2011 WL 5024283 (E.D.N.Y. Oct. 19, 2011); *cf.* Fed. R. Civ. P. 4(d)(4)."

In an April 25, 2018 letter to the Court, the SEC conceded that only "last week," *i.e.* the week of April 16, 2018, did the SEC begin the process to serve Defendants pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents (the "Hague Convention") as contemplated by Fed. R. Civ. P. 4(f)(1).  Dkt# 46.  In effect, the SEC has conceded that it has not yet served the Defendants.

## I.     Jurisdictional Discovery

On January 9, 2018, this Court ordered discovery into whether the SEC has personal jurisdiction over Defendants.  The SEC issued 20 document requests to each individual

Defendant (Gottlieb Decl. Ex. 3), 13 interrogatories (Gottlieb Decl. Ex. 4), and 12 requests for

admission to each individual Defendant (Gottlieb Decl. Ex. 5).  The SEC pressed for broad-

ranging depositions, leading to a compromise in which Defendants provided a jurisdictional

affidavit answering the SEC's jurisdictional questions.  Dkt# 49.

      The SEC also took extensive third party discovery.  It issued subpoenas or other

requests for information to approximately 20 parties, including Facebook, PayPal, Google,

Amazon, Stripe, and Square.  Gottlieb Decl. Ex. 7.  It interviewed at least eleven investors in the

United States.  Gottlieb Decl. Ex. 14.  The SEC received cooperation from the QAMF, which

provided the SEC with thousands of pages of documents and interview transcripts from the

QAMF's own investigation.  In sum, the SEC has taken full advantage of its status as an

investigative agency within the United States federal government, and has received an immense

amount of information.  In total, the SEC has come to possess over 18,000 pages of documents,

transcripts, and numerous audio recordings relating to this matter.  Gottlieb Decl. Ex. 8.

## ARGUMENT

      "The plaintiff bears the burden of establishing that the court has jurisdiction over

the defendant when served with a Rule 12 (b) (2) motion to dismiss." *Whitaker v. Am.*

*Telecasting, Inc*., 261 F.3d 196, 208 (2d Cir. 2001); *see also Laborers Local 17 Health & Benefit*

*Fund v. Phillip Morris, Inc.*, 26 F. Supp. 2d 593, 597 (S.D.N.Y. 1998) (plaintiff bears the

"ultimate burden" of showing proper jurisdiction by a preponderance of evidence).[6]  Conclusory

allegations are not enough to establish personal jurisdiction.  *Mugno v. Societe Internationale de*

---

[6]     Where jurisdictional facts are disputed, the Court has the power to consider matters outside the
pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists.  *See*
*Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek (Persero)*, 600 F.3d 171, 175 (2d Cir. 2010);
*APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003).

*Telecomms. Aeronautiques, Ltd.*, No. 05-cv-2037 (DRH) (ARL), 2007 U.S. Dist. LEXIS 6573, at *31-32 (E.D.N.Y. Jan. 30, 2007).

## I.     DEFENDANTS HAVE NOT BEEN SERVED WITH PROCESS

Federal Rule of Civil Procedure 4(f)(1) requires that an individual in a foreign country be served by any internationally agreed means of service reasonably calculated to give notice, such as those authorized by the Hague Convention.  Under Rule 4(h), a foreign corporate entity <u>must</u> be served in any manner prescribed by Rule 4(f), except personal delivery under Rule (f)(2)(C)(i).[7]  Thus, "a foreign corporate defendant is to be served outside of the United States in accordance with the Hague Convention, provided its country of domicile is a signatory."  *Kelly v. Vesnaver*, No. 16-CV-883 (DRH) (SIL), 2017 U.S. Dist. LEXIS 56262, at *14 (E.D.N.Y. Apr. 11, 2017) (quoting *Honig v. Cardis Enters. Int'l N.V.*, No. 14-CV-7548, 2016 U.S. Dist. LEXIS 149201 (E.D.N.Y. Oct. 27, 2016)).  Both Canada and the United Kingdom (the location of possible defendant Sidepay Ltd.) are Hague Convention signatories.

In its April 25, 2018 letter to the Court, the SEC conceded that it only began the process of service via the Hague Convention "last week" – the week of April 16, 2018.  Dkt# 46.  The SEC has thus conceded that it has not served the Defendants.  The SEC does not explain why it did not seek to serve Defendants in the nearly four months since it obtained an ex parte TRO against the Defendants.

Defendants have appeared in this action – for the purposes of challenging personal jurisdiction.  But the notion that the Defendants may have "actual notice" of the proceeding is insufficient.  "[T]he simple fact that [defendant] obtained a copy of the state court

---

[7]     Lack of proper service is an issue of personal jurisdiction:  "Objections pursuant to Rule 12(b)(2) concern lack of personal jurisdiction, which results when a summons and compliant have not been served on the defendant pursuant to Rule 12(b)(5)."  *Mugno*, 2007 U.S. Dist. LEXIS 6573, at *31-32 (citation omitted).

complaint against it is insufficient for service to be deemed effective under New York law."

*Gerena v. Korb*, 617 F.3d 197, 202 (2d Cir. 2010) (citing *Macchia v. Russo*, 67 N.Y.2d 592, 594

(1986)) ("In a challenge to service of process, the fact that a defendant has received prompt

notice of the action is of no moment.  Notice by means other than those authorized by statute

does not bring a defendant within the jurisdiction of the court.").  "[N]either actual notice nor

simply naming the defendant in the complaint will provide personal jurisdiction without

substantial compliance with Rule 4."  *SEC v. Ross*, 504 F.3d 1130, 1140 (9th Cir. 2007).

       Proper service in this case is vital.  The defendants are two foreign individuals,

neither of whom speaks English natively.  The plaintiff is no ordinary individual or company; it

is an agency of the United States federal government, and it is seeking to impose penalties and

injunctive relief upon foreign citizens.  The United States federal government should not be

allowed to take shortcuts on the service requirements for foreign citizens.

## II.     THE LEGAL STANDARDS FOR PERSONAL JURISDICTION

       "Upon motion, the Court is obligated to dismiss actions against defendants over

whom it has no in personam jurisdiction."  *Laborers Local 17 Health & Benefit Fund*, 26 F.

Supp. 2d at 597 (citing Fed. R. Civ. P. 12(b)(2)).  The SEC has failed to carry its burden.

       No general personal jurisdiction can exist in this case:  "for an individual, the

paradigm forum for the exercise of general jurisdiction is the individual's domicile."  *In re*

*Roman Catholic Diocese of Albany, New York, Inc*., 745 F.3d 30, 38 (2d Cir. 2014) (citation

omitted).  Neither of the individual defendants, nor the corporate defendant, is domiciled in the

United States.  *See Daimler AG v. Bauman*, 571 U.S. 117, 136 (2014).  Thus, the only question is

whether this Court has specific personal jurisdiction, which must be premised on the facts

pertaining to <u>each</u> individual defendant.  *Calder v. Jones*, 465 U.S. 783, 790 (1984).

In a case brought by the SEC, jurisdiction over a non-domiciliary is governed by two similar jurisdictional statutes, 15 U.S.C. § 77v and 15 U.S.C. § 78aa under the Securities Act of 1933 and the Securities Exchange Act of 1934 respectively (the "Jurisdictional Statutes"). *See, e.g.*, *SEC v. Sharef*, 924 F. Supp. 2d 539, 544 (S.D.N.Y. 2013). These sections permit the exercise of personal jurisdiction "to the limit of the Due Process Clause of the Fifth Amendment." *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990); *see also Bersch v. Drexel Firestone, Inc*., 519 F.2d 974, 998 (2d Cir. 1975), *cert. denied*, 423 U.S. 1018 (1975).

Under the Jurisdictional Statutes, the SEC may bring this suit "in any such district … wherein the defendant is found or is an inhabitant or transacts business." Both statutes also provide for "extraterritorial jurisdiction" in that U.S. district courts shall have jurisdiction of an action brought by the SEC involving "conduct occurring outside the United States that has a foreseeable substantial effect within the United States." 15 U.S.C. § 77v; 15 U.S.C. § 78aa.

It is "essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *see also Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir. 1972). In *Leasco*, the Second Circuit stated that this principle "must be applied with caution, particularly in an international context.… The person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him." 468 F.2d at 1341; *see also Bersch*, 519 F.2d at 1000 ("[E]ven assuming … some causal relation … the test for in personam jurisdiction is somewhat more demanding.").

The Jurisdictional Statues echo New York's long-arm statute: jurisdiction may be found if a defendant "transacts business" in the forum or takes action outside the forum that has a

"foreseeable substantial effect" within the forum.  *See* N.Y. C.P.L.R. § 302(a)(1); N.Y. C.P.L.R. § 302(a)(3)(ii); *see also Bensusan Rest. Corp. v. King*, 126 F.3d 25 (2d Cir. 1997) (dismissing for lack of personal jurisdiction where website available in New York was insufficient to establish jurisdiction under New York's long-arm statute).  Thus, case law interpreting these New York law provisions is instructive.

After any statutory analysis, the Court must consider Constitutional due process, which requires that if a defendant is "not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945) (cleaned up[8]); *Charles Schwab Corp. v. Bank of America Corp*., 883 F.3d 68, 82 (2d Cir. 2018) (citing *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2013)).

## III.   THERE IS NO PERSONAL JURISDICTION OVER THE DEFENDANTS UNDER THE JURISDICTIONAL STATUTES

### A.   Defendants Did Not Transact Business Within the United States to the Extent or In the Manner Required by Law

The SEC has alleged, and will contend, that hundreds of Americans bought PlexCoin, demonstrating that Defendants were transacting business in the United States. However, as New York law instructs for long-arm jurisdiction analysis, "[I]t is not the quantity but the quality of the contacts that matters."  *Doe v. Nat'l Conf. of Bar Exam'rs*, No. 1:16-CV-264 (PKC), 2017 U.S. Dist. LEXIS 2481, at *17 (E.D.N.Y. Jan. 6, 2017) (repeated correspondence with New York insufficient for personal jurisdiction) (*citing Yurasov-Lichtenberg v. Betz*, 15-CV-1430, 2016 U.S. Dist. LEXIS 117057, 2016 WL 4544031, at *4

---

[8]   "Cleaned up" is a parenthetical used to signal the removal of internal quotation marks, brackets, and parallel citations in quoted material for reading ease.  *See, e.g.*, *Forbes v. City of N.Y.*, No. 16 CV 2751 (SJ) (SJB), 2018 U.S. Dist. LEXIS 66117, at *6 (E.D.N.Y. Apr. 19, 2018); *United States v. Dowell*, 711 F. App'x 280 (6th Cir. 2017) (same); Jack Metzler, Cleaning Up Quotations, J. App. Prac. & Process (forthcoming 2018) (available at SSRN: https://ssrn.com/abstract=2935374)

(E.D.N.Y. Aug. 30, 2016)).  As for the "quality" of these transactions, it is clear that as to each, the Defendants purposely did not avail themselves of U.S. jurisdiction.

1.   Transacting Business Requires Purposeful Availment of the Forum

Transacting business requires "purposeful activity – some act by which the defendant purposefully avails itself of the privilege of conducting activities within [the forum], thus invoking the benefits and protections of its laws." *In re Dental Supplies Antitrust Litig*., No. 16 Civ. 696 (BMC)(GRB), 2017 U.S. Dist. LEXIS 153265, at \*22-23 (E.D.N.Y. Sep. 20, 2017) (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007)); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (defendant must have "purposefully directed" activities at forum residents).

"Purposeful availment occurs when the non-domiciliary, through volitional acts, seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship." *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 67 (2d Cir. 2017) (cleaned up) (citing *D&R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 298 (2017)).  Purposeful activities are volitional acts by which the non-domiciliary "avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Paterno v. Laser Spine Inst*., 24 N.Y.3d 370, 376 (2014) (cleaned up) (quoting *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007)).

At a minimum, the defendant must "on his or her own initiative project himself or herself into the state to engage in a sustained and substantial transaction of business." *Hau Yin To*, 700 F. App'x at 67 (cleaned up).  Accord *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (relationship "must arise out of contacts that the 'defendant himself' creates with the forum State.") (citing *Burger King*, 471 U.S. at 475).

21

2.   <u>Defendants Did Not Purposely Avail Themselves of United States Jurisdiction – Indeed They Tried to Avoid It</u>

The SEC's strongest argument for jurisdiction is that many U.S, persons purchased PlexCoin.  However, in none of these cases did Defendants purposely avail themselves of U.S. jurisdiction.  The evidence demonstrates that Defendants did not purposely seek out and initiate contact with Americans, solicit business in America, or establish a continuing relationship.  Far from "availing themselves" of United States institutions or relationships, they sought to <u>avoid</u> those relationships.  To the extent any transactions occurred, they were brought about solely because of the unilateral acts of U.S. persons – literally <u>despite</u> Defendants' express wishes.  *See SEC v. Carrillo Huettel LLP*, No. 13 Civ. 1735 (GBD), 2014 U.S. Dist. LEXIS 77560, at *18 (S.D.N.Y. June 4, 2014) (dismissing for lack of personal jurisdiction where it was not reasonably foreseeable to foreign resident that he would be the subject of personal jurisdiction); *AESP, Inc. v. Signamax*, LLC, 29 F. Supp. 3d 683, 690-91 (E.D. Va. 2014) (dismissing for lack of personal jurisdiction where the defendant "did not direct the sales of its products to Virginia or any Virginia customers, nor did it require [its authorized agent] to sell the products to Virginia customers…. [T]he record reflect[ed] no more than that defendant might expect that the products would eventually be sold somewhere in the United States, including Virginia.")

a.      *Defendants Sought to Avoid Contacts with U.S. Persons Through Use of a "Checkbox"*

"In order to determine whether a website constitutes 'transacting business' for purposes of personal jurisdiction, courts must look to the level of interactivity and commercial nature of the exchange of information that occurs on a website."  *Skrodzki v. Marcello*, 810 F. Supp. 2d 501, 514 (E.D.N.Y. 2011) (dismissing for lack of personal jurisdiction where others found defendant's webpage and initiated the transaction).

A website is considered "interactive" if it permits the exchange of information between viewers and a defendant and "depending on the level and nature of the exchange may be a basis for jurisdiction." *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000). On the opposite end of the spectrum are passive websites "that do[] little more than make information available to those who are interested in it." *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1121 (W.D. Pa. 1997). A passive website "alone would not provide a basis for the assertion of personal jurisdiction over [its owner]". *Grimaldi v. Guinn*, 72 A.D.3d 37, 50, (2d Dep't 2010) (collecting cases). If a passive website triggers an inquiry from a U.S. person, and that U.S. person responds to the website by seeking out the foreign defendants, that "responsive" interaction is "not the type of interactions that demonstrate the purposeful availment necessary to confer personal jurisdiction over these out-of-state defendants. *Paterno*, 24 N.Y.3d at 378.

Here, the PlexCoin website used a "checkbox" in which each potential purchaser would have to check a box confirming that he/she was not a citizen of the United States, and was not transacting in the name of a citizen of the United States. A transaction to acquire PlexCoin could not be completed without checking the box to confirm the purchaser was not a citizen of the United States. If a potential purchaser did not affirm his/her non-U.S. status, they could not progress to the next screen. *See* Lacroix Aff. ¶¶ 15-16 & Ex. 2; Thomas Aff ¶ 7.

Thus, the PlexCoin website was only "active" – i.e., allowing a purchase of PlexCoin – if a user clicked the box affirming that he or she was not a U.S. person. Otherwise, the website was completely passive – no purchases could be made, and all the website did was make information available. *See ISI Brands, Inc. v. KCC Int'l, Inc.*, 458 F. Supp. 2d 81, 86 (E.D.N.Y. 2006) ("Internet websites that are not of a commercial nature and do not permit the

23

purchase of products on-line are not sufficient to confer personal jurisdiction pursuant to section

302(a)(1).”); *Aqua Prods., Inc. v. Smartpool, Inc.*, No. 04-CV-5492, 2005 U.S. Dist. LEXIS

17246, at *18 (S.D.N.Y. Aug. 18, 2005) (“Passive websites which primarily make information

available to viewers, but do not permit an exchange of information, fail to justify the exercise

specific jurisdiction over a non-domiciliary.”).

        Defendants made plain that they did not want to deal with U.S. counterparties,

and attempted to screen out U.S. purchasers.  The fact that U.S. persons circumvented this

roadblock should not be held against Defendants.  Instead, it should be understood as a U.S.

person knowingly “going abroad” to transact business.

> b.    *Any Purchase of PlexCoin by a U.S. Person was a Unilateral*
>         *Action of that U.S. Person*

        “[U]nilateral activities of third parties … cannot, in themselves, satisfy the

requirement of contact with the forum.”  *Porina v. Marward Shipping Co.*, 521 F.3d 122, 128

(2d Cir. 2008) (citing *Hanson*, 357 U.S. at 253); *see also Helicopteros Nacionales de Colombia,

S. A. v. Hall*, 466 U. S. 408, 417 (1984) (“[The] unilateral activity of another party or a third

person is not an appropriate consideration when determining whether a defendant has sufficient

contacts with a forum State to justify an assertion of jurisdiction”)*; George Reiner & Co. v.

Schwartz*, 41 N.Y.2d 648, 650 (1977).  “The unilateral activity of plaintiff executing a contract in

New York is an insufficient basis upon which to acquire jurisdiction over a non-domiciliary

defendant.”  *Gordian Group, LLC v. Syringa Expl., Inc.*, 168 F. Supp. 3d 575, 586 (S.D.N.Y.

2016) (“Nothing in the record suggests that Defendant projected itself into a New York-based

transaction when [a counterparty] executed the Agreement.”)

        If a U.S. person circumvented Defendants’ efforts and unilaterally placed orders

for PlexCoin, without any personal involvement by the Defendants, that third-party unilateral act

does not create personal jurisdiction.  Any such transaction would have to have been initiated by the U.S. person, with active steps by that person – but not from Defendants.  *Skrodzki*, 810 F. Supp. 2d at 511 ("unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."); *see also Mortgage Funding Corp. v. Boyer Lake Pointe, L.C.*, 379 F. Supp. 2d 282, 287-88 (E.D.N.Y. 2005) (no personal jurisdiction over a defendant who did not initiate the communications alleged to be the basis for personal jurisdiction) (citing *Professional Personnel Mgmt. Corp. v. Southwest Medical Assocs.*, 216 A.D.2d 958, 628 N.Y.S.2d 919, 920 (1st Dep't 1995)).

        c.        *The PlexCoin Terms and Conditions, Which Contained a non-U.S. Governing Law and Dispute Resolution Clause, Militate Against Personal Jurisdiction*

Purchasers were obliged to have read and affirmatively agreed to the PlexCoin Terms and Conditions, which stated that their purchase of PlexCoin would be governed by Singapore law, and its dispute resolution clause called for mediation in Singapore, with any court dispute settled by the courts of "the defendant" – either Singapore or Quebec.  Lacroix Aff. ¶ 39 & Ex. 3.  Whether or not this choice of law clause was binding (an issue not before the Court), it is clear from these non-U.S. forum selections that Defendants purposely did not avail themselves of the law or courts of the United States – as evidenced, they desired and attempted to avoid dealing with U.S. persons or avail themselves of U.S. law or institutions.

        d.        *Defendants Did Not Communicate With Potential Purchasers in the United States*

To their knowledge, Defendants did not communicate directly with any potential purchaser in the United States – no phone calls, emails, or texts.  The Complaint is devoid of allegations of any direct sales efforts into the United States.  And even if the SEC could identify

certain isolated communications to people in the United States, "communications into New York will only be sufficient to establish personal jurisdiction if they were related to some transaction that had its 'center of gravity' inside New York, into which a defendant 'projected himself.'" *Skrodzki*, 810 F. Supp. 2d at 51 (quoting *Maranga v. Vira*, 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005)).  Here, the "center of gravity" for PlexCoin transactions was outside the United States.

> 3. The Nature of Blockchain Technology Reinforces That Defendants Did Not "Transact Business" Within The United States

A blockchain, also known as a distributed ledger, is an online database managed by a decentralized network of users, independent of any central bank or sovereign entity. Blockchain transactions are not based on any "concrete physical – or even digital – object."[9] Whereas the sale of a U.S. security is usually based on the existence and/or transference of a physical stock certificate (or transference of a book entry) created and/or sold in the United States, the sale of a digital currency is only effected when the intention to sell is published to the network of users.[10]  This publication is accomplished by the changing of code on an individual computer server.[11]  The "code change" is then broadcast automatically to the other participants in the blockchain for verification and entry into the ledger in order to recognize the sale.[12]

---

[9]     *See* https://www.theguardian.com/technology/2018/jan/29/cryptocurrencies-bitcoin-blockchain-what-they-really-mean-for-our-future (Gottlieb Decl. Ex. 9); *see also* https://blockgeeks.com/guides/what-is-blockchain-technology/ ("The blockchain database isn't stored in any single location . . .") (Gottlieb Decl. Ex. 10).

[10]    https://www.coindesk.com/information/how-do-bitcoin-transactions-work/ (Gottlieb Decl. Ex. 11).  While the article focuses on bitcoin, the basic principles are similar for other cryptocurrencies.

[11]    *Id.* ("[A]ny transaction I issue from my bitcoin address needs to be 'signed' with my private key [a string of 64 letters and numbers]. To do that, I put both my private key and the transaction details (how many bitcoins I want to send, and to whom) into the bitcoin software on my computer or smartphone.").

[12]    O'Shields, Reggie, SMART CONTRACTS: LEGAL AGREEMENTS FOR THE BLOCKCHAIN, 21 N.C. Banking Inst. 177, 180 (March 2017).  *See also* James Condos, William H. Sorrell and Susan L. Donegan, Blockchain Technology Opportunities and Risks (January 15, 2016) at *6, http://legislature.vermont.gov/assets/Legislative-Reports/blockchain-technology-report-final.pdf ("To add a block to a chain, parties broadcast to the network the details of the transaction, and nodes verify these transactions . . ."); 2017 Emerging Issues 7512, Blockchain Technology and Its Applicability to the

No physical object ever exists.  The transfer of rights to the currency is based solely on code.  In the absence of any physical point of reference (*i.e.* a stock certificate) on which the transaction is based, the transaction necessarily occurs at the location of the initial server where the number change is carried out.

In this case, that location was outside the United States.  Lacroix Aff. ¶ 10.  A U.S. investor may have placed an order to purchase PlexCoin, but that purchase was only executed when transmitted to a server outside the United States, and a digital "number change" took place on a server outside the United States.  Any further activity with the PlexCoin after that did not involve the Defendants.

4.    The SEC's Previous Suggestions For Why Jurisdiction Exists Are Wrong as a Matter Of Law

a.    *Internet Postings Are Not Transacting Business within the State*

The SEC alleges that Defendants posted information about PlexCoin on Facebook and other websites that were visible to U.S. persons.  Courts in this district and elsewhere routinely dismiss on jurisdictional grounds where the jurisdictional "hook" is that an internet webpage is available in the district.  *See, e.g.*, *Hsin Ten Enter. USA v. Clark Enters.*, 138 F. Supp. 2d 449, 456 (S.D.N.Y. 2000) ("[T]he Second Circuit has made clear that personal jurisdiction over a defendant is not appropriate simply because the defendant maintains a website which residents of New York may visit."); *Lyons v. Rienzi & Sons, Inc.*, 856 F. Supp. 2d 501, 509 (E.D.N.Y. 2012) (dismissing for lack of jurisdiction despite that company's Facebook page was admittedly accessible to that site's users in New York); *Weiss v. Barc, Inc.*, No. 12 CV 7571 (TPG), 2013 U.S. Dist. LEXIS 75406, at *6-7 (S.D.N.Y. May 29, 2013) ("The fact that Barc

---

Practice of Real Estate Law ("Once a command is made to execute a transaction, the node will trace through the history of the blockchain all the way to the genesis block to confirm that the new transacting party is 'cleared' to join the block. The new block can then be added to the chain, which creates an indelible and transparent record of transactions.").

operates a website that is open to the public as a whole is insufficient to form the basis for personal jurisdiction under N.Y. C.P.L.R. § 301…."); *Katiroll Co. v. Kati Roll & Platters, Inc.*, No. 10 Civ. 1703 (LTS)(RLE), 2010 U.S. Dist LEXIS 70977, at *11-12 (S.D.N.Y. July 9, 2010) (Facebook advertisements insufficient to establish personal jurisdiction).[13]

U.S. courts will not find personal jurisdiction unless the website specifically targets Americans, or is aimed at American users. *ISI Brands*, 458 F. Supp. 2d at 87 ("[T]he fact that the posting appears on the website in every state will not give rise to jurisdiction in every state.") (quoting *Seldon v. Direct Response Techs.*, No. 03 Civ. 5381, 2004 U.S. Dist. LEXIS 5344, at *15 (S.D.N.Y. Mar. 31, 2004)).

Defendants' use of a globally-available internet site like Facebook is thus insufficient to confer jurisdiction. A Facebook page can be posted, and accessed from, anywhere in the world with an internet connection. And finding jurisdiction based on use of a website run by a U.S. company, or use of a communication system that used U.S. resources, would lead to unintended absurdities: it would implicate personal jurisdiction in any district in the United States for virtually every transaction in the world that used Facebook, eBay, Google Mail, Yahoo Mail, or any similar means of international communication.

---

[13]     Courts outside the Second Circuit agree. *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454 (3d Cir. 2003) ("[T]he mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world."); *Adv. Tactical Ordinance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014) (a website "should not open a defendant up to personal jurisdiction in every spot on the planet where that website is accessible"); *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 419-20 (9th Cir. 1997) (no personal jurisdiction where there was "no question that anyone, anywhere could access that home page and thereby learn about the services offered," but found that it could not be inferred that defendant deliberately directed merchandising efforts toward Arizona residents); *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349-50 (D.C. Cir. 2000) ("Access to a website reflects nothing more than a telephone call by a District resident to the defendants' computer servers, all of which apparently are operated outside of the District."); *Blue Water Int'l., Inc. v. Hattrick's Ir. Sports Pub, LLC*, Civ. No. 8:17-cv-1584-T-23AEP, 2017 U.S. Dist. LEXIS 154121, at *10-11 (M.D. Fla. Sep. 21, 2017) (defendant's use of Facebook, Twitter, Yelp, and TripAdvisor did not suffice for personal jurisdiction); *see also* 6 McCarthy on Trademarks and Unfair Competition § 32:45.50 (5th ed.) ("The vast majority of courts reject the universal jurisdiction view.").

As the Circuit Court for the District of Columbia put it in *GTE*, 199 F.3d at 1350, a theory that mere accessibility of the defendants' websites establishes the necessary "minimum contacts" with a forum "simply cannot hold water":

> [U]nder this view, personal jurisdiction in Internet-related cases would almost always be found in any forum in the country.  We do not believe that the advent of advanced technology, say, as with the Internet, should vitiate long-held and inviolate principles of federal court jurisdiction.  The Due Process Clause exists, in part, to give "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."  … In the context of the Internet, [plaintiff's] expansive theory of personal jurisdiction would shred these constitutional assurances out of practical existence.  Our sister circuits have not accepted such an approach, and neither shall we.

(Quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).)

> b.    *Use of International Payment Services Does Not Confer Personal Jurisdiction*

The SEC alleges that Defendants used international payment services, such as Paypal or Stripe.  This district, as well as at least one other, has found that mere use of US-based payment services websites are insufficient to establish "transacting business" within the state for purposes of personal jurisdiction.  *See Novak v. Petsforum Group, Inc.*, No. 02-CV-2978 (DLI), 2005 U.S. Dist. LEXIS 48483, at *6-8 (E.D.N.Y. Aug. 1, 2005) (collection of money from the general population of Internet users through Paypal does not show commercial activity directed at the fourm); *Bragg Live Foods, Inc. v. Eco Action SDN BHD*, No. CV 15-8261 DSF (JPRx), 2016 U.S. Dist. LEXIS 186410, *8 (C.D. Cal. Apr. 29, 2016).

As *Bragg Live Foods* reasons, receiving payments through a U.S.-based payment services website is insufficient because "PayPal is available for transactions from around the world.  If its use were sufficient for jurisdiction, California courts would have jurisdiction over every tort and contract claim involving PayPal – regardless of where the parties are located and

the injuries occurred.  That simply is not consistent with the requirements of due process."  2016

Dist. LEXIS 186410, at *6-7 (dismissing where "Plaintiff fails to allege sufficiently that

Defendants purposely directed contact with California.").  *See also Intercarrier Commc'ns LLC

v. WhatsApp Inc*., No. 3:12-cv-776, 2013 U.S. Dist. LEXIS 131318 (E.D. Va. Sept. 13, 2013) (no

personal jurisdiction where defendant did not directly receive payment for "app" sold in district,

where payments were processed through third parties).

       In this case, the payment services alleged in the Complaint to have been used by

Defendants have a significant foreign presence, including in Canada.  *See, e.g*.,

https://www.paypal.com/ca/; https://squareup.com/ca; https://stripe.com/ca;

https://stripe.com/global ("Available for businesses in 25 countries.  Accept payments from

anywhere in the world."); https://www.facebook.com/payments_terms ("Person-to-Person

Transfer in the U.S. and Canada. Person-to-Person transfer of funds ('P2P') by people who are

residents of or have their principal place of business in the U.S. or Canada may be made

available to you in the Messenger service at our sole discretion.").  Gottlieb Decl. Ex. 12.

       Even if a global internet company maintained a base of operations in the United

States, use of that company cannot justify personal jurisdiction in the United States.  If it did,

U.S. courts would have personal jurisdiction over every person engaged in virtually every single

internet transaction in the world.  More is obviously necessary.

       *c.*     *Use of U.S. Dollars Does Not Confer Personal Jurisdiction*

       Similarly, courts routinely find it insufficient that defendants may have received

U.S. dollars as payment.  *See Krepps v. Reiner*, 414 F. Supp. 2d 403, 408 (S.D.N.Y. 2006)

(dismissing for lack of personal jurisdiction where a bank account in New York to pay U.S.

dollars to some of the individuals and entities who provide services in France was insufficient to

confer jurisdiction); *Mattel, Inc. v. Securenet Info. Servs. & 2857111 Can., Inc.*, 2001 U.S. Dist. LEXIS 6288, at *3-4 (S.D.N.Y. May 16, 2001).

This logic is even stronger when dealing with international transactions over the internet. The U.S. dollar is used around the world, and is (arguably) the foremost international reserve currency. Several foreign countries simply use the U.S. dollar instead of having their own currency, and the U.S. dollar is in wide use alongside foreign currency in several other foreign countries.[14] *See Bragg Live Foods,* 2016 Dist. LEXIS 186410, at *8 ("Defendants' acceptance of U.S. dollars from customers 'worldwide/overseas,' … and their alleged affiliation with a bank licensed in New York does not indicate purposeful direction at the United States.").

## B. Defendants Did Not Reasonably Expect Their Acts to Have Effects in the United States

The SEC must show that the defendants' acts allegedly presented "unmistakably foreseeable effect[s] within the United States" that could "reasonably be expected to be visited upon United States shareholders." *Unifund Sal*, 910 F.2d at 1033. But the SEC fails that test, in large part because the defendants specifically tried to exclude U.S. persons from participating. Their reasonable expectation was that U.S. persons, having been told they were not allowed to participate, would not then lie in order to participate.

To establish personal jurisdiction in a case brought by the SEC, "the person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him." *SEC v. Alexander*, 160 F. Supp. 2d 642, 655 (S.D.N.Y. 2001) (dismissing on personal jurisdiction SEC complaint against a foreign defendant

---

[14]     *See, e.g.*, https://www.investopedia.com/articles/forex/040915/countries-use-us-dollar.asp. (Gottlieb Decl. Ex. 13.)

who did not know that a sale order she placed would result in a sale of a security listed on the New York Stock Exchange) (quoting *Leasco*, 468 F.2d at 1341).

It is insufficient merely to assert that Defendants should have known that it was likely that some Americans would purchase PlexCoin, or even end up holding it.  "The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *J. McIntyre Mach. Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011) (Kennedy, J., judgment of Supreme Court).  The fact that someone "might" take unilateral action to circumvent PlexCoin's admonitions against U.S. persons to purchase PlexCoin is insufficient to provide jurisdiction.

## IV.  EXERCISING PERSONAL JURISDICTION WOULD ALSO VIOLATE CONSTITUTIONAL DUE PROCESS

Given all the above points, personal jurisdiction in this case is also inappropriate under a Constitutional due process analysis, which consists of two components:  a minimum contacts analysis and a reasonableness inquiry.  *See, e.g.*, *Sharef*, 924 F. Supp. 2d at 544.

"Although the long-arm statute and the Due Process Clause are not technically coextensive, the New York requirements (benefit, knowledge, some control) are consonant with the due process principle that a defendant must have 'purposefully availed itself of the privilege of doing business in the forum.'"  *Charles Schwab Corp.*, 883 F.3d at 85 (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)); *see also Burger King Corp.*, 471 U.S. at 472 ("This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of … the 'unilateral activity of another party or a third person.'") (citations omitted).  "Great care and reserve should be exercised when

extending our notions of personal jurisdiction into the international context."  *Sharef*, 924 F.

Supp. 2d at 548 (citing *Asahi Metal Indus. v. Superior Ct. of Cal.*, 480 U.S. 102, 115 (1987)).

### A.      The Defendants Have No Minimum Contacts With the United States

Under the minimum contacts test, the Court must determine that "the defendant

has 'purposefully directed' his activities at residents of the forum, and the litigation results from

alleged injuries that 'arise out of or relate to' those activities."  *Burger King*, 471 U.S. at 472

(citations omitted).  A defendant must have "'purposefully avail[ed] itself of the privilege of

conducting activities within the forum State.'"  *Id*. at 475 (quoting *Hanson v. Denckla,* 357 U.S.

235 (1958)); *see also In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 542 (S.D.N.Y. 2007)

(plaintiff "must show that his claim arises out of or relates to defendant's contacts with the forum

state [and] that the defendant purposefully availed himself of the privilege of doing business in

the forum state and that the defendant could foresee being haled into court there.") (cleaned up).

This requirement "ensures that a defendant will not be haled into a jurisdiction

solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King*, 471 U.S. at

475 (quoting *Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 774 (1984)); *see also Chew v.

Deitrich*, 143 F.3d 24, 28 (2d Cir. 1998), *cert. denied*, 525 U.S. 948 (1998).  If sufficient

minimum contacts are found such that the defendant "should reasonably anticipate being haled

into court there[,]" courts must then consider whether the exercise of jurisdiction would be "fair"

and "reasonable." *World-Wide Volkswagen,* 444 U.S. at 297.

For all the reasons set forth above, Defendants do not have minimum contacts

with the United States.  They live in Canada; are native French speakers; did not travel for

business to the United States; and deliberately sought to avoid transactions with U.S. persons.

**B.      It Is Not Fair or Reasonable to Exercise Jurisdiction Over Defendants**

For a "reasonableness" analysis, courts analyze: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *See Asahi Metal*, 480 U.S. at 113-14; *World-Wide Volkswagen*, 444 U.S. at 292; *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 83 (2d Cir. 1993) (discussing factors). While finding jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.

First, the burden on defendants in having to defend this litigation in New York is substantial. *See Asahi Metal*, 480 U.S. at 114 (personal jurisdiction "unreasonable" and "unfair" because it would require a foreign company to travel to California and submit its dispute to a foreign nation's judicial system; "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders").

The individual defendants are not native English speakers. All documents and legal advice must be rendered in French. Both individual defendants have extremely limited resources, in large part because of the broad asset freezes obtained by both the QAMF and the SEC. Defending themselves on the merits in the United States against the full weight of the United States federal government would be enormously burdensome, expensive, and unfair. Indeed, merely dealing with the SEC's discovery requests on personal jurisdiction has been an

34

extremely expensive endeavor.  A lack of geographic ties to the United States, poor proficiency in English, and a heavy defense burden, all counsel against jurisdiction – particularly where another jurisdiction has taken or is taking action.  *Sharef*, 924 F. Supp. 2d at 548.

        Second, the interests of the forum in adjudicating this matter are relatively minimal.  Undeniably, American courts have an interest in adjudicating SEC disputes relating to U.S. securities markets.  But the conduct in question here occurred in a product not traded on any regulated U.S. exchange.  Even crediting the SEC's contention that PlexCoin is a security (an issue for another day), it would be a foreign security in a foreign company.  The trades in question were all executed outside the United States.  The additional governmental interest for the United States in policing the alleged extraterritorial activities of foreign individuals is modest – indeed, the Supreme Court and Second Circuit have expressly warned against extraterritorial application of the securities laws.  *See Morrison v. Nat'l Austl. Bank Ltd*, 561 U.S. 247 (2010); *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014); *Loginovskaya v. Batratchenko*, 764 F.3d 266 (2d Cir. 2013); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012).  The SEC's mission to protect U.S. investors does not extend to protecting foreign investors in foreign products, or protecting those who misrepresent their identities in order to "go abroad," even virtually, to transact business.

        At any rate, Canada has a far greater interest in alleged conduct that may have occurred within its borders, and the Canadian equivalent of the SEC is already taking action to vindicate Canadian interests.  The Canadian authorities already have a broad asset freeze over Defendants' assets.  The Canadian government even briefly remanded Mr. Lacroix to a Canadian prison for an earlier alleged violation of the Canadian court's orders.  While that decision was successfully appealed, it shows clearly that the Canadian government is handling this matter.

There is no dispute that Canada, which obviously enjoys a robust legal system and well-functioning regulatory authorities, is well-equipped to do so.  The defendants are not hiding on a remote desert island, or camped out in some lawless country, where the U.S. must act or nobody will.  The individual defendants are subject to jurisdiction in Canada, where these issues are making their way through investigative processes that pre-dated the SEC's actions.  *See, e.g.*, *Ole Media Mgmt., L.P. v. EMI April Music, Inc*., 12-cv-7249 (PAE), 2013 U.S. Dist. LEXIS 82073, at *6-7 (S.D.N.Y. June 11, 2013) (court may dismiss or stay an action based on the pendency of a related proceeding in a foreign jurisdiction; this "prior action pending" doctrine "recognizes the principles upon which international comity is based:  the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency.") (cleaned up) (staying action in deference to pending litigation in Canada).

Finally, to the extent the SEC is interested in protecting U.S. investors, the defendants have already expressed a willingness to rescind any PlexCoin transactions with any U.S. person who wishes to unwind their transaction (subject to approval by the QAMF).  Were that to occur, the SEC will have had its interests upheld.

Third, the SEC has an interest in obtaining convenient and effective relief.  It would indeed be convenient for the SEC to litigate here in New York, and the SEC can legitimately claim policy reasons for wishing to do so.  However, even where there are "significant policy reasons" to justify jurisdiction, including a "strong interest" in protecting U.S. citizens, "the Constitution commands restraint before discarding liberty in the name of expediency."  *Nicastro*, 564 U.S. at 887 (citation omitted).  Due process is paramount.

Thus, the fourth factor, judicial economy, also favors dismissal.  The QAMF is already seeking relief in Canada against these defendants for the same set of circumstances.

36

Litigation can be conducted much more conveniently and efficiently in Quebec, defendants'
home jurisdiction.  Indeed, there has already been substantial overlapping and confusing
procedural wrangling in the Canadian courts over this action, which may be expected to continue
throughout the case as each side attempts to uphold their respective rights.  The Canadian
judicial system is well-equipped to handle this dispute as a whole, and United States courts
should step out of the way to let the Canadian process work unimpeded, which would also have
the salutary effect of avoiding potential conflicts in the area of international relations.  *See In re
Maxwell Commc'n Corp.*, 93 F.3d 1036, 1047-50 (2d Cir. 1996) (addressing comity).

   Indeed, the potential for conflict here is acute.  The SEC's request for relief
reaches beyond assets that originated from U.S. investors, into blockchain-based assets –
cryptocurrencies – that may now belong to Canadians, or other countries' citizens.  In securing a
freeze of all assets relating to PlexCoin, the SEC has frozen assets that the Canadian authorities
may believe should revert to Canadians.  If this Court were to grant the SEC's requested relief,
the Court would by necessity take assets that originated from Canadians (and citizens of other
countries), and deliver them to the U.S. Treasury, notwithstanding a Canadian process that will
likely address the disposition of those same assets.  *See Maxwell*, 93 F.3d at 1050 (where foreign
law "dictate[s] a different distributional outcome than would United States law…. a true conflict
exists for purposes of comity analysis").  Accordingly, both judicial economy and comity are
served by deferring to the Canadian proceedings.

   <u>Fifth</u> and finally, the social policies in this case favor dismissal.  There is
undeniably a social policy interest in the SEC's oversight of U.S. securities markets.  However,
there is a countervailing social policy interest in cabining the SEC to transactions over which it,
and U.S. courts, have proper jurisdiction.  The SEC is, and should be, an effective watchdog for

U.S. markets.  But that doggedness should not extend to haling foreign citizens into U.S. district courts for activities that the foreign citizens believed would not implicate the United States. Failure to curb the SEC's excesses in this case would lead to an incredibly bad social policy outcome:  it would give the SEC virtually unlimited jurisdiction to police the world's cryptocurrency markets, intruding on foreign countries' regulatory processes, and chilling development of this burgeoning technology in other areas of the world.  An adverse finding on personal jurisdiction would chill cryptocurrency markets around the world.

## V.    THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE CORPORATE DEFENDANT

### A.    The Corporate Defendant Was Not Properly Named

The SEC named as a defendant "Plexcorps (a/k/a and d/b/a Plexcoin and Sidepay.ca)".  There is no corporate entity of which Defendants are aware with any of those names.  "Plexcorps" and "PlexCoin" are merely project names.  "Sidepay.ca" is a Canadian website for a separate United Kingdom entity, Sidepay Ltd.

Sidepay Ltd., for its part, is a United Kingdom entity.  It is not named in the Complaint, and for that reason alone, it should be dismissed from this case.

The SEC easily could have learned this information before it filed suit.  The SEC has broad investigative authority.  "[A] central mission of the Commission is to investigate potential violations of the federal securities laws." *Gabelli v. SEC*, 568 U.S. 442, 451 (2013) (cleaned up) (citing SEC Enforcement Manual 1 (2012)).  The SEC has many legal tools at hand to aid in that pursuit, including – even without filing suit – power to subpoena any documents and witnesses it deems relevant or material to an investigation. *Id.*, citing §§77s(c), 78u(b), 80a–41(b), 80b–9(b).  The SEC cannot just name an entity that sounds close enough, and then pretend

it named the right party.  "Close enough" is not good enough for a federal agency seeking to freeze assets and assess civil penalties and injunctive relief.

      **B.**    **There is No Personal Jurisdiction Over Sidepay Ltd.**

      It is wholly unclear whether the SEC alleges that Sidepay Ltd. is the same legal entity as "Plexcorps (a/k/a and d/b/a Plexcoin and Sidepay.ca)," or what jurisdiction the SEC alleges over the U.K. entity Sidepay Ltd. at all.  Clearly, general jurisdiction could not exist under *Daimler AG v. Bauman*, 571 U.S. at 136, as there is no allegation nor evidence that Sidepay Ltd. has its "nerve center" in the United States.  Specific jurisdiction does not exist either, not only for all of the reasons above, but for the basic reason that it is unclear what the SEC is contending this entity – even had it been properly named – did at all to "transact business" in the United States.  The corporate entity, however named, should be dismissed.

**VI.**    **LEAVE TO AMEND SHOULD BE DENIED**

      The SEC has taken extensive personal jurisdiction discovery in this case, including document requests, interrogatories, requests for admission, affidavits, at least a dozen third-party interviews in the US and Canada, letters rogatory, approximately 20 third-party subpoenas, and full cooperation with the QAMF, which in turn has its own investigative powers – including the power to seize Defendants' computers and documents, which it did.  And of course, the SEC had a chance to undertake a normal-course investigation, which, in its haste to freeze assets that were already frozen, it declined to do.

      If after all of that discovery the SEC cannot present compelling evidence to justify jurisdiction, amendment would be futile.  *Carrillo Huettel LLP*, 2014 U.S. Dist. LEXIS 77560, at *18 (denying SEC leave to amend to cure personal jurisdiction defects); *see also Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni*, No. 15 CV 9003-LTS-SN, 2017 U.S. Dist. LEXIS 137829, at *11 (S.D.N.Y. Aug. 28, 2017).

Notably, the Magistrate Judge in this case suggested to the SEC that amending its complaint to address some of these issues might be proper.  March 27, 2018 Tr. 7:10–9:6 (Gottlieb Decl. Ex. 6).  The SEC declined to do so.  As the SEC previously passed up the chance to amend, leave to amend now should be denied.  *Gundlach v. IBM*, No. 11-CV-846 (CS), 2012 U.S. Dist. LEXIS 60926, at \*24 (S.D.N.Y. May 1, 2012) (denying leave to amend after deficiencies in complaint discussed at pre-motion conference; "That Plaintiff was provided notice of his pleading deficiencies and the opportunity to cure them is sufficient ground to deny leave to amend *sua sponte*.") (citation omitted).

## **CONCLUSION**

For the reasons set forth above, the Court should dismiss the complaint in its entirety, and stay any discovery pending the resolution of this motion.

Dated: New York, New York
        April 27, 2017

MORRISON COHEN LLP

By:      /s/ Jason P. Gottlieb
         Jason P. Gottlieb
         Allison Khaskelis
         909 Third Avenue
         New York, New York 10022
         (212) 735-8600
         *Attorneys for Defendants Sidepay Ltd.,*
         *Dominic Lacroix, and Sabrina Paradis-Royer*