1

```
1                 UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
     SECURITIES AND EXCHANGE      :    17-CV-7007(CBA)
4    COMMISSION,                  :
                                  :    U.S. Courthouse
5              Plaintiff,         :    Brooklyn, New York
                                  :
6                                 :    TRANSCRIPT OF
                                  :    ORAL ARGUMENT
7          -against-              :
                                  :
8                                 :    June 20, 2018
                                  :    10:00 a.m.
9                                 :
     PLEXCORPS,                   :
10
              Defendant.
11   - - - - - - - - - - - - - X

12   BEFORE:
                    HONORABLE CAROL B. AMON, U.S.D.J.
13
     APPEARANCES:
14
     For the Plaintiff:      U.S. SECURITIES
15                           and EXCHANGE COMMISSION
                             Division of Enforcement
16                           By:  JORGE G. TENREIRO, ESQ.
                                  DAVID H. TUTOR, ESQ.
17

18

19
     For the Defendant:      MORRISON COHEN, LLP
20                           BY:  JASON GOTTLIEB, ESQ.
                                  ALLISON KHASKELIS, ESQ.
21

22
     Court Reporter:    Holly Driscoll, CSR, FCRR
23                      Chief Court Reporter
                        225 Cadman Plaza East
24                      Brooklyn, New York 11201
                        (718) 613-2274
25   Proceedings recorded by mechanical stenography, transcript
     produced by Computer-Assisted Transcript.
```

2

1          THE CLERK:  Case number 17-CV-7007, the Securities

2    and Exchange Commission against Plexcorps, on for oral

3    argument.

4          THE COURT:  All right.  Would the parties state your

5    appearances please, first for plaintiffs.

6          MR. TENREIRO:  Good morning, Your Honor, Jorge

7    Tenreiro and David Tutor for the Securities and Exchange

8    Commission.

9          THE COURT:  Good morning.

10          MR. GOTTLIEB:  Good morning, Your Honor, for

11    defendants, Jason Gottlieb and Allison Khaskelis from Morrison

12    Cohen LLP.

13          THE COURT:  Good morning.

14          This is your motion, counsel; do you want to be

15    heard on the motion to dismiss on jurisdictional grounds?

16          MR. GOTTLIEB:  Yes, I would, Your Honor.

17          THE COURT:  Okay.  Everyone can be seated.

18          MR. GOTTLIEB:  Should I --

19          THE COURT:  Yes, you can step up here.

20          MR. GOTTLIEB:  Okay.  Thank you, Your Honor.

21          THE COURT:  Let me just ask you as an initial

22    question, you agree with, I take it, the government's

23    statement of law as to the requirements of personal

24    jurisdiction that were not technically under New York

25    law?  New York law was briefed in your papers.

3

1        MR. GOTTLIEB:  We do agree, Your Honor, and New York

2   law is briefed in our papers because, as Second Circuit

3   guidance shows, it is sometimes useful for interpretation of

4   what constitutional due process requires.

5        THE COURT:  Because it also addresses those -- many

6   of those cases address those issues.

7        MR. GOTTLIEB:  Correct, Your Honor, because there

8   are certain similarities.  Now, they're not the same, there

9   are differences between them, but there are similarities and

10  Second Circuit case law says that New York State case law can

11  be instructional in times like this but that being said, I do

12  agree with the Commission here that what is relevant are

13  contacts not with New York but with the United States.

14       THE COURT:  All right, then let me ask you another

15  question just to see if we can narrow the issues.  Assuming

16  that the infamous check box had not been there, would you

17  agree that there's jurisdiction here in the United States?

18       MR. GOTTLIEB:  Well, there are two points, there's

19  the check box and there are terms and conditions, statements

20  that PlexCoin was not for U.S. purchasers but if you did not

21  have those issues, I think it would be a much closer case.

22       THE COURT:  Would we have jurisdiction?

23       MR. GOTTLIEB:  Most likely, yes, and that, Your

24  Honor, is the reason why we didn't simply move on the

25  complaint as drafted because the complaint omitted the check

4

1   box, omitted the terms and conditions and on the four corners

2   of the complaint it would have been a very difficult road to

3   hoe on jurisdictional grounds.

4          THE COURT:  But terms and conditions, for someone

5   looking at the offering, they'd sort of be buried somewhere;

6   it's the check box on which you place primary emphasis, is

7   that correct?

8          MR. GOTTLIEB:  It's both.  I think the check box is

9   more important because it's more in the face of a user.

10  However, just because something may be buried in the terms and

11  conditions doesn't mean that it doesn't apply.  For example,

12  as the Commission itself points out, jurisdictional clauses,

13  so, for example, if a user agrees to terms and conditions and

14  those terms and conditions contain an arbitration clause, for

15  example, that arbitration clause in most circumstances is

16  going to apply to bind the parties who agreed to --

17         THE COURT:  What was the statement in the terms and

18  conditions that governs here?

19         MR. GOTTLIEB:  The statement was that PlexCoin --

20  let me get you the exact statement, Your Honor.

21         (Pause.)

22         The exact statement in Section 16 of the terms and

23  conditions says, the English version, of course:  Residents of

24  the United States and of the Province of Quebec, Canada cannot

25  directly or indirectly participate in this ICO.

5

1          THE COURT:  So, that means that if they do, they're

2    at their own risk.

3          MR. GOTTLIEB:  They're violating the terms and

4    conditions and they're at their own risk.

5          THE COURT:  So, if you stole money from them, that's

6    okay.

7          MR. GOTTLIEB:  No, Your Honor, of course not, but it

8    would be subject to a recision.  If somebody tried to do that,

9    we could say, sorry, you're not allowed to be here, we're

10    sending your money back --

11          THE COURT:  Was any money ever sent back to people

12    who requested that it be sent back?

13          MR. GOTTLIEB:  No, Your Honor, because nobody

14    requested it be sent back until after there were asset freezes

15    in place both in Canada and here in the Eastern District of

16    New York.  We have in fact had some people ask to have their

17    money back.  Defendant's position is that's fine, we're

18    perfectly willing to do that because we were always willing to

19    do that but --

20          THE COURT:  When you say you were always willing to

21    do that, what evidence is there that you were always willing

22    to do that?

23          MR. GOTTLIEB:  The evidence is from the affidavit,

24    the affidavit of Mr. Lacroix.

25          THE COURT:  Can I consider that because he -- it

6

1   seems like it is a little problematic considering his

2   affidavit because he took the Fifth; how can I consider his

3   affidavit?

4           MR. GOTTLIEB:  You can consider the affidavit and

5   you can give it whatever weight that you would like to give

6   it.  It is not necessary that you have any adverse inference

7   and I think that it would be valuable to consider it, you

8   should consider it because he makes several statements in

9   there that add to its credibility because they are statements

10  that, frankly, are bad for his case that the Commission seizes

11  on and says, see, look, these are statements that show this is

12  true.  Yes, he's had to plead the Fifth and that's a very

13  unfortunate problem for us.

14          THE COURT:  Did he waive the Fifth, by the way --

15          MR. GOTTLIEB:  No.

16          THE COURT:  -- when he submitted this most recent

17  declaration, did he waive the Fifth?

18          MR. GOTTLIEB:  The most recent?

19          THE COURT:  Right, you know, we pointed out by court

20  order that you had the wrong date on the affidavit and he

21  submitted a new declaration; did that waive the Fifth?

22          MR. GOTTLIEB:  No, I do not think that it did, Your

23  Honor, because what he did was he said that the date was in

24  error but he stands by what he said.

25          THE COURT:  What he said was, "I didn't participate

7

1    in any fraud" and now he's repeating that allegation, so does

2    that waive the Fifth?

3              MR. GOTTLIEB:  No, it doesn't, Your Honor, it

4    basically stands by what he previously said and he's pleading

5    the Fifth as to anything else.  He just can't answer questions

6    about anything else.  How we got to his affidavit is a bit of

7    a story but it is an important one here, Your Honor.

8              THE COURT:  Is it in the papers?

9              MR. GOTTLIEB:  It is in the papers and the reason we

10   got there was because from the beginning, because he's got

11   legal troubles in Canada as well as here, he said there are

12   going to be limited areas that I can address but there are

13   certain topics relevant to personal jurisdiction I can address

14   and we raise the issue and we raised the fact that he may have

15   to plead the Fifth with the magistrate judge in the case.  The

16   magistrate judge's very wise compromise proposal was that the

17   SEC should list the things, the questions that they want

18   Mr. Lacroix to address and then we'll see if Mr. Lacroix can

19   answer those questions and if he can, then he will put in an

20   affidavit on those questions.  So, it was very tailored.  That

21   is exactly what happened.  The Commission provided a list of

22   questions.  We studied it in conjunction with Canadian counsel

23   and said, yes, these questions he can answer.  We provided

24   that affidavit that has the answers to those questions.

25   Unfortunately, that did not satisfy the Commission and that in

8

1   conjunction with the Commission's complaints about document

2   production led Magistrate Levy to say, no, I'm sorry, I have

3   to order the deposition now, and at that point the defendant

4   was required to plead the Fifth.

5            THE COURT:  All right.  Anyway, why don't you just

6   return to your argument.  You do rely heavily on the existence

7   of this checked box but there's evidence in the record, as I

8   understand it, that there were points, at least some point in

9   time in which the defendant told them to remove the box, that

10  other people didn't see the box.  So, how do you deal with

11  that evidence?

12           MR. GOTTLIEB:  Well, the Commission has charged that

13  the check box was at some point removed.  Unfortunately, I

14  don't think that the evidence is clear on this point one way

15  or another because there's not consistent evidence.  So, for

16  example, even setting aside Mr. Lacroix's testimony that it

17  was there the whole time, which you can take or not as you see

18  fit; one investor, Ms. Rose Thomas, opened two accounts and

19  she confirmed that in both cases she saw the check box and she

20  had to click the check box and affirm that she was not a U.S.

21  person in order to purchase PlexCoin.  She had to do the same

22  when she opened an account for her daughter.  So, you have

23  evidence that the check box was there and evidence, frankly,

24  that is very trustworthy because --

25           THE COURT:  Well, it was there at one point in time

9

but that's not necessarily inconsistent with the claim that it was removed, right?

MR. GOTTLIEB:  That's correct, that is correct, it could have been there, however, the SEC's evidence, they have three folks who say when they did it they didn't see it. Now --

THE COURT:  Don't they also have an employee though, I mean more than the people who didn't see it, don't they have an employee who said that he --

MR. GOTTLIEB:  No.

THE COURT:  -- was told to take it out?

MR. GOTTLIEB:  Well, the statements don't quite say that it was taken out.  You've got two statements, you have Ms. Verdon-Martin statement who confirms that the check box was there and then says at some point Lacroix told us in the office that he wanted to remove the certification from the website but what she does not say is that the certification was removed from the website, just that Mr. Lacroix was musing that he wanted to.  Then you have Mr. Richard's statement that says at some point while the PlexCoin presale was still happening Lacroix instructed that it be removed and instead have the website direct investors to check their local laws. However, he talks about the certification from the website and the reference to checking local laws which is not consistent with the check box because (A) he doesn't say that it actually

10

1    was removed and (B) the reference to checking local laws in

2    the Commission's telling of it is a reference to an alleged

3    change that happened to the terms and conditions.

4            Now, I would add on the terms and conditions

5    document that there is no evidence that that happened either.

6    So, what you have are employees musing or saying that

7    Mr. Lacroix mused that he wanted to take it down but you don't

8    have any evidence that it was taken down.  That's the

9    employee's statement.  So, the evidence that the Commission --

10           THE COURT:  Well, the evidence that it was taken

11   down would be the people that said, "I didn't see it."

12           MR. GOTTLIEB:  That's true.  So, you've got three

13   people who said it.  Now, why are they saying it?  I don't

14   know, we don't know, and there are a few possibilities; one

15   possibility is they're being entirely truthful and accurate

16   and they didn't see it and there could have been something

17   with their setup, the three people out of the 10,000 people

18   who purchased PlexCoin who didn't see it.  It is also possible

19   that when an enforcement lawyer --

20           THE COURT:  Well, if they didn't see it, they didn't

21   check it, right?

22           MR. GOTTLIEB:  Well, no, not necessarily.  If they

23   don't remember seeing it or checking it, it just means they

24   don't remember doing it, so it is possible that for them it

25   was one more check box on the internet that they clicked and

1  went by and they don't remember it.  I don't mean to cast

2  aspersions on people I don't know but, Your Honor, when a

3  lawyer from the SEC's enforcement staff calls up a random

4  investor and says:  When you purchased PlexCoin did you

5  represent that you were not a U.S. citizen when in fact you

6  are a U.S. citizen, in other words, someone from the SEC

7  enforcement staff is saying:  Did you make a false statement

8  in connection with the purchase of a security?  And it may

9  well be that those people said, oh, no, I definitely didn't do

10 that.  I don't know, I don't know, but there is reason to

11 doubt their statements and I think that's why we have to weigh

12 Ms. Thomas's statement very heavily because she says she did

13 see it and in fact that's basically a statement against her

14 interest.

15        THE COURT:  Well, I know but it's not inconsistent

16 with the fact that the box could have been there at the time

17 that she made her purchase.

18        MR. GOTTLIEB:  It could be.

19        THE COURT:  I don't understand why that's so

20 significant.  I don't think the SEC is taking the position

21 that the box was never there.

22        MR. GOTTLIEB:  I think that's correct.

23        THE COURT:  So, why is the statement so relevant?  I

24 mean did she purchase way at the end?

25        MR. GOTTLIEB:  No, no, she purchased somewhere in

12

1   the middle.

2           THE COURT:  Okay.

3           MR. GOTTLIEB:  I think what's important though is to

4   note that there were efforts -- this is the important thing,

5   there's the check box, there's the terms and conditions and

6   you can dispute whether it was there the whole time, it's a

7   factual dispute, you can dispute the degree of the efforts

8   that were made but the important thing is you've got two

9   French Canadians sitting in their offices in Canada saying we

10  want to avoid the U.S., how can we do it, well, let's do this.

11  They're making efforts and I think that we can't overlook that

12  and those efforts are really what sets this case apart from

13  any of the other personal jurisdiction cases that the SEC is

14  bringing up in their papers.  In all of the other cases in

15  which courts find personal jurisdiction, especially the cases

16  that the SEC has brought as plaintiffs, you've got people

17  trading in U.S. securities, you've got alleged misstatements

18  in filings on EDGAR and in other U.S. securities filings.

19  This is a completely different situation where you've got

20  these folks who live and work in Canada, who don't have

21  offices here, they don't have property here --

22          THE COURT:  They came here though, didn't they?

23          MR. GOTTLIEB:  They came here on a vacation.

24          THE COURT:  In August.

25          MR. GOTTLIEB:  They came here on a vacation in

13

1  August.

2         THE COURT:  And didn't they engage in some

3  activities including accessing the PayPal account a number of

4  times and creating a couple of related websites?

5         MR. GOTTLIEB:  The evidence reflects that they

6  engaged in activities relating to Plex while they were here on

7  vacation, however, those are internet activities.

8         THE COURT:  How do we know they were here on

9  vacation, by the way?

10        MR. GOTTLIEB:  Because he said so and because --

11        THE COURT:  Where were they?

12        MR. GOTTLIEB:  Boston I think.  I think that that's

13  in the record.

14        THE COURT:  Boston in August.  Okay.

15        MR. GOTTLIEB:  Personally I go to Canada in August

16  but anyway, Your Honor, I think what's important here is that

17  the work that they were doing on this vacation, they weren't

18  coming here to have meetings, they weren't --

19        THE COURT:  They weren't coming --

20        MR. GOTTLIEB:  They were doing work that could have

21  been done from anywhere.

22        THE COURT:  But they were doing it here, they were

23  here.  I mean you don't deny that the evidence shows that they

24  were here in Boston and doing activities with PayPal which is

25  an American company, correct?

14

1          MR. GOTTLIEB:  The fact that PayPal is an

2    international company that was originally American is

3    something separate that we can address.

4          THE COURT:  Okay.

5          MR. GOTTLIEB:  The evidence does reflect that they

6    were here and they were doing work for it but they were not

7    here meeting with Americans or talking to Americans.  The work

8    they were doing was internet-based work that they could have

9    been doing if they were on vacation in Brazil or Singapore or

10   anywhere else in the word.  So, the connection of the work to

11   America is, frankly, not too relevant.  They just happen to

12   physically be here at the time because Boston is a nice city.

13          And if you'd like, we can move now to that issue

14   about PayPal and the other U.S. companies that they're alleged

15   because I think there's a very important point here and it's a

16   point that actually I think should be considered to guide the

17   Court's ruling in this case.  Other courts have said

18   repeatedly that advertising worldwide that is visible in the

19   U.S. or the use of these international companies that were

20   originally U.S. companies is not sufficient for jurisdiction

21   and there's a very, very good reason why, all of these

22   companies are now international companies, PayPal, Facebook,

23   Square, etc.

24          Now, they all have Canadian portals; you can go to

25   square.ca and you would think that you were visiting a

15

1   Canadian website, you may not have any idea that you're even

2   visiting a U.S. website.  But use of these international

3   websites alone can't suffice for jurisdiction and shouldn't

4   suffice for jurisdiction because if it did, then two people

5   talking to each other on Facebook in Moscow and Singapore

6   would be able to be haled into a New York court by the SEC or

7   in fact they could be haled anywhere in the United States by

8   the SEC merely by the fact that they're using Facebook and,

9   frankly, Your Honor, if that were the ruling of the Court, it

10  would radically affect global internet commerce.

11          There's one other point that is a policy point on

12  the affectation of global commerce that I think is critical

13  for this case and that goes back to the check box and the

14  terms and conditions.  The core question on this motion is how

15  much effort is enough to bubble off the United States; what do

16  you have to do if you're outside the United States to keep

17  yourself out of the United States.  If you put up a sign that

18  says, you know, we don't want anyone coming from the United

19  States, if you put in your terms and conditions this is not

20  for United States persons, is that enough?  If you make

21  efforts to block persons but those efforts do not achieve

22  100 percent success, what if Americans purchase your products

23  anyway?  If you say we don't want Americans but Americans

24  come, does that trigger jurisdiction?  These questions are not

25  answered by any clear case law, any statute, any SEC rule or

1  regulation.  There's really a lacuna in the law here, neither

2  side could find cases directly on this point.

3       The key to personal jurisdiction, going back to

4  Burger King, is is it reasonably foreseeable that they're

5  going to be haled into court here and if they're dealing with

6  an area of the law where there is this giant lacuna, where

7  there's no clear indication of what is enough to keep you out

8  of U.S. jurisdiction, I think that any thumb on the scale here

9  has to be for the defendants.

10      THE COURT:  But your argument would entail rejecting

11  evidence that the government has put forth, the SEC has put

12  forth about deleting this box, it would require rejection of

13  that evidence, correct?

14      MR. GOTTLIEB:  I don't think it would for a couple

15  of reasons.  The first reason is that there is no dispute

16  or -- again I should check that, there is a dispute but the

17  only evidence about the terms and conditions document, the

18  only terms and conditions document that is before the Court is

19  a terms and conditions document that says residents cannot

20  participate in the ICO.  You also have a statement from the

21  check box that says what it says.  Now, you can argue whether

22  it was here or not but if it's an unsettled issue of fact,

23  then, yes, you would have to credit the SEC's evidence, find

24  that it was deliberately taken out in a deliberate effort to

25  target Americans.  Once you get there, perhaps it's enough.

17

1    But, Your Honor, if you're making efforts, if you're making

2    efforts to stay out of the U.S. jurisdiction which at the very

3    least the terms and conditions document is and for as long as

4    it was up and for as many people saw it as the check box, then

5    you're in an area where there is no controlling law.  And the

6    policy point here is very important.

7              THE COURT:  But again let me just --

8              MR. GOTTLIEB:  Okay.

9              THE COURT:  -- ask you, I take your argument that if

10   there was a legitimate check box and if there are terms and

11   conditions that there is no controlling law that addresses

12   those unique facts but if the SEC has presented evidence that

13   this was nothing more than the defendants keeping their

14   fingers crossed and saying we really do want Americans by

15   saying, you know, that he was interested in -- the testimony

16   was he was interested in having Americans, this check box was

17   removed.  Why isn't that a different situation?

18             MR. GOTTLIEB:  Because as long as you have evidence

19   that they were making efforts, you could dispute the nature,

20   you could dispute the extent of those efforts.  You have to

21   deal with the idea that they are here doing something.

22             THE COURT:  But what if it wasn't sincere?  That's

23   in essence what the SEC is arguing about all this other

24   evidence, that these were not sincere efforts.

25             MR. GOTTLIEB:  Your Honor, there is no law on

18

1   sincerity, there's no law saying here are all of the things

2   that you have to do.  For example, the Commission is saying,

3   well, they could have used IPGO blocking but then they say

4   we're not relying on that because other courts have said you

5   can't rely on that.  What you're left with in this case is a

6   situation where folks around the world really have no idea how

7   much is enough because no one has ever said what is enough.

8   Is it enough just to have a statement in your terms of service

9   saying No Americans Allowed?  There are no cases addressing

10  this issue.  And if you're telling Americans we don't want

11  you, you're putting a No Americans Allowed sign on the front

12  door but Americans come in anyway, is that enough.  And a

13  ruling saying --

14          THE COURT:  Well, what about if over the course of

15  the investing history they come to know before the IPO (sic)

16  is completed that they are having a number of Americans come

17  in because of their IP addresses?

18          MR. GOTTLIEB:  That's exactly the choice that they

19  faced and they have two choices at that point.

20          THE COURT:  Don't they know that before the end of

21  the offering?

22          MR. GOTTLIEB:  They would -- they could know that

23  before the end of the offering.  There's no evidence that they

24  necessarily did but they could have known that and I wouldn't

25  dispute that they could have known that.  In fact, I think

1   that evidence shows that they did believe that some Americans

2   would buy, not that they knew how many or how much but that

3   some persons were buying.

4           And at that point, Your Honor, they had two choices,

5   one was to try to reverse all of those transactions through as

6   they came in but not only was this very difficult to do

7   because there were literally 10,000 transactions from around

8   the world and having to reverse each one of the -- as it

9   turned out to be, hundreds or thousands that came in from the

10  U.S.; the bigger problem, Your Honor, is that blocking them

11  once would not have prevented them from going back in because

12  they sought comments to the extent that people could and were

13  using VPNs, virtual private networks, which is basically an

14  untraceable way that would circumvent your IP blocker.  So,

15  they thought, well, if we shut all of these people out now,

16  they might just come right back in and then we'll never know

17  that they were Americans.  The better way to go, they decided,

18  was because they've got a limited two-month sale period, if

19  anyone wanted to come in and give their address as Americans,

20  let them do that and then at the end of it we can reverse

21  those transactions because they violated the terms and

22  conditions.  Unfortunately before the end of the pre-sale --

23          THE COURT:  What evidence is there in the record

24  that that was their intention of how to deal with this?

25          MR. GOTTLIEB:  I think there are three points; the

20

1    first is the affidavit, is what Mr. Lacroix says.  And the

2    other points are the terms of service and the check box

3    because --

4            THE COURT:  No, no, I'm talking about the idea that

5    the way we'll deal with this is we'll reverse all these

6    transactions at the end.  That just comes from his affidavit,

7    there isn't any other testimony of employees or that this was

8    discussed and, you know, we all recognize this was a problem,

9    this is what we're going to do; this is just his statement,

10   correct?

11           MR. GOTTLIEB:  That's correct, Your Honor, that's

12   the evidence in the record.  But if they didn't want -- if the

13   goal here was to accept American money, they didn't need any

14   of the terms and conditions, they didn't need a check box,

15   they could have just done it and you'll recall this is going

16   on back last year in August --

17           THE COURT:  Assuming a bad intent, then they

18   wouldn't have been able to argue -- I mean there's a view of

19   this that one can say they did this so we could argue that we

20   wouldn't be subject to laws of the SEC but we'd still get the

21   money from the Americans.

22           MR. GOTTLIEB:  It's possible but you would have to

23   assume that they were sophisticated enough to understand U.S.

24   personal jurisdiction law to the extent that we all in this

25   courtroom do and --

1          THE COURT:  Well, I don't know understanding

2    personal jurisdiction law, they just have to understand that

3    they don't want to get in the way of the SEC --

4          MR. GOTTLIEB:  At the time --

5          THE COURT:  -- which presumably someone who's

6    involved in the securities trade would know is an organization

7    in the United States that you don't want to mess with.

8          MR. GOTTLIEB:  Well, at the time, Your Honor, I

9    don't even believe that they thought that it was a security or

10   that it would have been subject to any securities laws in the

11   United States.  Remember we're not talking about securities

12   here, we're talking about crypto currencies.  Now, the SEC has

13   since that time come out repeatedly and said that certain

14   crypto currencies are securities and they have also said that

15   certain crypto currencies are not securities like Bitcoin and

16   most recently the head of the Division of Markets said that

17   Ethereum is not a security.

18          So, the idea that there's this clear guidance for

19   foreign French speakers about what the SEC is going to do is a

20   little bit fantastic when you look back last summer when they

21   were planning this thing.  Additionally, it's not unreasonable

22   for them, even if they had looked at personal jurisdiction

23   law, to say, wow, there's a giant hole in the law here, if we

24   make some efforts, there's no law saying that that's not

25   enough or that we're somehow going to get dragged in anyway.

22

1    If they had only put a terms and conditions statement which

2    would have been binding if it were, for example, an arbitrable

3    clause, is it not enough for them to be able to rely on that

4    statement, say we told people we didn't want them?  That alone

5    creates this issue where you're in a place where there is no

6    law that governs.  The problem here, Your Honor, is if you

7    find that even despite that sentence, they're subject to

8    personal jurisdiction here, what you're telling the entire

9    rest of the global internet world is if they want to avoid the

10   SEC's jurisdiction or any U.S. jurisdiction, any U.S.

11   regulatory jurisdiction, they can't just say we don't want

12   Americans, they can't just say -- they would have to reverse

13   any U.S. transactions, they would have to bubble off the US

14   with IPGO blocking.

15        THE COURT:  Can't they do that?

16        MR. GOTTLIEB:  They can but the result in global

17   commerce would be a nightmare because courts here have

18   correctly held that if somebody puts up a web page in Paris

19   that's universally available and most of their business is

20   from Paris, if one person from the United States places an

21   order, that's probably one of those random or fortuitous

22   contacts that does not suffice for personal jurisdiction

23   purposes.  A global commerce seller in Paris who had that

24   transaction would not necessarily have been expected to be

25   hauled into a court in Brooklyn by the SEC.  So, it is this

23

1    expectation and the fact that people around the world do not

2    know how much is enough, what they have to do --

3           THE COURT:  Well, here there were a lot of U.S.

4    investors though, correct, this isn't one investor?

5           MR. GOTTLIEB:  No, as it turned out, there were but

6    there's no evidence that the defendants knew that at the time.

7    I believe it's fair to say that they could have known that but

8    when they had 10,000 orders coming in in two months, there's

9    no evidence saying that he was looking at that saying, oh, we

10   have all these Americans -- that we know we have this many

11   Americans.  They knew some were coming in, they knew, okay,

12   that's fine, we can just reverse it later but I don't think

13   they quite knew how many were coming in until it was all over,

14   in fact until this case even started or certainly there's no

15   evidence in the record on that score.

16          THE COURT:  Are there any other points that you

17   wanted to emphasize?

18          MR. GOTTLIEB:  I think I would just take a look at

19   and I would just guide the Court to our papers to look at what

20   the best cases for the SEC are because they don't get us

21   there.  There are two cases that they cite to, there's the

22   Euromarket Designs case from the Northern District of

23   Illinois, that's a trademark case where there's an Irish

24   retailer, Crate & Barrel.ie selling physical goods to

25   Illinois.  After a suit was filed against them, the Irish

24

1    retailer issued a website disclaimer:  Goods Sold Only in the

2    Republic of Ireland, yet they were still doing business with

3    Americans and the SEC brings this case to say, well, look, a

4    disclaimer is not enough if you're still doing business with

5    Americans.  But this case is not at all on point.  There was

6    no -- before a suit was filed against them there was no effort

7    whatsoever to exclude Americans or to have any sort of

8    guidance at all and then even after the suit was filed and

9    they put that website disclaimer on, they still kept selling

10   knowingly to the Americans even while a suit was pending.  So,

11   it's distinguishable from here where you have those website

12   disclaimers in advance before the case starts.

13           The other one that the SEC cites is very interesting

14   because I think it supports our case and that's the Plixler

15   International v. Scrutinizer case from the District of Maine

16   in 2017.  There a foreign defendant had a large number of

17   sales transactions in the U.S. but also unlike here used

18   websites based on servers in the U.S., applied for a U.S.

19   trademark and, critically, they emailed the invoices to

20   Americans and continued to do business with them for three and

21   a half years consistently and still in that case, because it

22   was an internet commerce case, the Court ruled for personal

23   jurisdiction but said that jurisdiction was a close call that

24   was worthy of appellate review.

25           Now, Your Honor, if Plixler was a close call, then,

25

1    frankly, this case is an easier case for the defendants

2    because you don't have a three and a half year course of

3    conduct, you have one sale, one blizzard of conduct and then

4    everything was frozen.  The defendant's position is if the SEC

5    and this Court and Canadian courts would allow, they would

6    refund all of this money today.  So, it is a very different

7    decision.  If Plixler is a close call, this one is not a close

8    call.

9            Your Honor, I think one other point that I'd like to

10   talk about --

11           THE COURT:  You mean refund all the money to the

12   Americans?

13           MR. GOTTLIEB:  Yes.  The defendant's position is

14   that if there is any American who we know is an American who

15   purchased PlexCoin and still has PlexCoin, defendants have

16   always been willing to refund that money, are willing to do

17   that today.

18           THE COURT:  Of course, the problem is there are a

19   lot of victims that aren't Americans that claim they were

20   victimized by the fraud, so deciding that the Americans would

21   get the money first could be a problem.

22           MR. GOTTLIEB:  It could be but we view that as a

23   violation of the terms and conditions anyway so we wouldn't

24   have a problem making that change.  If there were other folks

25   in other countries who claim they were victimized, then they

1  have ways of dealing with that in their own countries but,

2  most importantly, they have ways of dealing with that in

3  Canada and I think this is the important point that I'd like

4  to close on is if you're arguing there should be no personal

5  jurisdiction and our guys were hiding out in some island in

6  the South Pacific saying, ha, ha, we're untouchable, nobody

7  can get it, then I would understand a court here would be very

8  reluctant to buy that argument but here because of all the

9  problems with internet commerce and the other policy problems

10  that exist, also we've got problems because it is a crypto

11  currency which is going to lead to other issues including

12  jurisdictional issues which I can speak about, but the problem

13  here is there is an easy solution to all these problems which

14  is let Canada deal with it.  The Canadian AMF which is the

15  equivalent of --

16          THE COURT:  Is that a legal solution you're

17  proposing to the Court or a practical one?  Are you saying

18  that I should take into balance in deciding this issue that

19  even if I were to conclude we had jurisdiction, let the

20  Canadians deal with it?

21          MR. GOTTLIEB:  Your Honor, I think what it goes to

22  is the constitutional factors for what is reasonable due

23  process under Asahi Metals and you've got a few factors there

24  but the key factors there are both the burden on the

25  defendant, which in this case is extreme, I'm happy to address

27

1    that if you'd like; but more to this point, we have the

2    interstate judicial systems' interest in obtaining the most

3    efficient resolution of the controversy and a shared interest

4    of the states in furthering substantive social policies.

5         Now, obviously Asahi is talking about the different

6    states but the analogy holds the same whether we're talking

7    about different countries.  There is a decided dispute here in

8    this case for how to -- a dispute between the Commission's

9    position and what the AMF's position might well be about how

10   to divvy up assets.  The Commission here has called for full

11   recision of the entire transaction and penalties and

12   disgorgement but that money would go to the U.S. Treasury, it

13   wouldn't go to any of the other alleged victims and obviously

14   we dispute that there are any victims but that's an argument

15   for another day.  The money here would not go to any Canadians

16   and I find it very difficult to believe that the AMF would be

17   very happy if the SEC got everything they wanted and all the

18   money came back --

19        THE COURT:  There's been no amicus brief filed here

20   on behalf of any Canadian authorities saying don't do this,

21   Judge, has there?

22        MR. GOTTLIEB:  No, there has not, Your Honor, and

23   the SEC has been speaking to the AMF so they might come and

24   say, well, we've been talking to them and we know differently

25   but the fact remains you have a potential for a conflict

28

between the legal systems in a situation that should just be
handled in one place.  It's more efficient because there are
Canadians in Canada unquestionably subject to personal
jurisdiction in Canada.  Letting Canada handle it addresses
all of the Asahi factors, it's the most reasonable resolution
for this and doesn't risk violating any of their due process
rights.

THE COURT:  Okay.  Thank you very much, counsel.
I'm going to say I appreciate your candor on a number of
points.

MR. GOTTLIEB:  Thank you, Your Honor.

THE COURT:  Counsel.

MR. TENREIRO:  Thank you, Your Honor.  Your Honor,
first, I'd like to start by addressing a couple of points that
were just discussed and I think that my colleague just made
this a very easy case for the Court on a motion to dismiss.
On a motion to dismiss the law, as this Court recognized in
the Aqua Shield case, is very clear and the Court has to
assume that the facts are as we present them based on the
evidence and draw reasonable inferences.  So, I don't want to
lose too much time with whether our witnesses might be lying
and imagining scenarios.  That is not the analysis before the
Court on a motion to dismiss.  The Court has to assume that
the check box was removed, therefore, we win.  That's the end
of the day, I think he conceded as much and, you know, I could

29

1   probably sit down right there.

2           The real question though that the Court will have to

3   deal with either now or eventually is whether we have

4   established personal jurisdiction as a matter of law and

5   whether the motion should be denied with prejudice which is

6   really what we urge the Court to do here given that we have

7   had to go through this six-month process of discovery and

8   there's really no actually legally relevant dispute as to the

9   facts that will control the outcome.  The check box that they

10  rely on so repeatedly is essentially a question of their

11  subjective intent and they continue to say repeatedly that the

12  core question here is how much effort that they made and what

13  reasonable intent they had.  Your Honor, that is not a correct

14  statement of the law.  When my colleague says that there's a

15  lacuna in the case law here, that is also incorrect.

16          THE COURT:  Well, what case -- you repeatedly in

17  your brief say they have no case that addresses this scenario

18  with the check box, they haven't provided any case but then

19  you haven't provided any case that says that these check boxes

20  are irrelevant.

21          MR. TENREIRO:  Right, and I don't think they are

22  irrelevant.  I think that there's two things to consider.  The

23  question before the Court is a question of due process and the

24  core of the question here is is there an intentional act plus

25  a foreseeable effect in the United States.  That's how courts

30

1    have distilled the purposeful availment test or the affects

2    test, that's what we're looking for here because under due

3    process you don't want someone to be surprised and the

4    quintessential example of surprise, you have the commerce

5    cases like Judge McIntyre where someone sells something in one

6    country and people resell it and resell it and then they're

7    surprised to find out where it ends up.

8         Here, as a matter of law, Your Honor, there can be

9    no surprise because they admit that they knew that they were

10   getting United States investors, that they suspected this was

11   going to happen.  So, the question is is it reasonably

12   foreseeable and that's the principle that the Second Circuit

13   pushes forward in Licci, that the Seventh Circuit pushes

14   forward in the cigarettes case which is called Hemi Corp.

15   They're explaining that the point is to avoid a surprise and

16   the defendants are not actually claiming to be surprised.

17        Now, what role does the check box play into all of

18   this --

19        THE COURT:  Well, the argument is that you have to

20   show purposeful availment and they say there's no purposeful

21   availment when we put in our terms and conditions that it's

22   not for Americans and when we affirmatively made them check

23   the box and if they answer truthfully, under the program they

24   could not invest.  So, why doesn't that refute purposeful

25   availment?

31

1          MR. TENREIRO:  Well, again, Your Honor on a motion

2     to dismiss, the evidence -- the Court has to assume that these

3     were removed but even if we assume that both the check box and

4     the terms and conditions were there for the entire period of

5     the ICO, the question then becomes for the Court is it

6     reasonably foreseeable for a defendant who hired an ad

7     campaign targeting North America, who --

8          THE COURT:  How did the ad campaign target North

9     America?

10         MR. TENREIRO:  So, it was a Facebook campaign, Your

11    Honor, that was, as Mr. Lacroix explains it in his affidavit

12    and as I think the Court can take judicial notice, Facebook

13    can target ads based on the user's geographical location; so,

14    they apparently bought ads that targeted North America and

15    their only response to that is to say, well, you know, there's

16    not a lot of countries in North America and that response,

17    again, exhibits their confusion about what the test is, it is

18    not a test about subjective intent, it is about what is

19    reasonably foreseeable and that is an age old legal principle

20    that courts have been dealing with for centuries.

21         So, when they say that there's a lacuna in the case

22    law, they are nitpicking at the facts of different cases, and

23    I can get to that, but it completely ignores the legal

24    principle that's at play here which is -- and Justice Kennedy

25    said it very clearly in McIntyre, it's not -- at the end of

1    the day it's not his expectations that control, it's his

2    actions because the analysis is reasonable foreseeability.

3         So, if they have a check box, the question becomes

4    is it reasonably foreseeable for a person who purchases an ad

5    campaign targeting North America which includes the United

6    States, for a person who is obtaining zip codes from credit

7    card billing, is it reasonably foreseeable that that person is

8    going to get United States investors and, again, we could have

9    an interesting debate about that but Mr. Lacroix admits that

10   he foresaw that, that he knew that was going to happen.

11        So, all he's left with, all he's reduced with is

12   this subjective intent that he claims to have had and the

13   Court has pointed out correctly that we have nothing in the

14   evidence other than his say so and I think that the case

15   exemplifies quite clearly why subjective intent is not the

16   test because any defendant could come in and say, I didn't

17   mean it, I didn't want to do it, and the courts have said

18   repeatedly that the subjective intent is not enough.  I think

19   if the Court looks at cases like the Hemi Corp. case where the

20   Seventh Circuit acknowledges -- and there's SEC cases as well

21   such as the Straub case; the courts say the defendant didn't

22   necessarily care that the purchasers were going to come from

23   California or from Nevada or from Illinois but they made a

24   general solicitation and they sat there and they received the

25   funds and that's purposeful availment.  So, they're trying to

1  make the inquiry --

2  THE COURT:  But in any of those cases was there any

3  effort to restrict American investors?  Here you have -- I

4  take your point that you have an ad campaign that's directed

5  to North America but they would argue that what separates this

6  case from the cases that you've cited is affirmative actions

7  to block Americans and that there is no case on all fours

8  where there have been affirmative actions to block Americans;

9  you'll agree with that that there is no case that discusses

10  this kind of action?

11  MR. TENREIRO:  Not quite, Your Honor, because I do

12  think that there's two cases where there's been -- so, first

13  of all, the Euromarkets case involved a statement that this

14  product is not for sale to Americans and even though that

15  arose after the beginning of the litigation, the courts have

16  actually said in the context of personal jurisdiction that the

17  court is allowed to look at actions that occurred afterwards

18  in determining whether there was purposeful availment and in

19  that case the Court came up with a very obvious answer which

20  is you can say what you want but if you have zip code boxes

21  for Americans, you know, it makes it reasonably foreseeable

22  that you're going to get Americans, that's obvious.

23  THE COURT:  You're saying during the course of this

24  offering purchases showed that the purchasers were purchasing

25  with credit cards that had zip codes that were American

34

1   citizens?

2         MR. TENREIRO:  That's really it and they're not

3   disputing this.  We could get into IP stuff as well and the

4   Court has noted that the IP issuer also helps us or I think

5   that was the import of the question.  They want to engage in

6   factual disputes about the accuracy of IP addresses.  The

7   Court does not need to resolve those factual disputes because

8   we have the zip code.

9         And to go back to Your Honor's earlier question

10  about efforts, the Hemi Corp. case is not about efforts to

11  exclude Americans but in that case the cigarette company did

12  actually say we're not selling to New York and they did not

13  sell to New York and the court there said, wait a minute, that

14  actually shows purposeful availment of the other

15  jurisdictions, you knew what was happening and you made a

16  decision.

17        And I think that that also, Your Honor, that

18  point -- that case is on all fours in the sense that, again,

19  the principle at issue there applies here and it also responds

20  to their point about how a ruling in the SEC's favor in this

21  case is going to somehow cripple crypto markets in the world.

22  Implicit in those determinations by those courts is that a

23  defendant has made some sort of choice that they're going to

24  avail themselves of our markets, of the vastness of our

25  population, of our financial markets and that in exchange for

35

1    that choice, they might have to one day answer to a United

2    States court.  That's all --

3         THE COURT:  Well, they're not availing themselves of

4    our markets, I mean in the sense that these aren't traded on

5    any of the markets that you generally regulate, they are

6    availing themselves of our citizens.

7         MR. TENREIRO:  Well, that's true, Your Honor, but

8    it's actually funny that they rely on that because the import

9    of that is that, you know, we're suing them for offering these

10   securities that should have been registered, so the import of

11   what they're saying is if we fail to register in addition to

12   defrauding people, then you don't have jurisdiction.  And the

13   Court can look at the SEC versus Brown case from Illinois

14   where there the defendant was just selling partnership

15   interest -- we do regulate the national securities exchanges

16   but the SEC also has authority over, you know, frauds that are

17   made in connection with, you know, the sale of securities that

18   are not actually listed on an exchange and the Brown case is

19   such an example.

20        And in any case, the only work that the registration

21   is doing, like in the Pinker case, the work that the

22   registration is doing is it is telling the Court, well, that's

23   why it is foreseeable, it is on the U.S. market, that's why it

24   is foreseeable for the defendant that they're going to get

25   U.S. investors.  It's not some sort of requirement.  Again, it

36

1    couldn't be a requirement because there's Section 5 issues.

2         Here the work of foreseeability is done by

3    Mr. Lacroix who admits that he knew he was going to get them

4    in addition to all the other undisputed factual points that

5    I've raised like the Facebook campaign and the zip codes.

6         So, recall the most important fact here then, Your

7    Honor, is they sold millions of dollars worth of PlexCoin to

8    thousands of United States investors and that they did so

9    knowingly, that's the end of the case, that's the only

10   principle that controls here.  This case is actually not a

11   novel case at all.  It is not requiring the Court to do

12   anything new.  And the fact that these assets -- the

13   defendants say, well, the fact that these assets are digital

14   is a crucial distinction, they never explain why.

15        And I think Judge Garland in the Gorman case said,

16   look, courts are made from brick and mortar, you know, the

17   internet and technology -- I don't understand how that's

18   relevant.  There's another case that we cite that we think is

19   very on point which they completely ignore in their reply

20   which is the Greene case where people in California were

21   sending money to a bank in either Japan or Canada and that

22   money was being then funneled for them to buy Bitcoins and

23   that bank, you know, didn't send any physical items into the

24   United States, they were just taking money from California

25   residents knowing they were California residents and the court

37

1  very logically said if you know that you're taking advantage

2  of our markets, you're getting fees and you're getting

3  revenue, that's it, and that's this case.

4          THE COURT:  So, you're basically saying that the

5  crux of your jurisdictional argument is they're taking money

6  from U.S. citizens as opposed to using PayPal or Stripe or

7  Facebook or some of these other entities?

8          MR. TENREIRO:  So, what I would say to that point,

9  Your Honor, is the Facebook and the PayPal -- I'd like to set

10 that aside, I mean there's a couple of red herrings in

11 defendant's reply brief about anyone who has an Amazon

12 account, we've not made that claim, but the Licci case from

13 the Second Circuit has very clear language about using such

14 accounts in furtherance of the very fraud or of the very harm

15 alleged and there might be a case I suppose where -- I can

16 imagine a situation where a defendant in Canada for whatever

17 reasons sets up only Citibank bank accounts and that's where

18 they put in all the money that they raise from foreigners, I

19 don't think a court would say there's no personal jurisdiction

20 there.  There might be an issue about the applicability of the

21 securities laws, Morrison issues and other issues, but as

22 Licci itself demonstrates, the harm occurred in Israel, the

23 bank was in Canada, they were supposedly just using the

24 corresponding account in New York to funnel money to the

25 terrorists and the Second Circuit said there's a reason you're

38

1  doing that, you are taking advantage of the reliability of New

2  York City's banking laws and banking systems.

3      Here, again, I'd like to set PayPal aside for a

4  second and Facebook, but they used Kraken to convert their

5  assets, their digital assets into fiat currency and they used

6  things such as Square and Stripe to raise money from our

7  investors and from other investors.  They also used foreign

8  accounts, they used one at Wave which is in Canada, and they

9  could have used foreign exchanges like Binance which is I

10  believe somewhere in Asia.  So, they chose to use those

11  accounts, it's not --

12      THE COURT:  So, you're saying that their use of

13  those accounts that you just identified is stronger than their

14  use of PayPal or Facebook?

15      MR. TENREIRO:  Well, I think that the use of PayPal

16  is essentially in the same vein because there are other

17  payment aggregating services, it is just that I think that

18  maybe psychologically for the Court PayPal might sound a

19  little bit harder because so many people use PayPal but I

20  think it is in fact the same.

21      Facebook is different.  Facebook would have

22  something to do with the act of offering the security or a

23  claim under 17(a) essentially.  Facebook does serve as a

24  digital billboard and if they are targeting Americans who are

25  using Facebook, I would say that there's absolutely personal

1    jurisdiction in a 17(a) case because of the use of PayPal.

2    But the principle, it's very limited --

3            THE COURT:  What is different about Kraken, Square

4    and Stripe, why are they more significant to your

5    jurisdictional argument?

6            MR. TENREIRO:  Well, part of the reason is that

7    their terms and conditions actually tell them that any dispute

8    related to their use of those services should be litigated in

9    the United States under United States law and what's funny --

10           THE COURT:  But this isn't a dispute about their

11   services.

12           MR. TENREIRO:  That's true, Your Honor, but again

13   the question is not whether this is a dispute about their

14   services but the question is whether it's reasonably

15   foreseeable that they might one day have to answer in a U.S.

16   court based on this conduct and that's what's happening here.

17   It is just that somebody else is in the dispute with them

18   based on this conduct.  And the cases that they rely on, you

19   know, that say, well, PayPal is not enough.  The use of PayPal

20   has nothing to do with the conduct that's being charged and

21   certainly that's not the position that we are taking.

22           If I might respond briefly, Your Honor, to some of

23   the policy arguments; I think I mentioned -- first of all,

24   it's not relevant to personal jurisdiction.  The Second

25   Circuit I think said that in Leasco and in Unifund.  The

40

1    policy dispute is not before the Court but it is also not --

2    it is just not logical for them to say that -- the SEC has

3    been enforcing the federal securities laws for 80 years and

4    the world markets are okay.  This happens to be a new area or

5    a new method in which people raise funds but there's no reason

6    to actually believe that the SEC enforcing the securities laws

7    when our investors are defrauded is going to cause a

8    disruption that the SEC has not caused in its entire history.

9            I really urge the Court to not fall for the

10   invitation of trying to turn this inquiry around into, you

11   know, what my colleague said which was the core of the case,

12   it is not the core of the case whether the efforts they made

13   was enough.  The core of the case is due process, reasonable

14   foreseeability and the Court can analyze the case and the

15   facts, the undisputed -- you know, even the facts taking them

16   in their light and we would still win.

17           On the reasonableness argument, it's interesting

18   that my colleague recognizes it in his candor that Asahi Metal

19   is a case about intrastate jurisdiction and the interests of

20   the state.  It's an open question and Judge Becker in the

21   Pinker case on the Third Circuit talks about, you know, this

22   reasonable analysis in the context of a law that is a

23   nationwide service of process when you have a U.S. regulatory

24   agency, it is not quite clear what role the reasonableness

25   inquiry plays and other courts have recognized that and the

1   reason for that is obvious, we have a national interest in

2   protecting our markets.  The SEC has a paramount interest in

3   protecting the retail investors that are funneling millions

4   and billions of dollars into these types of assets.  This is

5   money that can be used to raise capital for other ventures, to

6   create jobs in other areas.  The SEC has a quintessential role

7   in regulating when our investors are at issue.

8          THE COURT:  I'm not sure I understand what you mean

9   by that, a key role in regulating investors; are you saying we

10  want investors investing in the United States and not foreign

11  transactions?

12         MR. TENREIRO:  What I mean is we have a key interest

13  in protecting the investors that are American investors and

14  making sure that, for example, what they invest in is not a

15  fraud.  So, it is not about whether they invest abroad or here

16  but whether -- the interest of the SEC is disclosure, you

17  know, that the securities are registered under the '33 Act and

18  that the offering is not conducted in a fraudulent way.

19         THE COURT:  Does that mean you have jurisdiction,

20  assuming there was no targeting by Facebook, assuming that you

21  had to go to Canada to make this purchase, are you saying that

22  just because American investors made that purchase even if

23  they couldn't -- if there was no targeting to the U.S., if

24  they had to physically go to Canada let's say to purchase,

25  that the SEC still has jurisdiction because there are American

42

1  investors who are being defrauded?

2          MR. TENREIRO:  No, I don't think so, I don't think

3  that's necessarily our statement.  I'm just focused now on the

4  reasonableness analysis which kind of looks to the interests

5  of the sovereign.  I think there would be Morrison problems

6  and probably personal jurisdiction problems with the scenario

7  that the Court presented on the reasonable foreseeability

8  prong of the analysis.  The reasonableness inquiry the Court

9  wouldn't even get to.

10          So, I was now just trying to focus a little bit on

11  those factors and responding to my colleague's point that this

12  is a Canadian problem.  I don't think that it is a Canadian

13  problem.  I think it is a problem for the SEC when people come

14  to our shores and get money from our investors here and I

15  think that is the point I was making there.

16          Now, the idea that there's a lacuna in the case law

17  I've responded to, I don't agree with that, but what my

18  colleague is forgetting when he's calling for some sort of

19  rule of lenity or some sort of, well, the SEC needs to

20  regulate and tell people how it's going to treat these assets,

21  I think he's forgetting that this is a due process question

22  and it is up to the courts to decide what the limits or the

23  contours of due process are and the SEC can't override that

24  analysis by saying, well, this is what we're going to do.  I

25  mean the constitutional inquiry is what the constitutional

43

1    inquiry is.

2           There's a couple more points, Your Honor.  You know,

3    they talk about seven percent of investors in their brief.  I

4    think that the Court can see past that.  That's only of the

5    zip code or fiat currency raises.  It also doesn't matter

6    because the Court -- I mean the case law is clear one is

7    enough.  There's thousands here.

8           Finally, I think, unless the Court has any other

9    questions --

10          THE COURT:  No.  I meant to ask your adversary about

11   this but while you're up here.

12          MR. TENREIRO:  Yes.

13          THE COURT:  It's not clear to me what this dispute

14   about Sidepay is, Sidepay.ca, Sidepay, Ltd.; what is your

15   position on that?

16          MR. TENREIRO:  The SEC's position on that, Your

17   Honor, is that we listed a name, Sidepay, and we gave them

18   essentially sufficient notice that if there was an entity or

19   if there was a project, we were wanting to bring it into this

20   suit and in the complaint we specifically talked about the

21   accounts for which they had listed Sidepay.ca as the owner of

22   the account.  These were Stripe accounts.  So, because these

23   accounts have the name Sidepay.ca associated with them, they

24   are defendants, they have some of the money that was raised

25   from investors.

44

1           They then said, well, there's no entity and then a

2    few days later we found out there that there was an entity and

3    the Court issued a preliminary injunction.  So, our position

4    is the Court has issued a preliminary injunction.  If they

5    want to --

6               THE COURT:  On Sidepay.ca?

7               MR. TENREIRO:  Yes.

8               THE COURT:  Okay.  So, you're not amending to change

9    it or -- you say I've got the right entity, Sidepay.ca?

10              MR. TENREIRO:  Correct.

11              THE COURT:  You're not seeking to amend your

12   complaint to add anybody else?

13              MR. TENREIRO:   No, Your Honor, we are not.

14              THE COURT:  So, your position is we have named the

15   correct entity?

16              MR. TENREIRO:  Well, our position is at the very

17   least we have given them notice of who we are naming and it is

18   Sidepay and, yes, at the moment we filed the lawsuit we were

19   not aware that there was an entity, we were aware that there

20   was some name that was associated with the account and the

21   name was Sidepay.

22              THE COURT:  But the person restrained was

23   Sidepay.ca?

24              MR. TENREIRO:  Correct, and they are as well.

25              THE COURT:  And they are who?

45

1          MR. TENREIRO:  The individual defendants.

2          THE COURT:  Yes.  Okay.  All right.

3     Thank you.

4          MR. TENREIRO:  Thank you, Your Honor.

5          THE COURT:  You have a minute.

6          MR. GOTTLIEB:  One minute?

7          THE COURT:  We've been going on for hours here.  You

8     did have the bulk of the time.

9          MR. GOTTLIEB:  It may feel that way.  My colleague,

10    Mr. Tenreiro, and I can get in a lot of words.

11         THE COURT:  Tell me about Sidepay.

12         MR. GOTTLIEB:  Sidepay is a fairly simple point,

13    Your Honor.

14         THE COURT:  Do you represent Sidepay?

15         MR. GOTTLIEB:  I represent Sidepay, Ltd.

16         THE COURT:  They're not named.

17         MR. GOTTLIEB:  They're not named.

18         THE COURT:  And they don't seek to name them.  So,

19    you don't represent Sidepay.ca, correct?

20         MR. GOTTLIEB:  Sidepay.ca is a website, it is not an

21    entity, it is not something that's really capable of being

22    represented.

23         THE COURT:  So, you're just making the argument that

24    they identified the wrong party.

25         MR. GOTTLIEB:  That's right, Your Honor.

46

1          THE COURT:  But you do represent Sidepay, Ltd.?

2          MR. GOTTLIEB:  I do represent Sidepay, Ltd.

3          THE COURT:  So, they're not named so what is your

4   problem?

5          MR. GOTTLIEB:  The SEC believes that they are bound

6   and if they are not bound, then I have no problem.

7          THE COURT:  Let me ask you what is your position

8   with that?

9          MR. TENREIRO:  Your Honor, that's why I mentioned

10  that the individual defendants are bound.  So, to the

11  extent that Ms. Paradis-Royer is the sole shareholder of

12  Sidepay, Ltd., she's bound to not move the assets of

13  Sidepay, Ltd.  I don't even know if Sidepay, Ltd. has assets.

14  The Stripe accounts name Sidepay.ca as the owner and are being

15  controlled by Ms. Paradis-Royer.  So, they are bound to the

16  extent that they are controlled by Ms. Paradis-Royer, I don't

17  think there's any dispute on that.  If we identify that

18  Sidepay, Ltd. has opened a separate account and that there is

19  money that is relevant to this action there, then we might

20  need to amend the complaint but that is not our position now.

21         THE COURT:  Okay, that's that.  Did you want to

22  respond to anything else?

23         MR. GOTTLIEB:  I'll be very brief on the biggest

24  issues I can, Your Honor.  First of all, we don't agree that

25  you have to assume the facts are as alleged in the complaint,

1   that's true if we're moving just on the four corners of the

2   complaint but once you move past that and move into the

3   evidence, you're entitled to look at all the evidence and take

4   it however you'd like.  So, it is not the case that you can

5   just rely --

6           THE COURT:  What evidence do you want me to rely on,

7   the affidavit?

8           MR. GOTTLIEB:  The affidavit, the terms of service

9   and the check box, that's what we have advanced, that's what

10  we told you back in December we advanced, that's what we're

11  advancing.

12          Further, I think a number of the cases that he's

13  raised are completely distinguishable.  In Licci in the Second

14  Circuit the defendants there were using -- they opened a bank

15  account at Amex Bank New York and were using that bank account

16  continuously for their purposes.  In the Hemi case in the

17  Seventh Circuit the defendant was selling cigarettes to

18  Illinois residents for quite a period of time intentionally.

19  There's no issue about the personal jurisdiction in these

20  cases, it's obviously very well settled case law.  Here I

21  think you have something different because you have the

22  efforts to block.

23          And further, let me close on -- we said we'd come

24  back to it, just the nature of crypto currencies, what are

25  these transactions and how is it relevant, how does that

48

1    change anything different.

2           The item in question, PlexCoin, is not traded on a

3    U.S. exchange, it doesn't have U.S. public securities filings

4    unlike all of the other cases that the SEC has forwarded to

5    you where the SEC is a plaintiff.  Here PlexCoin is some

6    computer code that gets changed on a server outside the U.S.

7    So, a U.S. person sends money to Shopify, a Canadian

8    e-commerce company, to Sidepay.ca, a Canadian website, to

9    Stripe which is a U.S. based entity but with affiliated

10   entities in Canada, to Square which is a Canadian website,

11   Square.ca, as well as U.S. website, square.com, and all of

12   these are associated with Canadian bank accounts.  So, once a

13   purchaser from the U.S. or anywhere else in the world sends

14   their money through these Canadian services to Canada that

15   goes to a Canadian bank account, then the code on a computer

16   outside the U.S. is changed and that person can be said to own

17   PlexCoin.  That change is reflected all over the world on any

18   computer that has access to the PlexCoin blockchain.  PlexCoin

19   is based on the Ethereum blockchain.

20          Now, the reason this is relevant is if you -- if any

21   U.S. person pays to some foreign service for a foreign item,

22   that's not going to implicate personal jurisdiction and if any

23   transaction on a blockchain were to implicate personal

24   jurisdiction, then literally every transaction on any

25   blockchain around the world that were accessed by a single

49

1   American would trigger personal jurisdiction.

2        Your Honor, that rule of law would freeze blockchain

3   development all over the world.  It's no exaggeration to say

4   that the blockchain community around the world is watching

5   this case for guidance on what they can do and the blockchain

6   community outside the U.S. is watching this case for guidance

7   on what they need to do to stay out of the SEC's purview.

8   They've seen what the SEC is doing and they want no part of

9   it.  If there is no clear guidance, they don't know what to do

10  and it's going to radically affect internet and blockchain

11  commerce worldwide.

12       I know my colleagues at the Commission want you to

13  ignore policy but in this case to ignore policy is to --

14       THE COURT:  Well, that argument is an argument you

15  would make even if you didn't have a check box or terms and

16  conditions, correct?

17       MR. GOTTLIEB:  We could, Your Honor, but we confess

18  in that situation it would be a much weaker argument because

19  it would not be sufficient to market directly to Americans,

20  say, hey, Americans, come buy my stuff and say, oh, oh, we're

21  blockchained, that's different.  That wouldn't fly, I concede

22  that, Your Honor.

23       THE COURT:  All right.  I just wanted to make that

24  clear.

25       Is there anything else?

50

1          MR. GOTTLIEB:  I would love to refute my colleague's

2   points but I'm going to take it from Your Honor that that

3   should be all.

4          THE COURT:  Thank you, counsel.  Thank you very

5   much.

6

7          (Pause.)

8          THE COURT:  Oh, yes, I did want to raise the issue

9   because in my absence last week Judge Ross signed a TRO and

10  you've seen those papers, counsel?

11         MR. GOTTLIEB:  I have, Your Honor.

12         THE COURT:  Are you objecting to that TRO remaining

13  in force or are you going to respond to that?

14         MR. GOTTLIEB:  We haven't decided, we only got the

15  papers on Friday I think.

16         MR. TENREIRO:  Monday.

17         MR. GOTTLIEB:  Monday, sorry, sorry, Monday.  We

18  haven't decided yet.

19         My initial reaction is that it echos a legal dispute

20  that is being had in Canada because I believe that the

21  Quebecois AMF has moved for a similar TRO on this same issue.

22         THE COURT:  So, you're not sure yet whether you're

23  going to oppose it?

24         MR. GOTTLIEB:  That's correct because if the courts

25  in Canada -- this is another example of how Canada is already

51

1   all over this and we're just the tail wagging the dog here; if

2   Canada maintains a TRO on those assets, then it's, frankly,

3   not worth this Court's time to debate whether there should be

4   a similar TRO in the U.S., if the assets are enjoined, then

5   they're enjoined.

6           THE COURT:  So, it is in effect for 14 days.  When

7   do you plan on letting me know whether you're going to do

8   that?

9           MR. GOTTLIEB:  Definitely before 14 days, Your

10  Honor, but I'll tell you what, this is one of those instances

11  where I'm happy to say, Your Honor, you tell me when you'd

12  like to know.

13          THE COURT:  So, you got the papers on --

14          MR. GOTTLIEB:  On Monday.

15          THE COURT:  Monday.

16          Can you respond by Friday?

17          MR. GOTTLIEB:  Yes, Your Honor.

18          THE COURT:  Okay.

19          MR. GOTTLIEB:  And what I will do is I will try

20  before coming to the Court, I'll get my answer and I will talk

21  to Mr. Tenreiro because if we are going to agree, then we can

22  do something similar to what we've done for the others which

23  is, with Your Honor's permission, which is just agree to

24  extend the TRO on the same calendar as the TRO that's

25  currently in place which would save you a lot of time and

52

1    trouble.

2             THE COURT:  All right, but then there's another

3    motion, there's a motion for sanctions.

4             MR. TENREIRO:  For contempt, Your Honor.

5             THE COURT:  For contempt.  I take it you're going to

6    respond to that?

7             MR. GOTTLIEB:  I'm sorry, I'm actually not aware of

8    a separate motion.

9             MR. TENREIRO:  So, the papers were an ex parte

10   application with a TRO and for an order to show cause on a

11   contempt schedule and our papers -- maybe you haven't had a

12   chance to look at them, all the contempt arguments are in the

13   papers I sent you on Monday.

14            MR. GOTTLIEB:  I apologize, I saw Judge Ross's

15   orders and I just saw that she had ordered --

16            THE COURT:  She didn't order a response.

17            MR. TENREIRO:  She didn't, right.

18            THE COURT:  So, it's been filed, if we want to set

19   down a schedule today for responding to that.

20            MR. GOTTLIEB:  Okay, Your Honor.  To be honest, I

21   was not aware of this but okay.

22            THE COURT:  You didn't see -- you don't didn't read

23   the papers?

24            MR. GOTTLIEB:  I read the papers but I read them

25   quickly because we were preparing for this argument but on my

1  first read, my understanding and if it is a faulty

2  understanding, my apologies, but my understanding was that

3  Judge Ross's reaction was just to grant the TRO.

4          THE COURT:  She did, she didn't do an order to show

5  cause on the other but they're entitled to have that issue

6  briefed, so she left that to me to schedule.  So, they're

7  looking for a sanctions motion and contempt.  They filed the

8  papers, so I just want to set a schedule for you to respond to

9  those.

10         MR. GOTTLIEB:  Okay.  As long as we can possibly

11  have, Your Honor, since I haven't seen the papers.

12         THE COURT:  They were together.

13         MR. GOTTLIEB:  No, no, I apologize, apparently I've

14  seen the papers but completely did not understand them.  My

15  apologies for that.

16         THE COURT:  Okay.  Well, this is not of the same

17  exigency.  So, can you respond to those by July 2nd, does that

18  give you enough time?

19         MR. GOTTLIEB:  Probably not, Your Honor, I'm out

20  that week, my apologies.

21         THE COURT:  July 13th.

22         MR. GOTTLIEB:  Okay.

23         THE COURT:  Okay.  And any reply July 23rd.

24         MR. TENREIRO:  Yes, Your Honor.

25         THE COURT:  Okay.

54

1          That takes care of what's outstanding and I will

2     reserve decision on your jurisdictional argument.

3          Thank you, gentlemen.

4          MR. GOTTLIEB:  Thank you, Your Honor.

5          THE COURT:  And lady.

6          (Time noted:  11:40 a.m.)

7          (End of proceedings.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'33** [1] - 41:17

**1**

**10,000** [3] - 10:17, 19:7, 23:8
**100** [1] - 15:22
**10:00** [1] - 1:8
**11201** [1] - 1:24
**11:40** [1] - 54:6
**13th** [1] - 53:21
**14** [2] - 51:6, 51:9
**16** [1] - 4:22
**17(a** [2] - 38:23, 39:1
**17-CV-7007** [1] - 2:1
**17-CV-7007(CBA** [1] - 1:3

**2**

**20** [1] - 1:8
**2017** [1] - 24:16
**2018** [1] - 1:8
**225** [1] - 1:23
**23rd** [1] - 53:23
**2nd** [1] - 53:17

**5**

**5** [1] - 36:1

**6**

**613-2274** [1] - 1:24

**7**

**718** [1] - 1:24

**8**

**80** [1] - 40:3

**A**

**a.m** [2] - 1:8, 54:6
**able** [3] - 15:6, 20:18, 22:3
**abroad** [1] - 41:15
**absence** [1] - 50:9
**absolutely** [1] - 38:25
**accept** [1] - 20:13
**access** [1] - 48:18
**accessed** [1] - 48:25
**accessing** [1] - 13:3
**account** [10] - 8:22, 13:3, 37:12, 37:24, 43:22, 44:20, 46:18,

47:15, 48:15
**accounts** [11] - 8:18, 37:14, 37:17, 38:8, 38:11, 38:13, 43:21, 43:22, 43:23, 46:14, 48:12
**accuracy** [1] - 34:6
**accurate** [1] - 10:15
**achieve** [1] - 15:21
**acknowledges** [1] - 32:20
**Act** [1] - 41:17
**act** [2] - 29:24, 38:22
**action** [1] - 33:10, 46:19
**actions** [4] - 32:2, 33:6, 33:8, 33:17
**activities** [4] - 13:3, 13:6, 13:7, 13:24
**ad** [4] - 31:6, 31:8, 32:4, 33:4
**add** [3] - 6:9, 10:4, 44:12
**addition** [2] - 35:11, 36:4
**additionally** [1] - 21:21
**address** [7] - 3:6, 7:12, 7:13, 7:18, 14:3, 19:19, 26:25
**addresses** [6] - 3:5, 17:11, 18:17, 28:4, 29:17, 34:6
**addressing** [2] - 18:9, 28:14
**admit** [1] - 30:9
**admits** [2] - 32:9, 36:3
**ads** [2] - 31:13, 31:14
**advance** [1] - 24:12
**advanced** [2] - 47:9, 47:10
**advancing** [1] - 47:11
**advantage** [2] - 37:1, 38:1
**adversary** [1] - 43:10
**adverse** [1] - 6:6
**advertising** [1] - 14:18
**affect** [2] - 15:10, 49:10
**affectation** [1] - 15:12
**affects** [1] - 30:1
**affidavit** [14] - 5:23, 5:24, 6:2, 6:3, 6:4, 6:20, 7:6, 7:20, 7:24, 20:1, 20:6, 31:11, 47:7, 47:8
**affiliated** [1] - 48:9
**affirm** [1] - 8:20
**affirmatively** [1] - 30:22

**afterwards** [1] - 33:17
**age** [1] - 31:19
**agency** [1] - 40:24
**aggregating** [1] - 38:17
**agree** [9] - 2:22, 3:1, 3:12, 3:17, 33:9, 42:17, 46:24, 51:21, 51:23
**agreed** [1] - 4:16
**agrees** [1] - 4:13
**allegation** [1] - 7:1
**alleged** [6] - 10:2, 12:17, 14:14, 27:13, 37:15, 46:25
**ALLISON** [1] - 1:20
**Allison** [1] - 2:11
**allow** [1] - 25:5
**Allowed** [2] - 18:9, 18:11
**allowed** [2] - 5:9, 33:17
**alone** [2] - 15:3, 22:4
**Amazon** [1] - 37:11
**amend** [2] - 44:11, 46:20
**amending** [1] - 44:8
**America** [7] - 14:11, 31:7, 31:9, 31:14, 31:16, 32:5, 33:5
**American** [11] - 13:25, 14:2, 20:13, 25:14, 33:3, 33:25, 41:13, 41:22, 41:25, 49:1
**Americans** [38] - 14:7, 15:22, 15:23, 16:25, 17:14, 17:16, 18:9, 18:10, 18:11, 18:12, 18:16, 19:1, 19:17, 19:19, 20:21, 22:12, 23:10, 23:11, 24:3, 24:5, 24:7, 24:10, 24:20, 25:12, 25:19, 25:20, 30:22, 33:7, 33:8, 33:14, 33:21, 33:22, 34:11, 38:24, 49:19, 49:20
**Amex** [1] - 47:15
**AMF** [4] - 26:14, 27:16, 27:23, 50:21
**AMF's** [1] - 27:9
**amicus** [1] - 27:19
**AMON** [1] - 1:12
**analogy** [1] - 27:6
**analysis** [6] - 28:22, 32:2, 40:22, 42:4, 42:8, 42:24
**analyze** [1] - 40:14
**AND** [1] - 1:3
**answer** [8] - 7:5, 7:19,

7:23, 30:23, 33:19, 35:1, 39:15, 51:20
**answered** [1] - 15:25
**answers** [1] - 7:24
**anyway** [6] - 8:5, 13:16, 15:23, 18:12, 21:25, 25:23
**apart** [1] - 12:12
**apologies** [3] - 53:2, 53:15, 53:20
**apologize** [2] - 52:14, 53:13
**appearances** [1] - 2:5
**APPEARANCES** [1] - 1:13
**appellate** [1] - 24:24
**applicability** [1] - 37:20
**application** [1] - 52:10
**applied** [1] - 24:18
**applies** [1] - 34:19
**apply** [2] - 4:11, 4:16
**appreciate** [1] - 28:9
**Aqua** [1] - 28:18
**arbitrable** [1] - 22:2
**arbitration** [2] - 4:14, 4:15
**area** [3] - 16:6, 17:5, 40:4
**areas** [2] - 7:12, 41:6
**argue** [4] - 16:21, 20:18, 20:19, 33:5
**arguing** [2] - 17:23, 26:4
**ARGUMENT** [1] - 1:6
**argument** [16] - 2:3, 8:6, 16:10, 17:9, 26:8, 27:14, 30:19, 37:5, 39:5, 40:17, 45:23, 49:14, 49:18, 52:25, 54:2
**arguments** [2] - 39:23, 52:12
**arose** [1] - 33:15
**Asahi** [4] - 26:23, 27:5, 28:5, 40:18
**Asia** [1] - 38:10
**aside** [3] - 8:16, 37:10, 38:3
**aspersions** [1] - 11:2
**asset** [1] - 5:14
**assets** [11] - 27:10, 36:12, 36:13, 38:5, 41:4, 42:20, 46:12, 46:13, 51:2, 51:4
**Assisted** [1] - 1:25
**associated** [3] - 43:23, 44:20, 48:12
**assume** [6] - 20:23, 28:19, 28:23, 31:2,

31:3, 46:25
**assuming** [4] - 3:15, 20:17, 41:20
**August** [5] - 12:24, 13:1, 13:14, 13:15, 20:16
**authorities** [1] - 27:20
**authority** [1] - 35:16
**avail** [1] - 34:24
**available** [1] - 22:19
**availing** [2] - 35:3, 35:6
**availment** [7] - 30:1, 30:20, 30:21, 30:25, 32:25, 33:18, 34:14
**avoid** [3] - 12:10, 22:9, 30:15
**aware** [4] - 44:19, 52:7, 52:21

**B**

**bad** [2] - 6:10, 20:17
**balance** [1] - 26:18
**Bank** [1] - 47:15
**bank** [8] - 36:21, 36:23, 37:17, 37:23, 47:14, 47:15, 48:12, 48:15
**banking** [1] - 38:2
**Barrel.ie** [1] - 23:24
**based** [8] - 14:8, 24:18, 28:19, 31:13, 39:16, 39:18, 48:9, 48:19
**Becker** [1] - 40:20
**becomes** [2] - 31:5, 32:3
**BEFORE** [1] - 1:12
**beginning** [2] - 7:10, 33:15
**behalf** [1] - 27:20
**believes** [1] - 46:5
**best** [1] - 23:20
**better** [1] - 19:17
**between** [3] - 3:9, 27:8, 28:1
**bigger** [1] - 19:10
**biggest** [1] - 46:23
**billboard** [1] - 38:24
**billing** [1] - 32:7
**billions** [1] - 41:4
**Binance** [1] - 38:9
**bind** [1] - 4:16
**binding** [1] - 22:2
**bit** [4] - 7:6, 21:20, 38:19, 42:10
**Bitcoin** [1] - 21:15
**Bitcoins** [1] - 36:22
**blizzard** [1] - 25:3

**block** [4] - 15:21, 33:7, 33:8, 47:22
**blockchain** [8] - 48:18, 48:19, 48:23, 48:25, 49:2, 49:4, 49:5, 49:10
**blockchained** [1] - 49:21
**blocker** [1] - 19:14
**blocking** [3] - 18:3, 19:10, 22:14
**Boston** [4] - 13:12, 13:14, 13:24, 14:12
**bought** [1] - 31:14
**bound** [5] - 46:5, 46:6, 46:10, 46:12, 46:15
**box** [35] - 3:16, 3:19, 4:1, 4:6, 4:8, 8:7, 8:9, 8:10, 8:13, 8:19, 8:20, 8:23, 9:14, 9:25, 10:25, 11:16, 11:21, 12:5, 15:13, 16:12, 16:21, 17:4, 17:10, 17:16, 20:2, 20:14, 28:24, 29:9, 29:18, 30:17, 30:23, 31:3, 32:3, 47:9, 49:15
**boxes** [2] - 29:19, 33:20
**Brazil** [1] - 14:9
**brick** [1] - 36:16
**brief** [5] - 27:19, 29:17, 37:11, 43:3, 46:23
**briefed** [3] - 2:25, 3:2, 53:6
**briefly** [1] - 39:22
**bring** [1] - 43:19
**bringing** [1] - 12:14
**brings** [1] - 24:3
**Brooklyn** [3] - 1:5, 1:24, 22:25
**brought** [1] - 12:16
**Brown** [2] - 35:13, 35:18
**bubble** [2] - 15:15, 22:13
**bulk** [1] - 45:8
**burden** [1] - 26:24
**Burger** [1] - 16:4
**buried** [2] - 4:5, 4:10
**business** [4] - 22:19, 24:2, 24:4, 24:20
**buy** [4] - 19:2, 26:8, 36:22, 49:20
**buying** [1] - 19:3
**BY** [1] - 1:20

## C

**Cadman** [1] - 1:23
**calendar** [1] - 51:24
**California** [4] - 32:23, 36:20, 36:24, 36:25
**campaign** [6] - 31:7, 31:8, 31:10, 32:5, 33:4, 36:5
**Canada** [23] - 4:24, 5:15, 7:11, 12:9, 12:20, 13:15, 26:3, 26:14, 28:3, 28:4, 36:21, 37:16, 37:23, 38:8, 41:21, 41:24, 48:10, 48:14, 50:20, 50:25, 51:2
**Canadian** [14] - 7:22, 14:24, 15:1, 25:5, 26:14, 27:20, 42:12, 48:7, 48:8, 48:10, 48:12, 48:14, 48:15
**Canadians** [4] - 12:9, 26:20, 27:15, 28:3
**candor** [2] - 28:9, 40:18
**cannot** [2] - 4:24, 16:19
**capable** [1] - 45:21
**capital** [1] - 41:5
**card** [1] - 32:7
**cards** [1] - 33:25
**care** [2] - 32:22, 54:1
**CAROL** [1] - 1:12
**case** [73] - 3:10, 3:21, 6:10, 7:15, 12:12, 14:17, 15:13, 15:25, 18:5, 23:14, 23:22, 23:23, 24:3, 24:5, 24:12, 24:14, 24:15, 24:21, 24:22, 25:1, 26:25, 27:8, 28:16, 28:18, 29:15, 29:16, 29:17, 29:18, 29:19, 30:14, 31:21, 32:14, 32:19, 32:21, 33:6, 33:7, 33:9, 33:13, 33:19, 34:10, 34:11, 34:18, 34:21, 35:13, 35:18, 35:20, 35:21, 36:9, 36:10, 36:11, 36:15, 36:18, 36:20, 37:3, 37:12, 37:15, 39:1, 40:11, 40:12, 40:13, 40:14, 40:19, 40:21, 42:16, 43:6, 47:4, 47:16, 47:20, 49:5, 49:6, 49:13
**Case** [2] - 2:1
**cases** [20] - 3:6, 8:19,

12:13, 12:14, 12:15, 16:2, 18:9, 23:20, 23:21, 30:5, 31:22, 32:19, 32:20, 33:2, 33:6, 33:12, 39:18, 47:12, 47:20, 48:4
**cast** [1] - 11:1
**caused** [1] - 40:8
**centuries** [1] - 31:20
**certain** [4] - 3:8, 7:13, 21:13, 21:15
**certainly** [2] - 23:14, 39:21
**certification** [3] - 9:16, 9:17, 9:23
**chance** [1] - 52:12
**change** [5] - 10:3, 35:24, 44:8, 48:1, 48:17
**changed** [2] - 48:6, 48:16
**charged** [2] - 8:12, 39:20
**check** [33] - 3:16, 3:19, 3:25, 4:6, 4:8, 8:13, 8:19, 8:20, 8:23, 9:14, 9:22, 9:25, 10:21, 10:25, 12:5, 15:13, 16:16, 16:21, 17:4, 17:10, 17:16, 20:2, 20:14, 28:24, 29:9, 29:18, 29:19, 30:17, 30:22, 31:3, 32:3, 47:9, 49:15
**checked** [1] - 8:7
**checking** [3] - 9:24, 10:1, 10:23
**chief** [1] - 1:23
**choice** [3] - 18:18, 34:23, 35:1
**choices** [2] - 18:19, 19:4
**chose** [1] - 38:10
**cigarette** [1] - 34:11
**cigarettes** [2] - 30:14, 47:17
**Circuit** [11] - 3:2, 3:10, 30:12, 30:13, 32:20, 37:13, 37:25, 39:25, 40:21, 47:14, 47:17
**circumstances** [1] - 4:15
**circumvent** [1] - 19:14
**cite** [2] - 23:21, 36:18
**cited** [1] - 33:6
**cites** [1] - 24:13
**Citibank** [1] - 37:17
**citizen** [2] - 11:5, 11:6
**citizens** [3] - 34:1,

35:6, 37:6
**city** [1] - 14:12
**City's** [1] - 38:2
**claim** [5] - 9:1, 25:19, 25:25, 37:12, 38:23
**claiming** [1] - 30:16
**claims** [1] - 32:12
**clause** [3] - 4:14, 4:15, 22:3
**clauses** [1] - 4:12
**clear** [11] - 8:14, 15:25, 16:7, 21:18, 28:18, 37:13, 40:24, 43:6, 43:13, 49:9, 49:24
**clearly** [2] - 31:25, 32:15
**CLERK** [1] - 2:1
**click** [1] - 8:20
**clicked** [1] - 10:25
**close** [6] - 24:23, 24:25, 25:7, 26:4, 47:23
**closer** [1] - 3:21
**code** [5] - 33:20, 34:8, 43:5, 48:6, 48:15
**codes** [2] - 32:6, 33:25, 36:5
**COHEN** [1] - 1:19
**Cohen** [1] - 2:12
**colleague** [6] - 28:15, 29:14, 40:11, 40:18, 42:18, 45:9
**colleague's** [2] - 42:11, 50:1
**colleagues** [1] - 49:12
**coming** [7] - 13:18, 13:19, 15:18, 23:8, 23:11, 23:13, 51:20
**comments** [1] - 19:12
**commerce** [9] - 15:10, 15:12, 22:17, 22:23, 24:22, 26:9, 30:4, 48:8, 49:11
**COMMISSION** [2] - 1:4, 1:15
**Commission** [12] - 2:2, 2:8, 3:12, 4:12, 6:10, 7:21, 7:25, 8:12, 10:9, 18:2, 27:10, 49:12
**Commission's** [3] - 8:1, 10:2, 27:8
**community** [2] - 49:4, 49:6
**companies** [5] - 14:14, 14:19, 14:20, 14:22
**company** [4] - 13:25, 14:2, 34:11, 48:8

**complaint** [8] - 3:25, 4:2, 43:20, 44:12, 46:20, 46:25, 47:2
**complaints** [1] - 8:1
**completed** [1] - 18:16
**completely** [5] - 12:19, 31:23, 36:19, 47:13, 53:14
**compromise** [1] - 7:16
**Computer** [1] - 1:25
**computer** [2] - 48:6, 48:15, 48:18
**Computer-Assisted** [1] - 1:25
**concede** [1] - 49:21
**conceded** [1] - 28:25
**conclude** [1] - 26:19
**conditions** [27] - 3:19, 4:1, 4:4, 4:11, 4:13, 4:14, 4:18, 4:23, 5:4, 10:3, 10:4, 12:5, 15:14, 15:19, 16:17, 16:18, 16:19, 17:3, 17:11, 19:22, 20:14, 22:1, 25:23, 30:21, 31:4, 39:7, 49:16
**conduct** [5] - 25:3, 39:16, 39:18, 39:20
**conducted** [1] - 41:18
**confess** [1] - 49:17
**confirmed** [1] - 8:19
**confirms** [1] - 9:14
**conflict** [1] - 27:25
**confusion** [1] - 31:17
**conjunction** [2] - 7:22, 8:1
**connection** [3] - 11:8, 14:10, 35:17
**consider** [5] - 5:25, 6:2, 6:4, 6:7, 6:8, 29:22
**considered** [1] - 14:16
**considering** [1] - 6:1
**consistent** [2] - 8:15, 9:24
**consistently** [1] - 24:21
**constitutional** [4] - 3:4, 26:22, 42:25
**contacts** [2] - 3:13, 22:22
**contain** [1] - 4:14
**contempt** [5] - 52:4, 52:5, 52:11, 52:12, 53:7
**context** [2] - 33:16, 40:22
**continue** [1] - 29:11
**continued** [1] - 24:20
**continuously** [1] -

47:16
**contours** [1] - 42:23
**control** [2] - 29:9, 32:1
**controlled** [2] - 46:15, 46:16
**controlling** [2] - 17:5, 17:11
**controls** [1] - 36:10
**controversy** [1] - 27:3
**convert** [1] - 38:4
**core** [6] - 15:14, 29:12, 29:24, 40:11, 40:12, 40:13
**corners** [2] - 4:1, 47:1
**Corp** [3] - 30:14, 32:19, 34:10
**correct** [17] - 3:7, 4:7, 9:3, 11:22, 13:25, 16:13, 20:10, 20:11, 23:4, 29:13, 44:10, 44:15, 44:24, 45:19, 49:16, 50:24
**correctly** [2] - 22:18, 32:13
**corresponding** [1] - 37:24
**counsel** [6] - 2:14, 7:22, 28:8, 28:12, 50:4, 50:10
**countries** [4] - 25:25, 26:1, 27:7, 31:16
**country** [1] - 30:6
**couple** [5] - 13:4, 16:14, 28:14, 37:10, 43:2
**course** [6] - 4:23, 5:7, 18:14, 25:2, 25:18, 33:23
**court** [11] - 6:19, 15:6, 16:5, 22:25, 26:7, 33:17, 34:13, 35:2, 36:25, 37:19, 39:16
**COURT** [116] - 1:1, 2:4, 2:9, 2:13, 2:17, 2:19, 2:21, 3:5, 3:14, 3:22, 4:4, 4:17, 5:1, 5:5, 5:11, 5:20, 5:25, 6:14, 6:16, 6:19, 6:25, 7:8, 8:5, 8:25, 9:7, 9:11, 10:10, 10:20, 11:15, 11:19, 11:23, 12:2, 12:22, 12:24, 13:2, 13:8, 13:11, 13:14, 13:19, 13:22, 14:4, 16:10, 17:7, 17:9, 17:22, 18:14, 18:20, 19:23, 20:4, 20:17, 21:1, 21:5, 22:15, 23:3, 23:16, 25:11, 25:18,

26:16, 27:19, 28:8, 28:12, 29:16, 30:19, 31:8, 33:2, 33:23, 35:3, 37:4, 38:12, 39:3, 39:10, 41:8, 41:19, 43:10, 43:13, 44:6, 44:8, 44:11, 44:14, 44:22, 44:25, 45:2, 45:5, 45:7, 45:11, 45:14, 45:16, 45:23, 46:1, 46:3, 46:7, 46:21, 47:6, 49:14, 49:23, 50:4, 50:8, 50:12, 50:22, 51:6, 51:13, 51:15, 51:18, 52:2, 52:5, 52:16, 52:18, 52:22, 53:4, 53:12, 53:16, 53:21, 53:23, 53:25, 54:5
**Court** [39] - 1:22, 1:23, 15:9, 16:18, 23:19, 24:22, 25:5, 26:17, 28:16, 28:17, 28:18, 28:23, 29:2, 29:6, 29:23, 31:2, 31:5, 31:12, 32:13, 32:19, 33:19, 34:4, 34:7, 35:13, 35:22, 36:11, 38:18, 40:1, 40:9, 40:14, 42:7, 42:8, 43:4, 43:6, 43:8, 44:3, 44:4, 51:20
**Court's** [2] - 14:17, 51:3
**Courthouse** [1] - 1:4
**courtroom** [1] - 20:25
**courts** [15] - 12:15, 14:17, 18:4, 22:17, 25:5, 29:25, 31:20, 32:17, 32:21, 33:15, 34:22, 36:16, 40:25, 42:22, 50:24
**Crate** [1] - 23:24
**create** [1] - 41:6
**creates** [1] - 22:5
**creating** [1] - 13:4
**credibility** [1] - 6:9
**credit** [3] - 16:23, 32:6, 33:25
**cripple** [1] - 34:21
**critical** [1] - 15:12
**critically** [1] - 24:19
**crossed** [1] - 17:14
**crucial** [1] - 36:14
**crux** [1] - 37:5
**crypto** [6] - 21:12, 21:14, 21:15, 26:10, 34:21, 47:24
**CSR** [1] - 1:22

**currencies** [4] - 21:12, 21:14, 21:15, 47:24
**currency** [3] - 26:11, 38:5, 43:5

# D

**date** [2] - 6:20, 6:23
**daughter** [1] - 8:22
**David** [1] - 2:7
**DAVID** [1] - 1:16
**days** [3] - 44:2, 51:6, 51:9
**deal** [7] - 8:10, 17:21, 19:24, 20:5, 26:14, 26:20, 29:3
**dealing** [4] - 16:5, 26:1, 26:2, 31:20
**debate** [2] - 32:9, 51:3
**December** [1] - 47:10
**decide** [1] - 42:22
**decided** [4] - 19:17, 27:7, 50:14, 50:18
**deciding** [2] - 25:20, 26:18
**decision** [3] - 25:7, 34:16, 54:2
**declaration** [2] - 6:17, 6:21
**defendant** [13] - 1:10, 8:3, 8:9, 24:16, 26:25, 31:6, 32:16, 32:21, 34:23, 35:14, 35:24, 37:16, 47:17
**Defendant** [1] - 1:19
**defendant's** [4] - 5:17, 25:4, 25:13, 37:11
**defendants** [12] - 2:11, 16:9, 17:13, 23:6, 25:1, 25:15, 30:16, 36:13, 43:24, 45:1, 46:10, 47:14
**definitely** [1] - 11:9, 51:9
**defrauded** [2] - 40:7, 42:1
**defrauding** [1] - 35:12
**degree** [1] - 12:7
**deleting** [1] - 16:12
**deliberate** [1] - 16:24
**deliberately** [1] - 16:24
**demonstrates** [1] - 37:22
**denied** [1] - 29:5
**deny** [1] - 13:23
**deposition** [1] - 8:3
**Designs** [1] - 23:22
**despite** [1] - 22:7
**determinations** [1] -

34:22
**determining** [1] - 33:18
**development** [1] - 49:3
**differences** [1] - 3:9
**different** [11] - 12:19, 17:17, 25:6, 27:5, 27:7, 31:22, 38:21, 39:3, 47:21, 48:1, 49:21
**differently** [1] - 27:24
**difficult** [3] - 4:2, 19:6, 27:16
**digital** [3] - 36:13, 38:5, 38:24
**direct** [1] - 9:22
**directed** [1] - 33:4
**directly** [3] - 4:25, 16:2, 49:19
**disclaimer** [3] - 24:1, 24:4, 24:9
**disclaimers** [1] - 24:12
**disclosure** [1] - 41:16
**discovery** [1] - 29:7
**discussed** [2] - 20:8, 28:15
**discusses** [1] - 33:9
**disgorgement** [1] - 27:12
**dismiss** [5] - 2:15, 28:16, 28:17, 28:23, 31:2
**dispute** [20] - 12:6, 12:7, 16:15, 16:16, 17:19, 17:20, 18:25, 27:7, 27:8, 27:14, 29:8, 39:7, 39:10, 39:13, 39:17, 40:1, 43:13, 46:17, 50:19
**disputes** [2] - 34:6, 34:7
**disputing** [1] - 34:3
**disruption** [1] - 40:8
**distilled** [1] - 30:1
**distinction** [1] - 36:14
**distinguishable** [2] - 24:11, 47:13
**DISTRICT** [2] - 1:1, 1:1
**District** [3] - 5:15, 23:22, 24:15
**Division** [2] - 1:15, 21:16
**divvy** [1] - 27:10
**document** [6] - 8:1, 10:5, 16:17, 16:18, 16:19, 17:3
**dog** [1] - 51:1
**dollars** [2] - 36:7, 41:4

**done** [4] - 13:21, 20:15, 36:2, 51:22
**door** [1] - 18:12
**doubt** [1] - 11:11
**down** [5] - 10:7, 10:8, 10:11, 29:1, 52:19
**drafted** [1] - 3:25
**dragged** [1] - 21:25
**draw** [1] - 28:20
**Driscoll** [1] - 1:22
**due** [8] - 3:4, 26:22, 28:6, 29:23, 30:2, 40:13, 42:21, 42:23
**during** [1] - 33:23

# E

**e-commerce** [1] - 48:8
**easier** [1] - 25:1
**East** [1] - 1:23
**Eastern** [1] - 5:15
**EASTERN** [1] - 1:1
**easy** [2] - 26:13, 28:16
**echos** [1] - 50:19
**EDGAR** [1] - 12:18
**effect** [2] - 29:25, 51:6
**efficient** [2] - 27:3, 28:2
**effort** [5] - 15:15, 16:24, 24:6, 29:12, 33:3
**efforts** [16] - 12:4, 12:7, 12:11, 12:12, 15:21, 17:1, 17:2, 17:19, 17:20, 17:24, 21:24, 34:10, 40:12, 47:22
**either** [3] - 10:5, 29:3, 36:21
**emailed** [1] - 24:19
**emphasis** [1] - 4:6
**emphasize** [1] - 23:17
**employee** [2] - 9:7, 9:9
**employee's** [1] - 10:9
**employees** [2] - 10:6, 20:7
**end** [10] - 11:24, 18:20, 18:23, 19:20, 19:22, 20:6, 28:24, 31:25, 36:9, 54:7
**ends** [1] - 30:7
**enforcement** [3] - 10:19, 11:3, 11:7
**Enforcement** [1] - 1:15
**enforcing** [2] - 40:3, 40:6
**engage** [2] - 13:2, 34:5
**engaged** [1] - 13:6

**English** [1] - 4:23
**enjoined** [2] - 51:4, 51:5
**entail** [1] - 16:10
**entire** [4] - 22:8, 27:11, 31:4, 40:8
**entirely** [1] - 10:15
**entities** [2] - 37:7, 48:10
**entitled** [2] - 47:3, 53:5
**entity** [8] - 43:18, 44:1, 44:2, 44:9, 44:15, 44:19, 45:21, 48:9
**equivalent** [1] - 26:15
**error** [1] - 6:24
**especially** [1] - 12:15
**ESQ** [4] - 1:16, 1:16, 1:20, 1:20
**essence** [1] - 17:23
**essentially** [4] - 29:10, 38:16, 38:23, 43:18
**established** [1] - 29:4
**etc** [1] - 14:23
**Ethereum** [2] - 21:17, 48:19
**Euromarket** [1] - 23:22
**Euromarkets** [1] - 33:13
**eventually** [1] - 29:3
**evidence** [36] - 5:21, 5:23, 8:7, 8:11, 8:14, 8:15, 8:23, 9:4, 10:5, 10:8, 10:9, 10:10, 13:5, 13:23, 14:5, 16:11, 16:13, 16:17, 16:23, 17:12, 17:18, 17:24, 18:23, 19:1, 19:23, 20:12, 23:6, 23:9, 23:15, 28:20, 31:2, 32:14, 47:3, 47:6
**ex** [1] - 52:9
**exact** [2] - 4:20, 4:22
**exactly** [2] - 7:21, 18:18
**exaggeration** [1] - 49:3
**example** [10] - 4:11, 4:13, 4:15, 8:16, 18:2, 22:2, 30:4, 35:19, 41:14, 50:25
**EXCHANGE** [2] - 1:3, 1:15
**Exchange** [2] - 2:2, 2:7
**exchange** [3] - 34:25, 35:18, 48:3
**exchanges** [2] -

35:15, 38:9
**exclude** [2] - 24:7, 34:11
**exemplifies** [1] - 32:15
**exhibits** [1] - 31:17
**exigency** [1] - 53:17
**exist** [1] - 26:10
**existence** [1] - 8:6
**expectation** [1] - 23:1
**expectations** [1] - 32:1
**expected** [1] - 22:24
**explain** [1] - 36:14
**explaining** [1] - 30:15
**explains** [1] - 31:11
**extend** [1] - 51:24
**extent** [5] - 17:20, 19:12, 20:24, 46:11, 46:16
**extreme** [1] - 26:25

## F

**face** [1] - 4:9
**Facebook** [15] - 14:22, 15:5, 15:8, 31:10, 31:12, 36:5, 37:7, 37:9, 38:4, 38:14, 38:21, 38:23, 38:25, 41:20
**faced** [1] - 18:19
**fact** [17] - 5:16, 7:14, 11:5, 11:13, 11:16, 14:1, 15:7, 15:8, 16:22, 18:25, 23:1, 23:14, 27:25, 36:6, 36:12, 36:13, 38:20
**factors** [5] - 26:22, 26:23, 26:24, 28:5, 42:11
**facts** [7] - 17:12, 28:19, 29:9, 31:22, 40:15, 46:25
**factual** [4] - 12:7, 34:6, 34:7, 36:4
**fail** [1] - 35:11
**fair** [1] - 23:7
**fairly** [1] - 45:12
**fall** [1] - 40:9
**false** [1] - 11:7
**fantastic** [1] - 21:20
**faulty** [1] - 53:1
**favor** [1] - 34:20
**FCRR** [1] - 1:22
**federal** [1] - 40:3
**fees** [1] - 37:2
**few** [3] - 10:14, 26:23, 44:2
**fiat** [2] - 38:5, 43:5

**Fifth** [9] - 6:2, 6:12, 6:14, 6:17, 6:21, 7:2, 7:5, 7:15, 8:4
**filed** [7] - 23:25, 24:6, 24:8, 27:19, 44:18, 52:18, 53:7
**filings** [3] - 12:18, 48:3
**finally** [1] - 43:8
**financial** [1] - 34:25
**fine** [2] - 5:17, 23:12
**fingers** [1] - 17:14
**first** [9] - 2:5, 16:15, 20:1, 25:21, 28:14, 33:12, 39:23, 46:24, 53:1
**fit** [1] - 8:18
**fly** [1] - 49:21
**focus** [1] - 42:10
**focused** [1] - 42:3
**folks** [4] - 9:5, 12:20, 18:6, 25:24
**force** [1] - 50:13
**foreign** [7] - 21:19, 24:16, 38:7, 38:9, 41:10, 48:21
**foreigners** [1] - 37:18
**foresaw** [1] - 32:10
**foreseeability** [4] - 32:2, 36:2, 40:14, 42:7
**foreseeable** [11] - 16:4, 29:25, 30:12, 31:6, 31:19, 32:4, 32:7, 33:21, 35:23, 35:24, 39:15
**forgetting** [2] - 42:18, 42:21
**forth** [2] - 16:11, 16:12
**fortuitous** [1] - 22:21
**forward** [2] - 30:13, 30:14
**forwarded** [1] - 48:4
**four** [2] - 4:1, 47:1
**fours** [2] - 33:7, 34:18
**frankly** [6] - 6:10, 8:23, 14:11, 15:9, 25:1, 51:2
**fraud** [4] - 7:1, 25:20, 37:14, 41:15
**frauds** [1] - 35:16
**fraudulent** [1] - 41:18
**freeze** [1] - 49:2
**freezes** [1] - 5:14
**French** [2] - 12:9, 21:19
**Friday** [2] - 50:15, 51:16
**front** [1] - 18:11
**frozen** [1] - 25:4

**full** [1] - 27:10
**funds** [2] - 32:25, 40:5
**funnel** [1] - 37:24
**funneled** [1] - 36:22
**funneling** [1] - 41:3
**funny** [2] - 35:8, 39:9
**furtherance** [1] - 37:14
**furthering** [1] - 27:4

## G

**Garland** [1] - 36:15
**general** [1] - 32:24
**generally** [1] - 35:5
**gentlemen** [1] - 54:3
**geographical** [1] - 31:13
**giant** [2] - 16:6, 21:23
**given** [2] - 29:6, 44:17
**global** [5] - 15:10, 15:12, 22:9, 22:16, 22:23
**goal** [1] - 20:13
**goods** [2] - 23:24, 24:1
**Gorman** [1] - 36:15
**Gotlieb** [1] - 2:11
**GOTTLIEB** [89] - 1:20, 2:10, 2:16, 2:18, 2:20, 3:1, 3:7, 3:18, 3:23, 4:8, 4:19, 5:3, 5:7, 5:13, 5:23, 6:4, 6:15, 6:18, 6:22, 7:3, 7:9, 8:12, 9:3, 9:10, 9:12, 10:12, 10:22, 11:18, 11:22, 11:25, 12:3, 12:23, 12:25, 13:5, 13:10, 13:12, 13:15, 13:20, 14:1, 14:5, 16:14, 17:8, 17:18, 17:25, 18:18, 18:22, 19:25, 20:11, 20:22, 21:4, 21:8, 22:16, 23:5, 23:18, 25:13, 25:22, 26:21, 27:22, 28:11, 45:6, 45:9, 45:12, 45:15, 45:17, 45:20, 45:25, 46:2, 46:5, 46:23, 47:8, 49:17, 50:1, 50:11, 50:14, 50:17, 50:24, 51:9, 51:14, 51:17, 51:19, 52:7, 52:14, 52:20, 52:24, 53:10, 53:13, 53:19, 53:22, 54:4
**government** [1] - 16:11
**government's** [1] -

2:22
**governs** [2] - 4:18, 22:6
**grant** [1] - 53:3
**Greene** [1] - 36:20
**grounds** [2] - 2:15, 4:3
**guidance** [6] - 3:3, 21:18, 24:8, 49:5, 49:6, 49:9
**guide** [2] - 14:16, 23:19
**guys** [1] - 26:5

## H

**haled** [3] - 15:6, 15:7, 16:5
**half** [2] - 24:21, 25:2
**handle** [1] - 28:4
**handled** [1] - 28:2
**happy** [3] - 26:25, 27:17, 51:11
**harder** [1] - 38:19
**harm** [2] - 37:14, 37:22
**hauled** [1] - 22:25
**head** [1] - 21:16
**heard** [1] - 2:15
**heavily** [2] - 8:6, 11:12
**helps** [1] - 34:4
**Hemi** [4] - 30:14, 32:19, 34:10, 47:16
**herrings** [1] - 37:10
**hiding** [1] - 26:5
**hired** [1] - 31:6
**history** [2] - 18:15, 40:8
**hoe** [1] - 4:3
**holds** [1] - 27:6
**hole** [1] - 21:23
**Holly** [1] - 1:22
**honest** [1] - 52:20
**Honor** [63] - 2:6, 2:10, 2:16, 2:20, 3:1, 3:7, 3:24, 4:20, 5:7, 5:13, 6:23, 7:3, 7:7, 11:2, 13:16, 15:9, 17:1, 17:25, 19:4, 19:10, 20:11, 21:8, 22:6, 24:25, 25:9, 26:21, 27:22, 28:11, 28:13, 29:13, 30:8, 31:1, 31:11, 33:11, 34:17, 35:7, 36:7, 37:9, 39:12, 39:22, 43:2, 43:17, 44:13, 45:4, 45:13, 45:25, 46:9, 46:24, 49:2, 49:17, 49:22, 50:2, 50:11,

51:10, 51:11, 51:7, 52:4, 52:20, 53:11, 53:19, 53:24, 54:4
**Honor's** [2] - 34:9, 51:23
**HONORABLE** [1] - 1:12
**hours** [1] - 45:7
**hundreds** [1] - 19:9

## I

**ICO** [3] - 4:25, 16:20, 31:5
**idea** [6] - 15:1, 17:21, 18:6, 20:4, 21:18, 42:16
**identified** [2] - 38:13, 45:24
**identify** [1] - 46:17
**ignore** [1] - 36:19, 49:13
**ignores** [1] - 31:23
**Illinois** [5] - 23:23, 23:25, 32:23, 35:13, 47:18
**imagine** [1] - 37:16
**imagining** [1] - 28:22
**implicate** [2] - 48:22, 48:23
**implicit** [1] - 34:22
**import** [3] - 34:5, 35:8, 35:10
**important** [10] - 4:9, 7:7, 12:3, 12:4, 12:8, 13:16, 14:15, 17:6, 26:3, 36:6
**importantly** [1] - 26:2
**includes** [1] - 32:5
**including** [2] - 13:3, 26:11
**inconsistent** [2] - 9:1, 11:15
**incorrect** [1] - 29:15
**indication** [1] - 16:7
**indirectly** [1] - 4:25
**individual** [2] - 45:1, 46:10
**infamous** [1] - 3:16
**inference** [1] - 6:6
**inferences** [1] - 28:20
**initial** [2] - 2:21, 50:19
**injunction** [2] - 44:3, 44:4
**inquiry** [6] - 33:1, 40:10, 40:25, 42:8, 42:25, 43:1
**instances** [1] - 51:10
**instead** [1] - 9:21
**instructed** [1] - 9:21

**instructional** [1] - 3:11
**intent** [7] - 20:17, 29:11, 29:13, 31:18, 32:12, 32:15, 32:18
**intention** [1] - 19:24
**intentional** [1] - 29:24
**intentionally** [1] - 47:18
**interest** [8] - 11:14, 27:2, 27:3, 35:15, 41:1, 41:2, 41:12, 41:16
**interested** [2] - 17:15, 17:16
**interesting** [3] - 24:13, 32:9, 40:17
**interests** [2] - 40:19, 42:4
**international** [4] - 14:2, 14:19, 14:22, 15:2
**International** [1] - 24:15
**internet** [9] - 10:25, 13:7, 14:8, 15:10, 22:9, 24:22, 26:9, 36:17, 49:10
**internet-based** [1] - 14:8
**interpretation** [1] - 3:3
**interstate** [1] - 27:2
**intrastate** [1] - 40:19
**invest** [3] - 30:24, 41:14, 41:15
**investing** [2] - 18:15, 41:10
**investor** [3] - 8:18, 11:4, 23:4
**investors** [21] - 9:22, 23:4, 30:10, 32:8, 33:3, 35:25, 36:8, 38:7, 40:7, 41:3, 41:7, 41:9, 41:10, 41:13, 41:22, 42:1, 42:14, 43:3, 43:25
**invitation** [1] - 40:10
**invoices** [1] - 24:19
**involved** [2] - 21:6, 33:13
**IP** [5] - 18:17, 19:14, 34:3, 34:4, 34:6
**IPGO** [2] - 18:3, 22:14
**IPO** [1] - 18:15
**Ireland** [1] - 24:2
**Irish** [2] - 23:23, 23:25
**irrelevant** [2] - 29:20, 29:22
**island** [1] - 26:5
**Israel** [1] - 37:22

**issue** [13] - 7:14, 14:13, 16:22, 18:10, 22:5, 26:18, 34:19, 37:20, 41:7, 47:19, 50:8, 50:21, 53:5
**issued** [3] - 24:1, 44:3, 44:4
**issuer** [1] - 34:4
**issues** [9] - 3:6, 3:15, 3:21, 26:11, 26:12, 36:1, 37:21, 46:24
**item** [2] - 48:2, 48:21
**items** [1] - 36:23
**itself** [2] - 4:12, 37:22

## J

**Japan** [1] - 36:21
**JASON** [1] - 1:20
**Jason** [1] - 2:11
**jobs** [1] - 41:6
**JORGE** [1] - 1:16
**Jorge** [1] - 2:6
**judge** [1] - 7:15
**Judge** [7] - 27:21, 30:5, 36:15, 40:20, 50:9, 52:14, 53:3
**judge's** [1] - 7:16
**judicial** [2] - 27:2, 31:12
**July** [3] - 53:17, 53:21, 53:23
**June** [1] - 1:8
**jurisdiction** [40] - 2:24, 3:17, 3:22, 7:13, 12:13, 12:15, 14:20, 15:3, 15:4, 15:24, 16:3, 16:8, 17:2, 20:24, 21:2, 21:22, 22:8, 22:10, 22:11, 22:22, 24:23, 26:5, 26:19, 28:4, 29:4, 33:16, 35:12, 37:19, 39:1, 39:24, 40:19, 41:19, 41:25, 42:6, 47:19, 48:22, 48:24, 49:1
**jurisdictional** [7] - 2:15, 4:3, 4:12, 26:12, 37:5, 39:5, 54:2
**jurisdictions** [1] - 34:15
**Justice** [1] - 31:24

## K

**keep** [2] - 15:16, 16:7
**keeping** [1] - 17:13
**Kennedy** [1] - 31:24

**kept** [1] - 24:9
**key** [4] - 16:3, 26:24, 41:9, 41:12
**Khaskelis** [1] - 2:11
**KHASKELIS** [1] - 1:20
**kind** [2] - 33:10, 42:4
**King** [1] - 16:4
**knowing** [1] - 36:25
**knowingly** [2] - 24:10, 36:9
**known** [3] - 18:24, 18:25, 23:7
**Kraken** [2] - 38:4, 39:3

## L

**Lacroix** [11] - 5:24, 7:18, 9:15, 9:18, 9:21, 10:7, 20:1, 31:11, 32:9, 36:3
**Lacroix's** [1] - 8:16
**lacuna** [6] - 16:1, 16:6, 29:15, 31:21, 42:16
**lady** [1] - 54:5
**language** [1] - 37:13
**large** [1] - 24:16
**last** [3] - 20:16, 21:20, 50:9
**law** [31] - 2:23, 2:25, 3:2, 3:10, 15:25, 16:1, 16:6, 17:5, 17:11, 17:25, 18:1, 20:24, 21:2, 21:23, 21:24, 22:6, 28:17, 29:4, 29:14, 29:15, 30:8, 31:22, 39:9, 40:22, 42:16, 43:6, 47:20, 49:2
**laws** [9] - 9:22, 9:24, 10:1, 20:20, 21:10, 37:21, 38:2, 40:3, 40:6
**lawsuit** [1] - 44:18
**lawyer** [2] - 10:19, 11:3
**lead** [1] - 26:11
**Leasco** [1] - 39:25
**least** [3] - 8:8, 17:3, 44:17
**led** [1] - 8:2
**left** [3] - 18:5, 32:11, 53:6
**legal** [6] - 7:11, 26:16, 28:1, 31:19, 31:23, 50:19
**legally** [1] - 29:8
**legitimate** [1] - 17:10
**lenity** [1] - 42:19
**letting** [2] - 28:4, 51:7
**Levy** [1] - 8:2

**Licci** [4] - 30:13, 37:12, 37:22, 47:13
**light** [1] - 40:16
**likely** [1] - 3:23
**limited** [3] - 7:12, 19:18, 39:2
**limits** [1] - 42:22
**list** [2] - 7:17, 7:21
**listed** [3] - 35:18, 43:17, 43:21
**literally** [2] - 19:7, 48:24
**litigated** [1] - 39:8
**litigation** [1] - 33:15
**live** [1] - 12:20
**LLP** [2] - 1:19, 2:12
**local** [3] - 9:22, 9:24, 10:1
**location** [1] - 31:13
**logical** [1] - 40:2
**logically** [1] - 37:1
**look** [10] - 6:11, 21:20, 23:18, 23:19, 24:3, 33:17, 35:13, 36:16, 47:3, 52:12
**looked** [1] - 21:22
**looking** [4] - 4:5, 23:9, 30:2, 53:7
**looks** [2] - 32:19, 42:4
**lose** [1] - 28:21
**love** [1] - 50:1
**Ltd** [8] - 43:14, 45:15, 46:1, 46:2, 46:12, 46:13, 46:18
**lying** [1] - 28:21

## M

**Magistrate** [1] - 8:2
**magistrate** [2] - 7:15, 7:16
**Maine** [1] - 24:15
**maintains** [1] - 51:2
**market** [2] - 35:23, 49:19
**Markets** [1] - 21:16
**markets** [8] - 34:21, 34:24, 34:25, 35:4, 35:5, 37:2, 40:4, 41:2
**Martin** [1] - 9:14
**matter** [3] - 29:4, 30:8, 43:5
**McIntyre** [2] - 30:5, 31:25
**mean** [15] - 4:11, 9:8, 11:1, 11:24, 13:23, 20:18, 25:11, 32:17, 35:4, 37:10, 41:8, 41:12, 41:19, 42:25,

43:6
**means** [2] - 5:1, 10:23
**meant** [1] - 43:10
**mechanical** [1] - 1:25
**meeting** [1] - 14:7
**meetings** [1] - 13:18
**mentioned** [2] - 39:23, 46:9
**merely** [1] - 15:8
**mess** [1] - 21:7
**Metal** [1] - 40:18
**Metals** [1] - 26:23
**method** [1] - 40:5
**middle** [1] - 12:1
**might** [11] - 19:16, 27:9, 27:23, 28:21, 35:1, 37:15, 37:20, 38:18, 39:15, 39:22, 46:19
**millions** [2] - 36:7, 41:3
**minute** [3] - 34:13, 45:5, 45:6
**misstatements** [1] - 12:17
**moment** [1] - 44:18
**Monday** [6] - 50:16, 50:17, 51:14, 51:15, 52:13
**money** [26] - 5:5, 5:10, 5:11, 5:17, 20:13, 20:21, 25:6, 25:11, 25:16, 25:21, 27:12, 27:15, 27:18, 36:21, 36:22, 36:24, 37:5, 37:18, 37:24, 38:6, 41:5, 42:14, 43:24, 46:19, 48:7, 48:14
**month** [2] - 19:18, 29:7
**months** [1] - 23:8
**morning** [4] - 2:6, 2:9, 2:10, 2:13
**MORRISON** [1] - 1:19
**Morrison** [3] - 2:11, 37:21, 42:5
**mortar** [1] - 36:16
**Moscow** [1] - 15:5
**most** [10] - 3:23, 4:15, 6:16, 6:18, 21:16, 22:19, 26:2, 27:2, 28:5, 36:6
**motion** [12] - 2:14, 2:15, 15:14, 28:16, 28:17, 28:23, 29:5, 31:1, 52:3, 52:8, 53:7
**move** [5] - 3:24, 14:13, 46:12, 47:2
**moved** [1] - 50:21

**moving** [1] - 47:1
**MR** [117] - 2:6, 2:10, 2:16, 2:18, 2:20, 3:1, 3:7, 3:18, 3:23, 4:8, 4:19, 5:3, 5:7, 5:13, 5:23, 6:4, 6:15, 6:18, 6:22, 7:3, 7:9, 8:12, 9:3, 9:10, 9:12, 10:12, 10:22, 11:18, 11:22, 11:25, 12:3, 12:23, 12:25, 13:5, 13:10, 13:12, 13:15, 13:20, 14:1, 14:5, 16:14, 17:8, 17:18, 17:25, 18:18, 18:22, 19:25, 20:11, 20:22, 21:4, 21:8, 22:16, 23:5, 23:18, 25:13, 25:22, 26:21, 27:22, 28:11, 28:13, 29:21, 31:1, 31:10, 33:11, 34:2, 35:7, 37:8, 38:15, 39:6, 39:12, 41:12, 42:2, 43:12, 43:16, 44:7, 44:10, 44:13, 44:16, 44:24, 45:1, 45:4, 45:6, 45:9, 45:12, 45:15, 45:17, 45:20, 45:25, 46:2, 46:5, 46:9, 46:23, 47:8, 49:17, 50:1, 50:11, 50:14, 50:16, 50:17, 50:24, 51:9, 51:14, 51:17, 51:19, 52:4, 52:7, 52:9, 52:14, 52:17, 52:20, 52:24, 53:10, 53:13, 53:19, 53:22, 53:24, 54:4
**mused** [1] - 10:7
**musing** [2] - 9:18, 10:6

## N

**name** [6] - 43:17, 43:23, 44:20, 44:21, 45:18, 46:14
**named** [4] - 44:14, 45:16, 45:17, 46:3
**naming** [1] - 44:17
**narrow** [1] - 3:15
**national** [2] - 35:15, 41:1
**nationwide** [1] - 40:23
**nature** [2] - 17:19, 47:24
**necessarily** [6] - 9:1, 10:22, 18:24, 22:24, 32:22, 42:3

**necessary** [1] - 6:6
**need** [5] - 20:13, 20:14, 34:7, 46:20, 49:7
**needs** [1] - 42:19
**networks** [1] - 19:13
**Nevada** [1] - 32:23
**never** [3] - 11:21, 19:16, 36:14
**new** [4] - 6:21, 36:12, 40:4, 40:5
**NEW** [1] - 1:1
**New** [14] - 1:5, 1:24, 2:24, 2:25, 3:1, 3:10, 3:13, 5:16, 15:6, 34:12, 34:13, 37:24, 38:1, 47:15
**nice** [1] - 14:12
**nightmare** [1] - 22:17
**nitpicking** [1] - 31:22
**nobody** [2] - 5:13, 26:6
**North** [6] - 31:7, 31:8, 31:14, 31:16, 32:5, 33:5
**Northern** [1] - 23:22
**note** [1] - 12:4
**noted** [2] - 34:4, 54:6
**nothing** [3] - 17:13, 32:13, 39:20
**notice** [3] - 31:12, 43:18, 44:17
**novel** [1] - 36:11
**number** [6] - 2:1, 13:3, 18:16, 24:16, 28:9, 47:12

## O

**objecting** [1] - 50:12
**obtaining** [1] - 27:2, 32:6
**obvious** [3] - 33:19, 33:22, 41:1
**obviously** [3] - 27:5, 27:13, 47:20
**occurred** [2] - 33:17, 37:22
**OF** [2] - 1:1, 1:6
**offering** [7] - 4:5, 18:21, 18:23, 33:24, 35:9, 38:22, 41:18
**office** [1] - 9:16
**offices** [2] - 12:9, 12:21
**old** [1] - 31:19
**omitted** [2] - 3:25, 4:1
**once** [4] - 16:25, 19:11, 47:2, 48:12
**one** [28] - 7:7, 8:14,

8:18, 8:25, 10:14, 10:25, 15:11, 18:7, 19:5, 19:8, 20:19, 22:20, 22:21, 23:4, 24:13, 25:3, 25:7, 25:9, 26:17, 28:2, 30:5, 35:1, 38:8, 39:15, 43:6, 45:6, 51:10
**open** [1] - 40:20
**opened** [4] - 8:18, 8:22, 46:18, 47:14
**oppose** [1] - 50:23
**opposed** [1] - 37:6
**oral** [1] - 2:2
**ORAL** [1] - 1:6
**order** [7] - 6:20, 8:3, 8:21, 22:21, 52:10, 52:16, 53:4
**ordered** [1] - 52:15
**orders** [2] - 23:8, 52:15
**organization** [1] - 21:6
**originally** [2] - 14:2, 14:20
**outcome** [1] - 29:9
**outside** [4] - 15:16, 48:6, 48:16, 49:6
**outstanding** [1] - 54:1
**overlook** [1] - 12:11
**override** [1] - 42:23
**own** [4] - 5:2, 5:4, 26:1, 48:16
**owner** [2] - 43:21, 46:14

## P

**Pacific** [1] - 26:6
**page** [1] - 22:18
**papers** [17] - 2:25, 3:2, 7:8, 7:9, 12:14, 23:19, 50:10, 50:15, 51:13, 52:9, 52:11, 52:13, 52:23, 52:24, 53:8, 53:11, 53:14
**Paradis** [3] - 46:11, 46:15, 46:16
**Paradis-Royer** [3] - 46:11, 46:15, 46:16
**paramount** [1] - 41:2
**Paris** [3] - 22:18, 22:20, 22:23
**part** [2] - 39:6, 49:8
**parte** [1] - 52:9
**participate** [4] - 4:25, 6:25, 16:20
**parties** [2] - 2:4, 4:16
**partnership** [1] - 35:14

**party** [1] - 45:24
**past** [2] - 43:4, 47:2
**Pause** [2] - 4:21, 50:7
**payment** [1] - 38:17
**PayPal** [15] - 13:3, 13:24, 14:1, 14:14, 14:22, 37:6, 37:9, 38:3, 38:14, 38:15, 38:18, 38:19, 39:1, 39:19
**pays** [1] - 48:21
**penalties** [1] - 27:11
**pending** [1] - 24:10
**people** [24] - 5:11, 5:16, 8:10, 9:8, 10:11, 10:13, 10:17, 11:2, 11:9, 12:16, 15:4, 17:4, 19:12, 19:15, 22:4, 23:1, 30:6, 35:12, 36:20, 38:19, 40:5, 42:13, 42:20
**percent** [2] - 15:22, 43:3
**perfectly** [1] - 5:18
**perhaps** [1] - 16:25
**period** [3] - 19:18, 31:4, 47:18
**permission** [1] - 51:23
**person** [9] - 8:21, 22:20, 32:4, 32:6, 32:7, 44:22, 48:7, 48:16, 48:21
**personal** [23] - 2:23, 7:13, 12:13, 12:15, 16:3, 20:24, 21:2, 21:22, 22:8, 22:22, 24:22, 26:4, 28:3, 29:4, 33:16, 37:19, 38:25, 39:24, 42:6, 47:19, 48:22, 48:23, 49:1
**personally** [1] - 13:15
**persons** [3] - 15:20, 15:21, 19:3
**physical** [2] - 23:24, 36:23
**physically** [2] - 14:12, 41:24
**Pinker** [2] - 35:21, 40:21
**place** [5] - 4:6, 5:15, 22:5, 28:2, 51:25
**places** [1] - 22:20
**Plaintiff** [2] - 1:5, 1:14
**plaintiff** [1] - 48:5
**plaintiffs** [2] - 2:5, 12:16
**plan** [1] - 51:7
**planning** [1] - 21:21

play [2] - 30:17, 31:24
plays [1] - 40:25
Plaza [1] - 1:23
plead [3] - 6:12, 7:15, 8:4
pleading [1] - 7:4
Plex [1] - 13:6
PlexCoin [14] - 3:20, 4:19, 8:21, 9:20, 10:18, 11:4, 25:15, 36:7, 48:2, 48:5, 48:17, 48:18
PLEXCORPS [1] - 1:9
Plexcorps [1] - 2:2
Plixler [3] - 24:14, 24:25, 25:7
plus [1] - 29:24
point [28] - 8:3, 8:8, 8:13, 8:14, 8:25, 9:15, 9:20, 14:15, 14:16, 15:11, 16:2, 17:6, 18:19, 19:4, 24:5, 25:9, 26:3, 27:1, 30:15, 33:4, 34:18, 34:20, 36:19, 37:8, 42:11, 42:15, 45:12
pointed [2] - 6:19, 32:13
points [11] - 3:18, 4:12, 8:8, 19:25, 20:2, 23:16, 28:10, 28:14, 36:4, 43:2, 50:2
policies [1] - 27:4
policy [7] - 15:11, 17:6, 26:9, 39:23, 40:1, 49:13
population [1] - 34:25
portals [1] - 14:24
position [14] - 5:17, 11:20, 25:4, 25:13, 27:9, 39:21, 43:15, 43:16, 44:3, 44:14, 44:16, 46:7, 46:20
possibilities [1] - 10:14
possibility [1] - 10:15
possible [3] - 10:18, 10:24, 20:22
possibly [1] - 53:10
potential [1] - 27:25
practical [1] - 26:17
pre [1] - 19:22
pre-sale [1] - 19:22
prejudice [1] - 29:5
preliminary [2] - 44:3, 44:4
preparing [1] - 52:25
presale [1] - 9:20

present [1] - 28:19
presented [2] - 17:12, 42:7
presumably [1] - 21:5
prevented [1] - 19:11
previously [1] - 7:4
primary [1] - 4:6
principle [6] - 30:12, 31:19, 31:24, 34:19, 36:10, 39:2
private [1] - 19:13
problem [13] - 6:13, 19:10, 20:8, 22:6, 25:18, 25:21, 25:24, 26:12, 42:12, 42:13, 46:4, 46:6
problematic [1] - 6:1
problems [6] - 26:9, 26:10, 26:13, 42:5, 42:6
Proceedings [1] - 1:25
proceedings [1] - 54:7
process [10] - 3:4, 26:23, 28:6, 29:7, 29:23, 30:3, 40:13, 40:23, 42:21, 42:23
produced [1] - 1:25
product [1] - 33:14
production [1] - 8:2
products [1] - 15:22
program [1] - 30:23
project [1] - 43:19
prong [1] - 42:8
property [1] - 12:21
proposal [1] - 7:16
proposing [1] - 26:17
protecting [2] - 41:2, 41:3, 41:13
provided [4] - 7:21, 7:23, 29:18, 29:19
Province [1] - 4:24
psychologically [1] - 38:18
public [1] - 48:3
purchase [8] - 8:21, 11:8, 11:17, 11:24, 15:22, 41:21, 41:22, 41:24
purchased [4] - 10:18, 11:4, 11:25, 25:15
purchaser [4] - 48:13
purchasers [3] - 3:20, 32:22, 33:24
purchases [2] - 32:4, 33:24
purchasing [1] - 33:24
purposeful [7] - 30:1, 30:20, 30:24, 32:25, 33:18, 34:14

purposes [2] - 22:23, 47:16
purview [1] - 49:7
pushes [1] - 30:13
put [9] - 7:19, 15:17, 15:19, 16:11, 22:1, 24:9, 30:21, 37:18
puts [1] - 22:18
putting [1] - 18:11

## Q

Quebec [1] - 4:24
Quebecois [1] - 50:21
questions [9] - 7:5, 7:17, 7:19, 7:20, 7:22, 7:23, 7:24, 15:24, 43:9
quickly [1] - 52:25
quintessential [2] - 30:4, 41:6
quite [6] - 9:12, 23:13, 32:15, 33:11, 40:24, 47:18

## R

radically [2] - 15:10, 49:10
raise [6] - 7:14, 37:18, 38:6, 40:5, 41:5, 50:8
raised [4] - 7:14, 36:5, 43:24, 47:13
raises [1] - 43:5
random [2] - 11:3, 22:21
reaction [2] - 50:19, 53:3
read [4] - 52:22, 52:24, 53:1
real [1] - 29:2
really [9] - 12:12, 16:1, 17:14, 18:6, 29:6, 29:8, 34:2, 40:9, 45:21
reason [10] - 3:24, 7:9, 11:10, 14:21, 16:15, 37:25, 39:6, 40:5, 41:1, 48:20
reasonable [8] - 26:22, 28:5, 28:20, 29:13, 32:2, 40:13, 40:22, 42:7
reasonableness [4] - 40:17, 40:24, 42:4, 42:8
reasonably [8] - 16:4, 30:11, 31:6, 31:19, 32:4, 32:7, 33:21,

39:14
reasons [2] - 16:15, 37:17
received [1] - 32:24
recent [2] - 6:16, 6:18
recently [1] - 21:16
recision [2] - 5:8, 27:11
recognize [1] - 20:8
recognized [2] - 28:17, 40:25
recognizes [2] - 40:18
record [5] - 8:7, 13:13, 19:23, 20:12, 23:15
recorded [1] - 1:25
red [1] - 37:10
reduced [1] - 32:11
reference [3] - 9:24, 10:1, 10:2
reflect [1] - 14:5
reflected [1] - 48:17
reflects [1] - 13:5
refund [3] - 25:6, 25:11, 25:16
refute [2] - 30:24, 50:1
register [1] - 35:11
registered [2] - 35:10, 41:17
registration [2] - 35:20, 35:22
regulate [3] - 35:5, 35:15, 42:20
regulating [2] - 41:7, 41:9
regulation [1] - 16:1
regulatory [2] - 22:11, 40:23
rejecting [1] - 16:10
rejection [1] - 16:12
related [2] - 13:4, 39:8
relating [1] - 13:6
relevant [10] - 3:12, 7:13, 11:23, 14:11, 29:8, 36:18, 39:24, 46:19, 47:25, 48:20
reliability [1] - 38:1
reluctant [1] - 26:8
rely [8] - 8:6, 18:5, 22:3, 29:10, 35:8, 39:18, 47:5, 47:6
relying [1] - 18:4
remaining [1] - 50:12
remains [1] - 27:25
remember [4] - 10:23, 10:24, 11:1, 21:11
remove [2] - 8:9, 9:16
removed [8] - 8:13, 9:2, 9:18, 9:21, 10:1, 17:17, 28:24, 31:3
repeatedly [6] - 14:18,

21:13, 29:10, 29:11, 29:16, 32:18
repeating [1] - 7:1
reply [3] - 36:19, 37:11, 53:23
Reporter [2] - 1:22, 1:23
represent [6] - 11:5, 45:14, 45:15, 45:19, 46:1, 46:2
represented [1] - 45:22
Republic [1] - 24:2
requested [2] - 5:12, 5:14
require [1] - 16:12
required [1] - 8:4
requirement [2] - 35:25, 36:1
requirements [1] - 2:23
requires [1] - 3:4
requiring [1] - 36:11
resell [2] - 30:6
reserve [1] - 54:2
residents [2] - 16:19, 36:25, 47:18
Residents [1] - 4:23
resolution [2] - 27:3, 28:5
resolve [1] - 34:7
respond [7] - 39:22, 46:22, 50:13, 51:16, 52:6, 53:8, 53:17
responded [1] - 42:17
responding [2] - 42:11, 52:19
responds [1] - 34:19
response [3] - 31:15, 31:16, 52:16
rest [1] - 22:9
restrained [1] - 44:22
restrict [1] - 33:3
result [1] - 22:16
retail [1] - 41:3
retailer [2] - 23:24, 24:1
return [1] - 8:6
revenue [1] - 37:3
reverse [6] - 19:5, 19:8, 19:20, 20:5, 22:12, 23:12
review [1] - 24:24
Richard's [1] - 9:19
rights [1] - 28:7
risk [3] - 5:2, 5:4, 28:6
road [1] - 4:2
role [4] - 30:17, 40:24, 41:6, 41:9
rose [1] - 8:18

**Ross** [1] - 50:9
**Ross's** [2] - 52:14, 53:3
**Royer** [3] - 46:11, 46:15, 46:16
**rule** [3] - 15:25, 42:19, 49:2
**ruled** [1] - 24:22
**ruling** [4] - 14:17, 15:9, 18:13, 34:20

## S

**sale** [5] - 19:18, 19:22, 25:3, 33:14, 35:17
**sales** [1] - 24:17
**sanctions** [2] - 52:3, 53:7
**sat** [1] - 32:24
**satisfy** [1] - 7:25
**save** [1] - 51:25
**saw** [4] - 8:19, 17:4, 52:14, 52:15
**scale** [1] - 16:8
**scenario** [2] - 29:17, 42:6
**scenarios** [1] - 28:22
**schedule** [4] - 52:11, 52:19, 53:6, 53:8
**score** [1] - 23:15
**scrutinizer** [1] - 24:15
**seated** [1] - 2:17
**SEC** [39] - 7:17, 11:6, 11:20, 12:13, 12:16, 15:6, 15:8, 15:25, 16:11, 17:12, 17:23, 20:20, 21:3, 21:12, 21:19, 22:25, 23:20, 24:3, 24:13, 25:4, 27:17, 27:23, 32:20, 35:13, 35:16, 40:2, 40:6, 40:8, 41:2, 41:6, 41:16, 41:25, 42:13, 42:19, 42:23, 46:5, 48:4, 48:5, 49:8
**SEC's** [7] - 9:4, 11:3, 16:23, 22:10, 34:20, 43:16, 49:7
**second** [1] - 38:4
**Second** [7] - 3:2, 3:10, 30:12, 37:13, 37:25, 39:24, 47:13
**Section** [2] - 4:22, 36:1
**SECURITIES** [2] - 1:3, 1:14
**securities** [15] - 12:17, 12:18, 21:6, 21:10, 21:11, 21:14, 21:15,

35:10, 35:15, 35:17, 37:21, 40:3, 40:6, 41:17, 48:3
**Securities** [2] - 2:1, 2:7
**security** [4] - 11:8, 21:9, 21:17, 38:22
**see** [14] - 3:15, 6:11, 7:18, 8:10, 8:17, 9:5, 9:8, 10:11, 10:16, 10:18, 10:20, 11:13, 43:4, 52:22
**seeing** [1] - 10:23
**seek** [1] - 45:18
**seeking** [1] - 44:11
**seizes** [1] - 6:10
**sell** [1] - 34:13
**seller** [1] - 22:23
**selling** [5] - 23:24, 24:9, 34:12, 35:14, 47:17
**sells** [1] - 30:5
**send** [1] - 36:23
**sending** [2] - 5:10, 36:21
**sends** [2] - 48:7, 48:13
**sense** [2] - 34:18, 35:4
**sent** [4] - 5:11, 5:12, 5:14, 52:13
**sentence** [1] - 22:7
**separate** [3] - 14:3, 46:18, 52:8
**separates** [1] - 33:5
**serve** [1] - 38:23
**server** [1] - 48:6
**servers** [1] - 24:18
**service** [5] - 18:8, 20:2, 40:23, 47:8, 48:21
**services** [5] - 38:17, 39:8, 39:11, 39:14, 48:14
**set** [4] - 37:9, 38:3, 52:18, 53:8
**sets** [2] - 12:12, 37:17
**setting** [1] - 8:16
**settled** [1] - 47:20
**setup** [1] - 10:17
**seven** [1] - 43:3
**Seventh** [3] - 30:13, 32:20, 47:17
**several** [1] - 6:8
**shared** [1] - 27:3
**shareholder** [1] - 46:11
**Shield** [1] - 28:18
**Shopify** [1] - 48:7
**shores** [1] - 42:14
**show** [4] - 6:11, 30:20, 52:10, 53:4

**showed** [1] - 33:24
**shows** [4] - 3:3, 13:23, 19:1, 34:14
**shut** [1] - 19:15
**sic** [1] - 18:15
**side** [1] - 16:2
**Sidepay** [15] - 43:14, 43:17, 44:18, 44:21, 45:11, 45:12, 45:14, 45:15, 46:1, 46:2, 46:12, 46:13, 46:18
**Sidepay.ca** [10] - 43:14, 43:21, 43:23, 44:6, 44:9, 44:23, 45:19, 45:20, 46:14, 48:8
**sign** [2] - 15:17, 18:11
**signed** [1] - 50:9
**significant** [1] - 11:20, 39:4
**similar** [3] - 50:21, 51:4, 51:22
**similarities** [2] - 3:8, 3:9
**simple** [1] - 45:12
**simply** [1] - 3:24
**sincere** [2] - 17:22, 17:24
**sincerity** [1] - 18:1
**Singapore** [2] - 14:9, 15:5
**single** [1] - 48:25
**sit** [1] - 29:1
**sitting** [1] - 12:9
**situation** [6] - 12:19, 17:17, 18:6, 28:1, 37:16, 49:18
**six** [1] - 29:7
**six-month** [1] - 29:7
**social** [1] - 27:4
**Sold** [1] - 24:1
**sold** [1] - 36:7
**sole** [1] - 46:11
**solicitation** [1] - 32:24
**solution** [2] - 26:13, 26:16
**someone** [5] - 4:4, 11:6, 21:5, 30:3, 30:5
**sometimes** [1] - 3:3
**somewhere** [2] - 4:5, 11:25, 38:10
**sophisticated** [1] - 20:23
**sorry** [5] - 5:9, 8:2, 50:17, 52:7
**sort** [6] - 4:5, 24:7, 34:23, 35:25, 42:18, 42:19
**sought** [1] - 19:12

**sound** [1] - 38:18
**South** [1] - 26:6
**sovereign** [1] - 42:5
**speakers** [1] - 21:19
**speaking** [1] - 27:23
**specifically** [1] - 27:4
**Square** [4] - 14:23, 38:6, 39:3, 48:10
**Square.ca** [1] - 48:11
**square.ca** [1] - 14:25
**square.com** [1] - 48:11
**staff** [2] - 11:3, 11:7
**stands** [2] - 6:24, 7:4
**start** [1] - 28:14
**started** [1] - 24:12
**starts** [1] - 24:12
**State** [1] - 3:10
**state** [2] - 2:4, 40:20
**statement** [20] - 2:23, 4:17, 4:19, 4:20, 4:22, 9:14, 9:19, 10:9, 11:7, 11:12, 11:13, 11:23, 16:20, 18:8, 20:9, 22:1, 22:4, 29:14, 33:13, 42:3
**statements** [7] - 3:19, 6:8, 6:9, 6:11, 9:12, 9:13, 11:11
**states** [2] - 27:4, 27:6
**States** [22] - 3:13, 3:17, 4:24, 15:7, 15:15, 15:16, 15:17, 15:19, 15:20, 21:7, 21:11, 22:20, 29:25, 30:10, 32:6, 32:8, 35:2, 36:8, 36:24, 39:9, 41:10
**STATES** [1] - 1:1
**statute** [1] - 15:25
**stay** [2] - 17:2, 49:7
**stenography** [1] - 1:25
**step** [1] - 2:19
**still** [9] - 9:20, 20:20, 24:2, 24:4, 24:9, 24:21, 25:15, 40:16, 41:25
**stole** [1] - 5:5
**story** [1] - 7:7
**Straub** [1] - 32:21
**Stripe** [6] - 37:6, 38:6, 39:4, 43:22, 46:14, 48:9
**stronger** [1] - 38:13
**studied** [1] - 7:22
**stuff** [2] - 34:3, 49:20
**subject** [5] - 5:8, 20:20, 21:10, 22:7, 28:3

**subjective** [5] - 29:11, 31:18, 32:12, 32:15, 32:18
**submitted** [2] - 6:16, 6:21
**substantive** [1] - 27:4
**success** [1] - 15:22
**suffice** [3] - 15:3, 15:4, 22:22
**sufficient** [3] - 14:20, 43:18, 49:19
**suing** [1] - 35:9
**suit** [5] - 23:25, 24:6, 24:8, 24:10, 43:20
**summer** [1] - 21:20
**supports** [1] - 24:14
**suppose** [1] - 37:15
**supposedly** [1] - 37:23
**surprise** [3] - 30:4, 30:9, 30:15
**surprised** [3] - 30:3, 30:7, 30:16
**suspected** [1] - 30:10
**systems** [2] - 28:1, 38:2
**systems'** [1] - 27:2

## T

**tail** [1] - 51:1
**tailored** [1] - 7:20
**talks** [2] - 9:23, 40:21
**target** [3] - 16:25, 31:8, 31:13
**targeted** [1] - 31:14
**targeting** [5] - 31:7, 32:5, 38:24, 41:20, 41:23
**technically** [1] - 2:24
**technology** [1] - 36:17
**Tenreiro** [3] - 2:7, 45:10, 51:21
**TENREIRO** [30] - 1:16, 2:6, 28:13, 29:21, 31:1, 31:10, 33:11, 34:2, 35:7, 37:8, 38:15, 39:6, 39:12, 41:12, 42:2, 43:12, 43:16, 44:7, 44:10, 44:13, 44:16, 44:24, 45:1, 45:4, 46:9, 50:16, 52:4, 52:9, 52:17, 53:24
**terms** [30] - 3:19, 4:1, 4:4, 4:10, 4:13, 4:14, 4:17, 4:22, 5:3, 10:3, 10:4, 12:5, 15:14, 15:19, 16:17, 16:18, 16:19, 17:3, 17:10,

18:8, 19:21, 20:2,
20:14, 22:1, 25:23,
30:21, 31:4, 39:7,
47:8, 49:15
**terrorists** [1] - 37:25
**test** [5] - 30:1, 30:2,
31:17, 31:18, 32:16
**testimony** [3] - 8:16,
17:15, 20:7
**THE** [116] - 2:1, 2:4,
2:9, 2:13, 2:17, 2:19,
2:21, 3:5, 3:14, 3:22,
4:4, 4:17, 5:1, 5:5,
5:11, 5:20, 5:25,
6:14, 6:16, 6:19,
6:25, 7:8, 8:5, 8:25,
9:7, 9:11, 10:10,
10:20, 11:15, 11:19,
11:23, 12:2, 12:22,
12:24, 13:2, 13:8,
13:11, 13:14, 13:19,
13:22, 14:4, 16:10,
17:7, 17:9, 17:22,
18:14, 18:20, 19:23,
20:4, 20:17, 21:1,
21:5, 22:15, 23:3,
23:16, 25:11, 25:18,
26:16, 27:19, 28:8,
28:12, 29:16, 30:19,
31:8, 33:2, 33:23,
35:3, 37:4, 38:12,
39:3, 39:10, 41:8,
41:19, 43:10, 43:13,
44:6, 44:8, 44:11,
44:14, 44:22, 44:25,
45:2, 45:5, 45:7,
45:11, 45:14, 45:16,
45:18, 45:23, 46:1,
46:3, 46:7, 46:21,
47:6, 49:14, 49:23,
50:4, 50:8, 50:12,
50:22, 51:6, 51:13,
51:15, 51:18, 52:2,
52:5, 52:16, 52:18,
52:22, 53:4, 53:12,
53:16, 53:21, 53:23,
53:25, 54:5
**themselves** [3] -
34:24, 35:3, 35:6
**therefore** [1] - 28:24
**they've** [2] - 19:18,
49:8
**Third** [1] - 40:21
**Thomas** [1] - 8:18
**Thomas's** [1] - 11:12
**thousands** [3] - 19:9,
36:8, 43:7
**three** [6] - 9:5, 10:12,
10:17, 19:25, 24:20,
25:2

**thumb** [1] - 16:8
**today** [3] - 25:6, 25:17,
52:19
**together** [1] - 53:12
**took** [1] - 6:2
**topics** [1] - 7:13
**trade** [1] - 21:6
**traded** [2] - 35:4, 48:2
**trademark** [2] - 23:23,
24:19
**trading** [1] - 12:17
**transaction** [4] -
22:24, 27:11, 48:23,
48:24
**transactions** [8] -
19:5, 19:7, 19:21,
20:6, 22:13, 24:17,
41:11, 47:25
**transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:6
**Transcript** [1] - 1:25
**Treasury** [1] - 27:12
**treat** [1] - 42:20
**tried** [1] - 5:8
**trigger** [2] - 15:24,
49:1
**TRO** [9] - 50:9, 50:12,
50:21, 51:2, 51:4,
51:24, 52:10, 53:3
**trouble** [1] - 52:1
**troubles** [1] - 7:11
**true** [5] - 6:12, 10:12,
35:7, 39:12, 47:1
**trustworthy** [1] - 8:24
**truthful** [1] - 10:15
**truthfully** [1] - 30:23
**try** [2] - 19:5, 51:19
**trying** [3] - 32:25,
40:10, 42:10
**turn** [1] - 40:10
**turned** [2] - 19:9, 23:5
**Tutor** [1] - 2:7
**TUTOR** [1] - 1:16
**two** [12] - 3:18, 8:18,
9:13, 12:8, 15:4,
18:19, 19:4, 19:18,
23:8, 23:21, 29:22,
33:12
**two-month** [1] - 19:18
**types** [1] - 41:4

## U

**U.S** [42] - 1:4, 1:14,
3:20, 8:20, 11:5,
11:6, 12:10, 12:17,
12:18, 14:14, 14:19,
14:20, 15:2, 16:8,
17:2, 19:10, 20:23,
22:10, 22:13, 23:3,

24:17, 24:18, 27:12,
35:23, 35:25, 37:6,
39:15, 40:23, 41:23,
48:3, 48:6, 48:7,
48:9, 48:11, 48:13,
48:16, 48:21, 49:6,
51:4
**U.S.D.J** [1] - 1:12
**under** [7] - 2:24,
26:23, 30:2, 30:23,
38:23, 39:9, 41:17
**undisputed** [2] - 36:4,
40:15
**unfortunate** [1] - 6:13
**unfortunately** [3] -
7:25, 8:13, 19:22
**Unifund** [1] - 39:25
**unique** [1] - 17:12
**United** [22] - 3:13,
3:17, 4:24, 15:7,
15:15, 15:16, 15:17,
15:18, 15:20, 21:7,
21:11, 22:20, 29:25,
30:10, 32:5, 32:8,
35:1, 36:8, 36:24,
39:9, 41:10
**UNITED** [1] - 1:1
**universally** [1] - 22:19
**unless** [1] - 43:8
**unlike** [1] - 24:17, 48:4
**unquestionably** [1] -
28:3
**unreasonable** [1] -
21:21
**unsettled** [1] - 16:22
**untouchable** [1] - 26:6
**untraceable** [1] -
19:14
**up** [12] - 2:19, 11:3,
12:14, 15:17, 17:4,
22:18, 27:10, 30:7,
33:19, 37:17, 42:22,
43:11
**urge** [2] - 29:6, 40:9
**US** [1] - 22:13
**useful** [1] - 3:3
**user** [2] - 4:9, 4:13
**user's** [1] - 31:13

## V

**vacation** [6] - 12:23,
12:25, 13:7, 13:9,
13:17, 14:9
**valuable** [1] - 6:7
**vastness** [1] - 34:24
**vein** [1] - 38:16
**ventures** [1] - 41:5
**Verdon** [1] - 9:14
**Verdon-Martin** [1] -

9:14
**version** [1] - 4:23
**versus** [1] - 35:13
**victimized** [2] - 25:20,
25:25
**victims** [3] - 25:19,
27:13, 27:14
**view** [2] - 20:18, 25:22
**violated** [1] - 19:21
**violating** [2] - 5:3,
28:6
**violation** [1] - 25:23
**virtual** [1] - 19:13
**visible** [1] - 14:18
**visiting** [2] - 14:25,
15:2
**VPNs** [1] - 19:13

## W

**wagging** [1] - 51:1
**wait** [1] - 34:13
**waive** [4] - 6:14, 6:17,
6:21, 7:2
**watching** [2] - 49:4,
49:6
**Wave** [1] - 38:8
**ways** [2] - 26:1, 26:2
**weaker** [1] - 49:18
**web** [1] - 22:18
**website** [13] - 9:17,
9:18, 9:22, 9:23,
15:1, 15:2, 24:1,
24:9, 24:11, 45:20,
48:8, 48:10, 48:11
**websites** [3] - 13:4,
15:3, 24:18
**week** [2] - 50:9, 53:20
**weigh** [1] - 11:11
**weight** [1] - 6:5
**whatsoever** [1] - 24:7
**whole** [2] - 8:17, 12:6
**willing** [5] - 5:18, 5:20,
5:21, 25:16
**win** [2] - 28:24, 40:16
**wise** [1] - 7:16
**witnesses** [1] - 28:21
**word** [1] - 14:10
**words** [2] - 11:6,
45:10
**world** [11] - 18:6, 19:8,
22:9, 23:1, 34:21,
40:4, 48:13, 48:17,
48:25, 49:3, 49:4
**worldwide** [2] - 14:18,
49:11
**worth** [2] - 36:7, 51:3
**worthy** [1] - 24:24
**wow** [1] - 21:23

## Y

**year** [2] - 20:16, 25:2
**years** [2] - 24:21, 40:3
**YORK** [1] - 1:1
**York** [14] - 1:5, 1:24,
2:24, 2:25, 3:1, 3:10,
3:13, 5:16, 15:6,
34:12, 34:13, 37:24,
38:2, 47:15
**yourself** [1] - 15:17

## Z

**zip** [6] - 32:6, 33:20,
33:25, 34:8, 36:5,
43:5