UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

    -against-

PLEXCORPS (a/k/a and d/b/a PLEXCOIN
and SIDEPAY.CA), DOMINIC LACROIX,
and SABRINA PARADIS-ROYER,

                Defendants.

--------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG - 9 2018 ★

BROOKLYN OFFICE

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
17-CV-7007 (CBA) (RML)

**AMON, United States District Judge:**

## INTRODUCTION

On December 1, 2017, Plaintiff Securities and Exchange Commission (the "SEC") brought the instant action against Defendants PlexCorps (a/k/a and d/b/a PlexCoin and Sidepay.ca) ("PlexCorps"), Dominic Lacroix ("Lacroix"), and Sabrina Paradis-Royer ("Paradis-Royer," and with Lacroix, the "Individual Defendants"). (D.E. # 1 ("Compl.").) The SEC generally contends that Defendants unlawfully participated in a fraudulent fundraising scheme to amass more than $15 million from tens of thousands of investors who purchased certain "cryptocurrency" called "PlexCoin Tokens," or PlexCoin. The SEC asserts claims under §§ 5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a); § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); and SEC Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5.

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the Individual Defendants—who allegedly reside in Canada, (Compl. ¶¶ 23–24)—have filed a motion to dismiss the claims for lack of personal jurisdiction. For the reasons stated below, their dismissal motion is denied.

## PROCEDURAL HISTORY

On December 1, 2017, the SEC filed the instant action. That day, upon application of the SEC, the Court issued a temporary restraining order (the "TRO") freezing Defendants' assets and prohibiting them from destroying relevant documents, and the Court authorized expedited discovery. (D.E. # 10.) On December 8, 2017, the TRO was extended on consent of the SEC and the Individual Defendants. (D.E. # 19.)

On January 9, 2018, a pre-motion conference was held. The Individual Defendants were granted leave to conduct jurisdictional discovery and to file a jurisdictional motion. (D.E. dated Jan. 9, 2018.) Discovery continued until May 18, 2018. (See D.E. dated Apr. 26, 2018.) On May 8, 2018, the Honorable Robert M. Levy, United States Magistrate Judge, ordered Lacroix to appear for a deposition in Canada, (see D.E. dated May 8, 2018), but Lacroix failed to appear, (see Opp'n at 18). On May 29, 2018, after jurisdictional discovery had concluded, Lacroix invoked his Fifth Amendment privilege against self-incrimination as the reason for missing the deposition.[1] (See D.E. # 63 ¶¶ 4–5.) The Individual Defendants filed the instant motion on June 8, 2018. (D.E. # 60.) As part of the motion, Lacroix provided a declaration generally refuting the SEC's claims. (See D.E. # 72-1 ¶ 1.) The Court heard oral argument on June 20, 2018. (D.E. dated June 20, 2018.)

---

[1] The Second Circuit has held that "foreign nationals interrogated [abroad] but tried in the civilian courts of the United States are protected by the Fifth Amendment's self-incrimination clause." In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 177, 201 (2d Cir. 2008).

## FACTUAL BACKGROUND

PlexCoin is alleged to be "cryptocurrency," which is digital software disseminated through an online network. (PlexCoin Whitepaper Version 2.71 ("Whitepaper") at 16, D.E. # 9-20; see also Compl. ¶¶ 67–78 (describing statements in the Whitepaper).) As cryptocurrency, it constitutes "a measure of value, can be used as a means of payment, and, while perhaps not generally accepted as a medium of exchange, is accepted by some vendors as a medium of exchange." See SEC v. Shavers ("Shavers I"), No. 4:13-CV-416 (ALM), 2014 WL 12622292, at *6 (E.D. Tex. Aug. 26, 2014). Participants store their own cryptocurrency coins in digital "wallets." See SEC v. Shavers ("Shavers II"), No. 4:13-CV-416 (ALM), 2014 WL 4652121, at *1 (E.D. Tex. Sept. 18, 2014).

Completed transactions are recorded on a public database—a type of online ledger—that is seen by every computer on the network and publishes the pseudonyms of parties involved in every PlexCoin sale. (See Compl. ¶¶ 28 & n.1). An individual possesses a coin only if the ledger says she does, and every coin in existence is publicly associated with a particular PlexCoin program user. The PlexCoin system relies on cryptographic methods—hence, "cryptocurrency"— to ensure that PlexCoin transactions and coin production proceed securely on the online network. (See id. ¶ 28 n.1).

Developers often publicly sell coins in what are called "initial coin offerings," or ICOs, to fund future related projects. (See Whitepaper at 34; see also Compl ¶ 27.) The developers generally promote their ICOs "through public online channels" and release "a 'whitepaper' describing the project and the terms of the ICO." (Compl. ¶ 30.)

## I.    Allegations Related to PlexCoin

Taken in the light most favorable to the SEC, the pleadings indicate that Defendants devised an ICO for PlexCoin as early as June 2017. (Id. ¶ 37.) Defendants claimed that the PlexCoin system included a total supply of 1 billion PlexCoin. (Whitepaper at 28.) PlexCoin's ICO allegedly was publicized "using statements posted on the Internet and distributed throughout the world, including in the United States." (Compl. ¶ 2.) Lacroix issued the Whitepaper and created "webpages and Facebook accounts registered in [his] name, all of which were accessible to United States investors via the Internet during the relevant periods." (Id. ¶ 7.) Meanwhile, Paradis-Royer—who is Lacroix's "living partner," (Lacroix Decl. ¶ 7, D.E. # 60-7; see also D.E. # 72-1)—"obscur[ed]" Lacroix's "involvement with the registration of new domains or accounts by using a fake name . . . and/or using email addresses that belong to or were under his control," (Compl. ¶ 62).

Defendants wanted to sell up to 400 million PlexCoin during the ICO, and to disseminate the rest through "bonuses" awarded when users buy goods and services with PlexCoin. (Whitepaper at 28; see also id. at 36 (noting that remaining PlexCoin is "strictly reserved" for the bonuses); id. at 47.) In their Whitepaper, Defendants said they hoped to raise nearly $250 million with the ICO. (Whitepaper at 34.) Among the fraudulent misrepresentations Defendants allegedly made is that the earliest PlexCoin purchasers would see a return on investment of 1,354% within 29 days. (See Compl. ¶ 4; see also Whitepaper at 37.)

### A.    Communications with Potential Purchasers

Defendants employed numerous online communications to solicit potential buyers of PlexCoin. During its investigation, the SEC discovered that Defendants relied heavily on the United States–based Facebook. The agency found at least three relevant Facebook accounts. One

account allegedly announced the ICO and Whitepaper and posted several statements about PlexCoin, the ICO, and the development team. (Id. ¶¶ 38–40, 51, 79, 98.) Another Facebook account allegedly described a payment method for purchasing PlexCoin, future PlexCoin-related projects, and the "tradability of PlexCoin Tokens on digital asset exchanges." (Id. ¶¶ 98, 131.) A third Facebook account touted PlexCoin and sold related t-shirts. (Id. ¶¶ 12, 132.)

The Whitepaper states that, with respect to "marketing strategy," the developers "focused [their] efforts on Facebook," and that Facebook was their "main ally" in "mak[ing] PlexCoin known to the highest number of people possible." (Whitepaper at 31.) The Whitepaper also states that the "Facebook campaign targeted a total of 1.8 billion people from all over the world, every day (excluding the province of Quebec (Canada) and the United States)." (Id.) Lacroix stated in a sworn declaration that the "advertising campaigns were very broad," that the "ads were published everywhere on the planet," and that he recalled "one advertising campaigned that targeted North America as well as South America . . . ." (Lacroix Decl. ¶ 38; see also Verdon-Martin Decl. ¶ 7 (declaring that Lacroix told her about spending money on Facebook ads), D.E. # 65-5.) The SEC provided two sworn declarations from two PlexCoin purchasers in the United States who stated that they learned about the sale from the Facebook accounts. (See Hadley Decl. ¶ 2, D.E. # 66; Kirk Decl. ¶ 2, D.E. # 65-2.)

Lacroix also set up several websites. The website www.plexcoin.com (the "PlexCoin website") was registered by Lacroix on May 24, 2017, with United States–based GoDaddy.com, LLC and on June 28, 2017, with United States–based Namecheap, Inc. ("Namecheap"). (Compl. ¶¶ 43–44; Tutor Decl. ¶¶ 4, 13, D.E. # 62; id., Ex. A at 1; id., Ex. J at 5.) The PlexCoin website published statements similar to those found in the Whitepaper; the subjects included PlexCoin, the ICO, related products, and the development team. (See Compl. ¶¶ 22, 45–46, 48–54, 64.) On the

website, users could access a "registration tab" where they could enter their email address and register for the ICO "pre-sale." (Id. ¶ 68.) The term "pre-sale" was a bit of misnomer, because there was no further "sale"; after the pre-sale, the PlexCoin website planned to stop directly selling the assets, and interested buyers would purchase them only on secondary markets, (Hadley Decl., Ex. 11).

As Lacroix put it, each PlexCoin purchaser in the pre-sale needed to "provide a valid e-mail address . . . and a nickname." (Lacroix Decl. ¶ 29.) The website confirms the email address by sending an email with a link to a confirmation page. (Hadley Decl., Ex. 1; see also Lacroix Decl. ¶ 29.) If registered before the pre-sale, the account user received an email about being on a waiting list, being assigned a purchase date, and buying and selling PlexCoin directly from the account profile. (See Hadley Decl., Exs. 3–4.) Account users also could publish their overall "experience with cryptocurrency" on the website. (Kirk Decl., Ex. 1 at 3.) Moreover, users could access "payment portals" through which they could provide credit-card information and purchase PlexCoin. (Compl. ¶ 93.)

Two United States–based PlexCoin purchasers—Scott Hadley ("Hadley") and Robert Kirk ("Kirk")—declared that in July 2017, they created purchaser profiles within the Eastern District. (Hadley Decl. ¶ 3; Kirk Decl. ¶¶ 3–4.) Another United States–based buyer, Robert Anderson ("Anderson"), stated that he created his profile in Texas no later than September 2017. (Anderson Decl. ¶ 3, D.E. # 65.) Lacroix declared that "PlexCoin did not block" Internet Protocol ("IP") addresses[2] "located in the United States" because such blocking software "is very complex to

---

[2] An IP address is a "numerical label consisting of four numbers, separated by periods." United States v. Bershchansky, 788 F.3d 102, 105 n.2 (2d Cir. 2015). A web provider assigns an IP address to every "Internet connection used by one or more computer devices," United States v. Thomas, 788 F.3d 345, 348 n.3 (2d Cir. 2015); Sony Music Entm't Inc. v. Does 1–40, 326 F. Supp. 2d 556, 558–59 (S.D.N.Y. 2004); see also Patrick Collins, Inc. v. Doe 1, 288 F.R.D. 233, 235 (E.D.N.Y. 2012) (noting that all computers and devices connected to a single "wireless router" or "business intranet" may be assigned the same IP address). The IP address identifies the physical location of the Internet connection, Next Phase Distribution, Inc. v. John Does 1–27, 284 F.R.D. 165, 170 (E.D.N.Y. 2012),

install and is not reliable." (Lacroix Decl. ¶ 23.) Lacroix further stated that it would have been easy for United States purchasers to disguise their IP addresses.[3] (Id. ¶¶ 23, 26.)

### B. Trip to the United States

The ICO pre-sale started on August 7, 2017. (Compl. ¶ 68; but see Whitepaper at 32 (noting the start of the pre-sale as August 8, 2017).) Around that time, from August 4, 2017, to August 11, 2017, the Individual Defendants took a trip to Boston. (Lacroix Decl. ¶ 7.) In his declaration, Lacroix emphasized that the trip was for "leisure," and that neither of the Individual Defendants went "within the framework of the PlexCoin project." (Id.) Lacroix declared that neither he nor Paradis-Royer has returned to the United States since the trip. (Id.)

However, the SEC provided evidence indicating that the trip was related to PlexCoin. The evidence shows that on August 8, 2017, Lacroix registered two PlexCoin-related websites—plexcoin.tech and plexcoin.group—on Namecheap, the United States–based registration company. (Tutor Decl. ¶ 13; id., Ex. J at 5.) The SEC also provided evidence showing that the e-mail address service@dlinnov.com—which Lacroix registered as his email address when he created PlexCoin's PayPal account—logged onto the PayPal account about 20 times from August 9, 2017, to August 10, 2017, with the same IP address from which Lacroix registered the two websites. (Tutor Decl. ¶¶ 13–15; id., Ex. J at 5; id., Ex. K at 1; id., Ex. L.) The evidence also shows that Lacroix associated

---

and serves as "the routing address for email, pictures, requests to view a web page, and other data sent across the Internet from other end-users," Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 409 (2d Cir. 2004). Just as "mailing addresses and telephone numbers are essential to the functionality of the postal service and telecommunications system," so too is the "IP address routing system . . . essential to the basic functionality of the Internet." Id. at 409–10.

[3] In its briefing, the SEC also alleged that "Defendants . . . had the ability to control who had access and chose not to block United States visitors," and that Defendants once "blocked Quebec users from accessing the PlexCoin Website, but never United States users." (Opp'n at 9, D.E. # 61.) However, the materials to which the SEC cites as support do not back up the allegation.

the PayPal account with the plexcoin.tech website during this time. (Tutor Decl. ¶ 14; id., Ex. K at 1.)

Finally, the SEC provided a translated interview of a former PlexCoin employee by the Quebec Financial Marks Authority (the "Authority") in which the employee, Patrick Gauvreau-Leblanc ("Gauvreau-Leblanc"), appears to confirm a United States trip on behalf of PlexCoin:

| [Authority]: | OK, did Domin[i]que Lacroix ask you to keep the [PlexCoin] project anonymous? |
|---|---|
| [Gauvreau-Leblanc]: | Beh, at the beginning it was ... it wasn't necessarily anonymous but it was, during the first phase as at the beginning of all project, we can't necessarily say that it was out there because he wanted to do as a society apart, I think if I understood correctly there[.] |
| [Authority]: | To your knowledge, is it a pretty good company? |
| [Gauvreau-Leblanc]: | I think maybe not there yet, <u>I know he made a trip to the United States for that</u> but I'm not sure of my case[.] |

(Tutor Decl. ¶ 21; id., Ex. R at 60 (emphasis added).)

### C. ICO Sales Through United States–Based Payment Servicers

According to the Complaint, Defendants sold PlexCoin for United States or Canadian dollars, euros, and certain cryptocurrency called Bitcoin, Ethereum, and Litecoin. (Compl. ¶ 54; see also Lacroix Decl. ¶ 11.) To process payments from the ICO, Defendants opened "online payment services accounts in the United States" either "directly or indirectly" and "in the name of PlexCorps or its business alter egos, PlexCoin and Sidepay.Ca." (Compl. ¶ 8; see also Whitepaper at 38 (noting PayPal).) But according to Lacroix, the servers recording payments on the online network and conducting the automatic transfer of PlexCoin to purchasers "were not located in the United States." (Lacroix Decl. ¶ 10.) Lacroix also stated that he and PlexCoin employees never

"intend[ed] to accept money from residents of the United States" and wanted to "avoid" the United States and the SEC's jurisdiction. (Id. ¶ 26.)

Nonetheless, the payment system the alleged investors used had numerous connections with the United States. One payment service was SidePay, which was the webpage interface allowing www.plexcoin.com account users to purchase PlexCoin. (See, e.g., Compl. ¶ 98 (asserting that Lacroix announced SidePay to potential buyers on PlexCoin's Facebook page).) On the SidePay website, buyers could enter their credit-card information and billing addresses to complete a PlexCoin purchase. (See Anderson Decl. ¶ 4; Hadley Decl. ¶ 11; Kirk Decl. ¶ 7.) After the purchase, the SidePay website sent the purchaser a confirmation email with a copy of the buyer's billing address. One such email showed a purchaser with a billing address in Massachusetts. (See Tutor Decl., Ex. O.) The SEC alleges that the SidePay system "remit[ted] money to Defendants' PlexCoin account at" the Canadian online payment servicer Shopify. (Compl. ¶ 98; Lacroix Decl. ¶ 11.) Paradis-Royer created not only the Shopify account on behalf of Defendants, but also an account on the United States–based payment management company CyberSource, Inc. ("CyberSource") for the SidePay system. (Compl. ¶ 97; Tutor Decl. ¶ 12; id., Ex. I at CYBS10–12.) Paradis-Royer used the Cybersource account to "authorize, settle[,] and manage credit card and electronic check transactions" on SidePay. (Tutor Decl. ¶ 12 (citation omitted).)

The Individual Defendants also employed several United States–based payment servicers for the pre-sale: PayPal, Square, Stripe, and Kraken. (Compl. ¶ 93; see also Wraga Decl., ¶¶ 14–21, D.E. # 64.) Although the Individual Defendants created the Square and Stripe accounts together, only Lacroix set up the PayPal account. (See id. ¶¶ 8, 93–95, 107–20.) PlexCoin's PayPal account handled 1,456 sales, totaling $371,821.82. (Wraga Decl. ¶¶ 4–5; id., Ex. A.)

PlexCoin's Stripe account handled 890 sales, totaling $335,283.77. (Wraga Decl. ¶¶ 8–9; id., Ex. C.) SidePay's Stripe account handled 10,227 sales, totaling $2,280,782. (Wraga Decl. ¶¶ 6–7; id., Ex. B.) The PayPal and Stripe accounts described above processed purchases in United States dollars. (Wraga Decl. ¶¶ 4–9, id., Exs. A–C.) PlexCoin's and SidePay's Square accounts handled 1,501 purchases in Canadian dollars, which represents $656,751.24 in United States dollars when converted. (Wraga Decl. ¶¶ 10–11; id., Ex. D.)

In total, the one Paypal, two Square, and two Stripe accounts described above helped Defendants finalize 14,074 sales, totaling more than $3.6 million. Nearly 90% of those sales were made in United States dollars; more than 25% to United States buyers. (See Wraga Decl. ¶¶ 4–11, Exs. A–D.) The SEC also found another Stripe account holding over $372,000 from PlexCoin purchases. (Compl. ¶ 119.) The SEC has provided no further details about this sixth account. So far, Defendants have transferred at least $900,000 from the six accounts to a personal bank account in Canada under Paradis-Royer's name. (Id. ¶¶ 101, 115.)

In addition, Paradis-Royer and Lacroix each created an account through Kraken, a United States–based company that helps users buy, sell, and trade cryptocurrency. (Wraga Decl. ¶¶ 16–21; see also Tudor Decl. ¶ 27.) From August 17, 2017, to December 4, 2017, the two accounts received about $1.04 million in cryptocurrency from the PlexCoin ICO sales. (See Wraga Decl. ¶¶ 18–19.) And from September 22, 2017, to December 4, 2017, the Individual Defendants transferred about $260,000 and €200 from their Kraken accounts. (Id. ¶¶ 20–21.)

## D.     Knowledge of United States Buyers

The SEC has marshaled considerable evidence that Defendants knew about United States buyers despite their purported efforts to exclude them. The agency proffered a sworn declaration by Antoine Richard ("Richard"), a former PlexCoin employee who managed social-media

communications for PlexCoin during most of the pre-sale and "sometimes communicated" with United States–based individuals about the assets. (Richard Decl. ¶¶ 2–3, 10, D.E. # 65-4.) Richard declared that "[e]veryone involved with the PlexCoin project understood that people from all over the world purchased PlexCoin, including from the United States." (Id. ¶ 11.) Daphnée Verdon-Martin ("Verdon-Martin"), a former PlexCoin employee who directly worked with Lacroix at times, also declared that "[p]eople in our office, including Lacroix, understood that people from the United States were purchasing PlexCoin," and that the employees "were never instructed to turn away people from the United States." (Verdon-Martin Decl. ¶¶ 8, 17.)

### E. Defendants' Protections Against United States Buyers

Lacroix asserted that, in two ways, Defendants attempted to shield the ICO from United States–based buyers. First, he declared that "each potential buyer had to accept the terms and conditions" of the website (the "Terms and Conditions"). (Lacroix Decl. ¶ 22.) Under the "Exclusion" clause, the Terms and Conditions provide that "[r]esidents of the United States and of the Province of Quebec (Canada) could not directly or indirectly participate in this ICO." (Id., Ex. 3 at Lacroix_69.) The Individual Defendants provide a sworn declaration by Rose Thomas ("Thomas"), a self-described "investor in Plexcoin" who stated that, at some point, she checked a box on the website "saying that [she] read the Terms of Service." (Thomas Decl. ¶ 9, D.E. # 60-2.)

However, according to Verdon-Martin, PlexCoin "removed the exclusion clause from [its] terms and conditions because it caused a lot of confusion"; PlexCoin publicly declared the removal; and Lacroix drafted the announcement. (Verdon-Martin Decl. ¶ 12; id., Ex. G at 10.) The SEC provided a copy of PlexCoin's announcement, showing that removal occurred no later than August 25, 2017, less than three weeks after the start of the pre-sale.

11

Second, Lacroix further declared that "PlexCoin used two 'check boxes' [on the website] in order to try to eliminate the potential American buyers." (Lacroix Decl. ¶ 14.) He declared that "[e]ach buyer was required to accept and check both [of] those boxes before each purchase during the pre-sale," because the buyer could not finalize the online purchase without checking the boxes. (Id. ¶¶ 15–16.) Relevant here, one of the boxes states: "I hereby confirm that I am not a Quebec (Canada) or US citizen or resident, nor am I acting on behalf of a Quebec (Canada) or US citizen or resident." (Id., Ex. 1 at Lacroix_65.) Thomas stated that she checked the boxes when she set up her PlexCoin online account in early August 2017 and her daughter's account on an undisclosed date. (Thomas Decl. ¶¶ 1, 7, 17.)

There remains an issue of fact whether checking the boxes on the website was a requirement. Anderson, Hadley, and Kirk all stated that they never checked any box on the website and never were required to affirm their citizenship or residency outside the United States. (Anderson Decl. ¶ 3; Hadley Decl. ¶ 3; Kirk Decl. ¶ 3.) In the light most favorable to the SEC, Kirk's declaration states that he successfully purchased PlexCoin through PayPal on August 9, 2017, without checking the box.[4] (Kirk Decl. ¶ 5.) In September 2017, all three buyers were successful in purchasing PlexCoin without checking a box. (Anderson Decl. ¶ 4; Hadley Decl. ¶ 11; Kirk Decl. ¶ 7.) Moreover, buyers privately "indicated" to PlexCoin employees at some point that "they were disregarding the [checkbox] and purchasing PlexCoin anyway." (Richard Decl. ¶ 4.)

In her declaration, Verdon-Martin also noted that, although the PlexCoin website once "ask[ed] that individuals certify that they were not in the United States," Lacroix told employees during the pre-sale that "he wanted to remove the certification statement from the website" in part

---

[4] The purchase later was refunded, but no evidence indicates that the refund occurred because Kirk failed to check the box.

"because he was not getting enough purchasers." (Verdon-Martin Decl. ¶¶ 9–10; see also Richard Decl. ¶ 5.) According to Verdon-Martin, PlexCoin continued to sell the assets after removal of the certification, and Lacroix said "he 'did not care' if there were United States investors or not." (Verdon-Martin Decl. ¶ 13.) Lacroix told at least one employee that, if potential United States purchasers asked whether they could buy the assets, the employee should not say no and instead should "direct them to consult their own laws about cryptocurrencies." (Richard Decl. ¶ 6.) In response, Lacroix declared that he never asked his employees to recommend tampering with the checkboxes. (Lacroix Decl. ¶ 20.) According to Lacroix, he never said—and never advised any PlexCoin employees to say—"to any potential American buyers" that they should "avoid the requirement to check the boxes or to assert falsely that he or she was not a resident of the United States." (Id.)

For his part, Lacroix stated that he and PlexCoin employees "found, after credit card purchases, that some individuals used IP addresses located in the United States." (Lacroix Decl. ¶ 25.) Lacroix acknowledged that they "suspected from the outset that some individuals from the United States were going to . . . buy PlexCoin . . . ." (Id. ¶ 27.) Lacroix said he wanted to wait until the end of the pre-sale, when "it would have been impossible to purchase PlexCoin" any further, so that he could "reimburse all the buyers with a billing address in the United States." (Id.)

Ultimately, the ICO lasted until at least October 1, 2017, and netted Defendants at least $15 million from the sales of about 81 million PlexCoin. (Compl. ¶¶ 13, 68, 80, 94; see also Hadley Decl., Ex. 11.) The ICO proceeded even though the Quebec Financial Administrative Tribunal, on July 20, 2017, issued an ex parte order enjoining Lacroix, PlexCorps, and others from offering or distributing "investments in PlexCoin Tokens" and from operating the PlexCoin-related websites and other online content. (Compl. ¶¶ 55–59.) PlexCoin were launched on the secondary

markets starting on October 13, 2017. (Hadley Decl., Ex. 11.) As of December 1, 2017, there have been more than 76,000 transactions involving PlexCoin. (Compl. ¶ 125.)

## STANDARD OF REVIEW

In deciding a Rule 12(b)(2) motion, the Court has "considerable procedural leeway." Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981). "[H]owever, the showing a plaintiff must make to defeat a defendant's claim that the [C]ourt lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990)).

Because neither party requested an evidentiary hearing, cf. Ball, 902 F.2d at 197, the plaintiff "need make only a prima facie showing that jurisdiction exists," Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985). Although jurisdictional discovery was ordered here, the plaintiff still may rely on its pleadings. See S. New Eng. Tel. Co. v. Global NAPs Inc., 624 F.3d 123, 138–39 (2d Cir. 2010). Affidavits, deposition testimony, and other "supporting materials" from the discovery also may be considered. See Marine Midland Bank, 664 F.2d at 904.

The plaintiff may make a prima facie showing "notwithstanding a controverting presentation by the moving party," because "all pleadings and affidavits are construed in the light most favorable to the plaintiff, and [because] where doubts exist, they are resolved in the plaintiff's favor." Hoffritz for Cutlery, 763 F.2d at 57.

## DISCUSSION

"Personal jurisdiction is 'a matter of individual liberty' because due process protects the individual's right to be subject only to lawful power." Waldman v. Palestine Liberation Org., 835

F.3d 317, 328 (2d Cir. 2016) (quoting J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 884 (2011) (plurality opinion)), cert. denied sub nom., Sokolow v. Palestine Liberation Org., 138 S. Ct. 1438 (2018). "The lawful exercise of personal jurisdiction by a federal court requires" procedurally proper service of process, a statutory basis for jurisdiction, and compliance with due process. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci I"), 673 F.3d 50, 59 (2d Cir. 2012). Section 22 of the Securities Act and § 27 of the Exchange Act "permit[] the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment."[5] SEC v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990); In re CINAR Corp. Sec. Litig., 186 F. Supp. 2d 279, 304 & n.17 (E.D.N.Y. 2002); see also 15 U.S.C. §§ 77v(a), 78aa(a). Although the Individual Defendants initially challenged service of process, (see Br. at 17–18, D.E. # 60-1), they now concede proper service, (see Reply at 28–29, D.E. # 68). The Individual Defendants dispute personal jurisdiction on due process grounds.

"The constitutional analysis under the Due Process Clause consists of two separate components: [1] the 'minimum contacts' inquiry and [2] the 'reasonableness' inquiry." Licci I, 673 F.3d at 59 (quoting Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010)). The analysis "demands that courts assess '[e]ach defendant's contacts . . . individually.'" Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 84 (2d Cir. 2018) (alterations in original) (quoting Keeton v. Hustler Mag., Inc., 465 U.S. 770, 781 n.13 (1984)). For the reasons stated below, the SEC has made a prima facie case as to both Individual Defendants.

---

[5] "[T]he due process analysis is basically the same under both the Fifth and Fourteenth Amendments," but "the principal difference is that under the Fifth Amendment [which applies to this case] the [C]ourt can consider the defendant's contacts throughout the United States," not merely the state in which the Court is located. Chew v. Dietrich, 143 F.3d 24, 28 n.4 (2d Cir. 1998); see also Waldman, 835 F.3d at 330; Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978, 954 F.2d 1279, 1294 (7th Cir. 1992) (per curiam) ("When the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation.").

## I.   Minimum Contacts

The minimum contacts inquiry requires a court to consider whether a defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction. <u>Licci I</u>, 673 F.3d at 60. Courts may exercise "general or all-purpose jurisdiction" over defendants if the defendants' contacts with the forum state are "so 'continuous and systematic' as to render them essentially at home in the forum State." <u>Goodyear Dunlop Tires Operations, S.A. v. Brown</u>, 564 U.S. 915, 919 (2011) (quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 317 (1945)). Alternatively, courts may exercise "specific or case-linked jurisdiction" where conduct—or the effects of that conduct—"take[] place in the forum State and [are] therefore subject to the State's regulation." <u>Id.</u> The SEC argues that this Court has specific personal jurisdiction over the Individual Defendants.

The specific-jurisdiction inquiry "focuses on 'the relationship among the defendant, the forum, and the litigation.'" <u>Keeton</u>, 465 U.S. at 775 (quoting <u>Shaffer v. Heitner</u>, 433 U.S. 186, 204 (1977)). The Court "must evaluate the quality and nature of the defendants' contacts with the forum state under a totality of the circumstances test." <u>Best Van Lines, Inc. v. Walker</u>, 490 F.3d 239, 242 (2d Cir. 2007). The "defendant's suit-related conduct must create a substantial connection with" the forum. <u>Walden v. Fiore</u>, 571 U.S. 277, 284 (2014). The SEC must show that the Individual Defendants, through suit-related contacts with the forum, "should reasonably anticipate being haled into" this Court. <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297 (1980). Under the securities statutes at issue, the Court "should consider the defendant's contacts throughout the United States and not just those contacts with" New York. <u>U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.</u>, 241 F.3d 135, 152 n.12 (2d Cir. 2001).

The touchstone of specific personal jurisdiction is "an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State." Goodyear Dunlop Tires Operations, 564 U.S. at 919. In analyzing this affiliation, the Court must focus on "contacts that the 'defendant himself' creates with the forum State," not the contacts of plaintiffs or third parties. Walden, 571 U.S. at 284 (emphasis in original) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). The relevant contacts are those that the defendant has "with the forum State itself, not the defendant's contacts with persons who reside there." Id. at 285 (emphasis added). Through his "conduct," the defendant must "have purposefully 'reach[ed] out beyond' their State and into another." Id. (citing cases). Specific jurisdiction may not be asserted over a defendant based solely on "the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State." Id. at 286 (internal quotation marks omitted).

## A. Demonstrating Minimum Contacts

The vast majority of the contacts discussed below deal with the Individual Defendants' web activity. The Internet's "impact on conventional notions of personal jurisdiction has been hotly debated in courts throughout the country and in countless law review articles and treatises." Edberg v. Neogen Corp., 17 F. Supp. 2d 104, 113 (D. Conn. 1998); cf. South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2095 (2018) ("Between targeted advertising and instant access to most consumers via any internet-enabled device, 'a business may be present in a State in a meaningful way without' that presence 'being physical in the traditional sense of the term.'" (quoting Direct Mktg. Ass'n v. Brohl, 135 S. Ct. 1124, 1135 (2015) (Kennedy, J., concurring))). Both sides recognize that no precedents deal squarely with the circumstances presented here—a global online sale of digital assets designed by foreign defendants. Before addressing this fact pattern, the Court

explains the two types of contacts relevant to the demonstration of personal jurisdiction in this case.

The Second Circuit has explained that a defendant's "overall activity within the forum state" and the "in-state effects of out-of-state activity" are "independent, if conceptually overlapping, methods of demonstrating minimum contacts." Best Van Lines, 490 F.3d at 243. With respect to the former method, "[s]o long as th[e] in-forum activity sufficiently reflects the defendant's 'purposeful availment' of the privilege of carrying on its activities [in the forum], minimum contacts are established, even if the effects of the defendant's entire course of conduct are felt elsewhere." Licci ex rel. Licci v. Lebanese Can. Bank, SAL ("Licci II"), 732 F.3d 161, 173 (2d Cir. 2013); see also Hanson v. Denckla, 357 U.S. 235, 253 (1958) ("[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."). For ease of reference, the Court discusses these direct, in-state contacts under the shorthand "purposeful availment."

The second method is the "effects test" derived from Calder v. Jones, 465 U.S. 783 (1984). In Calder, the Supreme Court upheld the assertion of personal jurisdiction over a defendant for out-of-state conduct based on the "effects" in the forum state and because the conduct constituted intentional actions "expressly aimed" at the forum. 465 U.S. at 789–90. The "'effects test' theory of personal jurisdiction is typically invoked where 'the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff.'" Charles Schwab, 883 F.3d at 87 (quoting Licci II, 732 F.3d at 173). Courts in this Circuit have upheld personal jurisdiction based on the "effects test" when (1) a defendant's "acts caused effects in the United States," (2) the

18

effects "were the direct and foreseeable result of the actions abroad," and (3) "the defendant knew or had good reason to know that the actions would have effects in the United States." SEC v. Dunn, 587 F. Supp. 2d 486, 509 (S.D.N.Y. 2008).

In this case, the SEC points to relevant contacts both within the United States and outside the United States with effects therein. The Individual Defendants' contacts thus implicate both the purposeful availment test and the effects test. Of course, these "conceptually overlapping[] methods of demonstrating minimum contacts," Best Van Lines, 490 F.3d at 243, complement one another and can be used together to demonstrate personal jurisdiction under the "totality of the circumstances," id. at 242. The Court considers both the in-state contacts and out-of-state contacts with in-state effects in tandem in order to determine whether the Individual Defendants have sufficient contacts with the United States to support the exercise of specific personal jurisdiction over them. In so doing, the Court concludes that the minimum contacts requirement is met.

**B.    Contacts**

The Individual Defendants created contacts with the United States by, among other things, doing business while traveling in the United States, utilizing United States–based payment services, and marketing their products to United States consumers via the Internet. This relevant conduct is considered in detail below.

1.    United States Trip

Both Individual Defendants traveled to the United States at the start of the ICO pre-sale. From the evidence, it can be reasonably inferred that the trip related to the PlexCoin venture. Lacroix registered two PlexCoin-related websites with United States registration company Namecheap during the trip, and logged onto PlexCoin's PayPal account about 20 times. Former PlexCoin employee Gauvreau-Leblanc said in an interview with the Quebec Financial Marks

Authority that he knew that Lacroix "made a trip to the United States for" the project. (Tutor Decl. ¶ 21; id., Ex. R at 60.)

Although Lacroix described the trip as one for "leisure" and stated neither he nor Paradis-Royer went "within the framework of the PlexCoin Project," (Lacroix Decl. ¶ 7), the evidence must be construed in the SEC's favor, and the Court finds that the trip likely related to the PlexCoin project.[6] The trip is a significant contact with this forum.

### 2. Paypal, Square, Stripe, and Kraken Accounts

The Individual Defendants' repeated use of United States–based payment servicers is also significant. The Individual Defendants allegedly established and maintained accounts with Square and Stripe to receive and store funds from PlexCoin sales. (Compl. ¶¶ 8, 93, 107–20.) Lacroix allegedly established and maintained an account with PayPal. (Id. ¶¶ 93, 95.) And the Individual Defendants each created and regularly used an account with Kraken. (Wraga Decl. ¶¶ 16–21; see also Tudor Decl. ¶ 27.)

The "use of a forum's banking system as part of an allegedly wrongful course of conduct may" provide sufficient jurisdictional contacts "when that use is an integral part of the wrongful conduct." Licci II, 732 F.3d at 172 n.7. In Licci II, the Second Circuit has found personal jurisdiction based on a foreign defendant's maintenance and repeated access of an account with a bank in the forum state. Id. at 171–73. The repeated and deliberate use of the account allowed the foreign defendant to process numerous wire transfers, and the foreign defendants knew that the wired money served "as an instrument for accomplishing the alleged wrongs for which the

---

[6] In light of the factual dispute, the Court also declines to consider at this stage whether it should draw an adverse inference against Lacroix for invoking the Fifth Amendment privilege and failing to appear at his deposition. See, e.g., Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 98 (2d Cir. 2012); SEC v. Suman, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010), aff'd, 421 F. App'x 86 (2d Cir. 2011). It is worthy of note that Lacroix, despite asserting his Fifth Amendment privilege, was willing to put in a declaration for the instant motion. In sum, he asks the Court to credit his assertions while declining to have them tested by cross-examination.

plaintiffs seek redress"—terrorist attacks occurring abroad. Id. at 165–66, 171. The Second Circuit concluded that "[i]t should hardly be unforeseeable to a [defendant] that selects and marks use of a particular forum's banking system that it might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use." Id. at 171–72.

Although the Individual Defendants boldly assert that "there is a wide gulf between opening and using an account as a Citibank branch in Brooklyn, and sitting at a computer in Quebec to open a digital account through 'https://stripe.ca,'" (Reply at 13–14), they provide no reason to distinguish an account with a United States bank from an account with United States payment services companies such as PayPal, Square, Stripe, and Kraken.

The Individual Defendants' attempt to distinguish Licci II and related cases are unpersuasive. They contend that illegal conduct already had been proven in Licci II, that the SEC here has not yet proven any wrongdoing, and that therefore the agency cannot show that the accounts were instruments of wrongdoing. (See Reply at 10 ("This Court should not 'bootstrap' disputed and unproven allegations of wrongdoing into a finding of jurisdiction."); id. at 12 ("[The SEC's argument] jumps too far ahead, assuming the conclusion of fraud.").) The argument is meritless in light of the procedural posture of Licci II, which involved a motion to dismiss where the illegal conduct was assumed true. See 732 F.3d at 167. Here, the SEC is raising securities fraud claims. The Individual Defendants do not challenge the merits of the claims in this motion, and so the merits may be assumed true. The Court is not deciding the merits here. Rather, the Court is determining whether and to what extent the SEC's claims, if proven, "arise[] out of or relate[] to" the Individual Defendants' contacts. Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 242 (2d Cir. 1999).

As the SEC alleges and the record shows, the Individual Defendants processed thousands of sales, totaling nearly $4 million, through six accounts from Paypal, Square, Stripe, and Kraken. Given that the ICO netted at least $15 million, (see Compl. ¶¶ 13, 68, 80, 94; see also Hadley Decl., Ex. 11), the Individual Defendants received a sizeable amount of its proceeds through the accounts with United States payment servicers. Because the SEC alleges that the Individual Defendants secured the money based on their fraudulent scheme to deceive PlexCoin buyers, the accounts obviously served "as an instrument for accomplishing the alleged wrongs for which the [SEC] seek[s] redress," Licci II, 732 F.3d at 171.

SEC v. Gilbert, 82 F.R.D. 723 (S.D.N.Y. 1979), also is instructive. There, a Swiss bank with no offices in the forum opened "four accounts maintained with three . . . broker-dealers" based in the forum and used the accounts "as a service to its banking customers." Id. at 725. The only contact with the forum was "through" those four accounts. Id. The Gilbert court found that the bank "purposely avail[ed] itself of the privilege of conducting activities within the forum State" simply "[b]y opening [the] accounts with [in-forum] broker-dealers." Id. (first alteration in original) (quoting Hanson, 357 U.S. at 253). To the Gilbert court, the accounts were related to the securities claims at issue because the defendant bought and sold securities on behalf of its customers through the four accounts, "effect[ing]" transactions "by telephone or telex from [its] offices in Geneva." Id. The Swiss bank maintained "the accounts as a service to its customers in the expectation that this extra service [would] attract present and potential customers, and thus [would] inure to its benefit." Id. In this case, the Individual Defendants allegedly worked in Canada and executed their PlexCoin sales there, but they nonetheless sold PlexCoin through the payment services accounts and maintained them as a service to the alleged investors so that more of them could purchase PlexCoin. The Individual Defendants therefore likewise created the

accounts with the United States–based companies with the "expectation" that the accounts would "inure to [their] benefit."[7] See Gilbert, 82 F.R.D. at 725.

Simply opening an account with a United States–based bank or payment services company is not enough to hale the account user into federal court. As the Second Circuit cautioned in Licci II, the case law "by no means suggest[s] that a foreign defendant's 'mere maintenance' of" accounts "is sufficient to support the constitutional exercise of personal jurisdiction over the account-holder in connection with any controversy." 732 F.3d at 171. Nonetheless, the opening and use of such an account is a relevant contact in the minimum contacts inquiry. The Court must determine the "quality and nature" of the contact and weigh it given the "totality of the circumstances." See Best Van Lines, 490 F.3d at 242. Here, Plaintiff has shown that the repeated use of the payment accounts was "manifestly related to, and gave rise to, the causes of action." SEC v. Carrillo, 115 F.3d 1540, 1545 (11th Cir. 1997). It is obvious that the creation of those accounts assisted numerous alleged investors in purchasing PlexCoin. Many of the sales to those accounts were made in United States dollars, (see Wraga Decl. ¶¶ 4–9, Exs. A–C)—another relevant contact, albeit a less significant one, see, e.g., Atlantica Holdings, Inc. v. BTA Bank JSC, No. 13-CV-5790 (JMF), 2015 WL 144165, at *5 (S.D.N.Y. Jan. 12, 2015).

The Individual Defendants argue that they did not purposefully complete transactions with United States citizens. Even if true, the PayPal, Square, Stripe, and Kraken accounts—which were "integral" to the alleged fraudulent scheme—are significant contacts with the United States regardless of whether the Individual Defendants meant to sell PlexCoin only to foreign customers through those accounts. See Gilbert, 82 F.R.D. at 726; cf. Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 998–99 (2d Cir. 1975), abrogated in part on other grounds by Morrison v. Nat'l Austl.

---

[7] In an abundance of caution, the Court is not considering Lacroix's PayPal account when determining Paradis-Royer's contacts.

Bank, 561 U.S. 247 (2010).  In-forum contacts may evince purposeful availment even when "the effects of the defendant's entire course of conduct are felt" outside the forum.  Licci II, 732 F3d. at 173.

The Individual Defendants also argue that jurisdiction is not proper because the actual sale takes place outside the United States.  Because PlexCoin sales are not finalized until the cryptocurrency transfer occurs, and because the transfer does not complete until the PlexCoin owner publicly logs a record of the transfer on the online, network-wide ledger, the Individual Defendants contend that the PlexCoin sales "necessarily occur[] at the location of the" servers of the PlexCoin owner publicly logging the transfer.  (Br. at 26–27.)  In this case, according to Lacroix, those servers reside entirely outside the United States.  (Id. at 27 (citing Lacroix Aff. ¶ 10).)  Even if this accurately describes the transaction, it is hardly dispositive.  As recounted above, many of the PlexCoin sales involve buyers transferring money through United States payment servicers to the Individual Defendants.  Under the logic of Licci II, many of those transfers are in-forum activity because they involve use of an in-forum payment services system.  Thus, even if the final step of those sales (the public transfer of PlexCoin on the ledger) occurred outside the United States, the initial steps (the payment through the accounts) involved in-forum contacts.

The PayPal cases the Individual Defendants cite do not require a different result.  In Novak v. Petsforum Group, Inc., No. 02-CV-2978 (DLI), 2005 WL 1861778 (E.D.N.Y. Aug. 1, 2005), the district court held that the Internet money transfers through PayPal in the case "do[] not show commercial activity directed at New York."  Id. at *2.  The case is inapposite for two reasons. First, Novak involved only "random '[P]ay[P]al' donations," id. at *4, and "random, fortuitous, or attenuated" contacts do not suffice, Walden, 571 U.S. at 286.  Second, Novak involved a state

long-arm statute limiting the district court's consideration to New York–based contacts, and PayPal is located in California, see PayPal, About Us, www.paypal.com/cg/webapps/mpp/about (last visited June 14, 2018). Here, the SEC has brought a case under federal securities statutes permitting the consideration of nationwide contacts.

The Individual Defendants also invoke Bragg Live Foods, Inc. v. Eco Action SDN BHD, No. 15-CV-8261 (DSF), 2016 U.S. Dist. LEXIS 186410 (C.D. Cal. Apr. 29, 2016), which holds that if mere use of PayPal "were sufficient for jurisdiction, California courts would have jurisdiction over every tort and contract claim involving PayPal—regardless of where the parties are located and the injuries occurred." Id. at *7. Here, the SEC made a showing of neither mere nor random use but rather repeated use of United States accounts "as an instrument for accomplishing the alleged wrongs." Licci II, 732 F.3d at 171. This use is a significant in-forum contact even though the Individual Defendants used the accounts abroad and the money transfers related to conduct performed abroad. Id. at 165–66, 171–72. The difference between the nightmare scenario described in Bragg Live Foods and this case is the quality and quantity of contacts through PayPal and other payment servicers.

Finally, the Individual Defendants point out that Paypal and other payment servicers have significant presence abroad and are easily accessible by foreign entities. (Br. at 30.) So too are the accounts of multinational banks located in this country. The global accessibility of accounts did not change the result in Licci II. By choosing an in-forum payment services account substantially to further its commercial activity, the Individual Defendants relied on the strength, stability, and popularity of the payment servicers, which are supported by domestic commercial laws. See Licci II, 732 F.3d at 171 (noting repeated and deliberate use of the account shows,

among other things, purposeful availment of the forum's "dependable and transparent banking system" and the "predictable jurisdictional and commercial law" of the forum).

Accordingly, the creation and repeated use of multiple accounts with United States payment services companies constitute notable in-forum contacts in this case.

3.    Website Contacts

Finally, the Complaint alleges the purposeful distribution of web content to United States investors. Before turning to Lacroix's and Paradis-Royer's Internet contacts, the Court briefly discusses the analytical framework under which it considers the contacts.

a.    *Legal Standard for Website Contacts*

The Second Circuit has not provided clear guidance as to how website-based contacts should be analyzed. In dicta, the Second Circuit noted that the district court's analysis in Zippo Manufacturing Co. v. Zippo Dot Com, Inc. ("Zippo"), 952 F. Supp. 1119 (W.D. Pa. 1997), "may . . . be helpful in analyzing" contacts based on commercial and marketing activity through websites. See Best Van Lines, 490 F.3d at 251–52 & n.13; see also, e.g., Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 452 (3d Cir. 2003) (describing Zippo as the "seminal authority regarding personal jurisdiction based upon the operation of an Internet website"). Upon review of the case law in this Circuit, the Court finds that Zippo provides a useful framework for determining the "nature and quality" of the contacts here. See, e.g., In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 343 F. Supp. 2d 208, 214 (S.D.N.Y. 2004) (applying Zippo in due process analysis).

The Zippo court adopted a "sliding scale." 952 F. Supp. at 1124. At one end, a defendant creates sufficient contacts because he "clearly does business over the Internet"—that is, he "enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet." Id. At the other end, a defendant does not create

26

sufficient contacts because he has created only a "passive" website—in other words, he "has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions." Id.; see also, e.g., A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines, 828 F. Supp. 2d 557, 574 (E.D.N.Y. 2011) ("Most courts have found that the maintenance of a web site alone, without more, does not rise to the level of purposeful availment of [a forum's] laws."); Am. Network, Inc. v. Access Am./Connect Atlanta, Inc., 975 F. Supp. 494, 499 (S.D.N.Y. 1997) (noting that a defendant "should not be subject to jurisdiction in [a forum] simply because its home page could be viewed by users there").

In the middle of the spectrum, a defendant has created an "interactive" website "where a user can exchange information with the host computer." Zippo, 952 F. Supp. at 1124. In such a case, the "level of interactivity and commercial nature of the exchange of information" occurring on the website must be examined. Id. Still, an interactive website related to the claims generally "supports a finding of personal jurisdiction over the defendant." Hsin Ten Enter. USA, Inc. v. Clark Enters., 138 F. Supp. 2d 449, 456 (S.D.N.Y. 2000).

With respect to new technology, this Court must still apply "traditional . . . constitutional principles" because they "remain the touchstone of the inquiry." Best Van Lines, 490 F.3d at 252; see also Gorman v. Ameritrade Holding Corp., 293 F.3d 506, 510–11 (D.C. Cir. 2002) ("Just as our traditional notions of personal jurisdiction have proven adaptable to other changes in the national economy, so too are they adaptable to the transformations wrought by the Internet."); Triple Up Ltd. v. Youku Tudou Inc., 235 F. Supp. 3d 15, 28 (D.D.C. 2017) ("[A] website's 'interactivity' is generally relevant to the constitutional issue only insofar as it illustrates whether the website allows its operator 'to engage in real-time transactions with [forum] residents.'") (citation omitted), aff'd, Per Curiam Judgment, No. 17-7033 (D.C. Cir. filed July 17, 2018).

For the reasons stated below, the Court finds that Lacroix created significant website-based contacts with the United States, and that Paradis-Royer created meaningful website-based contacts, albeit fewer than Lacroix.

b. *Discussion of Website Contacts*

The Individual Defendants created United States–based website contacts through a number of channels. First, they created Facebook accounts through which they advertised and marketed to persons in and outside the United States. Second, they used multiple websites created specifically for the PlexCoin project in order to market and ultimately process sales to persons both within and without the United States. Regarding these PlexCoin websites, Lacroix played a larger role in their operation and management than Paradis-Royer. However, as detailed below, both Individual Defendants created notable contacts through the Internet.

i. **Facebook**

The mere creation and use of a Facebook account does not by itself confer specific personal jurisdiction over all cases. See, e.g., DFSB Kollective Co. Ltd. v. Bourne, 897 F. Supp. 871, 883 (N.D. Cal. 2012). Because Facebook accounts do not intrinsically implicate commercial activity, they do not evince purposeful availment "of the privilege of doing business" in the forum to the same extent as the financial payment services discussed above. See Licci II, 732 F.3d at 171 (quoting Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002)). Still, in assessing the totality of the circumstances, the Court concludes the repeated use of the Facebook accounts in this case are notable contacts.

The Individual Defendants' Facebook accounts fall somewhere in the middle of the Zippo spectrum. As an initial matter, the evidence shows that Lacroix created and maintained at least three accounts with Facebook in order to further the alleged scheme, and that Paradis-Royer helped

28

Lacroix to create and maintain those accounts. (See Compl. ¶ 62 (noting that Paradis-Royer "obscur[ed]" Lacroix's "involvement with the registration of new . . . accounts by using a fake name . . . and/or using email addresses that belong to or were under his control").) These Facebook accounts were clearly "interactive." Zippo, 952 F. Supp. at 1124. The Individual Defendants used the Facebook accounts to convey information about PlexCoin, PlexCorps, and the ICO; responded to questions about the PlexCoin project posed by other Facebook users; and provided links to the Individual Defendants' plexcorps.com website. (See Tutor Decl., Ex. E; id., Ex. G.) On the other hand, the Individual Defendants did not "clearly do[] business over" Facebook. Zippo, 952 F. Supp. at 1124. The Facebook accounts could not process sales, nor could the Defendants enter into contracts through Facebook. Although the Court recognizes that at least one court in the circuit has declined to extend personal jurisdiction under the New York long-arm jurisdiction statute where, among other minor contacts, a company advertised events through a Facebook account, see DH Servs., LLC v. Positive Impact, Inc., No. 12-CV-6153 (RA), 2014 WL 496875, at *4 (S.D.N.Y. Feb. 5, 2014), the Court finds that the Individual Defendants' Facebook use was a significant United States contact.

The Court's conclusion is bolstered through a more traditional specific personal jurisdiction analysis. The Facebook accounts were integral to finding investors and directing statements at them to encourage them to participate in the alleged fraudulent scheme. Cf. Carrillo, 115 F.3d at 1545. The accounts announced, among other things, details of PlexCoin, the ICO, the Whitepaper, and the development team. (See Compl. ¶¶ 38–40, 51, 79, 98, 131–32.) In light of these messages and the material PlexCoin information they contain, the Facebook accounts were instrumental to the Individual Defendants in furthering their alleged fraudulent scheme. See CINAR, 186 F. Supp. 2d at 305 (finding personal jurisdiction over foreign defendant because he

"must have known" the statements were "designed to attract American investment" and "must have known" the statements "would be used and relied upon by American investors").

Further, the SEC has proffered evidence suggesting that the Individual Defendants directed Facebook advertisements and messages containing fraudulent misrepresentations to potential purchasers who were United States residents. In <u>Keeton v. Hustler Magazine</u>, 465 U.S. 770 (1984), the Supreme Court upheld the assertion of personal jurisdiction in a libel suit against a defendant who published an allegedly defamatory statement in the forum, which had a readership of 10,000 to 15,000 people. See <u>id.</u> at 773–74; <u>see also Best Van Lines</u>, 490 F.3d at 243 (discussing <u>Keeton</u>). In light of the readership, the Court saw the defendant was "continuously and deliberately exploit[ing] the [forum's] market." <u>Keeton</u>, 465 U.S. at 781.

Here, the record—construed in the SEC's favor—reflects that the Individual Defendants purposely disseminated fraudulent messages to Facebook users in the United States. Defendants purport to have "exclud[ed] . . . the United States" from their Facebook marketing campaign, (Whitepaper at 31), and contend that they never have directly communicated with potential United States purchasers, (<u>see</u> Br. at 25). But the record includes evidence to the contrary. That is all the SEC needs at this stage of litigation. The Whitepaper emphasizes that PlexCoin's "marketing strategy" was to "focus[] . . . efforts on Facebook," and that Facebook was Defendants' "main ally" in making PlexCoin known to the "highest number of people possible." (Whitepaper at 31.) Lacroix declared that the "advertising campaigns were very broad," that the "ads were published <u>everywhere</u> on the planet," and that he knew of at least one campaign specifically targeting "North America."[8] (Lacroix Decl. ¶ 38 (emphasis added)); <u>cf. Kernan</u>, 175 F.3d at 243 (finding sufficient

---

[8] It does not matter that the Individual Defendants knowingly sent fraudulent messages to Facebook users in other countries. <u>See Keeton</u>, 465 U.S. at 780 (rejecting defendant's argument that "the bulk of the harm done to [plaintiff] occurred outside" the forum state, because "minimum contacts" nonetheless were established in the forum state); <u>cf. Chloé v. Queen Bee of Beverly Hills, LLC</u>, 616 F.3d 158, 171–72 (2d Cir. 2010) ("[T]hat [the defendant's] business

contacts by a third-party defendant in New York because "the 'exclusive sales rights' agreement, which contemplates that [a third-party plaintiff] will sell [the third-party defendant's products] in North America and throughout the world, serves as evidence of [the third-party defendant's] attempt to serve the New York market, albeit indirectly"). The advertisements met their targets; two United States purchasers declared that they learned about the sale from Facebook ads. (See Hadley Decl. ¶ 2; Kirk Decl. ¶ 2.) "[W]here doubts exist [in the factual record], they are resolved in the plaintiff's favor." Hoffritz for Cutlery, 763 F.2d at 57. At this stage, the record reasonably shows that the Individual Defendants knowingly used Facebook marketing to disseminate their messages into the United States—that is, they "continuously and deliberately exploit[ed] the [United States] market" of Facebook users. See Keeton, 465 U.S. at 781. Even if Plaintiffs cannot ultimately prove that the Individual Defendants "purposely availed" themselves of the United States market through their Facebook campaign, the record reflects that at least two United States purchasers learned about the PlexCoin sale through Facebook, evincing direct and foreseeable effects still relevant to the minimum contacts inquiry.

The three Facebook cases to which the Individual Defendants cite are inapposite. (See Br. at 27–28 & n.13.) Lyons v. Rienzi & Son, Inc., 856 F. Supp. 2d 501 (E.D.N.Y. 2012), involved general jurisdiction. See id. at 509. The Katiroll Co., Inc. v. Kati Roll & Platters, Inc., No. 10-CV-1703 (LTS), 2010 WL 2911621 (S.D.N.Y. Jul 9, 2010), found a lack of personal jurisdiction where none of the pleadings reasonably implied that the Facebook advertisements were "supplemented by any transactions occurring in New York or any other indicia of [the defendant]'s permanence and continuity in New York." See id. at *4. Further, Katiroll addressed New York's long-arm statute, which does not "go as far as is constitutionally permissible," Banco Ambrosiano,

---

attempted to serve a nationwide market does not diminish any purposeful contacts with [the defendant's] New York consumers.").

S.P.A. v. Artoc Bank & T. Ltd., 464 N.E.2d 432, 435 (N.Y. 1984). Unlike in Katiroll, the record here provides ample evidence that the Individual Defendants reached United States Facebook users as part of a targeted campaign.

Finally, Blue Water International, Inc. v. Hattrick's Irish Sports Pub, LLC, No. 8:17-CV-1584 (SDM), 2017 U.S. Dist. LEXIS 154121 (M.D. Fla. Sept. 21, 2017), noted that "[s]ubjecting the [foreign defendant] to personal jurisdiction in [the forum] merely because [a Facebook user in the forum] might view the [defendant's] Facebook . . . page[] 'offend[s] traditional notions of fair play and substantial justice.'" Id. at *10. As a variation of the same theme, Individual Defendants argue that jurisdiction premised on a Facebook account "would implicate personal jurisdiction in any district in the United States for virtually every transaction in the world that used Facebook, eBay, Google Mail, Yahoo Mail, or any similar means of international communication." (Br. at 28.) The Court recognizes that merely creating a Facebook account does not support jurisdiction in all cases. See also Edberg, 17 F. Supp. 2d at 115 ("If jurisdiction were . . . based upon a defendant's mere presence on the Internet, this would lead to a defendant's being subjected to jurisdiction on a worldwide basis and would eviscerate the personal jurisdiction requirements as they currently exist."). As detailed herein, the Individual Defendants' conduct is far more extensive.

In short, the repeated uses of Facebook accounts integral to the alleged fraudulent scheme and targeted at potential United States investors constitute notable contacts in the due process analysis.

### ii. Other Websites (Lacroix)

Lacroix created a considerable contact with the United States through the www.plexcoin.com website. The PlexCoin website is interactive, is accessible to United States

buyers, and facilitates sales by those buyers. See 952 F. Supp. at 1124. The website allegedly included a "registration tab"—where users could enter their email address and register for the ICO "pre-sale"—and "payment portals" through which users could provide their credit-card information and purchase PlexCoin. (Compl. ¶¶ 68, 93.) The website also sent an email to each account user requesting confirmation. (Hadley Decl., Ex. 1; see also Lacroix Decl. ¶ 29.) If the user had registered before the pre-sale, she received an email about a waitlist, her assigned PlexCoin purchase date, and information about buying and selling the assets directly from the account profile. (See Hadley Decl., Exs. 3–4.) Account users also could customize their profiles by making public their "experience with cryptocurrency." (Kirk Decl., Ex. 1 at 3.) The PlexCoin website is interactive and encourages web transactions. Analyzed under the Zippo framework, the PlexCoin website falls on the more-interactive side of the "sliding scale," evidencing that Lacroix "clearly does business over the Internet." 952 F. Supp at 1124.

These contacts also implicate the overlapping purposeful availment and effects theories. As relevant to purposeful availment, the SEC offered evidence that Lacroix registered the PlexCoin and other websites through United States companies. Lacroix registered www.plexcoin.com on GoDaddy.com, LLC on May 24, 2017, and on Namecheap on June 28, 2017. (Compl. ¶¶ 43–44; Tutor Decl. ¶¶ 4, 13; id., Ex. A at 1; id., Ex. J at 5.) On August 8, 2017, Lacroix also registered plexcoin.tech and plexcoin.group on Namecheap. (Tutor Decl. ¶ 13; id., Ex. J at 5.) And the record shows that Lacroix created and managed the PlexCoin website as an instrument to further Defendants' alleged fraudulent scheme.

With respect to the effects test, the SEC must show that (1) a defendant's "acts caused effects in the United States," (2) the effects "were the direct and foreseeable result of the actions abroad," and (3) "the defendant knew or had good reason to know that the actions would have

effects in the United States." <u>Dunn</u>, 587 F. Supp. 2d at 509. Undoubtedly, the PlexCoin website had effects in the United States. The PlexCoin website included marketing information about PlexCoin, the ICO, related products, and the development team. (<u>See</u> Compl. ¶¶ 22, 45–46, 48–54, 64.) Four United States buyers declared that they created accounts to purchase PlexCoin. (<u>See</u> Anderson Decl. ¶¶ 3, 4; Hadley Decl. ¶¶ 3, 11; Kirk Decl. ¶¶ 3, 5, 7; Thomas Decl. ¶¶ 1, 3.) By reaching the United States audiences, the website contributed to the purchase of PlexCoin by alleged United States–based investors, an in-forum effect. The expenditures were the direct and foreseeable effects of the creation of the PlexCoin website. The website marketing was material to alleged investors and was "distributed throughout the world, including the United States." (<u>Id.</u> ¶ 2.) Such global reach "serves as evidence of [their] attempt to serve the [United States] market, albeit indirectly." <u>See</u> <u>Chloé</u>, 616 F.3d at 171 (quoting <u>Kernan</u>, 175 F.3d at 243). Finally, Lacroix knew or at least had good reason to know that the United States would feel the effects. Richard and Verdon-Martin both declared that "[e]veryone involved with the PlexCoin project" knew of purchases from the United States buyers. (Richard Decl. ¶ 10; Verdon-Martin Decl. ¶ 17.) Lacroix acknowledged that he learned of users accessing the website from the United States. (<u>See</u> Lacroix Decl. ¶ 25.) Lacroix also acknowledged that PlexCoin employees "suspected from the outset that some individuals from the United States" would attempt to access the website and purchase PlexCoin. (<u>Id.</u> ¶ 27.)

Attempting to rebut the contacts established by his PlexCoin website, Lacroix hides behind two facts in the record. First, for some period of time, Lacroix had every "potential buyer" on the PlexCoin website accept certain Terms and Conditions, which included the "Exclusion" clause providing that "[r]esidents of the United States . . . could not directly or indirectly participate" in the ICO. (Lacroix Decl. ¶ 22; <u>id.</u>, Ex. 3 at Lacroix_69; <u>see also</u> Thomas Decl. ¶ 9.) Second,

Lacroix for some time included a checkbox on the website so that potential purchasers could certify that they were not United States citizens or residents. (Lacroix Decl. ¶¶ 15–16; id., Ex. 1 at Lacroix–65; see also Thomas Decl. ¶¶ 1, 7, 17.) The oral argument makes clear that the Individual Defendants' motion primarily relies on these two preventative measures. Counsel for the Individual Defendants conceded to the Court that, if they had not created the checkbox and Exclusion clause, it "[m]ost likely" would have personal jurisdiction over them. (Id. at 3:22–23.)

According to the Individual Defendants, the two preventative measures show that any contacts with the United States were not reasonably foreseeable. (Br. at 22 (citing SEC v. Carrillo Heuttel LLP, No. 13-CV-1735 (GBD), 2014 U.S. Dist. LEXIS 77560, at *18 (S.D.N.Y. June 4, 2014)).) They further contend that a finding of minimum contacts here would be tantamount to saying no reasonable efforts made online would suffice to avoid the SEC's jurisdiction. (See also Tr. at 15:14–17 ("The core question on this motion is how much effort is enough to bubble off the United States; what do you have to do if you're outside the United States to keep yourself out of the United States.").)

The Individual Defendants' arguments are unpersuasive. The SEC has provided evidence that Lacroix knew the checkbox and Exclusion clause were at least somewhat ineffective. Richard declared that "[e]veryone involved with the PlexCoin project understood that people from all over the world purchased PlexCoin, including from the United States." (Id. ¶ 11.) Verdon-Martin, who worked directly with Lacroix at times, also declared that "[p]eople in our office, including Lacroix, understood that people from the United States were purchasing PlexCoin," and that the employees "were never instructed to turn away people from the United States." (Verdon-Martin Decl. ¶¶ 8, 17.) Lacroix acknowledged learning about purchases from United States–based IP addresses. (See Lacroix Decl. ¶ 25.) Although Lacroix declared that he required all potential purchasers to check

the box, (id. ¶¶ 15–16), buyers "indicated" to PlexCoin employees that they "disregard[ed]" the checkbox and "purchas[ed] PlexCoin anyway," (Richard Decl. ¶ 4).

Moreover, the SEC has provided evidence showing that Lacroix removed the preventative measures in an attempt to gain more United States–based purchasers. As the record construed in the SEC's favor shows, less than three weeks after the start of the pre-sale, Lacroix had the Exclusion clause removed from the Terms and Conditions and publicly announced the removal through a statement that he drafted in French and ordered translated into English. (See Verdon-Martin Decl. ¶ 12; id., Ex. G at 10.) In addition, Verdon-Martin's testimony shows that, during the pre-sale, Lacroix "wanted to remove" the checkbox statement in part "because he was not getting enough purchasers." (Verdon-Martin Decl. ¶¶ 9–10; see also Richard Decl. ¶ 5.) The Individual Defendants point out that Verdon-Martin never expressly testified that Lacroix followed through with his desires. But Kirk's declaration, in the light most favorable to the SEC, shows that purchasers did not have to check a box as early as August 9, 2017, two days after the start of the pre-sale. (Kirk Decl. ¶¶ 3, 5.) Therefore, Verdon-Martin's testimony, buttressed by the investor testimony of Kirk and others, imply that Lacroix did remove the checkbox. By removing both the Exclusion clause and the checkbox, Lacroix must have known that United States–based investors would have been enticed to complete transactions on the PlexCoin website and would have spent money on the cryptocurrency.

Accordingly, in light of the interactivity of www.plexcoin.com and Lacroix's intentional enticement of United States–based investors, Lacroix established significant Internet contacts with the United States.

### iii. Other Websites (Paradis-Royer)

36

Although Paradis-Royer appears to have fewer website contacts with the United States, those contacts nonetheless are meaningful. For example, the Complaint suggests that Paradis-Royer helped Lacroix in the creation of the PlexCoin website. (See Compl. ¶ 62 (noting that Paradis-Royer "obscur[ed]" Lacroix's "involvement with the registration of new domains").).)

In addition, Paradis-Royer had significant control over the SidePay system, which was the main webpage allowing PlexCoin website users to purchase PlexCoin. The evidence shows that the SidePay page is interactive under the Zippo framework. Buyers on SidePay entered credit-card information and billing addresses to complete a PlexCoin purchase, and SidePay sent the purchasers confirmation emails. (See Anderson Decl. ¶ 4; Hadley Decl. ¶ 11; Kirk Decl. ¶ 7; Tutor Decl., Ex. O.) The money garnered from completed SidePay purchases were remitted to Defendants' PlexCoin account at Shopify, which Paradis-Royer created. (Compl. ¶ 98; Lacroix Decl. ¶ 11.) She also managed the SidePay system through an account with CyberSource, a United States payment management company. (Compl. ¶ 97; Tutor Decl. ¶ 12; id., Ex. I at CYBS10–12.) And, as stated above, two former PlexCoin employees declared that all involved in the ICO knew about United States PlexCoin purchases. (Richard Decl. ¶ 10; Verdon-Martin Decl. ¶ 17.) Indeed, three United States purchasers declared that they used SidePay. (See Anderson Decl. ¶ 4; Hadley Decl. ¶ 11; Kirk Decl. ¶ 7.) The record reasonably implies that, through her control of the SidePay system, she learned of numerous United States–based purchases and nonetheless permitted them to complete transactions.

The aid Paradis-Royer gave Lacroix with www.plexcoin.com, the creation of an interactive payment website accessible to United States buyers, the management of SidePay, and the use of the CyberSource account all provide evidence that Paradis-Royer availed herself of the United

States markets and directed her conduct at the United States. The Court accordingly considers these Internet contacts significant.

* * *

In sum, the pleadings and evidence, construed in the SEC's favor, show that the Individual Defendants visited Boston to support the PlexCoin project; opened numerous accounts with United States–based payment servicers to facilitate sales that were instrumental to their fraud; and used a variety of websites to disseminate PlexCoin marketing materials, make PlexCoin sales, and court United States–based investors. The Individual Defendants' physical presence within the United States on their Boston trip is the quintessential contact supporting personal jurisdiction. Burger King Corp., 471 U.S. at 476. Their use of United States–based payment servicers is analogous to Licci II, where the Second Circuit found personal jurisdiction based on use of United States financial institutions alone. 732 F.3d at 173. The Individual Defendants' website contacts evince that they "clearly do[] business over the Internet," a context in which "personal jurisdiction is proper." Zippo, 952 F. Supp. at 1124.

Many of these contacts standing alone might be sufficient to confer personal jurisdiction over this case. See Waldman, 835 F.3d at 331 ("In certain circumstances, the 'commission of certain "single or occasional acts" in a [forum] may be sufficient to render a [defendant] answerable in that [forum] with respect to those acts . . . .'" (quoting Goodyear Dunlop Tires Operations, 564 U.S. at 923)). But the Court need not separately analyze each contact. "In determining the strength of the contacts under . . . the Due Process Clause, [the Court] look[s] to the totality of Defendants' contacts with the forum . . . ." Chloé, 616 F.3d at 164 (emphasis added). In this case, the totality portrays a compelling picture of direct involvement with the United States,

and of purposeful creation of effects in the United States. Both Individual Defendants have sufficient contacts with the United States to satisfy the minimum contacts inquiry.

## II.  Reasonableness

After finding sufficient contacts with the forum, the Court must decide "whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." Chloé, 616 F.3d at 164 (internal quotation marks omitted). The defendant must "present[] 'a compelling case'" that jurisdiction is unreasonable. Id. at 165 (quoting Burger King, 471 U.S. at 477). The showing must be particularly compelling in a securities case because "[t]he reasonableness inquiry is largely academic in non-diversity cases brought under a federal law which provides for [worldwide] service of process because of the strong federal interests involved," SEC v. Straub, 921 F. Supp. 2d 244, 259 (S.D.N.Y. 2013). "[W]hile most courts continue to apply the test as a constitutional floor to protect litigants from truly undue burdens, few . . . have ever declined jurisdiction, on fairness grounds, in [securities] cases." Id.

The following considerations make up the reasonableness analysis: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Chloé, 616 F.3d at 164–65.

Here, the Individual Defendants fail to make a compelling case of unreasonableness at this stage of litigation. Although the SEC is "forcing the [Individual Defendants] to litigate in a forum relatively distant from [their] home base," the first factor supports them only somewhat, because

"the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." Bank Brussels Lambert, 305 F.3d at 129–30. Although the Individual Defendants do not speak English and claim to have "extremely limited resources," (Br. at 34), their retention of competent counsel in both Canada and the United States demonstrates that their claim of limited resources may be overstated, (see D.E. # 63 ¶ 9). In any event, precedent makes clear that a claim of "modest means" is not a particularly compelling point in securities actions. See, e.g., In re Parmalat Sec. Litig., 376 F. Supp. 449, 457 (S.D.N.Y. 2005).

The second factor strongly supports the United States, which has "strong federal interests" in pursuing securities cases and protecting domestic investors. See Straub, 921 F. Supp. 2d at 258. It bears emphasis that these interests are so compelling that courts have noted the reasonableness analysis is "largely academic." Id.

The third and fourth factors relate to "the ease of access to evidence and the convenience of witnesses, an issue which both supports and undermines" the Individual Defendants' position. Bank Brussels Lambert, 305 F.3d at 130. The transactions here involve Canada and the United States. Since the SEC has provided evidence that investors from the Eastern District bought PlexCoin, the factors are essentially neutral.

The fifth factor is either neutral or favors the SEC's case. As the Individual Defendants suggest, (see Br. at 35–36), both the United States and Canada share the interest of preventing securities fraud in their jurisdictions. Indeed, Canadian authorities already have issued an ex parte order against Lacroix for the conduct at issue here. (See Compl. ¶¶ 55–59; see also Br. at 35.) Still, there is no suggestion at this point that the instant action would interfere with the Canadian order or investigation in any way. The Canadian authorities have cooperated with the SEC by providing the agency, among other things, the transcript of Gauvreau-Leblanc's interview. (See

Tutor Decl. ¶ 21; id., Ex. R.) The Individual Defendants only have speculated about potential difficulties in dealing with both investigations, and they provide no evidence of actual burden. (See Br. at 36–37.) The Individual Defendants also cite two cases about comity, (see Br. at 36–37 (citing Old Media Mgmt., L.P. v. EMI Apr. Music, Inc., No. 12-CV-7249 (PAE), 2013 WL 2531277, at *2–6 (S.D.N.Y. June 10, 2013); In re Maxwell Commc'n Corp. by Homan, 93 F.3d 1036, 1047–50 (2d Cir. 1996)), but neither case addresses personal jurisdiction. Indeed, Old Media Management, expressly notes a court's "unflagging obligation . . . to exercise the jurisdiction given them." 2013 WL 2531277, at *3 (quoting Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)).

Taken as a whole, the allegations and evidence here do not suggest an "exceptional case" in which exercising personal jurisdiction would be inappropriate. Bank Brussels Lambert, 305 F.3d at 130.

At this stage of litigation, the SEC has made a prima facie showing of personal jurisdiction, and the Individual Defendants' Rule 12(b)(2) motion is denied. The SEC's request for a finding of personal jurisdiction as a matter of law is denied at this time. As the Memorandum and Order makes clear, the Court's determination of minimum contacts is premised on numerous factual disputes.

### III.    Motion to Dismiss PlexCorps

The Individual Defendants also move to dismiss PlexCorps for lack of personal jurisdiction. The Individual Defendants fail to enlighten the Court as to their legal authority to make this motion. The Individual Defendants' counsel made clear at the oral argument that he does not represent PlexCorps. (See Tr. at 45:14–22.) PlexCorps has not appeared in this case and is not represented. The motion to dismiss is denied.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Individual Defendants' motion to dismiss for lack of personal jurisdiction.

SO ORDERED.

Dated: August 8, 2018
      Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge